**JOSEPH P. GREEN, JR.**
Duffy & Green
138 West Gay Street
West Chester, PA 19380
Telephone 610-692-0500
Fax 610-430-6668
jpgreen@duffygreen.com

**CHRISTOPHER J. CANNON**, State Bar No. 88034
Sugarman & Cannon
44 Montgomery Street, Suite 2080
San Francisco, CA 94104
Telephone: 415-362-6252
Facsimile: 415-677-9445

Attorneys for Christopher Napoli

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 10-cr-00642-CRB |
| Plaintiff, | **DEFENDANT NAPOLI'S MOTION FOR TRANSFER UNDER RULE 21(b) AND FOR SEVERANCE OF DEFENDANTS AND/OR COUNTS** |
| v. | |
| CHRISTOPHER NAPOLI, | November 30, 2010, at 2:15 p.m. |
| Defendant. | |

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................1

II.     RELEVANT FACTS.............................................................................2

        A. History of Litigation and Investigation...........................................2

        B. The Location of the Parties and Witnesses....................................6

III.    QUESTIONS PRESENTED................................................................9

IV.     ARGUMENT......................................................................................10

V.      CONCLUSION..................................................................................15

# TABLE OF AUTHORITIES

## CASES

<u>Lou v. Belzberg</u>, 834 F.2d 730 (9th Cir. 1987) ............................................. …..11

<u>Platt v. Minn. Min. & Manufacturing Co.</u>, 376 U.S.  240, 84 S. Ct. 769,
11 L. Ed. 2d 674 (1964) ......................................................................10, 11, 13, 15

<u>United States v. Cotes</u>, 356 U.S. 405, 78  S. Ct. 875 (1958) ...............................11

<u>United States v. Fritts</u>, No. CR 05-00216, 2005 U.S. Dist. LEXIS 37034
(December 5, 2005) .......................................................................................10, 11

<u>United States v. Testa</u>, 548 F.2d 847 (9th Cir. 1977).........................................11

## FEDERAL STATUTES

28 U.S.C. 1404(a) ...............................................................................................11

Federal Rule of Criminal Procedure 21(b) .........................................................11

# **INTRODUCTION**

Defendant Christopher Napoli, by his attorneys, respectfully requests that this Honorable Court enter an Order pursuant to Rule 21(b), F. R. Crim. P., and notices this Motion for hearing on November 30, 2010, at 2:15 p.m.  Defendant requests transfer of the charges against defendant Christopher Napoli, and any other defendant for whom transfer is appropriate under that Rule, for trial in the United States District Court for the Eastern District of Pennsylvania.  In support of that Motion, counsel offers the attached Declaration and the legal argument contained herein.

Defendant Christopher Napoli is a resident of the Eastern District of Pennsylvania who has been investigated by a grand jury in the Eastern District of Pennsylvania regarding these precise charges.  He has been involved in litigation in the Eastern District of Pennsylvania concerning the precise subjects of this investigation. Transfer of the charges pending against him pursuant to Rule 21(b) is appropriate for the convenience of the parties and witnesses and in the interest of justice.

This is a complicated multi-defendant case in which the government has chosen to join the trial of three separate conspiracies in a single mega-trial.  We contend that the joinder of these Philadelphia defendants is neither necessary nor appropriate.

/ /

/ /

/ /

/ /

**RELEVANT FACTS**

Defendant Napoli has been seeking a judicial determination of the proper application of the Controlled Substance Act to his business model for internet commerce in pharmaceuticals since 2006.

**A.      History of the Litigation and Investigation**

Defendant Christopher Napoli, defendant Dr. Joseph Carrozza and others initiated a civil action seeking a Declaratory Judgment in the Eastern District of Pennsylvania in *PSA I,* No. 2:2006cv03212, on July 21, 2006, and later in *PSA II,* No. 2:2007cv00328.  The defendants were the Attorney General and the Department of Justice, the DEA and the United States Attorney in Philadelphia.

In those cases, defendants sought a Declaratory Judgment that the DEA and the federal entities had no authority to enforce uniform national standards for the establishment of a "legitimate doctor patient relationship" that the government claims is missing in Internet Pharmacy business models, and in the defendant's business model. The District Court first dismissed the first Declaratory Judgment action on standing and ripeness grounds on November 13, 2006.

DEA San Francisco and the United States Attorney for the Northern District of California sought seizure warrants regarding property of Mr. Napoli in early January, 2007.  After claims were filed, the government filed a Forfeiture Complaint in this District on June 13, 2007.  Defendant filed claims and an Answer, and challenged venue in this District.

After these seizures were made, Mr. Napoli and others filed a second Declaratory Judgment action, contending that the claims were now ripe because the government had now inflicted an actual injury on the plaintiffs. The District Court ultimately refused to consider the merits of the claims and dismissed the actions on standing and ripeness grounds. See, *Opinion and Order* dismissing *PSA II*, No. 2:2007cv00328 (April 18, 2007) (Dalzell, J.) (attached to counsel's Declaration as Exhibit A).

A Grand Jury in the Eastern District of Pennsylvania was actively investigating this case, and compelling the testimony of witnesses, during the Spring of 2007 while *PSAA II* was pending in that District.

It is now apparent that the Philadelphia investigators and prosecutors had a well-developed investigation of Internet Pharmacy operations, including the defendant Napoli's business, before September of 2005. An Affidavit filed by DEA Task Force Agent Cohen in connection with the investigation of "Budget Drug" and its owner Charlotte Lopacki in the Eastern District of Pennsylvania details at least portions of the history of DEA Philadelphia's Internet Pharmacy investigation. A copy of that Affidavit, filed by Agent Cohen in support of the Forfeiture Complaint filed on or about June 21, 2006, in the Eastern District of Pennsylvania in *United States v. $166,770.01, et al.* is attached to counsel's Declaration as Exhibit B.

That Affidavit establishes that DEA and other investigators were actively investigating Ms. Lopacki and her business, Budget Drug RX, in October of 2004. That Affidavit establishes that on October 4, 2004, DEA Philadelphia investigators met with

and interviewed Pennsylvania Pharmacy Inspectors regarding their inspection of the Budget Drug operation and the ongoing DEA investigation of the "Jive Network" Internet pharmacy.  In November of 2004, DEA Philadelphia investigators made undercover purchases from Internet Pharmacies.

Counsel believes, and therefore avers, that defendant Napoli and Charlotte Lopacki had a business relationship known to the DEA in Philadelphia by October, 2005.  Because discovery is not yet complete in this case, we are unable to completely outline the status of the Philadelphia investigation at this time.  We ask leave to supplement the factual information offered here after limited discovery and at a hearing.

In early October, 2005, the United States Attorney in Philadelphia delivered a target letter to Dr. John Wilkins, a physician from New Jersey who reviewed patient requests and approved prescriptions in connection with Mr. Napoli's Internet Pharmacy businesses.  At that time, there was an active investigation of Internet Pharmacies, including Budget Drugs and Mr. Napoli, underway in the Eastern District of Pennsylvania.

Mr. Napoli received a target letter from the United States Attorney for the Eastern District of Pennsylvania on or about February 1, 2006.  A copy of that Napoli target letter is attached to counsel's Declaration as Exhibit C.  In response to that target letter, counsel for defendant provided a substantive response to the government on February 24, 2006.  The target response letter provided on behalf of Mr. Napoli is attached to counsel's Declaration as Exhibit D.

4

Beginning in the summer of 2005, and continuing throughout 2006, an active investigation of Mr. Napoli was maintained by DEA Philadelphia and the United States Attorney in Philadelphia.  That investigation, and the parties' disagreement on the definition of a "legitimate" doctor patient relationship, led to the filing of the *PSA* Declaratory Judgment actions in the United States District Court for the Eastern District of Pennsylvania.

### B.       The Location of the Parties and Witnesses

The Napoli defendants reside in the Philadelphia area.  The defendant Christopher Napoli resides in the Eastern District of Pennsylvania, where he lives with his wife and his 2 minor children.  Defendants Carozza and LaMorte reside in New Jersey and are, generally, in commuting distance to the Federal Courthouse in Philadelphia.  The Defendant Johnson, who lives in Illinois, is equally distant from California and Pennsylvania.

The owners of property alleged to be subject to criminal forfeiture are not residents in California.  All of Christopher Napoli's assets were in Pennsylvania when seized (or deposited in accounts in Pennsylvania before being seized from account custodians located outside of Pennsylvania).  Assets seized from third party claimants include $40,000 in funds seized from Compass Bank, which funds are owned by Christopher Napoli's mother, Antoinette Napoli, who resides in San Antonio, TX.  These third party assets also include $50,000 in funds seized from a Pershing LLC, Brokerage Account owned by Christopher

Napoli's mother in law, Helene Corcoran.  Helene Corcoran resides in the Philadelphia area, and has no connection to Northern California.

Most of the potential witnesses concerning Mr. Napoli's business are located in the Eastern District of Philadelphia, or closer thereto than to the Northern District of California.

The witnesses to be called regarding the formation and operation of Mr. Napoli's Internet Pharmacy business are principally located in the Philadelphia area.  The formation witnesses will likely include Andrew Napoli, an attorney who lives and works in the Philadelphia area.  Mr. Napoli is the defendant's father who provided initial legal advice regarding the Internet Pharmacy business.  The operation witnesses will include Dr. Wilkins, a physician who practices in Southern New Jersey, a short distance from the United States Courthouse in Philadelphia.  The government's foundation and operation witnesses have not yet been disclosed, but they will of necessity be persons resident in the Philadelphia area.

The witnesses to be called regarding the financial transactions of Mr. Napoli's business will include Mr. Napoli's accountant, Frank DiSantis, who lives and practices in the Philadelphia area and who prepared all of Mr. Napoli's business and personal tax returns for the relevant business activities.  The financial transaction witnesses will also include a number of financial advisers from the Philadelphia area who gave Christopher Napoli advice about investments for his business proceeds.  The financial transaction witnesses may well also include bankers and bank employees located in the Eastern

District of Pennsylvania.  Mr. Napoli conducted his business with commercial banks and bankers in the Eastern District of Pennsylvania (Commerce Bank in Havertown PA and Citizens Bank in Broomall PA).[1]  In addition, many important character witnesses are located in the Philadelphia area where literally thousands of parents and children have been satisfied customers of Mr. Napoli's music and dance studios.

To the best of counsel's knowledge, there are no lay witnesses who reside in or near the Northern District of California.

Defendant Christopher Napoli may be unable to pay for the transportation and lodging of the witnesses he will need to call at trial in San Francisco because substantially all of his funds have been seized and are being subjected to criminal forfeiture allegations.

Defendant Christopher Napoli operates a music and dance studio business in suburban Philadelphia.  His business is the principal source of income for his family. If he is unable to attend to his business for weeks on end while engaged in litigation in San Francisco, it is unlikely that the business will be able to continue.

Trial in Philadelphia will save the substantial cost of bringing defense witnesses to San Francisco, and paying for their accommodations.  Moreover, those witnesses will lose substantially less income as a result of their testimony, if they testify in their home town of

---

[1] While his banking records are easily transported documents, the employees of the Bank with whom Mr. Napoli transacted business are located in the Eastern District of Pennsylvania.  Again, the fund owners Antoinette Napoli and Helene Corcoran do not reside in California, and travel to litigate in California will impose a hardship upon those claimants in their position as witnesses.

Philadelphia instead of across the country in San Francisco.  Again, there are no known lay witnesses who reside in the Northern District of California.  The government will have to bring witnesses to San Francisco, and the marginal expense to transport witnesses to Philadelphia instead of San Francisco is greatly outweighed by the expense to defendant to transport all of the Philadelphia area witnesses to San Francisco.

The location of counsel factor weighs in favor of transfer.  Principal trial counsel for Mr. Napoli will be Joseph P. Green, Jr., who practices in the Philadelphia area.  Mr. Green constitutes counsel of choice for defendant Napoli.  Mr. Green has been representing Mr. Napoli in these matters even before Mr. Napoli received a target letter in February of 2006.

The government is represented by counsel from the United States Attorney's Office in San Francisco.  The United States Attorney in the Eastern District of Pennsylvania has charged two pharmacists who formerly did business with Mr. Napoli's business: United States v. Charlotte Lopacki, No. 2:10-cr-00399, and United States v. Wayne White, 2:09-cr-00682-2.  Each of these cases arises from the same investigation as that conducted of Mr. Napoli.  The United States Attorney in Philadelphia has the resources and the skilled personnel necessary to prosecute an Internet Pharmacy conspiracy, and has such a case presently pending in United States v. Carleta Carolina, No. 2:09-cr-00682-1.

We do not know what reasons the government will offer for the decision to transfer the prosecution of Mr. Napoli from Philadelphia to San Francisco.  Defendant Christopher

Napoli requests a hearing, and has requested discovery, to establish that the government

had no legitimate reason to have transferred this case from Philadelphia to San Francisco.

