1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  KIRSTIN M. AULT  (CABN 206052)
   TRACIE BROWN (CABN 184339)
5  Assistant United States Attorneys

6     450 Golden Gate Ave., Box 36055
      San Francisco, CA 94102
7     Telephone: (415) 436-6940
      Facsimile: (415) 436-7234
8     E-mail:     kirstin.ault@usdoj.gov
                  tracie.brown@usdoj.gov
9

10               UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                 SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,          )    No.  CR 10-0642 CRB
                                       )
14          Plaintiff,                 )
                                       )
15     v.                              )    **UNITED STATES' TRIAL MEMORANDUM
                                       )    AND RULE 17-1-1 STATEMENT**
16  CHRISTOPHER NAPOLI,                )
    DANIEL JOHNSON, and                )    Pretrial:      June 6, 2012
17  JOSEPH CAROZZA,                    )    Trial Date:    June 18, 2012
                                       )    Time:          8:30 a.m.
18          Defendants.                )    Court:         Courtroom No. 8
                                       )                   Hon. Charles R. Breyer
19  _____   )

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.  CHARGES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   1.  Defendants and Roles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   2.  Evidence of Drug Distribution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   3.  Evidence that Distribution Was Outside the Course of Professional Practice. and Not For a Valid Medical Purpose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   4.  Evidence that Defendants Knew the Distribution Was Outside the Course of Professional Practice and Not For a Valid Medical Purpose. . . . . . . . . . . . . . 15

   5.  Count Two - Distribution on February 24, 2006. . . . . . . . . . . . . . . . . . . . . . . . 18

   6.  Count Three - Money Laundering Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . 18

   7.  Forfeiture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

   8.  Potential Advice of Counsel Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III. EVIDENTIARY ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

IV. STATEMENT PURSUANT TO CRIMINAL LOCAL RULE 17-1-1(B). . . . . . . . . . . . . . . 23

   1.  Disclosure of Jencks Act Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   2.  Disclosure of Grand Jury Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   3.  Disclosure of Exculpatory Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   4.  Stipulations of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   5.  Appointment of Interpreters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

   6.  Dismissal or Elimination of Counts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   7.  Joinder Pursuant to Rule 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   8.  Identification of Informants, Use of Line-Ups, Evidence of Prior Convictions of Defendant, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   9.  Witnesses to Be Called At Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

   10. Pretrial Exchange of Exhibits and Diagrams. . . . . . . . . . . . . . . . . . . . . . . . . . 24

   11. Objections to Exhibits or Testimony to Be Offered at Trial. . . . . . . . . . . . . . . . . 24

   12. Trial Briefs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

   13. Scheduling of Trial and Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

14. Voir Dire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

15. Other Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## <u>TABLE OF AUTHORITIES</u>
### FEDERAL CASES

*United States v. Feingold,* 454 F.3d 1001 (9th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Moore,* 423 U.S. 122 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Munoz,* 233 F.3d 1117 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Pursuant to Criminal Local Rule 17-1-1(b), the United States respectfully submits the following Pre-Trial Memorandum.

## I.   CHARGES

On August 31, 2010, the three defendants and eight others were charged in a thirteen-count indictment with conspiracy to distribute and possess with intent to distribute Schedule III and IV controlled substances, in violation of 21 U.S.C. § 846, distributing and possessing with intent to distribute a Schedule IV controlled substance, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to launder money, in violation of 18 U.S.C. § 1956(h).  On or about December 7, 2010, a superseding indictment was returned that made technical changes to the indictment but charged the defendants with the same offenses.  Since indictment, one defendant (Steven Paul) has died and one defendant (Diego Paes) remains a fugitive, leaving nine defendants who have appeared before the Court.

The indictment organized the thirteen counts into three separate conspiracies related to three separate Internet pharmacies.  The Court severed the case into the three separate conspiracies for trial, ordering that Counts Four through Nine (the Pitcairn conspiracy) would be tried first, because one of the defendants was in custody.  The Court ordered that Counts One through Three (the Safescripts Online conspiracy) would proceed to trial next, and that Counts Ten through Thirteen (the United Mail Pharmacy Services "UMPS" conspiracy) would proceed to trial last.

The Pitcairn conspiracy (Counts Four through Nine) proceeded to trial on February 6, 2012.  Two of the four charged defendants (Salvatore Lamorte and Darrell Creque) entered guilty pleas prior to trial.  The remaining two defendants (Michael Arnold and Jeffrey Herholz) were convicted of all counts following a four-week jury trial.

The two defendants charged in the UMPS conspiracy (Jeffrey Entel and Dino Antononi) have entered guilty pleas.  As a result, a third trial will not take place.

The Safescripts Online conspiracy (Counts One through Three) is presently set for trial on June 18, 2012.  Of the seven defendants charged in this conspiracy, four have entered guilty pleas (Lamorte, Entel, Herholz and Creque).  Three have elected to proceed to trial (Napoli, Johnson

and Carozza).  Defendants Lamorte, Entel and Creque agreed to cooperate with the United States.

Conspiracy (Count One)

All defendants are charged in Count One.  The elements of conspiracy are: (1) beginning no later than November of 2004, and ending in or about December of 2006, there was an agreement between two or more persons to distribute or possess with intent to distribute Schedule III or IV controlled substances outside the scope of professional practice and not for a legitimate medical purpose, knowing that the distribution or possession with intent to distribute was outside the scope of professional practice and not for a legitimate medical purpose; (2) the defendant knew the agreement had an unlawful object or purpose; and (3) the defendant joined in the agreement with the intent to further its unlawful object or purpose.

Distributing and Possessing With Intent to Distribute a Schedule IV Controlled Substance (Count Two)

All defendants are charged in Count Two.  The elements of distributing and possessing with intent to distribute phentermine, a Schedule IV controlled substance, are: (1) the defendant knowingly delivered phentermine outside the scope of professional practice and not for a legitimate medical purpose; (2) the defendant knew that the delivery was outside the scope of professional practice and not for a legitimate medical purpose; and (3) the defendant knew that it was phentermine or some other controlled substance; (Distribution) OR (1) the defendant knowingly possessed phentermine; (2) the defendant possessed it with the intent to deliver it to another person outside the scope of professional practice and not for a legitimate medical purpose; and (3) the defendant knew that the delivery would be outside the scope of professional practice and not for a legitimate medical purpose. (Possession with intent to Distribute).