## <u>QUESTION PRESENTED</u>

**SHOULD THE COURT EXERCISE ITS DISCRETION TO TRANSFER THIS PROSECUTION BACK TO PHILADELPHIA TO PROVIDE DEFENDANT NAPOLI WITH A FAIR TRIAL AND TO PROTECT HIM FROM THE IRREPARABLE PREJUDICE INVOLVED IN DEFENDING HIMSELF 2500 MILES FROM THE RELEVANT WITNESSES AND EVIDENCE?**

## ARGUMENT

**THE COURT SHOULD EXERCISE ITS DISCRETION TO TRANSFER THIS PROSECUTION BACK TO PHILADELPHIA TO PROVIDE DEFENDANT NAPOLI WITH A FAIR TRIAL AND TO PROTECT HIM FROM THE IRREPARABLE PREJUDICE INVOLVED IN DEFENDING HIMSELF 2500 MILES FROM THE RELEVANT WITNESSES AND EVIDENCE.**

Rule 21(b), F.R.Crim.P., provides for transfers for trial:

> (b) For Convenience. Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties and witnesses and in the interest of justice.

Defendant Christopher Napoli would be irreparably prejudiced by the conduct of a trial on these charges in this District.  We contend that the severance of Defendant Christopher Napoli and the charges pending against him, and such other defendants as can properly be tried with him in the Eastern District of Pennsylvania, is required and authorized by Rule 21(b), F.R.Crim.P.

The Court is vested with substantial discretion to decide whether to transfer charges or defendants for trial in another District.  The government's "choice of forum" is entitled to *no weight* in the analysis.  We contend here that the interests of justice require transfer, and that the history of the litigation demonstrates a conscious choice by some governmental actors to disadvantage Mr. Napoli by trial in this distant forum.

The transfer analysis required by Rule 21(b) will include an analysis of at least the nine factors identified in <u>United States v. Fritts</u>, No. CR 05-00216, 2005 U.S. Dist. LEXIS 37034, (December 5, 2005) (Alsup, J.), citing <u>Platt v. Minn. Min. & Mfg. Co.</u>, 376 U.S.

240, 243-44, 84 S. Ct. 769, 11 L. Ed. 2d 674 (1964).  In <u>Fritts</u>, Judge Alsup stated the

analytical framework required for consideration of a Rule 21(b) transfer request:

> Upon a defendant's motion, however, criminal proceedings may be transferred to another district "for the convenience of the parties and witnesses and in the interest of justice" under Federal Rule of Criminal Procedure 21(b). Factors to balance in deciding such a motion by a corporate defendant are: (1) location of the corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of the place of trial; and (9) docket conditions in each district involved. <u>Platt v. Minn. Min. & Mfg. Co.</u>, 376 U.S. 240, 243-44, 84 S. Ct. 769, 11 L. Ed. 2d 674 (1964). These factors have been adapted to trials of individuals. <u>See</u>, *e.g.*, <u>United States v. Testa</u>, 548 F.2d 847, 856-57 (9th Cir. 1977). This analysis is more defendant-friendly than is the civil transfer rule under 28 U.S.C. 1404(a). For one, only the defendant can bring the motion whereas either side can bring it civilly. Second, there is no presumption in criminal cases in favor of the government's choice of forum. <u>See</u> <u>Lou v. Belzberg</u>, 834 F.2d 730, 739 (9th Cir. 1987) (deference to plaintiff's choice in civil case).

<u>United States v. Fritts</u>, *supra*.  An analysis of the <u>Platt</u> factors demonstrate that transfer is

necessary to provide a fair trial in this case.

The <u>Platt</u> factors are not the only factors that the Court should consider in its

transfer analysis.  Both Article III and the Sixth Amendment provide that trial shall be held

in the state where the crimes were committed. <u>Platt v. Minn. Min. & Mfg. Co.</u>, 376 U.S.

245, 84 S. Ct. 772.  The Supreme Court has stated the principle that "trial in the vicinity of

the crime is a safeguard against the unfairness and hardship involved when an accused is

prosecuted in a remote place."  <u>Id.</u>, <u>quoting</u> <u>United States v. Cotes</u>, 356 U.S. 405, 407, 78

S.Ct. 875, 877 (1958).  In this case, there is no justification for forcing Mr. Napoli to mount his defense thousands of miles from home, from the office of his chosen counsel, from the witnesses, and from the seat of the investigation.

The history of this litigation reveals an odd venue decision.  Mr. Napoli has had a disagreement with the government, and agents and prosecutors in Philadelphia, since at least October of 2005 when the United States Attorney in Philadelphia had a target letter hand-delivered to Dr. Wilkins, one of the physician's who reviewed online patient requests for Mr. Napoli's business.  Mr. Napoli received a target letter from the United States Attorney in Philadelphia in February, 2006, and responded within weeks with his views of the applicable law.  Mr. Napoli affirmatively attempted to secure judicial review in Philadelphia of the government's threats to prosecute what he believed was a legitimate business model.  A Grand Jury in Philadelphia investigated Mr. Napoli and his business at great length.  This case has no connection to San Francisco except the agents and prosecutors who, at some point and for no apparent reason, took control of the existing Philadelphia investigation.

It is now apparent that the agents and prosecutors in Philadelphia had a well-developed investigation of Internet Pharmacy operations, including the Defendant Christopher Napoli's business, before September of 2005.  The Cohen Affidavit establishes that DEA and other investigators were actively investigating Ms. Lopacki and her business, Budget Drug RX, in October of 2004.  In November of 2004, DEA Philadelphia investigators made undercover purchases from Internet Pharmacies.  By early

October, 2005, when the United States Attorney in Philadelphia delivered a target letter to Dr. John Wilkins, there was an active investigation of Internet Pharmacies, and Mr. Napoli, underway in the Eastern District of Pennsylvania.  Throughout 2006 and into 2007, there was an active investigation of Mr. Napoli maintained by the DEA and the United States Attorney in Philadelphia.  That investigation, and the parties' disagreement on the definition of a "legitimate" doctor patient relationship, led to the filing of the PSA Declaratory Judgment actions in the United States District Court for the Eastern District of Pennsylvania.  In short, there was no San Francisco investigation until someone in the Government decided to transfer the investigation here.

A review of the Platt factors in light of the history of the Napoli investigation establish that a Rule 21(b) transfer is appropriate.

The residence factor weighs heavily in favor of a transfer to the Eastern District of Philadelphia.  Both family and business ties in Philadelphia favor transfer, back to the East Coast for Christopher Napoli and for the property claimants.

The location of witnesses factor weighs heavily in favor of a transfer to the Eastern District of Philadelphia.  Mr. Napoli's business was formed in and operated in Pennsylvania, and never operated in California.  Mr. Napoli's tax professionals and financial advisors are in Pennsylvania, and have no connection to San Francisco.  Even the government's witnesses must, of necessity, come from the Philadelphia area.

The location of events factor and location of documents factors are likely neutral, although assets were seized from the defendant in the Eastern District of Pennsylvania.

The disruption of business factor weighs heavily in favor of transfer for Defendant Napoli, and the expense of litigation factor likewise weighs in favor of transfer. It will be substantially cheaper for the witnesses to take a cab to the Philadelphia Courthouse than to fly to San Francisco. Trial in the witnesses' home town will save the costs of travel, accommodation and compensation for interruption of business. Again, there are no known lay witnesses who reside in the Northern District of California. The government will have to bring witnesses to San Francisco, and the marginal expense to bring witnesses to Philadelphia instead of San Francisco is greatly outweighed by the expense to Defendant Christopher Napoli to transport all of the Philadelphia area witnesses to San Francisco, and the inconvenience to the witnesses of a cross country trial.

Finally, the location of counsel factor weighs in favor of transfer. Mr. Napoli's chosen trial counsel has been representing Mr. Napoli in these matters since even before Mr. Napoli received a target letter in February of 2006. The government has duplicative representation here only because someone in the government made a decision to bring this prosecution here for no apparent or weighty reason. The United States Attorney in the Eastern District of Pennsylvania has charged two pharmacists who formerly did business with Mr. Napoli's business: United States v. Charlotte Lopacki, No. 2:10-cr-00399, and United States v. Wayne White, 2:09-cr-00682-2. Each of these cases arises from the same investigation as that conducted of Mr. Napoli. The United States Attorney in Philadelphia has the resources and the skilled personnel necessary to prosecute an Internet Pharmacy

conspiracy, and has such a case presently pending in <u>United States v. Carleta Carolina</u>, No. 2:09-cr-00682-1.


## **CONCLUSION**

In summary, the factors set forth by the Supreme Court in <u>Platt v. Minn. Min. & Mfg. Co.</u>, 376 U.S. 240, 243-44, 84 S. Ct. 769, 11 L. Ed. 2d 674 (1964) suggest that transfer is appropriate here for convenience of the parties and witnesses and to ensure a fair trial in the interest of justice.  The government has been on notice since the filing of the defendant's Answer to the Complaint for Forfeiture that the defendant will object to venue in the Northern District.  There are no substantial government interests that require trial of the Napoli conspiracy claims in California.  On the other hand, there are substantial private interests that compel transfer; and we request this case be transferred to the Eastern District of Pennsylvania where it began.


DATED: November 16, 2010                         Respectfully submitted,


                                                 <u>/s/Christopher Cannon/s/</u>
                                                 Christopher J. Cannon
                                                 Attorney for Christopher Napoli

JOSEPH P. GREEN, JR.
Duffy & Green
138 West Gay Street
West Chester, PA 19380
Telephone 610-692-0500
Fax 610-430-6668
jpgreen@duffygreen.com

CHRISTOPHER J. CANNON, State Bar No. 88034
Sugarman & Cannon
44 Montgomery Street, Suite 2080
San Francisco, CA 94104
Telephone: 415-362-6252
Facsimile: 415-677-9445

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 10-cr-00642-CRB |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF JOSEPH P. GREEN, JR.,** |
| | ) | **IN SUPPORT OF DEFENDANT NAPOLI'S** |
| v. | ) | **MOTION FOR TRANSFER UNDER RULE** |
| | ) | **21(b) AND FOR SEVERANCE OF** |
| | ) | **DEFENDANTS AND/OR COUNTS** |
| CHRISTOPHER NAPOLI, | ) | |
| | ) | November 30, 2010, at 2:15 pm |
| Defendant. | ) | |
| | ) | |

Counsel offers this Declaration in support of defendant Napoli's *Motion For Transfer under Rule 21(b)*. This Declaration is based on counsel's personal knowledge, and/or upon documents reviewed by counsel and submitted herewith. Each of the documents identified herein and attached hereto include facts that would be admissible in evidence, generally through the testimony of the author of the document identified.

1.      This is a complicated multi-defendant case in which the government has chosen to join the trial of three separate conspiracies in a single mega-trial.

2.      The transfer analysis required by Rule 21(b) will require an analysis of at least the nine factors identified in *United States v. Fritts*, No. CR 05-00216, 2005 U.S. Dist. LEXIS 37034, (December 5, 2005) (Alsup, J.), citing *Platt v. Minn. Min. & Mfg. Co.*, 376 U.S. 240, 243-44, 84 S. Ct. 769, 11 L. Ed. 2d 674 (1964):

> Upon a defendant's motion, however, criminal proceedings may be transferred to another district "for the convenience of the parties and witnesses and in the interest of justice" under Federal Rule of Criminal Procedure 21(b). Factors to balance in deciding such a motion by a corporate defendant are: (1) location of the corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of the place of trial; and (9) docket conditions in each district involved. *Platt v. Minn. Min. & Mfg. Co.,* 376 U.S. 240, 243-44, 84 S. Ct. 769, 11 L. Ed. 2d 674 (1964). These factors have been adapted to trials of individuals. *See, e.g., United States v. Testa,* 548 F.2d 847, 856-57 (9th Cir. 1977). This analysis is more defendant-friendly than is the civil transfer rule under 28 U.S.C. 1404(a). For one, only the defendant can bring the motion whereas either side can bring it civilly. Second, there is no presumption in criminal cases in favor of the government's choice of forum. *See Lou v. Belzberg,* 834 F.2d 730, 739 (9th Cir. 1987) (deference to plaintiff's choice in civil case).

*United States v. Fritts,* supra. This Declaration is offered to provide the Court with background factual information sufficient for the Court to apply these *Platt* factors.

3.      Defendant Napoli, defendant Joseph Carrozza and others previously initiated a civil action seeking a Declaratory Judgment in the Eastern District of Pennsylvania in *PSA I,* No. 2:2006cv03212, and in *PSA II,* No. 2:2007cv00328. In those cases, defendants commenced a Declaratory Judgment action on July 21, 2006, against the Department of Justice, the DEA and the United States Attorney in Philadelphia in an

effort to secure a judicial determination of whether the DEA and the federal government had authority to enforce uniform national standards for the establishment of a "legitimate doctor patient relationship" that the government claims is missing in Internet pharmacy business models. The District Court ultimately refused to consider the merits of the claims and dismissed the actions on ripeness grounds. See, *Opinion and Order* dismissing PSA II, No. 2:2007cv00328 (April 18, 2007) (Dalzell, J.) (Attached hereto as Exhibit A).

     A.     The initial Declaratory Judgment action was filed on July 21, 2006. The action was dismissed on Motion for lack of standing on November 13, 2006. An appeal was taken to the Third Circuit from that dismissal.