Conspiracy to Launder Money (Count Three)

Only defendants Napoli and Johnson are charged in Count Three.[1]  The elements of

---

[1]     Defendant Carozza was initially charged in Count Three; however, the United States has moved to dismiss that Count as to defendant Carozza.

conspiracy to launder money are: (1) there was an agreement to launder money by transporting, transmitting or transferring money or monetary instruments from a place in the United States to a place to or through a place outside the United States or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of the unlawful distribution of controlled substances; (2) the defendant knew the agreement had an unlawful object or purpose; and (3) the defendant joined in the agreement with the intent to further its unlawful object or purpose.

Forfeiture Allegation

A forfeiture allegation is also alleged in the indictment against all defendants.

II.     **STATEMENT OF FACTS**

At trial, the United States expects to prove the following facts through competent witnesses and evidence.

1.      Defendants and Roles

| | |
|---|---|
| **Christopher Napoli** - | owned and operated the Internet pharmacies Pharmacy USA (PSA) and Safescripts Online (SSO or Safescripts) as well as the fulfillment pharmacy Discount U.S. Drugs; |
| **Daniel Johnson** - | created, hosted and maintained the computer hardware and software that constituted PSA's and Safescripts' back end; also owned and operated the affiliate marketing website dietpills.com; |
| Salvatore Lamorte (pled) - | acted as a consultant who found fulfillment pharmacies for Internet pharmacies; worked closely with new fulfillment pharmacies, including Kwic Fill, to train pharmacy staff how to log-in to Internet pharmacy back-ends and efficiently print and fill orders; |
| Steve Paul (deceased) - | owned and operated Security Edge Inc., a business that provided credit card processing services for Safescripts and a number of other online pharmacies; |

| | | |
|---|---|---|
| Jeffrey Entel (pled) - | owned and operated Groupo Call Center in the Dominican Republic as well as several affiliate marketing websites, including bestcyberpills.com, that directed business to PSA and/or Safescripts Online; |
| **Dr. Joseph Carozza** - | primary doctor used to approve drug orders for SSO; |
| Jeffery Herholz (pled) - | owned and operated a fulfillment pharmacy called Kwic Fill that filled orders for Safescripts and numerous other Internet pharmacies; |
| Darrrel Creque (pled) - | pharmacist for Kwic Fill. |

2.    Evidence of Drug Distribution

In November of 2004, Napoli entered into a contract with Kevin Mullin where Mullin agreed to invest in an Internet pharmacy called Pharmacy USA (PSA) that would be run by Napoli.  On April 8, 2005, Napoli registered the domain name pharmacyusameds.com in his own name, and shortly thereafter, PSA began taking orders for Schedule III and IV controlled substances.

Also in April of 2005, Napoli entered into a contract with Dr. Alvin Oscar, whereby Dr. Oscar agreed to review applications and write prescriptions "for clients that Pharmacy USA refers to him."  Oscar was to be paid $5 "per client request whether the prescription is accepted or denied."  In September of 2005, this contract was revised so that Dr. Oscar's compensation was calculated based on the number of "client requests" reviewed per week.  For up to 1749 requests per week, Dr. Oscar would receive $2,000; for 1750-2799, he would receive $3,000; and for 2800-4199, he would receive $4,000.  (It should be noted that for Dr. Oscar to achieve the lowest goal of 1749 prescriptions reviewed in a standard 40-hour work week, he would need to review a prescription every 90 seconds.)  Both of these contracts were signed by Napoli on behalf of PSA.  Although Dr. Oscar was only licensed to practice in New York, he issued prescriptions for customers located throughout the United States, none of whom he ever spoke to, let alone examined.  Moreover, Dr. Oscar's DEA registration was expired during the time that he was writing prescriptions for controlled substances for PSA.

In addition, in April of 2005, Napoli entered into a contract with Dr. John Wilkins to review orders and issue prescriptions for PSA. Dr. Wilkins was paid $5 per order reviewed, and he reviewed approximately 100 questionnaires each day. Like Dr. Oscar, Dr. Wilkins never met with or spoke to any of the customers for whom he wrote prescriptions, and, although he was licensed to practice only in New York, he wrote prescriptions for customers in all 50 states.

Daniel Johnson created and managed the computer software and hardware necessary to run the Internet pharmacy. Napoli's servers were located in the United Kingdom but administered by Johnson from Internet Commerce Corp (ICC) in Illinois. A search warrant was executed at ICC on August 1, 2007 and followed by a subpoena to NTS[2], ICC's parent corporation, for data located on NTS's servers related to Johnson's involvement with Internet pharmacies. In addition to portions of the Internet pharmacy database, agents located e-mails and Skype[3] communications that documented Johnson's day-to-day management of the Safescripts and PSA back ends. Moreover, agents located a written contract that set out the relationship between PSA/Safescripts and Johnson that is signed by both Johnson and Napoli. Witnesses will testify that when they had technical issues regarding PSA or Safescripts, they would contact Johnson to resolve their concerns. E-mail and Skype communications will corroborate their testimony. Johnson also operated the affiliate website dietpills.com that directed traffic to Safescripts Online. Robyn Bloom, a cooperating defendant, will testify regarding Johnson's activity as an SSO affiliate, and her computer records will corroborate her testimony. In addition, bank records for both Napoli and Johnson reflect payments from Napoli to Johnson, both for management services and for commissions earned by dietpills.com.

Salvatore Lamorte acted as a consultant, broker and trainer for illegal Internet pharmacy operations. In this capacity, he facilitated and managed the complex series of relationship

---

[2] NTS is owned by Daniel Johnson's father, Daniel L.R. Johnson. NTS primarily provides tax preparation services but is involved in a number of other technology-related enterprises as well. NTS's non-pharmacy businesses appear to be legitimate.

[3] Skype is a on-line chat and file-transfer service. Depending on user settings, Skype chats can be saved as a file on the user's computer.

required to make an Internet pharmacy work. Lamorte worked with numerous Internet pharmacies, including PSA and Safescripts, to help them obtain fulfillment pharmacies to fill and ship drug orders. For each relationship that Lamorte established and managed, he obtained a fee, usually calculated as $1-$2 per order completed by virtue of the relationship that he had established. So, for example, for each order filled by a fulfillment pharmacy to which Lamorte had referred an Internet pharmacy, Lamorte would receive $2. The pharmacies affiliated with Lamorte typically would ship 1,000-2,000 orders each day. Lamorte had accounts in the United States and abroad into which the proceeds of his illegal activity were deposited by wire transfers from Safescripts and others.