     B.     DEA San Francisco and the US Attorney here sought seizure warrants regarding property of Mr. Napoli in early January, 2007. After claims were filed, the government filed a Forfeiture Complaint in this District on June 13, 2007. Defendant filed claims and an Answer, and challenged venue in this District.

     C.     After the seizures occurred, a second Declaratory Judgment action (PSA II) was filed in the Eastern District of Pennsylvania on January 25, 2007, at No. 2:2007cv00328. That action was dismissed on justiciability grounds with the Opinion and Order attached as Exhibit A.

     D.     A second appeal was taken to the Court of Appeals for the Third Circuit. The Order dismissing PSA II was affirmed by the Third Circuit Court of Appeals on May

20, 2008.

E.      A Grand Jury in the Eastern District of Pennsylvania was actively

investigating this case, and compelling the testimony of witnesses, during the Spring of

2007 while PSAA II was pending in that District.

4.      In addition to the nine enumerated *Platt* factors, the Court must also

consider the history of this investigation. It is now apparent that the Philadelphia

investigators and prosecutors had a well-developed investigation of Internet Pharmacy

operations, including the defendant Napoli's business, before September of 2005. An

Affidavit filed by DEA Task Force Agent Cohen in connection with the investigation of

"Budget Drug" and its owner Charlotte Lopacki in the Eastern District of Pennsylvania

details at least portions of the history of DEA Philadelphia's Internet Pharmacy

investigation. A copy of that Affidavit, filed by Agent Cohen in support of the Forfeiture

Complaint filed in *United States v. $166,770.01, et al.* on or about June 21, 2006, is

attached hereto as Exhibit B.

A.      That Affidavit establishes that DEA and other investigators were actively

investigating Ms. Lopacki and her business, Budget Drug RX, in October of 2004.

B.      That Affidavit establishes that on October 4, 2004, DEA Philadelphia

investigators met with and interviewed Pennsylvania Pharmacy Inspectors regarding their

inspection of the Budget Drug operation and the ongoing DEA investigation of the "Jive

Network" Internet pharmacy.

C.      In November of 2004 DEA Philadelphia investigators made undercover purchases from Internet pharmacies.

D.      Counsel believes, and therefore avers, that defendant Napoli and Charlotte Lopacki had a business relationship known to DEA Philadelphia by October, 2005. Because discovery is not yet complete in this case, we are unable completely to outline the status of the Philadelphia investigation at this time. We ask leave to supplement the factual information offered here after limited discovery and at a hearing.

5.      In early October, 2005, the United States Attorney in Philadelphia delivered a target letter to Dr. John Wilkins, a physician from New Jersey who reviewed patient requests and approved prescriptions in connection with Mr. Napoli's Internet Pharmacy businesses. At that time, there was an active investigation of Internet Pharmacies, including Budget Drugs and Mr. Napoli, underway in the Eastern District of Pennsylvania.

6.      Mr. Napoli received a target letter from the United States Attorney for the Eastern District of Pennsylvania on or about February 1, 2006. A copy of that Napoli target letter is attached hereto as Exhibit C. In response to that target letter, counsel for defendant provided a substantive response to the government on February 24, 2006. The target response letter provided on behalf of Mr. Napoli is attached hereto as Exhibit D.

7.      Beginning in the summer of 2005, and continuing throughout 2006, there was an active investigation of Mr. Napoli maintained by DEA Philadelphia and the

United States Attorney in Philadelphia. That investigation, and the parties' disagreement on the application of federal law to the formation of a "legitimate" doctor patient regulation, led to the filing of the PSA declaratory judgment actions in the United States District Court for the Eastern District of Pennsylvania.

8.      A review of the *Platt* factors in light of the history of the Napoli investigation establishes that a Rule 21(b) transfer is appropriate here.

8.1     The defendant Christopher Napoli resides in the Eastern District of Pennsylvania, where he lives with his wife and his 2 minor children. An extended trial in the Northern District of California will impose an obvious and apparent hardship upon the defendant and his wife and children.

A.      Defendants Carozza and LaMorte also reside in New Jersey and are, generally, in commuting distance to the federal courthouse in Philadelphia. The defendant Johnson who lives in Illinois is equally distant from California and Pennsylvania.

B.      The owners of property alleged to be subject to criminal forfeiture are not resident in California, and trial in the Northern District of California would seriously prejudice those claimants. All of Christopher Napoli's assets were in Pennsylvania when seized (or deposited in accounts in Pennsylvania before being seized from account custodians located outside of Pennsylvania). Assets seized from third party claimants include $40,000 in funds seized from Compass Bank, which funds are owned by

6

Christopher Napoli's mother, Antoinette Napoli, who resides in San Antonio, TX. She is able to stay with family during any litigation in Philadelphia. She has no family in or connection to the Northern District of California. These third party assets also include $50,000 in funds seized from a Pershing LLC, Brokerage Account owned by Christopher Napoli's mother in law, Helene Corcoran. Helene Corcoran resides in the Philadelphia area, and has no connection to Northern California. Litigation of these claims in the Northern District of California will impose substantial prejudice upon these claimants.

8.2    Most of the potential witnesses concerning Mr. Napaoli's business are located in the Eastern District of Philadelphia, or closer thereto than to the Northern District of California.

A.    The witnesses to be called regarding the formation and operation of Mr. Napoli's Internet Pharmacy business are principally located in the Philadelphia area. The formation witnesses will likely include Andrew Napoli, an attorney who lives and works in the Philadelphia area. Mr. Napoli is the defendant's father who provided initial legal advice regarding the Internet pharmacy business. The operation witnesses will include Dr. Wilkins, a physician who practices in Southern New Jersey a short distance from the United States Courthouse in Philadelphia. The government's foundation and operation witnesses have not yet been disclosed, but they wilkl of necessity be persons resident in the Philadelphia area.

B.    The witnesses to be called regarding the financial transactions of Mr.

Napoli's business will include Mr. Napoli's accountant, Frank DiSantis, who lives and practices in the Philadelphia area and who prepared all of Mr. Napoli's business and personal tax returns for the relevant business activities. The financial transaction witnesses will also include a number of financial advisers from the Philadelphia area who gave Christopher Napoli advice about investments for his business proceeds. The financial transaction witnesses may well also include bankers and bank employees located in the Eastern District of Pennsylvania. Mr. Napoli conducted his business with commercial banks and bankers in the Eastern District of Pennsylvania (Commerce Bank in Havertown PA and Citizens Bank in Broomall PA). While his banking records are easily transported documents, the employees of the Bank with whom Mr. Napoli transacted business are located in the Eastern District of Pennsylvania. Again, the fund owners Antoinette Napoli and Helene Corcoran do not reside in California, and travel to litigate in California will impose a hardship upon those claimants in their position as witnesses

      C.     In addition, many important character witnesses are located in the Philadelphia area where literally thousands of parents and children have been satisfied customers of Mr. Napoli's music and dance studios.

      D.     To the best of counsel's knowledge, there are no lay witnesses who reside in or near the Northern District of California.

      E.     Defendant will be likely be unable to pay for the transportation and lodging

of the witnesses he will need to call at trial in San Francisco because substantially all of his funds have been seized and are being subjected to criminal forfeiture allegations.

8.3    There are no scenes to be viewed by jurors. Assets were seized from defendant in the Eastern District of Pennsylvania.

8.4    The documents involved here can likely be transported electronically or by mail, and the authenticity of most documents will likely not be an issue at trial.

8.5    Defendant Christopher Napoli operates a music and dance studio business in suburban Philadelphia. His business is the principal source of income for his family. If he is unable to attend to his business for weeks on end while engaged in litigation in San Francisco it is unlikely that the business will be able to continue.

8.6    The cost to defendant will be substantial to bring all of his witnesses to San Francisco, to pay for their accommodations in advance of their appearances, and to pay for the witnesses' lost income. Again, there are no known lay witnesses who reside in the Northern District of California. The government will have to bring witnesses to San Francisco, and the marginal expense to transport witnesses to Philadelphia instead of San Francisco is greatly outweighed by the expense to defendant to transport all of the Philadelphia area witnesses to San Francisco.

8.7    The location of counsel factor weighs in favor of transfer. Principal trial counsel for Mr. Napoli will be Joseph P. Green, Jr., who practices in the Philadelphia area. Mr. Green constitutes counsel of choice for defendant Napoli. Mr. Green has been

representing Mr. Napoli in these matters since before the receipt of a target letter in February of 2006.

A.    The government is represented by counsel from the United States Attorneys Office in San Francisco. The US Attorney in the Eastern District of Pennsylvania has charged two pharmacists who formerly did business with Mr. Napoli's business: *United States v. Charlotte Lopacki*, No. 2:10-cr-00399, and *United States v. Wayne White*, 2:09-cr-00682-2. Each of these cases arises from the same investigation as that conducted of Mr. Napoli. The US Attorney in Philadelphia has the resources and the skilled personnel necessary to prosecute an Internet pharmacy conspiracy, and has such a case presently pending in *United States v. Carleta Carolina*, No. 2:09-cr-00682-1.

B.    The only apparent reason to transfer the prosecution of Mr. Napoli from Philadelphia to San Francisco was related to the filing of the PSA declaratory judgment actions. If in fact Mr. Napoli was Indicted in San Francisco instead of Philadelphia in retaliation for the filing of the PSA declaratory judgment actions, that decision constitutes impermissible retaliation for Mr. Napoli's exercise of his protected federal constitutional rights.

C.    Defendant Napoli requests a hearing, and has requested discovery, to establish that the government had no legitimate reason to have transferred this case from Philadelphia to San Francisco.

8.8    The relative accessibility factor weighs in favor of transfer for the reasons

10

outlined above in paragraph 8.6 (location of witnesses) and paragraph 8.7 (location of counsel).

8.9    There are no docket factors that weigh either in favor of or against transfer. The docket conditions factor is apparently neutral.

Dated: _Nov 16, 2010_                  By: _____

                                              Joseph P. Green, Jr.

Counsel hereby affirms that the facts set forth herein are based upon his personal knowledge, and/or the personal knowledge of the authors of the various Exhibits appended hereto, in accordance with Criminal L.R. 47-2 (b) and Civil L.R. 7-5(b).

Dated: _NOV 16, 2010_                  By: _____

                                              Joseph P. Green, Jr.

# Exhibit A

```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PSA, LLC, et al.              :        CIVIL ACTION
                              :
        v.                    :
                              :
HON. ALBERTO GONZALES, et al. :        NO. 07-328
```

ORDER

AND NOW, this 18th day of April, 2007, upon consideration of defendants' motion to dismiss (docket entry # 11) and plaintiffs' response (docket entry # 12) and the Court finding that:

(a)  Plaintiff PSA, LLC is an Internet intermediary involved in electronic commerce in prescription drugs, including drugs covered by the Controlled Substances Act, 21 U.S.C. § 801 et seq., ("CSA");

(b)  Plaintiff Christopher Napoli is the owner of PSA;

(c)  Plaintiffs Joseph Carrozza and Alan Winter are, respectively, a physician and a pharmacist with whom PSA has contracts to write and fill prescriptions as part of its business;

(d)  All four initially filed suit in July of 2006, claiming that the Drug Enforcement Administration ("DEA") lacked the authority to require that prescriptions for controlled substances be written only after a face-to-face meeting between the prescribing physician and the patient, effectively rendering PSA's business model illegal;

(e)  On November 13, 2006, we dismissed plaintiffs' suit, finding that they had "failed to demonstrate an invasion of a 'concrete and particularized' legally protected interest, PSA, LLC v. Gonzales, 461 F. Supp. 2d 351, 356 (E.D. Pa. 2006) ("PSA

I") (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560
(1992)) and that the issues raised were not ripe for adjudication;

    (f)  Subsequent to our dismissal of <u>PSA I</u>, the DEA,
pursuant to a warrant they obtained from the U.S. District Court
for the Northern District of California, apparently seized two
luxury automobiles belonging to Napoli and his wife and froze one
or more of PSA's bank accounts;

    (g)  Plaintiffs, feeling that the Government's action[1]
significantly altered the standing and ripeness calculus as we
applied it in <u>PSA I</u>, have now filed this suit seeking: (i) a
declaration that the DEA lacks the authority to require a face-to-
face meeting between physician and patient prior to writing a
prescription for a controlled substance; (ii) an order enjoining
the DEA from prosecuting plaintiffs on such a basis; and (iii) an
order requiring the DEA to disclose the grounds on which the
seizure warrants were issued and return the property that was
seized;

    (h)  The Government again moves to dismiss this case on
grounds of ripeness and failure to state a claim;

    (i)  The parties agree that our inquiry into the
ripeness of plaintiffs' request for declaratory relief is
controlled by <u>Pic-A-State Pa., Inc. v. Reno</u>, 76 F.3d 1294, 1298

---

    [1] Plaintiffs also attach an indictment, filed in this
district, against Michael Bezonsky and his associates in an
Internet pharmacy similar to PSA known as "Rx Medical One."  This
is presumably the indictment referenced in <u>PSA I</u> about which
plaintiffs provided no material information.  <u>See</u> 461 F. Supp. 2d
at 354-55 n.8.