In addition to facilitating the relationship between the Internet and fulfillment pharmacies, Lamorte also recruited small pharmacies to provide fulfillment for Internet pharmacies and worked with people who wanted to start up pharmacies specifically to fill Internet orders. Since these pharmacies would go from filling less than 100 prescriptions per day for walk-in customers to over 1,000 prescriptions per day for Internet customers, or would be starting from scratch, the pharmacy staff needed training on how to work with Internet pharmacies and shippers to fill the large number of orders in an efficient manner. Lamorte trained pharmacy staff, helped to set up equipment, and frequently would spend several weeks at a new pharmacy, or at a pharmacy that was having issues, to trouble-shoot problems and assist pharmacy staff with processing orders. From approximately April of 2004 through January of 2007, Lamorte worked with numerous Internet pharmacies, including Safescripts, and multiple fulfillment pharmacies, including Kwic Fill.

Initially, the largest fulfillment pharmacy for PSA, and many other Internet pharmacies, was Budget Drugs, located in Pennsylvania. On September 12, 2005, Budget Drugs was shut down by the DEA for illegally filling prescriptions that were written based only upon review of an on-line questionnaire. Shortly thereafter, Napoli 's business partner Kevin Mullin informed Napoli that he was terminating his association with PSA because he had become concerned that the business was illegal. Napoli continued to operate PSA, and Lamorte began finding additional pharmacies to fill drug orders placed through Napoli's website. On September 16, 2005, four

1    days after Budget Drugs was shut down, PSA orders began to be filled by United Care Pharmacy

2    (UCP).  UCP had been opened by Tom Russo[4] in Wilmington, North Carolina in July of 2005 for

3    the sole purpose of providing fulfilment for Internet pharmacies.  Records obtained from a search

4    warrant executed at UCP reflect that from September 16, 2005 through October 28, 2005, UCP

5    alone filled 2,643 orders for PSA.  Lamorte received a commission from both UCP and Napoli

6    for each PSA order filled by UCP.

7            On October 8, 2005, DEA investigators visited Dr. Wilkins and informed him that his

8    prescribing practices were illegal.  After the DEA visit, Dr. Wilkins called Napoli to tell him that

9    he had been visited by the DEA, who told him that what he was doing was illegal, and that he

10   was going to stop writing prescriptions for PSA immediately.  On October 27, 2005, DEA

11   investigators also interviewed Dr. Oscar regarding his prescribing practices for PSA and

12   informed him that writing prescriptions for controlled substances based only on a review of an

13   on-line questionnaire was illegal.  Dr. Oscar similarly informed Napoli that he would no longer

14   authorize prescriptions for PSA because of the DEA's visit.[5]

15           On November 7, 2005, Napoli sent a message to all of the affiliates who had been

16   working with PSA, informing them that he was terminating PSA's operations "to look for a new

17   model for this industry."  However, on November 8, 2005, Napoli registered the domain name

18   safescriptsonline.com, and by November 10, 2005, he had re-started his Internet pharmacy

19   operation under the name Safescripts Online or SSO.  E-mail and Skype communications

20   between Johnson and Napoli document the transfer of operations between PSA and SSO and

21   confirm that the only thing Johnson did to transform PSA into SSO was change the name on the

22   web pages.  These communications also reveal Napoli's awareness of the illegality of his

23   business.  For example, in a December 16, 2005, exchange in which Johnson asked Napoli what

24   he wanted for Christmas, Napoli responded: "The DEA off my back and for this business to run

25

26           [4]  Russo was indicted in this district in 2005, pled guilty pursuant to a cooperation

27   agreement, and was sentenced to one year in prison.

28           [5]  Approximately one year later, in November of 2006, Dr. Oscar committed suicide.

for 12 more months."

Around this time, Napoli recruited Dr. Joseph Carozza to replace Drs. Oscar and Wilkins, who had both terminated their association with Napoli after being told by the DEA that what they were doing was illegal. As with Drs. Wilkins and Oscar, Dr. Carozza was licensed to practice only in New York; however, he approved orders for customers in all 50 states from his home in New Jersey or a location in Connecticut. Dr. Carozza did not see or even speak to any of the customers for whom he approved drug orders. In an interview with the DEA, Carozza admitted that he spent only a few seconds reviewing each order, that he never met any of the drug customers, and that he was not licensed to practice in the states where the customers resided. That Carozza did not exercise any medical judgment when approving prescriptions for Safescripts is highlighted by the fact that when orders became backed up in the doctor's queue, Napoli asked Johnson to log in as Carozza and approve orders as if he were the doctor in order to clear the backlog.

Also in December of 2005, Napoli hired Robyn Bloom, who had been a PSA affiliate, to act as the affiliate manager for Safescripts Online. Bloom recruited individuals to act as affiliate marketers for SSO, calculated affiliate commissions, answered affiliate questions, and facilitated communications between the affiliates and Napoli and Johnson. Bloom has entered into a plea agreement in which she has pled guilty to conspiracy to distribute Schedule III and IV controlled substances; she has agreed to cooperate with the United States. Bloom has turned over to the DEA the computer that she used while she was affiliate manager for SSO. Her computer contains records of her e-mail and Skype communications with Napoli and Johnson regarding the day-to-day operations of SSO. Those communications document Napoli's control over the business and Johnson's role as both the manager of the back-end software and hardware and as an affiliate marketer through his website dietpills.com. Bloom will testify at trial as to how Safescripts Online operated and the roles of Napoli and Johnson in that business.

Bloom's records also document Jeffrey Entel's involvement as an affiliate marketer for SSO using the website bestcyberpills.com. In addition to the website, Entel operated a call center in the Dominican Republic called Grupo Call Center. Entel's operators would contact potential

1   customers and then fill out the SSO online order form with the information the customers gave

2   them over the telephone.  The records on Bloom's computer document Entel's relationship with

3   SSO.  In addition, Napoli's bank account records reflect wire transfers to Entel as payment for

4   his services as an affiliate.  Entel has entered into a cooperation agreement and will testify at

5   trial.