(3d Cir. 1996), which directs us to "look, among other factors, to (1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment";

(j)  The parties will generally have sufficiently adverse interests "where a regulation requires immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance," id. at 1299 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 153 (1967));

(k)  While there has been no change in the regulations applicable to plaintiffs' conduct,[2] the indictment of Mr. Bezonsky and his associates and the seizure of certain assets are together a strong indicator that Napoli and PSA are significantly more likely to be prosecuted now than they were a year ago;

(l)  Plaintiffs allege -- and at this stage of the proceedings we must accept their allegation as true -- that PSA has suspended its operations in the wake of our earlier ruling, see Compl. ¶ 32;

(m)  Even though that suspension was not in response to a change in the law, it was, at least partly, in response to the Government's enforcement actions and was, therefore, sufficient to demonstrate adversity of interest as Pic-a-State uses that term;

---

[2] Plaintiffs challenge not a regulation but an interpretive guideline, specifically Dispensing and Purchasing Controlled Substances over the Internet, 66 Fed. Reg. 21181 (Apr. 27, 2001).

3

(n)   The conclusiveness requirement asks whether the case arises out of a "real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts"  Step-Saver Data Sys. v. Wyse Tech., 912 F.2d 643, 649 (3d Cir. 1990) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937));

(o)   The utility factor asks "whether the parties' plans of actions [sic] are likely to be affected by a declaratory judgment,"  Step-Saver 912 F.2d at 649 n.9;

(p)   Because the problems with plaintiffs' request for declaratory relief lie at the intersection of these two factors, we examine them together;

(q)   Plaintiffs first ask us to enter a declaratory judgment that "Defendants lack the authority to declare that no legitimate doctor-patient relationship can be established without a face-to-face meeting between a physician and patient," Compl. ¶ 34(1)(a);

(r)   Such a declaration would not be conclusive or useful to plaintiffs;

(s)   The Government's ability to prosecute plaintiffs is not in any way dependent on the authority of a particular administrative agency to define the legitimate doctor-patient relationship;

(t)   Regardless of whether we enter such a declaration, it is the courts, not the DEA, that will determine conclusively

4

whether a business model such as PSA's constitutes a legitimate doctor-patient relationship in the context of the CSA;[3]

(u)  Plaintiffs do not ask (and it is not at all clear that, at this juncture, they could ask) us to make that determination and the declaration they do seek will not conclusively resolve their rights;

(v)  The second declaration that plaintiffs seek is that "Defendants cannot interfere with the operation of legitimate electronic commerce in pharmaceuticals as described herein on such a basis," Compl. ¶ 34(1)(b);

(w)  Such a declaration would be entirely meaningless, since it would hinge entirely on the definition of "legitimate electronic commerce";

(x)  It is a tautology to say that the Government cannot use criminal penalties or the threat thereof to interfere with the operation of a legitimate[4] business;

(y)  Because plaintiffs only ask us to declare what is patently obvious, such a declaration will, again, not bring resolution to their adverse relationship with the DEA;

---

[3] It goes without saying that, if Congress chose to do so, it could enter the fray as well and, subject to the enumerated powers of Article I, determine conclusively whether PSA's approach to the dispensing of controlled substances was legal.

[4] The Oxford English Dictionary defines legitimate as "Conformable to law or rule; sanctioned or authorized by law or right; lawful; proper."  8 Oxford English Dictionary 811 (2d ed. 1989).

5

(z)   Plaintiffs face a similar problem with their third request, which asks us to declare that "the operation of legitimate electronic commerce in pharmaceuticals as described herein is not unlawful under the CSA," Compl. ¶ 34(1)(c);

(aa) This again begs the question since a business that violated the CSA would, by definition, not be legitimate;[5]

(bb) Plaintiffs do no better if we interpret their complaint as asking us to declare that PSA's operations do not violate the CSA;

(cc) Even if we were to find that it were possible to write prescriptions for controlled substances without a face-to-face visit without violating the CSA, that would not permit us to declare that PSA is not in violation;

(dd) Because the CSA imposes strict licensing and record keeping requirements, there are literally dozens of other ways that plaintiffs could, consistent with the business model they have described, violate the CSA;

(ee) Indeed, assuming that the requirement that prescriptions be issued in the normal course of medical practice has any meaning at all, plaintiffs could still violate that requirement even if some prescriptions without face-to-face consultation were permissible;

(ff) We could not, without examining every controlled substance transaction in which PSA has engaged, issue the declaration plaintiffs seek;

---

[5] See definition of _legitimate_ _supra_ at note 4.

6

(gg) Further, even if we could issue such a declaration, it would not be of any real value to PSA because it would have no res judicata effect in a subsequent criminal proceeding, see United States v. Bertucci, 333 F.2d 292 (3d Cir. 1964); Dranow v. United States, 307 F.2d 545, 557 (8th Cir. 1962);

(hh) Because none of the declaratory judgments plaintiffs seek would be conclusive, or even useful, they do not present a justiciable case or controversy;

(ii) Plaintiffs also seek injunctive relief, asking us to enjoin the Government from taking various enforcement actions;

(jj) While injunctive relief would be conclusive, we find that plaintiffs have not, and in fact cannot, state a claim that would support such expansive relief;

(kk) As we noted above, there are many ways that PSA's conduct might have violated the CSA even if, as they claim, the issuing of prescriptions without a face-to-face contact can be legitimate;

(ll) The injunction plaintiffs seek does not distinguish between prosecutions based specifically on their Internet-based mode of business and prosecutions based on other potential violations of the CSA;

(mm) Because plaintiffs do not challenge the application of a statute or regulation to their situation, but instead seek to block the use of a theory of inculpation, we can find no grounds

for granting such an injunction that would grant them the relief they seek but allow prosecution for other violations;[6]

(nn) Although we have found that plaintiffs have a sufficiently reasonable fear of prosecution to meet the adversity of interest requirement, we are aware of no basis on which we could grant an injunction barring the use of a particular legal theory;[7]

(oo) Where, as here, we are unable to base the relief plaintiffs seek on the case as they have laid it out in their complaint, we must dismiss the claim under Fed. R. Civ. P. 12(b)(6);

(pp) Finally, Count II of plaintiffs' complaint asks us to require affidavits of probable cause and the return of seized property;

(qq) As we noted in our Order of March 1, 2007, the Criminal Code lays out procedures for challenging the issuance of a seizure warrant and the seizure of property;

(rr) Where, as here, plaintiffs have given us no basis to believe that these procedures are inadequate to the current situation, there is no basis for us to interfere with the efficient operation of a sister court;

(ss) For the reasons enumerated in our March 1 Order, we will dismiss Count II of plaintiffs' complaint;

---

[6] Plaintiffs do not appear to claim that they are entitled to immunity for _any_ violation of the CSA.

[7] Indeed, the relief plaintiffs seek here is more suited to a motion _in limine_ than a request for injunction.

(tt) Because none of plaintiffs' claims for relief survive, we will dismiss the entire complaint;

It is hereby ORDERED that:

1.   Defendants' motion to dismiss is GRANTED;

2.   Plaintiffs' complaint is DISMISSED WITH PREJUDICE; and

3.   The Clerk of Court shall CLOSE this matter statistically.

BY THE COURT:

_____ /s/ Stewart Dalzell, J.

# Exhibit B

<u>AFFIDAVIT</u>

I, JON COHEN, being duly sworn, depose and say:

<u>Section I</u>

    A.        <u>Background</u>

    1.      I am employed as a Narcotics Agent by the Pennsylvania Office of Attorney General, Bureau of Narcotics Investigation and Drug Control (BNI) and have been so employed since January of 1988. I am currently assigned as a deputized Federal Drug Task Force Agent to the United States Drug Enforcement Administration (DEA) and have been so assigned since January of 1992 (with exception of nine months in 1999 when I was detailed to BNI as an acting Group Supervisor). Prior to being employed by BNI I was a Law Enforcement Officer for the Cheltenham Township, PA, Police Department, beginning in 1980.

    2.      I have received specific training in the methods of drug law enforcement from numerous agencies including DEA, the FBI, the United States Department of Justice, and other state and federal agencies. I have also received training in regards to the diversion of prescription medications and related compliance regulations which govern the conduct of pharmacists, physicians and other allied health professionals. I am familiar with the weighing, manufacturing, packaging, distribution and pricing structure of pharmaceutical controlled substances. I have also served as an instructor in numerous drug investigation subjects for various federal and state agencies. I have been certified as an expert witness in drug related subjects in proceedings before federal and state courts in Pennsylvania. I have been involved in more than 1800 criminal investigations into numerous violations of the drug laws, and have applied for and executed numerous arrest and search and seizure warrants for drug offenses. I have also conducted numerous investigations into the illegal diversion of controlled substances, specifically prescription medications, and related money laundering offenses.

    3.      I make this affidavit in support of a Complaint for Forfeiture against the following sums of money seized pursuant to criminal forfeiture seizure warrants from accounts under the control of Charlotte Lopacki, doing business as Budget Drug Rx and Budget Drug and Wellness Center, located in the Budget Pharmacy and Wellness Center at 1137 Bustleton Pike, Featerville, Pennsylvania: $166,770.01, $726,425.84 and $45,311.87. This complaint arises out of an investigation into the illegal distribution of pharmaceutical controlled substances by physicians and pharmacists through an Internet pharmacy scheme, and a conspiracy to do so, by them and others who assist and coordinate those illegal distributions.

    4.      The pharmaceutical distributions involved in this investigation are in response to customer orders sent over the Internet. The distributions are illegal because they are not pursuant to valid prescriptions. The prescriptions which purport to authorize these distributions are invalid because they are issued by practitioners who have never seen, talked to, or examined the "patient"/ customer, and therefore such prescriptions are not issued in the usual course of

professional practice or for a legitimate medical purpose, as required by law. These distributions violate 21 U.S.C. §§ 841 and 843(b), and the agreement among the participants to further these distributions violates 21 U.S.C. § 846. All moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished, or intended to be furnished in exchanged for controlled substances in violation of these statutes, along with all proceeds traceable to such an exchange, as well as those moneys, negotiable instruments, and securities intended to be used to facilitate these violations are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

5.      This affidavit is based on my own investigation, in addition to the investigation of DEA Diversion Investigators (DIs) Lynda Eleazer and Julianne Dunphy, and on investigation conducted by other agents and investigators, the results of which have been provided to me.

B.      Law Relating to Unlawful Prescriptions Over the Internet

6.      Title 21, United States Code, Section 812 establishes schedules of controlled substances for drugs which present a potential for abuse and a likelihood that abuse of the drug could lead to physical or psychological dependence on that drug. Such controlled substances are listed in Schedules I through V depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence. These drugs are regulated as controlled substances because they are dangerous. There are other drugs which are available only by prescription but are not classified as controlled substances.

7.      Controlled substances may only be dispensed or distributed by those persons who are registered with the Attorney General to do so (with some exceptions, such as delivery persons). 21 U.S.C. § 822. Controlled substances may only be dispensed pursuant to a valid prescription. 21 U.S.C. §§ 353, 829.

8.      Title 21 of the Code of Federal Regulations, § 1306.4, discusses the definition of a "valid prescription." It provides that a "prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not [a lawful prescription] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

9.      In April 2001, the DEA posted a Federal Register Notice giving guidance regarding the dispensing and purchasing of controlled substances over the Internet. 66 Fed.Reg. 21181-21184 (2001). The notice states that in order for a prescription to be valid and effective a doctor must be acting in the usual course of professional practice. The notice further states that in order for that to occur "there must be a bona fide doctor/patient relationship." It notes several elements which may be considered in determining whether there is such a relationship, one of

which is that a physical examination has been performed. The notice then states that "[c]ompleting a questionnaire that is then reviewed by a doctor hired by the Internet pharmacy could not be considered the basis for a doctor/patient relationship. . . . [I]t is unlikely for such a relationship to be formed through Internet correspondence alone."

10.     The Chief of Drug Operations of the DEA Office of Diversion Control has stated that acting within the course of professional practice "includes having an established doctor-patient relationship based upon a medical history, a physical exam and diagnosis. There must be a logical connection between the medical diagnosis and the controlled substance prescribed. A written prescription based solely upon an on-line questionnaire does not meet these requirements. It is not a valid prescription and the distribution of any controlled substance pursuant to an invalid prescription is illegal." This has been set out at "Records Comments About On-Line Pharmacies" and can be found on the Internet at http://www.dea.gov/pubs/pressrel/diversion_actualities_transcript.html.

11.     The American Medical Association (AMA) has provided guidance for physicians on Internet prescribing with requirements for a valid patient-physician relationship. The AMA states that physicians who prescribe medications via the Internet "shall establish, or have established, a valid patient-physician relationship, including, but not limited to, the following components. The physician shall: i. obtain a reliable medical history and perform a physical examination of the patient, adequate to establish the diagnosis for which the drug is being prescribed and to identify underlying conditions and/or contraindications to the treatment recommended/provided; ii. have sufficient dialogue with the patient regarding treatment options and the risks and benefits of treatment(s); iii. as appropriate, follow up with the patient to assess the therapeutic outcome; iv. maintain a contemporaneous medical record that is readily available to the patient and, subject to the patient's consent, to his or her other health care professionals; and v. include the electronic prescription information as part of the patient medical record." AMA Policy H-120.949.