6          In January of 2006, Jeffrey Herholz opened Kwic Fill in Fayetteville, North Carolina.

7   Kwic Fill was funded by Tom Russo and modeled its operations after UCP.  UCP's pharmacy

8   manager Brandon Winstead went to Kwic Fill to help set up operations, and some of the

9   employees who worked at UCP helping to fill pill bottles and ship drugs also worked at Kwic

10  Fill.  Winstead set up the computer system at Kwic Fill and established a Skype account for

11  Herholz, which Herholz used to communicate with Russo and Lamorte.   Kwic Fill began filling

12  orders for Safescripts, and, when UCP was shut down by the North Carolina Board of Pharmacy

13  on March 8, 2006, for illegally filling Internet drug orders, all of the Internet pharmacies' orders

14  were transferred from UCP to Kwic Fill.  As the owner and operator of the pharmacy, Herholz

15  was in charge of its daily operations.  Herholz placed orders with, and arranged for payment of

16  drug wholesalers for, the pills that were distributed by Kwic Fill.  Herholz was at the pharmacy

17  every day and provided the employees with instructions on how to perform their jobs.  Herholz

18  was initially concerned about "staying under the DEA radar" by not shipping too many drugs, but

19  later Herholz wanted to ship as many drugs as possible so that he could increase the amount of

20  money he was making.

21         Darrell Creque was hired by Herholz to be the sole pharmacist for Kwic Fill, starting in

22  February of 2006.  In January of 2006, the North Carolina Board of Pharmacy sent a letter to all

23  pharmacists registered in the state informing them that filling orders for controlled substances

24  based on completion of an on-line questionnaire without a face-to-face examination by a

25  physician was illegal under North Carolina law and that pharmacists should not fill drug orders

26  based on such prescriptions.  A copy of this letter was found at Kwic Fill.  Creque was at the

27  pharmacy every day, but he only spot-checked the prescriptions and drug orders, as there were

28  too many for him to review each one.  Moreover, Kwic Fill employees, with the knowledge of

Herholz and Creque, filled drug orders when neither Creque, nor any other pharmacist, was present. A file found at the pharmacy documents the large number of complaints from customers who received the wrong type or quantity of drugs, received drugs they did not order, or were charged for drugs they never received. Kwic Fill was shut down by the DEA and North Carolina Board of Pharmacy on April 5, 2006, for illegally filling Internet drug orders. When speaking with investigators, Herholz stated that Kwic Fill began by filling 800-1,800 prescriptions per day and recently had been averaging about 3,500-4,000 prescriptions per day. Herholz admitted that the majority of the prescriptions were for the controlled substance phentermine. Creque told investigators that Herholz had set up the pharmacy and took care of the day-to-day management of the business, such as ordering drugs, printing drug orders, and all other business duties. Creque further stated that Herholz was the person who would download orders from the computer each day.

In spite of the fact that three of the pharmacies that had been filling orders for him were shut down by law enforcement, two doctors had been visited by the DEA and told that what they were doing was illegal, and his business partner had quit over concerns about the business's legality, Napoli continued to operate Safescripts Online, finding fulfillment for his drug orders from other pharmacies.

In April of 2006, Steve Paul arranged for Napoli to process credit card transactions with RxPayments. Credit card processing was difficult for Internet pharmacies to obtain because in 2004, Master Card stopped accepting Internet pharmacies as merchants unless they were VIPPS certified.[6] Visa followed shortly thereafter; however, because Visa was more decentralized than Master Card, there were rogue banks (such as ICC/CAL in Israel, the acquiring bank for RxPayments) that continued to process Internet pharmacy drug orders for a fee that was substantially higher than the typical merchant processing fee. As reflected in e-mails between

---

[6] VIPPS stands for Verified Internet Pharmacy Practice Sites. In 1999, the National Board of Pharmacies (NABP) established standards for pharmacies to follow when dealing with prescriptions transmitted over the Internet. Pharmacies that follow these practices are listed on the NABP VIPPS website. Walgreens, CVS, Aetna, and drugstore.com are among the approximately 15 pharmacies that are VIPPS certified.

1   Paul and employees at various banks, Paul was aware that most banks, with a very few

2   exceptions, viewed Internet pharmacies as illegal businesses and refused to process for them

3   unless they were VIPPS certified.

4        Because Napoli was having trouble finding fulfillment for his Internet pharmacy orders

5   (this was a perennial problem for Internet pharmacies, as legitimate pharmacies would not violate

6   the law by filling orders placed by Internet pharmacies), he decided to purchase a pharmacy for

7   himself.  In May of 2006, Napoli used Christopher ("Kit") Latham as an intermediary to purchase

8   Discount U.S. Drugs from Hoang Mach and Howard Smith.  Smith and Mach had been operating

9   the pharmacy as a traditional retail establishment since 2004.  During this time, the pharmacy

10  filled approximately 30-35 prescriptions each day for walk-in customers.

11       Initially, Napoli requested that the purchase be completed in August of 2006, but that the

12  pharmacy begin to fill Internet orders in May.  Napoli, through Latham, offered Mach and Smith

13  $10,000 if they would allow Latham to begin operating the pharmacy prior to the final sale in

14  August, using Mach and Smith's existing DEA license.  When Napoli's business model was

15  explained to them, Smith and Mach stated that they did not want to have any part in it because

16  they thought it was illegal.  Instead, they sold the pharmacy to Latham (as the straw purchaser for

17  Napoli) on May 8, 2006.  Discount U.S. Drugs began filling Napoli's Internet drug orders on

18  May 12, 2006.

19       Napoli hired Brandon Winstead, who had been the pharmacy manager at UCP and Kwic

20  Fill, to run day-to-day operations at Discount U.S. Drugs.  Although the pharmacy was purchased

21  in Latham's name, Napoli was the true owner and operator of Discount U.S. Drugs.  Napoli gave

22  Winstead directions regarding what drugs to purchase for the pharmacy and supplied the money

23  to purchase those drugs.  Bank records for Napoli's accounts show wire transfers from Napoli to

24  Winstead during the time that Winstead worked at Discount U.S. Drugs.  Napoli told Winstead

25  to keep the orders from Discount U.S. Drugs to under 1,000 per day to keep the DEA from

26  looking at the pharmacy.  Napoli told Winstead that the reason he used Latham to purchase the

27  pharmacy was because Napoli had filed a law suit against the DEA to have his business model

28  declared legal and it would not "look good" if he owned a pharmacy while the law suit was

1  pending.