12.     The National Association of Boards of Pharmacy (NABP) assists state licensing boards in developing, implementing, and enforcing uniform standards to protect the public health. Its members are the pharmacy boards from the 50 states, the District of Columbia, and other jurisdictions. The NABP has stated, concerning on-line pharmacies, that "[c]ompleting only an online questionnaire does not establish a valid patient-prescriber relationship. Moreover, without a physical examination you could receive inappropriate medication and worsen an underlying, undiagnosed, serious medical condition." This statement is found at page 2 of their document at www.nabp.net/vipps/consumer/faq.asp.

13.     DEA Website regarding Internet Prescriptions

        a)     At this time, DEA regulations do not permit the filling of prescriptions based solely on the electronic transmission of prescriptions from prescribers to pharmacies by the Internet. If a pharmacy receives prescription information for a Schedule III-V prescription via the Internet, the pharmacy must contact the prescriber via telephone and receive an oral

-3-

prescription for the controlled substance, including the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the name, address and registration number of the practitioner (21 C.F.R. 1306.05(A)).  This DEA guidance document called "Dispensing and Purchasing Controlled Substances Over the Internet" explicitly states that "[a]t this time, DEA does not permit a prescription received via the Internet to be filled."  It notes that the pharmacy must telephonically contact the prescriber.  A copy of this guidance document is available at the Office of Diversion Control website: http://www.deadiversion.usdoj.gov.

       b)      The DEA Diversion website examines the dispensing and purchasing of controlled substances over the Internet and explains what constitutes legitimate transactions though a series of frequently asked questions.  The site first entertains the question, "<u>Can an individual order drugs using the Internet without seeing a doctor?</u>"  The explanation reads as follows:

> Federal law requires that "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice" (<u>21 CFR 1306.04(a)</u>).  Every state imposes the same requirement under its laws.  Under Federal and state law, for a doctor to be acting in the usual course of professional practice, there must be a bona fide doctor/patient relationship.  For the purposes of state law, many state authorities, with the endorsement of medical societies consider the existence of the following four elements as an indication that a legitimate doctor/patient relationship has been established:

>     1. A patient has a medical complaint;

>     2. A medical history has been taken;

>     3. A physical examination has been performed; and

>     4. Some logical connection exists between the medical complaint, the medical history, the physical examination, and the drug prescribed.

> A patient completing a questionnaire that is then reviewed by a physician hired by or working on behalf of an Internet pharmacy does not establish a doctor/patient relationship.  A consumer can more easily provide false information in a questionnaire than in a face-to-face meeting with a physician.  It is illegal to receive a prescription for a controlled substance without the establishment of a legitimate doctor/patient relationship, and it is unlikely for such a relationship to be formed through Internet correspondence alone.

Additionally, the site addressed the question, "<u>What are the basic requirements for prescribing, dispensing, and importing controlled substances?</u>", to which the following response was given:

Only practitioners acting in the usual course of their professional practice may prescribe controlled substances.....both the practitioner and the pharmacy have a responsibility to ensure that only legitimate prescriptions are written and filled.

When questioning the legitimacy of Internet pharmacies to approach a physician to write prescriptions based on consultations with customer/consumers, the site takes the following position:

A physician may use the Internet to provide information and to communicate with the patient, but it cannot be the sole basis for authorizing prescriptions. If a doctor /patient relationship exists, a doctor can use the Internet to communicate with patients. Where a doctor/patient relationship exists, the doctor may use the Internet to receive requests for treatment. DEA cautions, however, that requests for treatment should be logical based upon a doctors knowledge of the patient's medical history and the medical complaint. The doctor may also use the Internet to receive requests for refills of prescriptions from patients.

The site gave the following response to the question "Is it possible for an Internet pharmacy to fill prescriptions for Schedule III-V controlled substances?":

Internet pharmacies may receive an original signed prescription or a facsimile of the original signed prescription, or an oral prescription, where allowed, which must be verified and immediately reduced to writing. Internet pharmacies have the responsibility to ensure the legitimacy of the prescription and the prescriber. At this time, DEA does not permit a prescription received via the Internet to be filled. If prescription information is transmitted via Internet, the receiving pharmacy must contact the prescriber via telephone and receive an oral prescription for the controlled substance, including the full name and address of the patient, drug name, strength, dosage form, quantity prescribed, directions for use and the name, address and registration number of practitioner (21 CFR 1306.05(a)). The pharmacy must immediately reduce this oral prescription to writing (21 CFR 1306.21(a)).

Section II

Investigation in this Case

14.    Entities and Physicians Involved

As supported by the evidence set forth below, there are several entities which are the principal entities involved in this investigation.

-5-

A)    Facilitators

"Jive Network," located in Daytona Beach, Florida, "Hope Mills Universal," located in Miami, Florida, "Direct Meds" located in Arizona, "Online Pharmacy" and "Coral Pharmaceuticals," are facilitators and coordinators of Internet prescriptions. They function by receiving orders for drugs from customers over the Internet, sending the orders to doctors, receiving responses from the doctors, and sending the approved prescriptions to pharmacies for filling and sending to the customer.  These entities provide websites to customers, physicians and pharmacies.

B)    Pharmacy

Budget Drug RX is a pharmacy located in Feasterville, Pennsylvania, which fills prescriptions and sends them to customers who have ordered them over the Internet, and fills these prescriptions after receiving them from "Jive Network," "Hope Mills," or other similar facilitators.

C)    Physicians

A number of doctors, the identities of which are known to your affiant, have approved prescriptions based on receiving a questionnaire filled out by the customer over the Internet and forwarded to one of the facilitators.

None of these doctors practice within the Commonwealth of Pennsylvania.

15.    Initial Investigation

On or about 08/05/04, DEA Diversion Group Supervisor (G/S) Cheryl Brown received information from a DEA Diversion Investigator ( "D/I") in Columbia, SC regarding a complaint concerning an Internet pharmacy prescription.  The D/I related that he had been telephoned by a concerned citizen whose wife had ordered 37.5mg. phentermine capsules from the Internet website www.giantrx.com.  The wife had received a prescription vial of 90 capsules on 08/04/04 The prescription label listed the filling pharmacy as Budget Drug ("Budget"), 1137 Bustleton Pike, Feasterville, PA 19053 with the pharmacy telephone number of 215/322-4048 and the prescription number 512049-503979-C.

16.    Phentermine is a non-narcotic diet pill which is listed by DEA as a Schedule IV controlled substance.

17.    Additionally, in August of 2004, DEA received an excessive/suspicious purchase report from Anda Pharmaceuticals regarding Budget which detailed purchases of controlled substances made by the customer, Budget.  In essence, Budget ordered the following amounts of controlled substances:  396,300 dosage units for the week period ending 07/25/04, and  350,000 dosage units for the week period ending 08/01/04.  ANDA has established criteria setting any

-6-

product ordered which exceeds 5,000 dosage units per week will be reported on an excessive purchase report. The controlled substances ordered include phentermine in 15mg, 30mg, and 37.5mg. strengths and 75mg. diethylproprion.

18.     Both phentermine and diethylproprion are medications primarily dispensed for weight control and are listed by DEA as Schedule IV controlled substances.

19.     DEA records show that Budget has a Pennsylvania state pharmacy license and is also registered with DEA. Under the DEA #BB5209223, the registered information of the premises is listed as BUDGET PHARMACY AND WELLNESS CENTER, 1137 Bustleton Pike, Feasterville, PA 19053. Furthermore, the registration permits the pharmacy to handle Schedule II-V controlled substances, and expires on 07/31/05. In addition, under the DEA #BB5181742, the registered information of the premises is listed as BUDGET DRUG RX, 1137B Bustleton Pike, Feasterville, PA 19053. This registration also permits the pharmacy to handle Schedule II-V controlled substances, and expires on 07/31/05.

20.     It was learned the owner and pharmacist of Budget is Charlotte J. Lopacki, a.k.a. Charlotte J. Montemuro (DOB 07/21/64), Pennsylvania retail pharmacy #PP415102-L. Lopacki's home address was initially found to be 166 Propert Drive, Huntingdon Valley, PA 18966. However, during the course of the investigation, Lopacki purchased property and moved her residence to 917 North Hancock Street, Philadelphia, PA 19123.

21.     According to Pennsylvania State Pharmacy Board Inspectors, Budget's Internet filling activity began in July 2004. Therefore, this investigation has focused on records and information from July 2004 through the present.

22.     Budget's authorizing physician pool is extremely small, as the pharmacy continually fills Internet prescriptions for the same group of 14 to 20 doctors located throughout the continental United States and Puerto Rico. Through this investigation and statements made to Pharmacy Inspectors by Lopacki, it was learned that Budget during 2005 filled approximately 3,000 prescriptions a day. This, therefore, equates to hundreds of prescriptions being authorized per day by the same physicians. Additionally, each patient, more often than not, resides out-of-state from both the physician and pharmacy. As such, there are no physical examinations or face to face meetings between physician and patient, thus there is no legitimate patient/physician relationship. As a result, these Internet prescriptions are not valid prescriptions issued for a legitimate medical purpose by a practitioner acting in the usual course of his or her professional practice, as required by law.

23.     Undercover Internet Prescription Purchases

DEA Diversion Investigators (D/I)Lynda Eleazer and Julianne Dunphy made several undercover purchases through Internet pharmacy websites between November 2004 and April 2005.

In each of these transactions, D/Is Eleazer and Dunphy went onto an Internet website, posed as a customer using a fictitious name, completed a medical questionnaire, and placed an order for controlled substances.  All orders were placed by customers representing to live in Philadelphia, Pennsylvania.  No physicians were ever personally seen or spoken to by the undercover customers prior to or after placing the order.  All orders were received by FedEx delivery.  Below is a summary of the undercover purchases:

| Order Date | Internet Website | Order | Prescribing Physician | Pharmacy |
|---|---|---|---|---|
| 11/15/04 | giantrx.com | 90 Phendimetrazine (Diet pill, Schedule III) | Dr. Andrew Desonia, Plymouth, IN | Tri-Phasic Pharmacy, Arlington, VA |
| 12/29/04 | pillstore.com | 60 Phentermine (Diet pill, Schedule IV) | Dr. Alfred Valdivieso, San German, PR | Family Health Pharmacy, Hyattsville, MD |
| 4/18/05 | RxMeds.com | 90 Phentermine (Diet pill, Schedule IV) | Dr. Brent Textor, Lady Lake, FL | Budget Drug Rx, Feasterville, PA |

24.     9/17/04 Pennsylvania Pharmacy Inspection of Budget Drug

a)     On 10/04/04, D/Is Lynda Eleazer and Julianne Dunphy interviewed Pennsylvania Pharmacy Inspectors Sherri Gillespie and Arlene Gerson regarding the results of a routine pharmacy inspection conducted on Budget on 09/17/04.  According to the Inspectors, Budget is a retail pharmacy that also operates a separate Internet business in an adjacent room and utilizes the names Budget Drug and Budget Drug RX.  The pharmacy uses the addresses 1137 Bustleton Pike and 1137B Bustleton Pike, both in Feasterville, PA.  Furthermore, through employee interviews, the Inspectors learned that the Internet operation is facilitated by Jive Network  ("Jive") located at 420 Fentress Blvd., Daytona Beach, FL 32114.  It is through Jive that Budget downloads authorized prescriptions and shipping labels with affixed customer information.  Subsequently, the labels are affixed to prescription bottles containing controlled substances that have been pre-counted by pharmacy personnel.  It was noted by the Inspectors that there were four (4) unlicensed women performing the aforementioned tasks without a licensed pharmacist present.  The technicians further stated that they only fill one type of prescription/controlled substance per day.  One employee fills a counting machine with the controlled substance being worked on that day and, in turn, the machine dispenses thirty (30), sixty (60), or ninety (90) dosage units.  Upon receiving a filled bottle, another technician attaches labels containing the customer information supplied by Jive.

-8-

b) Inspectors further stated that there were no dispensing records on site and the technicians did not know where the documents were housed. The technicians stated that each prescription received daily from Jive via the Internet includes a prescription label, a prescription record, electronic signatures from various physicians throughout the United States, a patient medication sheet, and a mailing sticker for the Federal Express packaging. Additionally, Inspectors noted that during the above-described Internet prescription filling, technicians were left unattended through various, if not all, phases of the operation, including the mailing of the prescription without review of a pharmacist.

c) Furthermore, at the time of the inspection, David Rosenblum was the only pharmacist on duty for the two pharmacies. He admitted to the Inspectors that Budget fills a single drug product in the adjacent Internet operation room each day and it is not uncommon for the daily filling total to exceed one thousand (1,000) prescriptions. Rosenblum stated that he only verifies the original medication dispensed in the counting machine at the beginning of the day, but he does not check each finished prescription. Upon inspection of the prescriptions, it was noted that the verifying pharmacist's initials being used were "CL". Your affiant believes that the initials refer to Charlotte Lopacki, owner and pharmacist of Budget who, at the time of the inspection, was on vacation in Bermuda.

d) Also during the inspection, the Inspectors conducted an inventory of controlled substances related to the Internet processing section of the pharmacy and discovered the bottles were being filled predominantly with the following Schedule III and IV medications typically prescribed as diet aids: 70,000 tablets of 37.5mg. phentermine; 37,000 capsules of 30mg. phentermine; 500 dosage units of 37.5mg. Adipex; 700 dosage units of 75 mg. diethylpropion, and 2,000 tablets of 35mg. phendimetrazine.