2      During the two months that it was in operation, Discount U.S. Drugs filled thousands of

3  orders for Schedule III and IV controlled substances.  All of these drugs were ordered through

4  Napoli's Internet pharmacy Safescripts Online and were approved by Dr. Carozza.   Discount

5  U.S. Drugs was shut down by the DEA in July of 2006 for illegally filling Internet pharmacy

6  orders.

7      After Discount U.S. Drugs was shut down, the DEA interviewed Dr. Carozza regarding

8  the thousands of prescriptions they had found at Discount U.S. Drugs bearing his name.  During

9  the interview, the agents informed Carozza that his prescribing practices were illegal; however,

10  Napoli continued to operate SSO, with Carozza approving prescriptions for controlled

11  substances.   Napoli found a new fulfillment pharmacy - Woodbury Pharmacy in Highland Mills,

12  NY.  Napoli continued to ship orders from Woodbury until that pharmacy was also shut down by

13  the New York State Board of Pharmacy on September 6, 2006.  Napoli then used two pharmacies

14  - Mail Meds and Sain Solutions - that had been started by Salvatore Lamorte, until those

15  pharmacies were shut down in October of 2006.  On July 17, 2006, David Glass, the owner of the

16  Internet pharmacy Affpower who was cooperating with the DEA, recorded a conversation with

17  Lamorte during which the two discussed the fact that Lamorte had arranged for Mail Meds and

18  Sain Solutions to fulfill orders for Napoli's pharmacy and that each of these pharmacies was

19  shipping 2,500 orders of controlled substances each day.  Napoli finally ceased operations in

20  December of 2006.

21      When a seizure warrant was executed on Lamorte's assets in January of 2007, Lamorte

22  agreed to speak with DEA agents.  Lamorte admitted that he had been acting as a consultant for

23  Internet pharmacies since approximately 2004, finding fulfillment pharmacies and receiving a

24  commission from the relationships that he formed.  Lamorte further admitted to working with

25  Budget Drugs, UCP, Kwic Fill, Sain Solutions, Mail Meds and Alpha fulfillment pharmacies and

26

27

28

with Safescripts, Pitcairn, and Affpower[2] online pharmacies. Lamorte stated that Napoli owned Safescripts but that Johnson was the day-to-day manager of the back end. Lamorte also admitted that in January of 2006, he reviewed a publication on the DEA's website stating that it was illegal for a doctor to issue a prescription for a controlled substance without meeting the patient face-to-face. Lamorte further admitted that he knew that the fulfillment pharmacies he was working with stated on their pharmacy license applications that they were "mail order" pharmacies because if they stated that they were filling Internet orders, the licences would have been denied. Finally, Lamorte admitted that beginning in 2005, he and his wife sometimes logged in to Internet pharmacy backends and approved orders as if they were doctors. They did this to earn the extra money that came from approving orders as if they were doctors. Lamorte stated that Napoli and Johnson asked him to review orders for Safescripts Online as if he were a doctor and that he did so. After Safescripts shut down in December of 2006, Lamorte continued to work with Johnson when Johnson began leasing the Safescripts Online Internet pharmacy software to other Internet pharmacy owners. Johnson continued to operate dietpills.com as a marketing affiliate website that referred customers to the other Internet pharmacies. Lamorte assisted Johnson with finding pharmacies for these other Internet pharmacies. Lamorte also approved orders for Johnson as if he were a doctor. Johnson continued his involvement with Internet pharmacies until at least August of 2007, when the DEA executed a search warrant at ICC, the business from which he managed the Internet pharmacy software.

During the two years that it operated, SSO was well managed and well run. As a result, it was one of the most successful Internet pharmacies in the country, distributing millions of doses of Schedule III and IV substances and earning at least $22 million in revenues.

        3.    <u>Evidence that Distribution was Outside the Usual Course of Professional Practice and Not for a Valid Medical Purpose</u>.

Napoli's Internet pharmacy exhibited all of the factors outlined in *United States v. Moore*,

---

[2] The owners and operators of Affpower were successfully prosecuted in the Southern District of California.

423 U.S. 122 (1975), and *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006), indicating that drugs were distributed outside the scope of professional medical practice and not for a valid medical purpose.

| *Moore/Feingold* Factor | Safescripts Online Conspiracy |
|---|---|
| doctor gave inadequate physical examinations or none at all | no examinations given |
| doctor ignored the results of any tests he did make | no tests given |
| doctor did not give drugs or prescriptions at a clinic or hospital | no clinic, hospital or office visit |
| doctor took no precautions against misuse or diversion of the drugs | no precautions against misuse or diversion |
| doctor did not regulate the dosage at all, prescribing as much and as frequently as the patient demanded | customer given the type and quantity of drugs ordered from the webiste; no mechanism for doctor to change type or quantity of drug |
| doctor did not charge for medical services rendered but based his fee on the number of pills or prescriptions issued | doctor paid based on number of orders reviewed |
| doctor failed to record the basis for prescribing drugs in patient medical records | no medical records kept |

In fact, this case is more egregious than those presented by *Moore* and *Feingold* because in this case, not only did the doctors perform no physical examination, they never even saw or spoke to the patients for whom they were prescribing controlled substances and were not licensed to practice in the states where the patients resided.

Evidence will be presented at trial that the drugs ordered from PSA/SSO were not prescribed for a legitimate medical purpose, but were diverted to drug addicts who were abusing the controlled substances that they were ordering from Napoli's website, including:

• The February 2006 shipment of lorazepam to Sarah Hobbs-Phillips in Virginia. Ms. Phillips was referred to the DEA by a pharmacist who was concerned that Hobbs-Phillips was addicted to lorazepam and clonazepam that she was purchasing over the Internet.

• A February 2006 phentermine shipment to Nancy Bradley in Louisiana that was approved by Dr. Carozza after Bradley placed an order with safescriptsonline.

The drugs were shipped from Discount U.S. Drugs.  When a controlled delivery of the package was made to Bradley, the agents noted that Bradley was not overweight and had no medical need for phentermine.