25.     On 11/30/04, investigators telephoned Budget at 215-322-6160 in an attempt to ascertain the direct website used by customers to acquire controlled substances. Investigators were told by an unknown male that they would have to call 215-322-4048 and speak with "one of the girls in the back." The unknown male was nervous and anxious to dispose of the telephone request at the mention of diet pills. After calling 215-322-4048, a D/I stated to an unknown female that she was interested in obtaining diet pills from the pharmacy as a "friend" had done successfully in the past via the Internet. The D/I stated she was having difficulty accessing Budget's website and requested assistance. The unknown female instructed the D/I to go to www.pillstore.com and the purchase of the diet pills should be completed with ease. If, however, the D/I encountered any difficulties, the unknown employee informed the D/I that she could call the customer service number of 866/384-3680 and order the pills telephonically.

26.     On or about 02/02/05, D/I Lynda Eleazer discovered an article published in the Cleveland, Ohio newspaper, *The Plain Dealer,* which depicted the author's experience in obtaining controlled and non-controlled substances via the Internet. In essence, the article stated that the author ordered and received thirty (30) dosage units of 50mg. Didrex, a Schedule III controlled substance. The transaction was initiated by the author logging onto the website www.RxMedicationsbiz.com, filling out a ten (10) page questionnaire, and providing a credit

card number for payment. The cost of the prescription was $189.00, but in addition, the author was charged a $49.95 dispensing fee and $18.00 shipping and handling fee. The prescription was authorized by Dr. Akhil Baranwal, located within the state of Georgia. The author made an additional purchase of Didrex from an additional website, www.ordermedication.biz, which was linked to the original website he used for the first order. The second order was authorized by Dr. Alexis Roman, located in Adjuntas, PR. This prescription was filled by Budget Drug RX in Feasterville, PA. According to the author, he/she called Budget to inquire about the preceding prescription and was told that the owner was out of town and not available for comment. The author then called the customer service telephone number provided with the prescription and found that the telephone number belonged to Jive Network located in Daytona Beach, FL.

27.     Federal Express Activity with Budget Drug

On 03/10/05, DEA Investigators traveled to the Federal Express Warehouse located in Bristol, PA to gather a random sample of customers from the packages retrieved from Budget. Federal Express Operations Managers escorted Investigators to the warehouse area of the facility where the most recent parcels from Budget were staged. Investigators immediately determined that due to the shape of the package and the sound made when it was shaken, it was obvious that each contained a prescription-type bottle filled with pills. The random customer list gathered at the site indicated Budget is filling prescriptions for customers in, but not limited to, the following states: Kentucky, Minnesota, North Carolina, Florida, South Carolina, Louisiana, California, New Jersey, Texas, Alabama, Virginia, Michigan, Georgia, Ohio, Idaho, Arizona, Vermont, Maryland, Tennessee, Connecticut, Wisconsin, Massachusetts, West Virginia, New York, Washington, Illinois, Alaska, Oklahoma, New Mexico, Kansas, Mississippi, and Colorado.

28.     Moreover, a Federal Express manager informed investigators that due to consistent mass quantities, Federal Express performs three daily pick-ups at Budget pharmacy. Typically, Budget mails between 2,000 and 3,000 pieces via Federal Express per day. The manager stated that the pharmacy fills prescriptions over the weekend, and therefore there tends to be more volume on Mondays. Additionally, the manager stated that the large quantities are not surprising to him because the pharmacist at Budget has told at least one of his drivers that she "subcontracts from 3 or 4 companies out of Florida".

29.     Statements by Budget owner Charlotte Lopacki to Pennsylvania State Pharmacy Inspector

On 05/17/05, D/Is Lynda Eleazer and Julianne Dunphy interviewed Pennsylvania State Pharmacy Inspector Arlene Gerson subsequent to her approving a storage room at Budget. Gerson provided the following information as a result of her conversation with owner/pharmacist, Charlotte Lopacki.

a)     Lopacki then had three pharmacists, in addition to Lopacki, working at Budget. Lopacki told Gerson that the pharmacists work an eight hour day, and she pays them as

-10-

much as the chain stores pay their pharmacists.  Gerson stated the current rate is approximately $90,000 per year, and Lopacki confirmed the salary for her pharmacists was equivalent. Additionally, Gerson stated the pharmacists at Budget have an easy job because they mainly approve the prescriptions of phentermine and phendimetrazine filled in large quantities by the pharmacy technicians.  Since being cited during the last inspection, Budget no longer  pre-fills prescription bottles with diet medications.

        b)     Furthermore, Lopacki told Gerson that she makes $7.00 per prescription she approves through the Internet filling operation.  Lopacki estimated that Budget fills approximately 3,000 prescriptions per day.  Lopacki stated that it was easy for her to get setup because the company that introduced her to Internet prescribing, Jive, helped her out a great deal and fronted all of the money.  Now, Lopacki pays the wholesaler for the diets pills and gets reimbursed by the fulfillment company.  Lopacki claimed that the facilitator pays not only for the wholesale price of the controlled substances, but also for the cost of shipping, packaging, and the machines used to count the pills.  Basically, Lopacki receives pure profit from the $7.00 per prescription Budget authorizes.  Gerson said to Lopacki, "so you're making tens of thousands of dollars," and Lopacki agreed with the statement.

        c)     Lopacki further told Gerson there are many companies like Jive that are involved in  this type of business practice.  Lopacki stated these businesses are "fly by night" and you never know when they will shut down.

        d)     Gerson asked Lopacki about her malpractice insurance or where her liability comes into play when a 90 pound minor, who lied on the Internet medical questionnaire, orders diet pills from the Internet and drops dead from taking an overdose.  Lopacki stated the aforementioned scenario was impossible because "they need an adult signature to get the pills." Gerson asked Lopacki to clarify her explanation because it is impossible to determine the age of an individual from a signature.  Lopacki stated that the doctor who approved the patient's prescription is responsible if something like the above-described were to occur.

Trash Seizures

    30.    On 08/31/04 through 06/13/05, Lt. Raymond Weldie of the Lower Southampton Twp. Police Department conducted random trash pulls from the dumpster located next to Budget Drug , 1137 Bustleton Ave, Feasterville, PA.  As to the 8/31/04 trash pull, D/I Julianne Dunphy and Bucks County Detective Michael Mosiniak met with Lt. Weldie, who turned over the recovered evidence from the 08/31/04 trash pull for further investigation.  The recovered evidence contained numerous empty manufacturer bottles of 37.5mg. phentermine tablets, labeled with the name Amide Pharmaceuticals, nine (9) empty prescription bottles with patient, physician, and pharmacy information, empty federal express envelopes from customer returns, and pharmacy/shipping labels detailing patient, physician, and pharmacy information.  All of the pharmacy information on the labels related solely to Budget.

-11-

31.     D/I Dunphy later conducted an analysis of the trash bag contents and learned the following information: several empty prescription bottles listed Dr. "AB" of Waycross, GA as the approving physician for three prescriptions for ninety (90) dosage units of 37.5mg of phentermine for one customer in Massachusetts and two in New York.  Other bottles indicated the following prescribing physicians:  Dr. "AT" of Adjuntas, PR, Dr. "MM" of Kannapolis, NC, Dr. "AV" of San German, PR, and Dr. "JP" of Salt Lake City, UT.  The patient information on the preceding listed addresses in the following states:  Alabama, Texas, Ohio, California, and New York.  These other prescription labels were written for ninety (90) dosage units of 37.5mg phentermine and thirty (30) dosage units of 37.5mg of phentermine.

32.     Other analysis of numerous other trash pulls revealed similar findings of prescriptions for controlled substances issued by a physician from one state for a patient residing in a different state.

33.     On all of the above-described evidence, the pharmacy information related to Budget.  However, on one Federal Express shipping label which appeared to your Affiant to be a customer return, the addressee information was listed as follows:  Charlotte Lopacki(305)412-3250, Online Pharmacy Group, 10850 SW 113th Place, Suite 220, Miami, FL 33176.

34.     On 2/1/05, agents discovered within the trash pull evidence a copy of a *Pennsylvania Pharmacists Association New Bulletin*, dated 01/31/05 containing Charlotte LOPACKI's typed name at the top of each page of the article, appearing to your Affiant to be an emailed document.  On page two of the bulletin, a section with the heading "DEA Looking Into Internet Pharmacies" was highlighted.  The description under the caption read as follows:  "The following link provided by the DEA is available to report any suspicious internet pharmacies.  http://www.deadiversion.usdoj.gov/index and click on Report Suspicious Internet Pharmacies.  You can also report internet pharmacies by calling the toll free number 1-877-RxAbuse (1-877-792-2873).  The DEA has set up a task force to try to track down where these pharmacies are actually located."  In addition, further information is contained on the identified DEA Diversion website warning that online prescriptions without any legitimate doctor/patient relationship is unlawful.  See par. 13 above for specific references to website.

35.     Also obtained during the 2/1/05 trash pull at Budget was a copy of a document listing controlled substances and prescription medications.  Next to the name and strength of the drug was a column listing "pill cost".  The following are prices for medications typically used for weight loss and are frequently purchase and filled by BUDGET:  37.5mg. Adipex - $1.25 per pill;  diethylpropion - $0.44 per pill;  105mg. phendimetrazine - $0.50 per pill;  35mg. phendimetrazine - $0.06 per pill;  30mg. phentermine(blue) - $0.39 per pill; 15mg. phentermine(blue) - $0.10 per pill;  30mg. phentermine(yellow) - $0.34 per pill;  37.5mg. phentermine - $0.18.

36.     5/19/05 trash pull - On 05/19/05, Lower Southampton Twp. Lt. Ray Weldie, at the request of D/I Julianne Dunphy, retrieved trash from the dumpster located next to Budget, 1137 Bustleton Pike, Feasterville, PA.  Lt. Weldie segregated the articles pertaining to the drug

store, as the dumpster can be utilized by other stores located within the strip mall. On 05/24/05, D/Is Lynda Eleazer and Julianne Dunphy met with Lt. Weldie, who turned over the recovered evidence from the 05/19/05 trash pull for further investigation. The recovered evidence contained miscellaneous documentation and a prescription bottle of 90 (ninety) 37.5mg. phentermine tablets in a plain white envelope with a hand-written note. The oblong tablets were white with blue and scored on one side and contained the logo "A257" on the reverse side. The prescription label, dated 04/21/05, listed "RZ" M.D. as the authorizing physician and Budget Drug RX, 1137 Bustleton Ave., Feasterville, PA 19053, telephone 215/322-6660, as the dispensing pharmacy. Additionally, the label indicated the initials "C.S." followed by another telephone number, 888/557-1872. Previous investigative reports have revealed this telephone number to be the customer service number of the facilitator, Hope Mills. The patient information listed on the bottle was as follows: "JT", Mastic Beach, New York 11951. Lastly, the prescription number contained on the label was 4-39118.

      a)     The note enclosed with the bottle of pills appeared to be authored and signed by "JT". In essence, "JT" stated she never ordered the pills and was returning the merchandise to Budget so that the pharmacy would credit her Citibank account in the amount of $155.00. "JT" supplied her telephone number in the closing of the letter.

      b)     On 05/27/05, D/I Dunphy contacted "JT" at the above-referenced telephone number. "JT" relayed that she never ordered the pills, and does not know of anyone who has her credit card number. Furthermore, she has never heard of, let alone been seen by, the physician and has no knowledge of Budget. "JT" stated she contacted "Budget" at the toll-free number listed on the bottle to explain that she did not order the pills. Once she told the customer service representative that she did not authorize the use of her credit card and did not want the pills, the representative became extremely rude and argued with her about the transaction. The unknown individual told "JT" to keep the pills and the company would only charge her half of the listed price. "JT" told the operator there was going to be no negotiations and that she was sending the pills back and wanted the full amount credited to her account. "JT" then asked to speak to a supervisor who told "JT" that if she sent the prescription bottle back to the pharmacy with the pills in tact, she would be reimbursed. The individual then threatened "JT" that if she returned the pills she would not be able to order from them anymore. "JT" subsequently told the supervisor to never send another thing to her house. She also stated she was calling her credit card company to start an investigation regarding the unauthorized transaction. "JT" had not yet received her credit card statement, and could therefore not supply the name of the company as it appeared on the bill.

    37.    8/9/05 shipments of Phentermine (Schedule IV controlled substance) from Budget Drug to customers in Louisville, Kentucky

    Diversion Investigators in Louisville, Kentucky learned that on 8/9/05, approximately 33 prescriptions for Phentermine, a Schedule IV controlled substance, were dispensed by Budget Drug in Feasterville, PA to various customers in the Louisville, Kentucky vicinity via Internet pharmacy prescription orders.