• August 22 and September 8, 2006, DEA agents in Pittsburgh, Pennsylvania made undercover purchases of phentermine from safescriptsonline. The phentermine was purportedly prescribed by Dr. Carozza and shipped by Mail Meds, a pharmacy referred to Napoli by Lamorte.  The agents completed the questionnaire with false information and had no medical need for the drugs.

• Recovery of a bottle of alprazolam (Xanax) from the purse of Sara Volpe following a car accident in which she killed her 6-year-old daughter.  Witnesses stated that Volpe was clearly under the influence of alcohol or drugs when the accident occurred, and Volpe's husband stated that she was addicted to Xanax. The pill bottle found in the car and SSO database records indicate that the alprazolam was purchased through Safescripts, filled by Creque at Herholz's pharmacy Kwic Fill, and authorized by Carozza.

4.   <u>Evidence that Defendants Knew the Distribution was Outside the Usual Course of Professional Practice and Not for a Valid Medical Purpose.</u>

Although it is not necessary to prove that the defendants knew what they were doing was illegal, the United States must prove that the defendants knew that controlled substances were being distributed under the auspices of invalid prescriptions.  The most damning evidence of guilty knowledge is the public closure by law enforcement of the fulfillment pharmacies that supplied drugs to the defendants, and the general publicity surrounding the illegality of the industry.  In addition, it was difficult to find doctors, pharmacies and credit card processors that would do business with Internet pharmacies because of widespread knowledge that the means by which Internet pharmacies did business were illegal.  For example, beginning in 2004, Master Card refused to do business with Internet pharmacies that did not have the National Board of Pharmacies' VIPPS certification (only reputable pharmacies such as Walgreens and CVS are VIPPS certified).  Similarly, Visa in the United States refused to have these customers as

accounts, forcing all credit card processing to be done "off shore" in countries where Visa's policies were less strictly enforced.  In addition to these general facts, evidence establishing the guilty knowledge of each defendant is outlined below:

**Christopher Napoli**

- When Budget Drugs, one of PSA's primary fulfillment pharmacies, was shut down in September of 2005, Napoli's business partner Kevin Mullin withdrew from the business over fears that PSA was illegal.  Drs. Oscar and Wilkins informed Napoli that they would no longer issue prescriptions for him because the DEA had told them that what they were doing was illegal.  In response, Napoli shut down PSA claiming that he was seeking a new business model; however, days later, he reopened as Safescripts Online, without changing anything other than the name of his Internet pharmacy.

- When Napoli decided to purchase his own fulfillment pharmacy, Discount U.S. Drugs, he did not do it in his own name but used Kit Latham as a nominee. Latham and Brian Winstead (Napoli's pharmacy manager) will testify that Napoli told them that this was because Napoli was filing a law suit and it would not "look good" if he owned a pharmacy.

- Successive closure of each fulfillment pharmacy that provided drugs for PSA and Safescripts, starting with Budget Drugs in September of 2005, UCP in March of 2006, Kwic Fill in April of 2006, and continuing through each pharmacy used by Napoli.

- DEA's closure of Napoli's own pharmacy, Discount U.S. Drugs, for filling drugs illegally over the Internet without a valid prescription.

- Skype conversations with Lamorte, Johnson and Bloom in which Napoli complained about the increasing difficulty of finding fulfillment pharmacies and the increasingly high prices charged by the pharmacies for fill fees because of the widely publicized closures by the DEA and boards of pharmacies.

- Napoli requested that Johnson login as if he were Dr. Carozza and clear the

1   backlog in orders that were waiting for physician approval.

2   •   Napoli made similar requests of Salvatore Lamorte - that Lamorte login as a

3   doctor to approve orders as if he were a physician.

4   •   Napoli was aware that the actual doctors who were reviewing orders spent no

5   more than 2-4 seconds reviewing each order.  In fact, he set up the payment

6   mechanism to reward doctors for approving more orders.  Eventually, Napoli

7   relied on Johnson and Lamorte to clear the backlog of orders by approving orders

8   themselves when the doctors could not, or would not, do it fast enough.

9   **Daniel Johnson**

10   •   Johnson's Skype communications and e-mails reflect his knowledge that

11   fulfillment pharmacies used by PSA and SSO were shut down by the DEA and

12   that persons involved with other online pharmacies were charged with drug

13   trafficking as a result of their participation in the pharmacies.

14   •   Johnson was aware that doctors spent no more than a few seconds reviewing each

15   order and that PSA/SSO's payment system was set up to encourage doctors to

16   review as many orders as possible in a single day.

17   •   Johnson had Skype conversations with Lamorte in which the two discussed that

18   DEA was the biggest risk for Internet pharmacies because they required a face-to-

19   face visit with the doctor in order to establish a valid physician-patient

20   relationship for the issuance of controlled substance prescriptions.

21   •   Napoli requested that Johnson login as a physician and approve orders that were

22   waiting in the physician queue.

23   •   After Napoli finally closed down Safescripts Online in December of 2006,

24   Johnson began to administer the databases and software for Internet pharmacies

25   run by others.  Lamorte, with Johnson's knowledge, logged in as a doctor and

26   approved orders for the Internet pharmacies that Johnson was managing.

27   **Joseph Carozza**

28   •   Carozza was aware that he was not licensed to practice medicine in the states

where most of his "patients" resided.

- • Carozza knew that he was not conducting any medical review of the customers and that there was no way to confirm whether the information he was provided was accurate.

- • When interviewed by the DEA regarding his approval of thousands of prescriptions found at Discount U.S. Drugs, Carozza admitted that he spent only a few seconds reviewing each questionnaire and that he would review questionnaires wherever he happened to have his laptop - including while waiting to have his car repaired.

5.    Count Two - Distribution on February 24, 2006

An undercover purchase was made by San Jose Police Department (SJPD) officers on or about February 24, 2006 from www.safescripts.online.com.  An officer ordered 30 pills of phentermine by filling out an online questionnaire.  A few days later, the officer received a shipment from Kwic Fill, the pharmacy owned by Jeffrey Herholz, that contained a pill bottle stating that the prescription had been issued by Dr. Carozza and filled by Darryl Creque.  The bottle contained 60 phentermine pills, although the "prescription" and description on the bottle stated that it should only contain 30 pills.  The officer recorded the web transaction on video and preserved the e-mails received from safescriptsonline during the processing of the order.  The information provided by the officer on the online questionnaire was completely fabricated and false.  Visa records for the undercover purchase indicate that on February 24, 2006, Visa processed a transaction on the SJPD officers' undercover credit card through an acquiring bank located in St. Kitts & Nevis for a merchant account bearing the descriptor "IP-www.pharmacyusameds.com."