38.    Suspicious Purchase/Excessive Purchase Reports

       In August 2004, November 2004, February 2005, March 2005 and April 2005,
DEA received Suspicious Purchase/Excessive Purchase Reports from drug suppliers of
controlled substances for purchased by Budget.  Such drug suppliers are required by law to make
such reports to DEA when a purchaser makes suspicious orders including those of unusual size,
orders deviating substantially from a normal pattern, and orders of unusual frequency.
Generally, controlled substance suppliers will issue a suspicious purchase report to DEA if a
customer order per controlled substance exceeds 5,000 dosage units of a specific controlled
substance, either within a one week or one month period, depending on the supplier.

       a)     In August, 2004, DEA received a "Suspicious Purchase Report" from a
wholesale supplier of controlled substances for purchases by Budget.  Such suppliers are
required to make such reports to DEA  In summary, this report noted the excessive purchase of
the following amounts of controlled substances:  396,300 dosage units for the week period
ending 07/25/04, and 350,000 dosage units for the week period ending 08/01/04.  The controlled
substances ordered included phentermine and diethylproprion in varying strengths.  Both
phentermine and diethylproprion are Schedule IV controlled substances intended for weight
control.

       b)     In November, 2004, DEA received a "Suspicious Purchase Report" from a
wholesale supplier of controlled substances for purchases by Budget.   In summary, the report
noted the unusual/ excessive purchase of 80,000 tablets of 37.5mg Adipex by Budget in October,
2004.  Adipex is a Schedule IV controlled substance intended for weight control.

       c)     In February, 2005, DEA received a "Suspicious Purchase Report" from a
wholesale supplier of controlled substances for purchases by Budget.  In summary, the report
noted the unusual/ excessive purchase of 40,000 capsules of 105mg. Bontril by Budget in
January 2005.  Bontril is a Schedule III controlled substance intended for weight control.

       d)     In March, 2005, DEA received a "Suspicious Purchase Report" from a
wholesale supplier of controlled substances for purchases by Budget.  In summary, the report
noted the unusual/ excessive purchase of 85,000 tablets of 105mg. Bontril capsules by Budget in
February 2005.  Bontril is a Schedule III controlled substance intended for weight control.

       e)     In April, 2005, DEA received a "Suspicious Purchase Report" from a
wholesale supplier of controlled substances for purchases by Budget in March 2005.  In
summary, the report noted the following unusual/excessive purchases:  100 bottles of 100 count
37.5 Adipex-P tablets, i.e. 10,000 dosage units,  and 300 bottles of 100 count 105mg Bontril SR
tablets, i.e. 30,000 dosage units.

39.   <u>Evidence of Prescriptions Written in Computer Storage at AOL</u>

As set forth in Par. 24 (a) above, pharmacy inspection conducted on Budget on 09/17/04.  According to the Inspectors, Budget is a retail pharmacy that also operates a separate Internet business in an adjacent room and utilizes the names Budget Drug and Budget Drug RX. The pharmacy uses the addresses 1137 Bustleton Pike and 1137B Bustleton Pike, both in Feasterville, PA.  Furthermore, through employee interviews, the Inspectors learned that the Internet operation is facilitated by Jive Network ("Jive") located at 420 Fentress Blvd., Daytona Beach, FL 32114.  It is through Jive that Budget downloads authorized prescriptions and shipping labels with affixed customer information.  Subsequently, the labels are affixed to prescription bottles containing controlled substances that have been pre-counted by pharmacy personnel.

As set forth in Par. 36 above, during a 5/19/05 trash pull, miscellaneous documentation was recovered which included a prescription label dated 4/21/05 listing Dr. R. Zwitiashvilli as the authorizing physician and Budget Drug Rx, 1137 Bustleton Ave., Feasterville, PA as the dispensing pharmacy.  The label further listed the initials "C.S." together with a telephone number which was the telephone number of the facilitator "Hope Mills."  This indicates further internet usage by Budget Drug for prescriptions.  Investigators have consistently recovered copies of prescription labels and shipping labels which were created through Internet communication by Budget.  In addition, investigators recovered an e-mail message to Charlotte Lopacki of Budget Drug from a "MG", believed to be of Hope Mills, regarding certain Internet orders which were printed on 5/18/05 but were not shipped.  It is therefore believed that Lopacki uses AOL for e-mail correspondence relating to Budget Drug in furtherance of the Internet pharmacy prescription scheme.

Investigators found no significant records or documents maintained in hard copy paper and therefore believe that Budget uses Internet storage of documents.

Investigators learned that the owner of Budget Drug, Charlotte J. Lopacki, uses an AOL internet account of  "Cjlrx8@aol.com" as the internet address which is also used by Budget.

40.   <u>Financial Records</u>

a)   A financial analysis of bank records obtained from Bank of America reveal six separate bank accounts in the names of Charlotte Lopacki or Budget Drug.  They are as follows:

Account #4780000530 in the name of Charlotte Lopacki/Budget Drug - checking account

Account #4780009880 in the name of Budget Drug - checking account

Account #4780000557 in the name of Charlotte Lopacki - checking account

-15-

Account # 578000981 in the name of Charlotte Lopacki - money market account

Account #9419338722 in the name of Budget Drug - checking account

Account# 9496836012 in the name of Budget Drug - checking account

        b)      A financial analysis of these bank records show numerous deposits from facilitators of the Internet pharmacy scheme into the bank accounts of Budget Drug as follows:

        Between January 2004 and July 2005:

| Facilitator | Account | Amount |
|---|---|---|
| Jive Network to Budget Drug #9419338722 | | $5.8 million |
| Hope Mills to Budget Drug #9419338722 | | $2.4 million |
| Online Pharmacy to Budget Drug #9419338722 | | $1.2 million |
| Coral Pharmaceuticals to Budget Drug # #9419338722 | | $ 391,000. |
| Jive Network to Budget Drug #4780009880 | | $ 172,000. |
| Unidentified Sources to Budget Drug #4780009880 | | $2.5 million |
| Unidentified Sources to Budget Drug ##9419338722 | | $ 606,000 |
| | TOTAL | $13,069,000. |

        c)      There were transfers of funds from one of these Budget Drug accounts directly into a personal account of Charlotte Lopacki, account #9519815100, of at least $120,000.

        d)      Certain of the currently unidentified sources making deposits into the Budget Drug accounts may come from facilitators or other drug suppliers participating in the Internet pharmacy prescription scheme.

        e)      It is believed that all of these deposits represent proceeds directly from the unlawful Internet pharmacy prescription scheme.

41. Patient/Customer Complaints

      a)     On or about 12/01/04, DEA received information regarding an arrest as a result of a narcotics investigation conducted by the DEA Tactical Diversion Squad in St. Louis concerning the attempted filling of fraudulent OxyContin prescriptions. The report states that an inventory search subsequent to the arrest resulted in the seizure of a prescription bottle listing the name and address of the arrestee, Stacy Reed of 3319 Droste Rd., St. Charles, MO 63301, labeled for ninety (90) tablets of an unknown strength of phentermine, but containing thirty (30) tablets. The label on the bottle also revealed that the prescription was filled on 10/09/04 by Budget Drug RX, 1137B Bustleton Pike, Feasterville, PA, 19053, telephone (215)322-6660. The prescription, RX #718487-771007-C, was authorized by Dr. "TH". Further investigation revealed Dr. "TH" is registered by DEA to 14 Suffolk Rd., South Glastonbury, CT 06073.

      When questioned about the bottle, Reed stated she ordered the prescription over the Internet and paid $115.00 for the pills. Reed stated she "surfed" the Internet and found the website of "BUDGET DRUG RX". After filling out a questionnaire on the website, she requested to be sent phentermine. Then, Reed stated she simply paid for the controlled substances with a credit card and the drugs were delivered to her residence via a "DHL" delivery truck. Reed told Investigators that she never spoke to anyone and couldn't believe she was able to get drugs that way and asked, "Is that legal what they did, it was really easy".

      On 11/29/04, a D/I telephonically interviewed Dr. "TH" regarding the aforementioned prescription. "TH" stated he does do some work on the Internet only authorizing "lifestyle drugs, no hard stuff, like Vicodin". "TH" advised that he is currently working for an Internet company called "RXNETWORK.COM" owned by a subject known as Hudson Smith. "TH" stated he found the company on the Internet and has been working for Smith since 09/27/04, after signing a "loose" contract. "TH" stated he is paid $2.46 for every prescription he authorizes. Furthermore, "TH" said he was "hired" over the telephone by Smith and stated Smith provided him the phone number of (866)462-9857 as the means of which to be contacted. When "TH" was questioned about the patient Stacy Reed, "TH" stated he would have to check his database file because he could not remember every patient.

      b)     On 03/16/05, D/I Lynda Eleazer telephonically contacted "WJ" regarding a complaint "WJ" had made with the DEA Detroit Field Division regarding his wife purchasing controlled substances via the Internet. "WJ" stated that his wife has been ordering drugs via the Internet for approximately four years. Furthermore, "WJ" stated he has moved out of the family home and is in the process of getting a divorce due to his wife's addiction to Adipex and Xanax. "WJ" claims his wife stated she has taken up to seventy (70) Xanax in one day.

      Furthermore, "WJ" reported that two of his daughters, ages 17 and 15, are currently on probation for one year because each of them brought pills to school. The aforementioned pills were obtained from the girls' mother. "WJ" stated that his wife gave his girls the pills because she thought they may want to lose weight. In addition, "WJ" relayed that

his younger daughter brought some Xanax to a neighbor's house. The daughter and a friend ingested the pills, and the friend was subsequently rushed to the hospital. At the time of the incident, the cause of the illness was not determined. However, "WJ" later discovered the ingestion of Xanax caused the girl's illness.

At the time "WJ" contacted the DEA Detroit Office, he had in his possession two pill bottles for Adipex. One bottle was dated 01/29/05, and the other dated 01/31/05. The physician listed on both bottles was Dr. "LT", DEA #BT1548570. The prescription dated 01/31/05 was filled by Budget. Furthermore, "WJ" stated that his wife was using credit cards to purchase the controlled substances and was spending over $700.00 a month. According to "WJ", his wife did not use any fictitious names or addresses to obtain the pills. However, he indicated that she did not use her real weight because she was afraid that she would not get the pills. He stated that his wife is 5'7 and weighs about 150 pounds. Lastly, "WJ" confirms that, to his knowledge, his wife has never been contacted by "LT" or any other physician regarding the prescriptions she received via the Internet.

c)      On 04/21/05, D/I Julianne Dunphy received a Report of Investigation, DEA Form 6, from D/I Paul Settle of the DEA Louisville, Kentucky office regarding the arrest and surrender of DEA registration by Dr. Don Wayne Bowman, DMD. In essence, D/I Settle received a tip from local law enforcement concerning the delivery of controlled substances to Bowman via U.P.S. delivery. Upon further investigation, D/I Settle discovered Bowman had surrendered DEA #BB7318822 in January 1996 due to illegal prescribing stemming from his own drug addiction. On 03/16/05, pursuant to a signed Consent to Search Form, numerous controlled substances were discovered in Bowman's dentist office. Bowman stated he had ordered drugs from the Internet and continued this practice because it was so easy. Furthermore, he stated he filled out a form and the controlled substances were sent, without ever being contacted by a physician or pharmacy. In addition, Bowman stated he knew purchasing the drugs over the Internet was probably illegal and unethical, but it was so easy to do and he could keep his wife from knowing. Bowman said asking his family physician for controlled substances would be very embarrassing because his doctor knew his wife and his past drug problem.

When Bowman was asked to identify pharmacies and physicians from which he received controlled substances, he included Budget. The prescription he received from Budget was authorized by "RZ", MD, DEA #AZ2877667. Bowman was charged with the state of Kentucky statues, Possession of a Controlled Substance and Possession of a Controlled Substance in an improper container.

d)      On or about April 21, 2005, DEA in Milwaukee, Wisconsin was contacted by an individual who was concerned about the legality of his wife ordering diet pills from the Internet. The caller stated he accessed several websites, including DEA and FDA, regarding this matter and believed his wife's purchase to be illegal. He immediately notified DEA and explained that his wife initially logged onto the website www.123drugsonline.com. Furthermore, she filled out a "patient survey" and requested phentermine. She subsequently

-18-

received a verification email stating that her prescription for phentermine had been transmitted to the website www.medbizsupply.com for processing.  He stated that a few days later, she received a shipment via Federal Express containing the phentermine.   Eventually, the caller's wife telephoned DEA,  reiterated the preceding, and added that she was looking for a less expensive alternative to obtaining phentermine and was unaware of the illegal nature of Internet prescribing and filling until it was brought to her attention by her husband.  She then agreed to send the remaining controlled substances to DEA for further investigation.

Upon receipt of the aforementioned, it was discovered the pharmacy label on the vial identified the contents as 30mg. phentermine capsules.  The pharmacy was listed as Budget Drug RX and the authorizing physician was "RZ", MD.

DEA Investigators conducted further searches and found the domain name www.medbizsupply.com is registered by Hope Mills Universal, an international, multi-level advertising and customer services company with primary contacts with distributors of pharmaceuticals.

42.   Federal Search Warrant on September 12, 2005

On September 12, 2005, DEA agents executed a federal search warrant and seized documents, records and computer materials and information, in addition to controlled substances, all of which verified the existence of the unlawful internet pharmacy scheme.