6.    Count Three - Money Laundering Conspiracy

Beginning in April of 2006, Napoli entered into a contract with Steve Paul by which RxPayments, an Israeli company, provided credit card processing services for Safescripts. Customers (living in the Northern District of California and elsewhere) provided their credit card information to Safescripts, who in turn provided that information, as well as the amount of the

1  charge, to RxPayments.  Daniel Johnson implemented and managed the computer systems that

2  performed this process.  RxPayments then provided the information to its acquiring bank,

3  ICC/CAL, which is located in Israel.   ICC/CAL provided the information to VISA.  VISA

4  communicated this information to the bank that issued the customer's credit card.  The issuing

5  bank debited the customer's credit card account in the United States, and ICC/CAL credited the

6  RxPayments account in the amount of the transaction, effectively transferring the money from

7  the customer's credit card bank in the U.S. to RxPayments's account at ICC/CAL in Israel.

8  RxPayments aggregated the credit card payments and transferred them from ICC/CAL in Israel to

9  Christopher Napoli's Commerce Bank account in Pennsylvania.

10       Napoli then transferred funds from this account to Kwic Fill, Inc., run by Jeffrey Herholz,

11  to pay for the drugs shipped to the customers, as well as to Joseph Carozza, as payment for

12  approving the drug orders, Daniel Johnson, as payment for technical support for Safescripts,

13  Jeffrey Entel (in the Dominican Republic), as payment for his services as an affiliate marketer,

14  and Salvatore Lamorte, as payment for his consulting services.



The transfer of funds from the customers' banks in the United States to ICC/CAL in Israel, as well as the transfer of funds from ICC/CAL in Israel to Napoli's bank in the United States, constitute the movement of funds out of and into the United States from another country. The use of those funds to pay for the drugs shipped to the customer, as well as to pay the doctor, marketers and technical support staff, all promoted Napoli's illegal drug trafficking business. Venue to charge the conspiracy in the Northern District of California exists because some of the customers who made the purchases that initiated the transfer of funds from U.S. banks to ICC/CAL in Israel were located in this district.

       7.   <u>Forfeiture</u>

On January 11, 2007, DEA agents executed seizure warrants for a 1997 Lamborghini Diablo, a 2006 Porsche Cayenne Turbo, and approximately $1.5 million in cash from various accounts owned by PSA LLC, Pharmacy USA LLC, Christopher Napoli, and ZZR Enterprises. All of these assets were traced to money Napoli obtained from customers who purchased drugs through PSA or Safescripts Online. Napoli maintained multiple business and personal accounts in various names and transferred funds between these accounts. In addition, from August of 2005 through May of 2006, Napoli placed approximately $500,000 in proceeds from PSA and SSO with the Asset Protection Group (APG), a Las Vegas-based business that claimed to provide services relating to the concealment and protection of assets. APG was placed into receivership by the Federal Trade Commission (FTC) in June of 2006. According to records obtained from the FTC, approximately $200,000 of Napoli's investment with APG was paid to Lines Overseas Management, a passthrough account. The funds were then transferred to accounts in at least five other countries. Agents have been unable to trace the final disposition of these proceeds.

Also on January 11, 2007, DEA agents executed seizure warrants for a 2006 Maserati Auattroport and over $800,000 in cash located in various accounts owned by Salvatore Lamorte. In addition, Lamorte has repatriated over $900,000 in funds that he had deposited in an account in Turks & Caicos. All of these assets were traced to money Lamorte obtained from various Internet and fulfillment pharmacies.

///

8.      Potential Advice of Counsel Defense

In July of 2006, Napoli and Carozza filed suit in the Eastern District of Pennsylvania seeking to have the business model of Pharmacy USA (PSA) declared legal and to enjoin the DEA from "harassing" Napoli and his business.  The district court dismissed the suit without prejudice as not ripe in November of 2006.  Napoli filed an amended complaint in January of 2007, after the DEA seized money in several of his bank accounts and his Lamborghini and Porsche.  The district court dismissed that suit in April of 2007 for lack of standing and failure to state a justiciable case or controversy.  The district court's rulings were upheld by the Third Circuit on appeal in March of 2008.

Napoli may seek to introduce evidence of these proceedings under either an advice of counsel theory (*i.e.* that his lawyer advised him that his business practices were legal and even tried to get a court to confirm this advice) or to argue in some fashion that he tried to comply with the law.  However, Napoli's disingenuousness in his court filings actually demonstrates his consciousness of guilt, rather than the reverse.  In his July 2006 complaint, Napoli asserted that he was seeking a declaration in advance of setting up an Internet pharmacy business.  In fact, Napoli had operated PSA for seven months (April through November 2005) and Safescripts Online for eight months (November 2005 through July 2006) before filing the suit.  Moreover, Napoli continued to operate Safescripts Online until the first law suit was dismissed in November of 2006.   Nevertheless, the July 2006 law suit that was filed on behalf of PSA represented that PSA was a planned business, with no mention of the fact that it had actually operated for seven months or that its name had been changed to SSO, which was an on-going Internet pharmacy operation.  As the district court pointed out in one of its opinions, if Napoli truly thought that what he was doing was legal, there would have been no need to seek a declaration from the district court.  Moreover, by hiding the fact that he was continuing to operate the Internet pharmacy under a different name, Napoli attempted to obtain a favorable judgment from the court while hiding his on-going illegal conduct in the event that the law suit failed.  In addition, Napoli did not accurately describe his Internet pharmacy operation in the civil

complaints, further indicating that he was aware that what he was actually doing was illegal.[3]

These facts also demonstrate that any advice of counsel defense is unlikely to succeed. Napoli either failed to inform his lawyer of the true state of affairs, or his lawyer was complicit in attempting to mislead the civil court in an effort to obtain a favorable ruling.  If the lawyer told Napoli that it was necessary to misrepresent facts in order to win a favorable judgment, it is unlikely that Napoli will be able to successfully argue that his lawyer advised him that the course of conduct he actually pursued (as opposed to the one claimed in the civil court papers) was lawful.