43.   Federal Seizure Warrant on September 12, 2005

On September 12, 2005, DEA agents executed a federal seizure warrant at Bank of America, 4966 Old Street Road (Trevose Branch) Feasterville, Pennsylvania, and seized the following:

a)   Funds seized from Bank of America account number 9419338722 in the amount of $726,425.84, held in the name of Charlotte Lopacki and/or Budget Drug;

b)   Funds seized from Bank of America account number 4780009880 in the amount of $45,311.87, held in the name of Charlotte Lopacki and/or Budget Drug; and

c)   Funds seized from Bank of America account number 9519815100 in the amount of $166,770.01, held in the name of Charlotte Lopacki.

44.   Charlotte Lopacki's Knowledge

At all times relevant to the operation of the internet pharmacy by CHARLOTTE LOPACKI, she had the following knowledge:

-19-

a)      since February 2005, she was aware that DEA issued a warning notice about the operation of internet pharmacies,

b)      she knew that the physicians were not having any contact with the patients they were prescribing for, that is, no verbal communication or face to face meeting,

c)      there were no prescription refills on any of the internet pharmacy prescriptions she filled,

d)      there was no insurance accepted for payment on the prescriptions,

e)      the primary controlled substance which was being prescribed was Phentermine, a Schedule IV controlled substance, a diet drug;

f)      she made no telephone contact with any of the physicians to verify the prescriptions.

Conclusion

Based on the foregoing there is probable cause to believe that the funds seized from Bank of America account numbers 9419338722, 4780009880 and 9519815100 constitute moneys, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and 846; all proceeds traceable to such an exchange or moneys, negotiable instruments and securities used or intended to be used to facilitate such violations; and are therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

JON COHEN
Task Force Agent
U.S. Drug Enforcement Administration

-20-

# Exhibit C

4562



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

*AUSA Seth Weber*
*Direct Dial: (610) 776-0186*
*Facsimile: (610) 776-1184*

*504 W. Hamilton Street*
*Suite 3701*
*Allentown, Pennsylvania 18101*

February 1, 2006

Christopher Napoli
1825 Lawrence Road
Havertown, PA 19083

Re: Christopher Napoli

Dear Mr. Napoli:

The Department of Justice guidelines encourage prosecutors to notify individuals who are targets of grand jury investigations. You are presently a target of a grand jury investigation concerning among others, violations of Title 21, United States Code, Sections 846 and 841(a), concerning conspiracy regarding illegal distribution of a controlled substance.

In order to determine how best to proceed in this matter, I would like an opportunity to discuss your case with an attorney representing you. At that time, decisions regarding what charges might be filed, whether you would want to appear before the grand jury, as well as other matters could be resolved.

If you have the financial ability to retain your own attorney, please do so and have him or her contact me. If you do not have the resources to retain your own attorney, you may contact the Federal Defenders Association of Philadelphia, Federal Court Division at (215) 928-1100. In either event, please have an attorney contact me no later than February 15, 2006, otherwise this office will proceed with its investigation.

For your attorney's convenience, I can be reached at the above address or at (610) 776-0186.

Very truly yours,

PATRICK L. MEEHAN
United States Attorney

Seth Weber
Assistant United States Attorney

# Exhibit D

*Law Offices*

# DUFFY GREEN & REDMOND

JOHN J. DUFFY
JOSEPH P. GREEN, JR.
P.J. REDMOND

ELIZABETH A. REDMOND

SUITE 307
TEN NORTH CHURCH STREET
WEST CHESTER, PA 19380-3059
*Telephone* 610-692-0500
*Facsimile* 610-430-6668

February 24, 2006

Seth Weber, Esquire
United States Attorneys Office
Suite 1250, 615 Chestnut Street
Philadelphia 19106

*Re: Christopher Napoli*

Dear Mr. Weber:

I write to confirm that we represent Mr. Napoli, and to request notice if he is Indicted. We will produce Mr. Napoli whenever and wherever required (with reasonable notice).

Please inform the grand jury that we contend that Mr. Napoli never knowingly or intentionally violated the law, or knowingly engaged in any act that assisted unlawful activity. Mr. Napoli never knowingly encouraged or assisted any unlawful delivery, or any delivery to minors. He has always acted on sound advice that he continues to believe.

We understand that you and DEA Washington take the position that there are no circumstances under which a "legitimate" doctor patient relationship can be formed without a "face-to-face" examination by a physician. We believe that, as a matter of fact and law, this is the necessary predicate of your proposed prosecution, and an unsupportable assumption. Accordingly, we believe that there is no criminal responsibility for acting as an internet intermediary.

We recognize that you, your Office  and your agents may be in a difficult position, required to act in accordance with policy set by others. Similarly, Internet intermediaries want to service consumers but are being subjected to threats of prosecution. Reasonable people have divergent, strongly held views on the difference between Internet commerce in pharmaceuticals and Internet abuse in pharmaceuticals.

The government has the ability to resolve these issues without resorting to Indictment: the government has available to it expedited civil justice processes and procedures to enforce the drug laws, and has the ability to commence a declaratory judgment action to secure an independent, judicial judgment on the proper application of federal laws to Internet intermediaries. We continue to believe that the use of the criminal

Seth Weber, Esquire                                    February 24, 2006
    *Re: Christopher Napoli*

justice system to secure a judicial interpretation is wholly inappropriate.

    We are convinced that there is a material difference between Internet abuse, and legitimate Internet marketing. DEA apparently takes the position that the federal government has the exclusive and final authority to define the scope and contour of a "legitimate" doctor-patient relationship. We believe that physicians have the right, and the duty, to determine what is a "legitimate" doctor-patient relationship. Further, we contend that the federal government has no authority to intervene in the physician's assessment of the legitimacy of a doctor-patient relationship. These differences can be resolved in civil litigation before the federal courts. Criminal prosecution, under the circumstances here, is wholly inappropriate.

    The DEA's "face-to-face" rule is not medically required, and we believe that you and/or your agents already have spoken with at least one physician who has articulated his view on the propriety of our approach. The American College of Physicians has articulated a broadly held view on the need for our government, and our economy, to incorporate increased reliance on physicians' e-consulting.[1] I hope that you will be able to inform the grand jury that the government's views are not universally accepted, and not the only legitimately held views, on what is required to create a "legitimate" doctor-patient relationship. The American College of Physicians has provided its views on an analogous subject, billing for e-consulting:

    Medicare should also begin paying for e-mail and telephonic consultations with patients. ACP, in a series of papers on the "The Changing Face of Ambulatory Medicine," has highlighted the positive use of telephone (http://www.acponline.org/hpp/tel_care.pdf) and internet (http://www.acponline.org/hpp/e-consult.pdf) communications in improving the

---

    [1]    American College of Physicians, *The Changing Face of Ambulatory Medicine—Reimbursing Physicians for Computer-Based Care: ACP Analysis and Recommendations to Assure Fair Reimbursement for Physician Care Rendered Online.* (Philadelphia: American College of Physicians; 2003: Policy Paper.) (Available from American College of Physicians, 190 N. Independence Mall West, Philadelphia, PA 19106.) (http://www.acponline.org/hpp/e-consult.pdf).

2

Seth Weber, Esquire                                                                    February 24, 2006
     *Re: Christopher Napoli*

       quality of patient care and increasing physician productivity. These non face-to-
       face services, which Medicare currently does not routinely reimburse, can improve
       quality by facilitating physician-patient contact that will allow for improved
       symptom recognition, diagnosis and follow-up care. These tools can also help
       physicians optimize their productivity in serving patients; allowing them to treat a
       wide array of non-urgent  conditions and needs by phone or internet without the
       time and expense of an office visit, while reserving face-to-face care for patients
       most in need of intensive direct care.

*The Impending Collapse of Primary Care Medicine and Its Implications for the State of
the Nation's Health Care: A Report from the American College of Physicians* (January
30, 2006).

       Our free-market economy and technological developments of the 21st century are
leading inexorably to efficiencies in the pharmaceutical industry; pharmaceutical
manufacturers advertise, Internet intermediaries provide software-controlled opportunities
to purchase the advertised substance, licensed doctors review the patients' requests for
propriety and efficacy. Software design and delivery safeguards can provide at least as
stringent protection for consumers, and at least as much protection against abuse, as the
requirement for a "face-to-face" meeting between the physician and the patient.

       Privacy and convenience issues lead consumers to choose internet intermediaries
to purchase pharmaceutical products. We offer to sponsor an independent survey of
customers to determine why they chose the Internet to service their pharmaceutical
purchases. Let's use an independent consulting firm; if you will agree to release customer
information from your investigation to an independent market research firm, we'll
arrange for an Internet trade group to fund it. If the government really believes that
Internet intermediaries serve no legitimate purpose, let's ask the consumers whether they
confirm that view.

       How will Internet intermediaries operate going forward? Doctors will act as
consultants, and intermediaries will operate as independent practice system providers and
billing services. Doctors will review patients' written requests and make independent
assessments of the propriety and efficacy of the requests. No opiates or Schedule I or II
medications will be prescribed, as existing rules require delivery of a paper prescription,
and make Internet commerce inefficient.

3

Seth Weber, Esquire                                      February 24, 2006
    *Re: Christopher Napoli*

An Internet intermediary will provide an on-line opportunity for consumers to purchase approved products from U.S. licensed pharmacies after online consultation with a U.S. licensed physician. An Internet intermediary will provide the Doctor with on-line requests from potential patients requesting authorization to purchase prescription medication and other pharmaceuticals. An Internet intermediary will utilize software that requires that the customer provide relevant physical and diagnostic information, and an opportunity for Doctor to contact customer by telephone to discuss the request, if deemed appropriate by Doctor.

An Internet intermediary will maintain software and other safeguards that will ensure, inter alia, that

      a.    customers will be able to request any particular pharmaceutical or medication only once per month from any particular computer;

      b.    customers do not order or receive incompatible or contraindicated pharmaceuticals or medications

      c.    customers do not receive inappropriate multiple deliveries; and

      d.    customers will only receive a requested pharmaceutical or medication by restricted delivery requiring the signature of an adequately identified adult (including, by way of example only, the customer's identification of an adult authorized to accept the pharmaceutical or medication, along with customer's designation of an accepted form of identification);

The Doctor will utilize independent medical judgment to review patients' requests to secure medications. The Doctor will decide whether or not to approve the request, and, where appropriate, to prescribe medication. The Doctor will exercise independent medical judgment, and will conduct the practice of medicine within and in accordance with all relevant ethical and legal regulations.

An Internet intermediary will act as a payment and billing service for the Doctor, and will allocate compensation to the Doctor for his or her services based on a negotiated fee per request reviewed, whether the request to secure medications is approved or rejected. The Doctor will act as an independent contractor, exercising independent

4

Seth Weber, Esquire                                      February 24, 2006
     *Re: Christopher Napoli*


medical judgment, and will not act as an employee of an Internet intermediary.

        An Internet intermediary will also act as custodian of the records of patient
prescription requests and review thereof, and records of any contact between Doctor and
patient. The Internet intermediary will ensure that the Doctor obtains and maintains
appropriate professional liability insurance independent of an Internet intermediary.

        We respectfully suggest that, if the United States is looking for an Internet
intermediary to Indict, this isn't the one to choose. We have a good faith disagreement on
the scope of federal authority. We urge you to elect civil judicial proceedings, because
neither a conviction nor an acquittal will provide the guidance that the government and
the industry need.

        Thank you for your consideration.

                                        Very truly yours,


                                        Joseph P. Green, Jr.

JPGjr/pcl

cc:    Mr. Christopher Napoli


                                        5

**JOSEPH P. GREEN, JR**.
Duffy & Green
138 West Gay Street
West Chester, PA 19380
Telephone 610-692-0500
Fax 610-430-6668
jpgreen@duffygreen.com

**CHRISTOPHER J. CANNON**, State Bar No. 88034
Sugarman & Cannon
44 Montgomery Street, Suite 2080
San Francisco, CA 94104
Telephone: 415-362-6252
Facsimile: 415-677-9445

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER NAPOLI, <br><br> Defendant. | No. 10-cr-00642-CRB <br><br> **[PROPOSED] ORDER GRANTING DEFENDANT NAPOLI'S MOTION FOR TRANSFER UNDER RULE 21(b) AND FOR SEVERANCE OF DEFENDANTS AND/OR COUNTS** <br><br> November 30, 2010, at 2:15 pm. |

## ORDER GRANTING TRANSFER

AND NOW, this     day of                   , 2010, upon consideration of the Motion

for Transfer of the Defendant Christopher Napoli, and the government's response, and

after hearing and argument, the Court directs that the trial of the Napoli conspiracy

allegations shall be transferred to the United States District Court for the Eastern District

1

of Pennsylvania for the convenience of the parties and witnesses and to ensure a fair trial for defendants in the interest of justice.

**IT IS SO ORDERED.**

Dated: _____

_____
HON. CHARLES R. BREYER
United States District Court Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system, except for the party listed below, who has been served by regular mail and by e-mail:

> Victor A. Afandor, Esquire
> Lite Depalma Greenberg, LLC
> Two Gateway Center, 12th Floor
> Newark, NJ 07102
> Email: vafanador@litedepalma.com
> *Defendant Lamorte*

                                              \_\_\_\_/s/_____

                                              Ryan Davis