Defendants Johnson and Carozza have also indicated their intention to assert an advice of counsel defense based on the advice given by Napoli's lawyer Joe Green.  However, because Green did not represent Johnson or Carozza, and did not give them any advice, they will not be able to rely on Green's advice to Napoli as a potential defense.  *United States v. Munoz*, 233 F.3d 1117, 1132 (9th Cir. 1990), *superseded by statute on other grounds*, 18 U.S.C. §1341, U.S.S.G. § 2B1.1.

Defendant Johnson has also stated that he will seek to rely on the advice of two lawyers who did represent him - John Bagley and Michael Costa.  Michael Costa advised Johnson to pursue a course of action that he did not take.  Therefore, it is unlikely that he will be able to successfully assert a defense based on Mr. Costa's advice.  Defendant Johnson received advice from a third lawyer - Robert Tarun - who advised him to cease his involvement with Internet pharmacies.  Johnson also ignored this advice.

## III.   EVIDENTIARY ISSUES

The United States has raised potential evidentiary issues in its motions in limine.

///

///

///

---

[3]  In an amended complaint filed after the DEA seized his assets, Napoli admitted that PSA had been in operation for over one year; however, by this point, the DEA was obviously aware of Napoli's connection to PSA and Safescripts Online.

## IV.   STATEMENT PURSUANT TO CRIMINAL LOCAL RULE 17–1–1(b)

### 1.      Disclosure Of Jencks Act Material

The United States believes that it has produced or provided the defense access to all Jencks Act material in its possession, with the exception of Grand Jury testimony.  As the United States continues to review evidence and interview witnesses, attorneys for the United States will produce or provide access to any additional Jencks Act material of which we become aware.

### 2.      Disclosure Of Grand Jury Testimony

The United States will produce transcripts of Grand Jury testimony for any witnesses it intends to call at trial pursuant to an appropriate court order.  The United States will make an oral motion for disclosure at the pretrial conference.  Assuming that the Court grants the United States' request, the United States will provide all relevant Grand Jury testimony.  *See* Fed.R.Crim. Pro. 6(e)(3)(E)(I); 26.2(f).

### 3.      Disclosure of Exculpatory Information

The United States believes that it has produced or provided access to all exculpatory information to the defense that is currently in its possession.  The United States will provide additional information by letter to the defense.  The United States recognizes its ongoing obligation to provide the defendants with any exculpatory material in its possession and will continue to provide copies or access to such material.  The United States has offered the defense the opportunity to examine the physical evidence in its possession.

### 4.      Stipulations Of Fact

The United States will meet and confer with defense counsel to discuss possible stipulations of fact.

### 5.      Appointment Of Interpreters

The United States does not anticipate that any of its witnesses will need the services of an interpreter.  If the United States becomes aware during trial preparation that any witness will need the services of an interpreter, the United States will make the necessary arrangements and will inform the Court.

///

### 6.     *Dismissal of Counts, Elimination Of Issues*

The United States has moved to dismiss Count Three as to defendant Carozza.

### 7.     *Joinder Pursuant to Rule 13*

The Court has resolved all joinder issues.

### 8.     *Identification of Informants, Use of Line-ups, Evidence of Prior Convictions of the Defendant, etc.*

If defendant Johnson elects to testify at trial, the United States will use his prior conviction to impeach his credibility pursuant to Federal Rule of Evidence 609(a)(1).

### 9.     *Witnesses To Be Called At Trial*

*See* United States' Witness List.  The United States reserves the right to amend this list as trial approaches.

The United States intends to call one witness, Special Agent Brandon Bridgers, to testify as both a fact witness and expert witness.  The United States proposes that Special Agent Bridgers be permitted to testify at two different times during the trial - once in his capacity as an expert and once in his capacity as a fact witness, so that there is a clear separation between the two forms of testimony and the risk that the jury will confuse the two types of testimony will be minimized.

### 10.    *Pretrial Exchange of Exhibits and Diagrams*

*See* United States' Exhibit List.  The United States reserves the right to amend this list as trial approaches.

### 11.    *Objections To Exhibits Or Testimony To Be Offered At Trial*

On April 30, 2012, counsel for defendant Carozza notified the United States that he might seek to qualify Mr. Rick Albee as a computer forensics expert to testify regarding certain aspects of the Safescripts Online back end.  After a meet-and-confer, counsel for defendant Carozza has since informed the government that he does not currently intend to call Mr. Albee.  The government is therefore not filing a motion in limine regarding the previously-noticed expert testimony.  Counsel for defendant Carozza and the government have agreed that if defendant Carozza decides to call Mr. Albee, the government will have 48 hours' notice and time to file a

motion in limine concerning the proposed expert testimony.

In addition, defendant Carozza served a subpoena on DEA Deputy Assistant Administrator Rannazzisi who has no personal knowledge of the events underlying the charges in the indictment. The United States will be moving to quash this subpoena on behalf of the DEA.

The defense has not provided any discovery to the United States, other than that pertaining to Mr. Albee discussed above; therefore, the United States is unable to present its objections in advance of trial to any evidence that the defendants may seek to offer. The United States requests that the Court order the defense to produce copies of any exhibits that it intends to introduce immediately, as well as to provide the United States with a list of potential witnesses, so that the United States may raise any objections prior to trial, thereby avoiding any unnecessary delay in the proceedings.

### 12. Trial Briefs

*See* discussion above.

### 13. Scheduling of Trial and Witnesses

The parties will meet and confer regarding the trial schedule and order of witnesses. The United States agrees to provide the defense with a list of the witnesses it intends to call on a particular day, twenty-four hours in advance, provided that the defense agrees to do the same.

### 14. Voir Dire

The United States has submitted its response to the defendants' objections to the proposed juror questionnaire.

### 15. Other Matters

The indictment includes a forfeiture allegation against both defendants. In the event that either defendant is convicted of one or more of the crimes in the indictment, the

///

///

///

///

///

issue of forfeiture will need to be submitted to the jury, or to the Court if the defendants do not request a jury on this issue.


DATED: May 25, 2012                    Respectfully Submitted,


                                       MELINDA HAAG
                                       United States Attorney

                                                /s


                                       _____
                                       KIRSTIN M. AULT
                                       TRACIE BROWN
                                       Assistant United States Attorneys