Volume 4

Pages 698 – 974

United States District Court

Northern District Of California

Before The Honorable Charles R. Breyer

United States of America,       )
                                )
            Plaintiff,          )
                                )
   vs.                          )          NO. CR 10-0642 CRB
                                )
Joseph Carozza, Christopher )
Napoli, and Daniel Johnson, )
                                )          **JURY TRIAL**
            Defendants.         )
_____)

San Francisco, California
Thursday, October 4, 2012

**Reporter's Transcript of Proceedings**

**Appearances:**

For Plaintiff:          Melinda Haag
                        United States Attorney
                        450 Golden Gate Avenue, Box 36055
                        San Francisco, California  94102
                    By: **Kirstin M. Ault, Esquire**
                        **Tracie L. Brown, Esquire**
                        **Assistant United States Attorneys**

For Defendant:
Christopher Napoli:     Sugarman & Cannon
                        44 Montgomery Street, Suite 2080
                        San Francisco, California  94104
                    By: **Christopher J. Cannon, Esquire**
                        **Bonnie Chan, Esquire**

(Appearances continued on next page.)

**Reported By:**          ***Sahar Bartlett, RPR, CSR 12963***
                        ***Official Reporter, U.S. District Court***
                        ***for the Northern District of California***

(Computerized Transcription by Eclipse)

```
 1   Appearances (continued):

 2   For Defendant
     Daniel Johnson:          Law Offices of Martin A. Sabelli
 3                            149 Natoma Street, Suite 300
                              San Francisco, California  94105
 4                       By:  Martin Antonio Sabelli, Esquire
                              David W. Fermino, Esquire
 5
     For Defendant
 6   Joseph Carozza:          Clarence Dyer & Cohen, LLP
                              899 Ellis Street
 7                            San Francisco, California  94109
                         By:  Josh Alan Cohen, Esquire
 8                            Nicole Howell Neubert, Esquire

 9   Also Present:            Jason Chin
                              Brandon Bridgers
10                            Government's DEA Special Agents

11                            Denise Oki
                              Technical Support for the Government
12
                              Kevin Morley
13                            Technical Support for the Defense

14

15

16                       ---o0o---

17

18

19

20

21

22

23

24

25
```

<u>**I N D E X**</u>

**Page**

**Plaintiff's Witnesses:**

**McCance-Katz**
**(Previously sworn)**

Cross-Examination, (continued) by Mr. Cohen         703
Cross-Examination by Mr. Cannon                     715
Cross-Examination by Mr. Sabelli                    719
Redirect Examination by Ms. Ault                    723
Recross-Examination by Mr. Cohen                    740
Recross-Examination by Mr. Cannon                   740

**Benjamin, Anat**
**(Sworn)**

Direct Examination by Ms. Ault                      742
Cross-Examination by Mr. Cannon                     761

**Thomson, Kenneth**
**(Sworn)**

Direct Examination by Ms. Ault                      767
Cross-Examination by Mr. Cannon                     789
Redirect Examination by Ms. Ault                    796
Recross-Examination by Mr. Cannon                   799

**Catizone, Carmine**
**(Sworn)**

Direct Examination by Ms. Brown                     801
Cross-Examination by Mr. Cannon                     849
Cross-Examination by Ms. Howell Neubert             889
Cross-Examination by Mr. Sabelli                    908
Redirect Examination by Ms. Brown                   923
Recross-Examination by Mr. Sabelli                  929
Further Redirect Examination by Ms. Brown           931
Further Recross Examination by Mr. Sabelli          932
Further Redirect Examination by Ms. Brown           935
Further Recross Examination by Mr. Sabelli          938
Further Redirect Examination by Ms. Brown           941

---o0o---

**E X H I B I T S**

| Plaintiff's Exhibits: | W/Drawn | Iden. | Evid. |
|---|---|---|---|
| 583 | | | 747 |
| 583A | | | 750 |

| Defendant's Exhibits: | W/Drawn | Iden. | Evid. |
|---|---|---|---|
| 3003 | | 793 | 793 |

---o0o---

1    **Thursday**, **October** **4**, **2012**                                    **9:10 a.m.**

2                              **P R O C E E D I N G S**

3                        (Proceedings began/jury in at 9:10 a.m.)

4            **THE COURT:**  All right.  Let the record reflect that

5    all jurors are present.  And the parties are present.

6                Good morning, ladies and gentlemen.

7                You may proceed, Mr. Cohen.

8                      **CROSS EXAMINATION, CONTINUED**

9    **BY MR. COHEN:**

10   **Q.**  Good morning, Dr. McCance-Katz.

11   **A.**  Good morning.

12   **Q.**  When we left off yesterday, we were talking about your

13   understanding of the guidelines relating to Internet

14   prescribing, remember that?

15   **A.**  Yes.

16   **Q.**  And you told us that until the Government retained you as

17   an expert in this case, you were not familiar with the

18   Federation of State Medical Boards' model guidelines for the

19   appropriate use of the Internet in medical practice, right?

20   **A.**  I had not read them, correct.

21   **Q.**  But now that you are familiar with them, they are a basis

22   for the opinions that you've offered us in court, correct?

23   **A.**  One basis.

24   **Q.**  Yes.

25                And I had just shown you an exhibit that had been

 1   marked as Exhibit 4001.  And I'm going to bring that back to

 2   you.

 3   A.  Okay.

 4          MR. COHEN:  And, Mr. Morley, if we could bring that

 5   up, please.

 6          And if I could publish it to the jury?

 7          THE COURT:  Go ahead.

 8   BY MR. COHEN:

 9   Q.  This is a document entitled "Model Policy Guidelines for

10   the Appropriate Use of Social Media and Social Networking in

11   Medical Practice."  Do you see that?

12   A.  Yes.

13   Q.  And this is also published by the Federation of State

14   Medical Boards, right?

15   A.  Yes.

16   Q.  And that's the same organization that issued the Model

17   Guidelines for the Appropriate Use of the Internet in Medical

18   Practice that you testified about yesterday, right?

19   A.  Yes.

20   Q.  And I just ask you, please, to turn to page 4 of this

21   document.

22          MR. COHEN:  And, Mr. Morley, if you could go there

23   as well.  I guess that's -- there you are.  And if you could

24   blow up that first paragraph for us, please.

25   ///

McCance–Katz – Cross / Cohen

 1   *BY MR. COHEN:*

 2   *Q.*  And there's a section here entitled "An Appropriate

 3   Physician-Patient Relationship."  Do you see that?

 4   *A.*  I do.

 5   *Q.*  Okay.  And underneath that it says, "The health and

 6   well-being of a patient depend upon a collaborative effort

 7   between the physician and the patient."

 8           Do you agree with that?

 9   *A.*  Yes.

10   *Q.*  "The physician-patient relationship is fundamental to the

11   provision of acceptable medical care, and physicians are

12   expected to recognize the obligations, responsibilities, and

13   patient rights associated with establishing and maintaining an

14   appropriate physician-patient relationship."

15           Do you agree with that?

16   *A.*  Yes.

17   *Q.*  "The relationship between a physician and patient begins

18   when an individual seeks assistance from a physician for a

19   health-related matter and the physician agrees to undertake

20   diagnosis and treatment of the patient."

21           Do you agree with that?

22   *A.*  Yes.

23   *Q.*  "The physician-patient relationship can begin without a

24   personal encounter which allows for online interactions to

25   constitute the beginning of the relationship."

**McCance–Katz – Cross / Cohen**

1              Do you agree with that?

2   *A.*   Sure.

3   *Q.*   "Physicians should remember that when using electronic

4   communications they may be unable to verify that the person on

5   the other end of the electronic medium is truly the patient;

6   likewise, the patient may not be able to verify that a

7   physician is on the other end of the communication.

8              "For that reason, the standards of medical care do

9   not change by virtue of the medium in which physicians and

10   their patients choose to interact."

11              Do you agree with that?

12   *A.*   I would agree with that.

13   *Q.*   Thank you.

14              *MR. COHEN:*   You can take that down, Mr. Morley.

15   *BY MR. COHEN*

16   *Q.*   Now, you testified yesterday that another basis for your

17   opinions about Internet prescribing was some guidance that was

18   issued by the California State Medical Board.  Do you remember

19   that?

20   *A.*   Yes.

21              *MR. COHEN:*   And, Mr. Morley, if you could bring up

22   Exhibit 715, please.

23   *BY MR. COHEN*

24   *Q.*   This is the document that you were testifying about

25   yesterday, right?

McCance–Katz – Cross / Cohen

1   **A.**   Yes.

2   **Q.**   The "Guide to the Laws Governing the Practice of Medicine

3   by Physicians and Surgeons," right?

4   **A.**   Yes.

5   **Q.**   Published by the Medical Board of the State of California?

6   **A.**   Yes.

7           **MR. COHEN:**   And if we could turn to page 8 of this

8   exhibit, please, Mr. Morley, and blow up the Section 5.12,

9   please.

10  **BY MR. COHEN**

11  **Q.**   This is the section of this guidance that you read out loud

12  to us yesterday, right?

13  **A.**   Yes, it is.

14  **Q.**   And you read to us the portion that says here -- well, you

15  read all of it, but you read "Business and Professions Code

16  Section 2241 requires that a physician provide a patient with

17  an appropriate prior examination and that there exists a

18  medical indication before prescribing, dispensing, or

19  furnishing a dangerous drug," right?

20  **A.**   Yes.

21  **Q.**   And further down, you also read this part to us that says

22  telephone interviews, Internet questionnaires or online

23  consultations do not -- are not appropriate or acceptable by

24  law and fail to meet the minimum components of an appropriate

25  prior examination since they can't with any certainty provide

1   enough information to make a verifiable diagnosis, right?

2   *A.*   Yes.

3   *Q.*   Now, Section 2241 of the -- excuse me, Section 2242.1 of

4   the Business and Professions Code is a provision of California

5   state law, correct?

6   *A.*   I believe it is.  I'm not an attorney, so I can't make

7   those legal judgments.

8   *Q.*   Is that your understanding?

9   *A.*   That is my understanding.

10  *Q.*   And, of course, we're talking about a document that's been

11  published by the California Medical Board, right?

12  *A.*   Yes, the California Medical Board, which regulates

13  physicians.

14  *Q.*   In the State of California?

15  *A.*   In the State of California, correct.

16  *Q.*   Okay.

17         Doctor, are you aware of any provision of federal

18  law that specifically requires a physician to conduct an

19  in-person examination?

20  *A.*   I don't -- I can't quote the law.  We teach to the

21  Controlled Substances Act, which says there has to be a valid

22  physician-patient relationship.  It does not designate the

23  specific components, that I can recollect.

24  *Q.*   Are you aware of a provision of federal law that

25  specifically requires a doctor to conduct an in-person

1  examination?

2  **A.**  No.

3  **Q.**  Okay.

4          **MR. COHEN:**  And if we could go back to the second

5  page of this exhibit, please, Mr. Morley.  And then one more

6  page, please.

7  **BY MR. COHEN:**

8  **Q.**  This document that you testified about yesterday does have

9  a discussion about the federal drug laws, doesn't it?

10  **A.**  Yes.

11  **Q.**  And if we go through this, Section 5.1 discusses the Drug

12  Enforcement Administration, right?

13  **A.**  Yes.

14  **Q.**  Do you see anything in this section that mentions a federal

15  requirement for an in-person examination?

16  **A.**  No, not in this section.

17  **Q.**  Okay.

18          **MR. COHEN:**  And if you could zoom out, please.  And

19  then we have some addresses for DEA offices.  And if you could

20  go to the next page, please, Mr. Morley.

21  **BY MR. COHEN:**

22  **Q.**  And then Section 5.2 appears to refer to the schedules of

23  controlled drugs, right?

24  **A.**  Yes.

25  **Q.**  It gives some examples, first of all, of Schedule I

**McCance–Katz – Cross / Cohen**

1    substances, correct?

2    *A.*   Yes.

3    *Q.*   And then it moves on to Schedule II substances?

4    *A.*   Yes.

5    *Q.*   And do you see anything in that discussion that

6    specifically refers to a federal requirement for an in-person

7    examination?

8    *A.*   No.

9    *Q.*   Okay.

10          **MR. COHEN:**   And the next page, please, Mr. Morley.

11   *BY MR. COHEN:*

12   *Q.*   More discussion of scheduled substances, right?

13   *A.*   Yes.

14          **MR. COHEN:**   And the next page, Mr. Morley.

15   *BY MR. COHEN*

16   *Q.*   The top of this page we see Schedule V substances, correct?

17   *A.*   Yes.

18   *Q.*   And then Section 5.3 refers to federal registration of

19   practitioners, correct?

20   *A.*   Yes, it does.

21          **MR. COHEN:**   And, Mr. Morley, if you could blow that

22   section up, please.

23   *BY MR. COHEN*

24   *Q.*   This section says that prior to administering, prescribing,

25   or dispensing any scheduled drugs, a physician must be

**McCance–Katz – Cross / Cohen**

1  registered with the Drug Enforcement Administration, correct?

2  **A.**  Yes, it does.

3  **Q.**  It gives some information on how to apply for registration,

4  right?

5  **A.**  Yes.

6  **Q.**  It says, "No separate state drug license is needed or

7  applicable in California," right?

8  **A.**  Correct.

9  **Q.**  And then it contains a further discussion about the

10  requirements for registration, right?

11  **A.**  Yes.

12  **Q.**  And nothing in this discussion about a requirement for an

13  in-person examination, correct?

14  **A.**  Correct.

15  **Q.**  Okay.

16          **MR. COHEN:**  And you can zoom back out, and let's

17  look at Section 5.4, which is federal registration of interns,

18  residents, and foreign-trained physicians who are fellows.

19  **BY MR. COHEN**

20  **Q.**  Nothing in there about an in-person examination

21  requirement, right?

22  **A.**  No.

23  **Q.**  Am I right that there's nothing in there that says that

24  there's an in-person examination required?

25  **A.**  Yeah, I just said no.

**McCance–Katz – Cross / Cohen**

1   **Q.**  I just wanted to make sure the record was clear.

2   **A.**  Oh, okay.

3          **MR. COHEN:**  And if you could go to the next page

4   please, Mr. Morley.

5   **BY MR. COHEN:**

6   **Q.**  Section 5.5 deals with order forms, right?

7   **A.**  Yes.

8   **Q.**  Yes, that refers to order forms?

9   **A.**  Yes.

10  **Q.**  And then Section 5.6 is inventory?

11  **A.**  Yes.

12  **Q.**  Nothing in there about an in-person examination

13  requirement?

14  **A.**  No.  No.

15  **Q.**  Okay.  If we look carefully here in the bottom -- but this

16  is page 49, right?  Do you see it's page 49?

17  **A.**  Yes, yes, page 49.

18          **MR. COHEN:**  And if you'll go one more page,

19  Mr. Morley, the next page actually appears to be 51.  But if

20  you go to page 12 of the PDF, I think you'll get to page 50.

21  **BY MR. COHEN:**

22  **Q.**  And here we're at Section 5.7, which refers to records,

23  right?

24  **A.**  Yes.

25  **Q.**  And then Section 5.8, which refers to security and storage,

1    right?

2    **A.**   Yes.

3    **Q.**   And then Section 5.9, which talks about discontinuation of

4    practice by a physician, right?

5    **A.**   Correct.

6    **Q.**   And then at Section 5.10, we get to California state drug

7    laws, right?

8    **A.**   Yes.

9              **MR. COHEN:**   And I just want to go one more page, to

10   page 51.  And then you have to go back, Mr. Morley.

11   **BY MR. COHEN**

12   **Q.**   And page 51, Section 511 is prescribing controlled

13   substances, do you see that?

14   **A.**   I do.

15   **Q.**   And it refers to, again, the requirements of California

16   law?

17   **A.**   Yes.

18   **Q.**   And then we get to Section 512, which is the section that

19   you had testified about earlier, right?

20   **A.**   Yes.

21   **Q.**   Okay.  Nowhere in this guide to the laws governing the

22   practice of medicine by physicians and surgeons is there any

23   reference to a federal requirement for an in-person

24   examination, is there?

25   **A.**   No, but what -- the requirement for a DEA registration is

**McCance—Katz — Cross / Cohen**

1  that you must have a valid medical license in the state in

2  which you practice, which means that you must abide by

3  California law.

4  *Q.*  And my question is simply:  In this guide to the laws

5  governing the practice of medicine by physicians and surgeons

6  that is the basis for the opinions that you've offered here

7  today, there is no reference to the need for an in-person

8  examination under federal law, correct?

9  *A.*  Not in what you've shown me, no.

10 *Q.*  Thank you.

11        And nothing in this guide refers to any federal

12 prohibition against using online questionnaires for prescribing

13 purposes, is there?

14 *A.*  For federal?

15 *Q.*  Yes.

16 *A.*  No.

17 *Q.*  And I take it, therefore, that the opinions that you have

18 shared with us during the past couple of days are not based on

19 any federal law that specifically requires an in-person

20 examination, correct?

21 *A.*  Correct.

22 *Q.*  Thank you very much.

23        **MR. COHEN:**  I have nothing further.

24 ///

25 ///

## CROSS-EXAMINATION

*BY MR. CANNON:*

*Q.*  Good morning.

*A.*  Good morning.

*Q.*  My name is Chris Cannon, I represent Chris Napoli.  I'm
just going to ask you a few questions this morning.

*A.*  Okay.

*Q.*  Once of the things I noticed was when Mr. Cohen was asking
you some questions you said you couldn't answer those questions
because those were legal questions because you're not a lawyer,
right?

*A.*  I am not a lawyer.

*Q.*  And so your testimony in this case is just limited to
medical issues, right?

*A.*  Yes, sir.

*Q.*  Okay.

        And you indicated yesterday that -- Mr. Cohen asked
you some questions about some guidelines and Ms. Ault asked you
questions about those same guidelines?

*A.*  Yes.

*Q.*  And those were guidelines that Ms. Ault had provided you
before you testified in this case, right?

*A.*  What specifically do you mean?

*Q.*  When she -- before you agreed to testify in this case,
Ms. Ault provided you a set of documents -- guidelines,

1    correct?  She provided you with some documents?

2              *THE COURT:*  Well, what is your question?

3              *THE WITNESS:*  I don't know.

4              *THE COURT:*  She provided these documents --

5              *MR. CANNON:*  Did Ms. Ault provide --

6              *THE COURT:*  Wait.  You've got to have clarity.

7              Are you asking whether she provided her with

8    guidelines?  Is that your question?

9              *MR. CANNON:*  Yes.

10             *THE COURT:*  Did she provide you with a copy of the

11   guidelines?

12             *THE WITNESS:*  If what you're asking me is whether

13   she provided me with anything related to the Federation of

14   State Medical Boards or California medical boards, no, she did

15   not.

16   *BY MR. CANNON:*

17   *Q.*  But didn't she provide you with a set of model guidelines?

18   *A.*  No, she didn't present -- she did not give me model

19   guidelines.  The model guidelines from the Federation of State

20   Medical Boards?

21   *Q.*  Yes.

22   *A.*  No.

23   *Q.*  I thought she provided them with you as one of the things

24   you should review before you were testifying?

25   *A.*  No, I provided that.

**McCance–Katz – Cannon**

1    **Q.**  Thank you -- thank you very much.

2              And in -- in this case, you testified for a while

3    about your qualifications, correct?

4    **A.**  I did.

5    **Q.**  And they're extensive?

6    **A.**  One might say that.

7    **Q.**  And they're probably even better than -- you testified -- I

8    was doing some math in my head and kind of going through when

9    you started school and when you got out.

10             Did you actually finish college in two years?

11   **A.**  Yes.

12   **Q.**  And did you graduate with any awards or honors?

13   **A.**  Yes.

14   **Q.**  What were those awards or honors?

15   **A.**  Oh, well, magna cum laude.

16   **Q.**  And so is it fair to say that you know a lot more about

17   prescribing drugs than the average person?

18   **A.**  Than the average person --

19   **Q.**  Yes.

20   **A.**  -- or the average physician?

21             Than the average person, I hope so.  Than the

22   average physician, I actually hope not.

23   **Q.**  Okay.  And you can assume that the average person does not

24   have the medical knowledge to determine the kind of details

25   that you testified about yesterday, right?

1    **A.**   Yes.  Yes.

2    **Q.**   And you can also assume that many people know a lot about

3    medications, but it wouldn't be your general expectation that

4    people would, correct?

5    **A.**   It would not.

6    **Q.**   And -- and you also -- lay people wouldn't be able to

7    describe what you described yesterday in terms of the

8    physician-patient relationship, would they?

9    **A.**   I wouldn't think so.

10   **Q.**   Okay.  And I just kind of want to go back to what I talked

11   about before because -- those guidelines regarding the

12   Federation of State Medical Boards?

13   **A.**   Yes.

14   **Q.**   And that's something you teach your students, right?

15   **A.**   Oh, yes.

16   **Q.**   And your students are physicians when they can come in or

17   they're --

18   **A.**   Medical students and physicians.  Really, we start training

19   from the time people enter medical school.  They'll start a

20   clinical, at least observation from the first year of medical

21   school.

22   **Q.**   And how much training have they had before they come in and

23   you teach them?  How many years?

24   **A.**   It depends on -- on what I'm doing.  It could be medical

25   students -- I generally don't teach medical students until they

McCance-Katz – Cross / Sabelli

```
 1   are at least third year.  I will sometimes do a second-year
 2   lecture on impaired physicians.
 3           And then with residents, of course, they have the MD
 4   degree already and they are practicing to obtain specialty
 5   training.
 6   Q.  So these are doctors and students, these are people with a
 7   considerable amount of medical experience and training before
 8   they have the opportunity to learn from you, correct?
 9   A.  Yes.
10   Q.  And you have to teach them about the -- the guidelines from
11   the Federation of State Medical Boards, correct?
12   A.  Yes, yes.
13           MR. CANNON:  Thank you.  I have no further
14   questions.
15                       CROSS-EXAMINATION
16   BY MR. SABELLI:
17   Q.  Good morning again, Doctor.
18   A.  Yes, good morning.
19   Q.  Did you have an image in front of you?
20   A.  Yes, I do.
21   Q.  Do you recognize this as one of the exhibits that Ms. Ault
22   showed you yesterday?
23   A.  I do.
24   Q.  Okay.  And that's Exhibit 3A, part of 3A?
25           I'll show you the exhibit tab so you...
```

 1                    **THE COURT:**  You're saying it's a part of 3A?

 2                    **MR. SABELLI:**  Yes, it is, Your Honor.

 3                    **THE COURT:**  Okay.  Go ahead.

 4   **BY MR. SABELLI**

 5   **Q.**  Okay.

 6   **A.**  Okay.

 7   **Q.**  Now I'm going to show you another page.  Got a good look at

 8   this page, doctor?

 9   **A.**  Yes.

10   **Q.**  Thank you.

11               I'm going to show you another page which I have

12   marked -- I haven't marked it yet.

13                    **MR. SABELLI:**  If I could just borrow a pen.

14                    **THE COURT:**  3A in entirety is in evidence, right?

15                    **MR. SABELLI:**  Yes.

16                    **MS. AULT:**  It is, Your Honor.

17                    **THE COURT:**  Why don't we give it to the witness --

18   the entire exhibit to the witness, and she can leaf through it.

19                    **MR. SABELLI:**  Sure.

20                    **THE COURT:**  It's just simply not as clear on this

21   ELMO.

22                    **MR. SABELLI:**  Sure.  I think it's all here.

23   **BY MR. SABELLI:**

24   **Q.**  Here's the entirety of 3A.

25               And to remind the jury, isn't it true, Doctor, that

1   3A is a series of screen shots from the purchase video that you

2   reviewed as part of your preparation for your testimony?

3   **A.**  Yes.

4   **Q.**  In other words, you watched a video about how drugs were

5   purchased from Safescripts; is that correct?

6   **A.**  Yes.

7   **Q.**  And there were a bunch of screen shots taken from that

8   video?

9   **A.**  Yes.

10  **Q.**  And that's what 3A is?

11  **A.**  Yes.

12  **Q.**  Okay.  And I've asked to you look at one of those pages of

13  that?

14  **A.**  Okay.

15  **Q.**  The one that I first showed you, it's sort of cut off there

16  in the -- sort of bottom of the page, it says "before using

17  this medicine" in bold, do you see that?

18  **A.**  I do.

19  **Q.**  Okay.  And I'm going to show you what I've marked as

20  Defense 2502.  Does this appear to be --

21          **MR. SABELLI:**  This has been provided in discovery,

22  Your Honor.

23          **THE COURT:**  Wait.  Wait.  2502.

24          **MR. SABELLI:**  Yes.

25          **THE COURT:**  Okay.

1  *BY MR. SABELLI:*

2  *Q.*  Dr. McCance-Katz, is this the complete page that you would

3  have been looking at during the time that you were viewing the

4  video?

5  *A.*  The video moved quickly, and so it was hard, I couldn't

6  really control, like, cutting it off to look at things.  And so

7  the screen shots were made.

8  *Q.*  Okay.

9  *A.*  But I -- I looked at the whole thing, but I couldn't tell

10  you exactly the flow of it because I didn't commit it to

11  memory.

12  *Q.*  Okay.  So you just plain don't remember whether or not

13  these sections -- before using the medicine, proper use of this

14  medicine, precautions while using this medicine or side effects

15  of this medicine, you don't recall whether or not those were

16  part of the video or not?

17  *A.*  No.

18  *Q.*  Is that correct?

19  *A.*  That is correct.

20  *Q.*  Okay.  All right.

21          *MR. SABELLI:*  The video, Your Honor, is already in

22  evidence.

23  *BY MR. SABELLI:*

24  *Q.*  Thank you very much.  Doctor.

25          *MR. SABELLI:*  That's all I have.

1           ***THE WITNESS:*** Oh, okay.

2           ***THE COURT:*** Ms. Ault?

3           ***MS. AULT:*** Thank you, Your Honor.

4                       **REDIRECT EXAMINATION**

5   **BY MS. AULT:**

6   **Q.** Good morning.

7           So Mr. –– well, Mr. Cohen and Mr. Cannon asked you a

8   lot of questions about your medical practice; specifically,

9   over the past two years since 2010, do you recall that –– or in

10  2010?

11  **A.** Oh, in 2010?

12  **Q.** Yes.

13  **A.** Yes.

14  **Q.** So for the past two years, in 2010, has treating patients

15  been a part of your practice?

16  **A.** Yes.

17  **Q.** And how much time have you spent on average treating

18  patients over the past two years as opposed to other things

19  like writing articles or doing the administrative parts of your

20  job?

21  **A.** I'd say six to seven hours a week.

22  **Q.** Okay.

23  **A.** I have a half-day clinic in one of our clinics at San

24  Francisco General, and I also do some consultation, so on

25  average.

1    **Q.**  Okay.  So that's the last two years?

2    **A.**  Yes.  And prior to that, I had even more clinical time

3    because I -- I had a lot of -- now I only have one active

4    research study, before I had several.

5    **Q.**  Okay.

6    **A.**  So I see all of my patients in my research studies.

7    **Q.**  Okay.

8               So I want to talk to you about the previous 23

9    years, before the last two years.

10   **A.**  Okay.

11   **Q.**  Has your practice changed over time?

12   **A.**  Yes.

13   **Q.**  All right.  And at various times over the course of your 25

14   years as a physician, have you sometimes spent more time than

15   others actually treating patients as opposed to writing

16   articles and testifying to Congress and doing those other

17   things?

18   **A.**  The answer is yes, but I've always had a substantial amount

19   of clinical time.

20   **Q.**  Okay.

21   **A.**  I think it's worth saying that this is my profession.  I'm

22   a physician, but I'm an academic physician.  It's part of my

23   job to be able to teach, do research, see patients, and write

24   papers, publish my research findings.  And at this point in my

25   career, I happen to have a fair amount of national matters that

**McCance-Katz - Redirect / Ault**

1    I work on and state matters that I work on in addition.

2    *Q.*  Okay.

3          And so over the past 25 years, what kind of settings

4    have you treated patients in?

5    *A.*  Mainly hospital settings.

6    *Q.*  Um-hmm.

7    *A.*  That would include inpatient settings, inpatient

8    psychiatry, inpatient what we used to call dual diagnosis units

9    where patients have both co-occurring mental illness and

10   substance abuse disorders.

11         I've been the medical director of several different

12   types of substance abuse treatment programs, including cocaine

13   abuse treatment clinics that also focused on the treatment of

14   alcoholism.  And in more recent years I've spent a good bit of

15   time working with opioid dependent patients.

16         I have been the medical director of a methadone

17   maintenance program and continue to work in the area of

18   office-based treatment of opioid dependence, and have done so

19   for quite a number of years now.

20   *Q.*  Okay.  So hospitals, clinics, office settings.  You worked

21   in the emergency room?

22   *A.*  Yes, yes.

23   *Q.*  Okay.

24         And approximately how many patients have you treated

25   over the past 25 years?

**McCance-Katz – Redirect / Ault**

1    **A.**  Um, I don't -- I would say several thousand.

2    **Q.**  Okay.

3    **A.**  Hard to say.

4    **Q.**  All right.  But you haven't been sitting in an ivory tower

5    writing articles and testifying before Congress for the last 25

6    years?

7    **A.**  No.  The reason that I can do what I do for the State of

8    California and for the Substance Abuse and Mental Health

9    Services Administration is because I do see patients.  I've

10   made it my business not to become an ivory tower academic.

11   **Q.**  And you also testified that you teach residents and medical

12   students, people who are training to be doctors.

13           About how many residents and medical students have

14   you trained?

15   **A.**  Again, I would say, if you include classroom teaching and

16   clinic teaching, probably several thousand over 25 years.

17   **Q.**  And have they all become academic professors?

18   **A.**  Almost none of them.

19                      **(Laughter.)**

20   **BY MS. AULT:**

21   **Q.**  Okay.

22   **A.**  I've tried a few times, but it's hard to convince

23   physicians to become academic.

24   **Q.**  So, in fact, most of them go out and practice medicine?

25   **A.**  Most of them do, yes.

**McCance–Katz – Redirect / Ault**

1  **Q.**  What kinds of settings do they go out and practice medicine

2  in?

3  **A.**  Hospital settings, group practices.  Not so much individual

4  solo practice anymore.  It's just very difficult to do with all

5  of the -- all of the regulatory requirements and burdens that

6  physicians have.  So usually group practices or treatment

7  programs, hospital settings, residential programs, those sorts

8  of things.

9  **Q.**  Okay.

10          Is there any difference in how you teach the basic

11  tenets of the physician-patient relationship, the basic

12  requirements of what a doctor needs to do before he or she can

13  write a prescription for a patient, based on whether a resident

14  or a medical student is going to practice in a hospital or a

15  clinic or some office-based setting?

16  **A.**  No.

17  **Q.**  Do you teach them all the same thing?

18  **A.**  I do.

19  **Q.**  And, in fact, you went to medical school and you did an

20  internship?

21  **A.**  I did.

22  **Q.**  Okay.

23          And was that before you chose to specialize in

24  psychiatry?

25  **A.**  Yes.

**McCance-Katz – Redirect / Ault**

1   **Q.**  All right.

2           And so when you were mixed in with all of the other

3   medical students and interns, was there any difference in the

4   way that all of the medical students and interns were taught

5   the basics of the physician-patient relationship and what you

6   needed to do before you could write a prescription based on

7   what you wanted to specialize in?

8   **A.**  No.  And, in fact, medical school curriculum requires

9   didactics, lectures on how to appropriately write

10  prescriptions, and that's not separated by whatever specialty

11  one might be interested in.

12  **Q.**  Okay.

13          And do you also work with colleagues who practice in

14  all types of medicine?

15  **A.**  Yes.

16  **Q.**  Can you just briefly name some of the other types of

17  physicians that you work with?

18  **A.**  Well, to be honest, I work mainly with internal medicine.

19  The treatment of substance use disorders, particularly from the

20  vantage point of opiate addiction, at this point has become an

21  epidemic, and that has been related to over-prescribing of

22  certain types of opioid medication.  So I work a lot with

23  internal medicine and family practice.

24  **Q.**  Okay.

25          And in your experience working with doctors in those

**McCance-Katz - Redirect / Ault**

1    other disciplines, do the basics of the physician-patient

2    relationship and proper prescribing practices change based on

3    what your specialty is?

4    **A.**  No.

5    **Q.**  Okay.

6          So it doesn't matter if you are a cardiologist,

7    pulmonologist, an internist, a bariatrician, the standards are

8    the same?

9    **A.**  Yes.

10   **Q.**  Defense counsel asked you some questions about the

11   Federation of State Medical Boards.  Now, that's a document

12   that you found; is that correct?

13   **A.**  Yes.  I'm familiar with the Federation because of my work

14   with impaired health professionals.

15   **Q.**  Okay.

16          Is there anything about what you read in that

17   document that changed your opinion about what proper

18   prescribing practices are and what an appropriate

19   physician-patient relationship is?

20   **A.**  No.

21   **Q.**  Did it just confirm what you already knew?

22   **A.**  Yes.  We -- we teach from the beginning of medical school

23   that the physician-patient relationship is based on an

24   agreed-upon relationship that the patient agrees, consents, to

25   treatment and then there is an examination.

1          It includes a medical history, it includes a

2     physical examination, and any other types of ancillary tests

3     that are needed to make diagnosis and treatment plans and then

4     to provide follow-up.

5          That's -- that's the way medicine is practiced in

6     the United States.  That's not unique to California.  It's not

7     unique to any particular state.  It's not unique to any

8     particular practice setting, and it is not unique to any

9     medical specialty.  That is the way every physician is taught

10    to practice from the time they enter medical school.

11          **MR. COHEN:**  Objection, Your Honor, foundation.

12          **THE COURT:**  Sorry.

13          **MR. COHEN:**  I object on foundation grounds, and I

14    move to strike that last response.  Dr. McCance-Katz can talk

15    about her own experience, but not all physicians everywhere.

16          **THE COURT:**  Your opinion is based upon your

17    experience; is that correct?

18          **THE WITNESS:**  My opinion is based on my experience.

19          **THE COURT:**  That would include what you've read?

20          **THE WITNESS:**  It includes what I've read and what

21    I've discussed.

22          **THE COURT:**  Okay.  With that limitation, the motion

23    to strike denied.

24    ///

25    *BY MS. AULT:*

**McCance–Katz – Redirect / Ault**

1  **Q.** And does it also include your interaction with, I don't

2  know, countless physicians over 25 years of practice?

3  **A.** Yes, it does.

4  **Q.** So I want -- I would like for you to refer -- do you still

5  have Defense 401 up there?

6          **MR. COHEN:** She does.

7  **BY MS. AULT:**

8  **Q.** Can you please turn to page 6.

9          Can you read -- well, under Section 3, where it

10  says, "Parity of Professional and Ethical Standards," can you

11  read what it says under that -- under that paragraph?

12  **A.** Yes.

13          It says, "To ensure a proper physician-patient

14  relationship, there should be parity of ethical and

15  professional standards applied to all aspects of a physician's

16  practice, including online interactions through social media

17  and social networking sites, referencing the FSMB House of

18  Delegates model guidelines for the appropriate use of the

19  Internet in medical practice adopted in 2002.  Physicians using

20  social media and social networking sites are expected to

21  observe the following ethical standards."

22  **Q.** Okay.

23          **MS. AULT:** And, Special Agent Chin, can you bring up

24  Exhibit 714, please.

25

1    *BY MS. AULT*

2    *Q.*   And Exhibit 714 that's displayed on the screen, is that

3    what was referenced in there, the model guidelines for the

4    appropriate use of Internet in medical practice?

5    *A.*   Yes.

6    *Q.*   All right.

7            *MS. AULT:*   Special Agent Chin, can you go to page 6,

8    and can you blow up the part that says --

9            *THE COURT:*   Is this 714?

10            *MS. AULT:*   Can you go to page 8.  There we go.  And

11   can you blow up the part that says "Treatments"?

12   *BY MS. AULT:*

13   *Q.*   And so this document is referenced in Defense Exhibit 4001;

14   is that right?

15   *A.*   I believe it is.

16   *Q.*   And can you again read what it says under "Treatment"?

17   *A.*   "Treatment and consultation recommendations made in an

18   online setting, including issuing a prescription via electronic

19   means, will be held to the same standards of appropriate

20   practice as those in traditional face-to-face settings.

21   Treatment, including issuing a prescription based solely on an

22   online questionnaire or consultation, does not constitute an

23   acceptable standard of care."

24   *Q.*   Do doctors make mistakes?

25   *A.*   Yes.

**McCance—Katz — Redirect / Ault**

1    *Q.*  All right.

2           And when a doctor makes a mistake, does that

3    necessarily mean that the doctor is acting outside the usual

4    course of professional medical practice?

5    *A.*  No.  Often they are acting within the course of medical ——

6    standard professional medical practice.  They made a mistake.

7    *Q.*  Okay.

8           So if a doctor does all the things that you

9    described that make up the basic tenets of the

10   physician-patient relationship —— they see the patient, they

11   conduct a physical exam, they take a medical history, they do

12   all of those things —— and then at the end they forgot to

13   follow up with a patient when maybe they probably should have,

14   does that mean they are acting outside the usual course of

15   professional medical practice?

16   *A.*  It could, but it could be a mistake.

17   *Q.*  Okay.

18          And in the emergency room scenario that I think

19   Mr. Cohen brought up yesterday, if something falls through the

20   cracks and the patient who was seen in the emergency room isn't

21   followed up with either by the physician or somebody who was

22   tasked with that —— that follow-up, does that necessarily mean

23   that that physician is acting outside the usual course of

24   professional medical practice?

25   *A.*  Well, let me just expand on that a bit more since you bring

 1    it up.

 2            Whenever a patient is seen in the emergency

 3    department, as I mentioned, there are arrangements made to do

 4    some sort of follow-up, be it make an appointment for the

 5    person with their provider in the morning or one of our

 6    clinics, or there is follow-up if there is some treatment given

 7    in the ED.

 8            Every patient will leave with discharge

 9    instructions.  The discharge instructions will always include a

10    clause that says "If your condition worsens, changes, you have

11    concerns, call or come back."  That's follow-up.

12    Q.  Okay.

13            But if for some reason that doesn't happen, if

14    there's a mistake that's made, does that mean the physician is

15    acting outside the usual course of professional practice?

16    A.  No.

17    Q.  But if a doctor makes a deliberate choice never to follow

18    up with any of his patients after prescribing them addictive

19    and dangerous controlled substances, is that doctor acting

20    outside the course of professional medical practice?

21    A.  It could depend on the situation.  So if there's an

22    established physician-patient relationship, as you've just

23    described with the ED, this could be a more extreme form of

24    that, but there was a relationship.

25            In the materials that I was presented and asked to

**McCance–Katz – Redirect / Ault**

 1  evaluate, there was no evidence that there was ever any

 2  interaction between whoever was prescribing, and I don't know

 3  who was writing the prescriptions, but what I was informed of

 4  was that there was no contact with any physician at any time.

 5  *Q.*  Okay.

 6  *A.*  That's not -- that's far, far outside of standard

 7  professional practice.

 8  *Q.*  All right.

 9        So -- so I just want to, you know, be clear.  There

10  were things that you outlined as part of the physician-patient

11  relationship.  So in the usual course of professional practice,

12  does the doctor always have to see the patient?

13  *A.*  There needs to the an -- at least an initial examination.

14  That can be done in a number of ways, but there must be an

15  examination that includes a history and a physical examination.

16        After that, the physician has latitude as to what

17  they choose to do in terms of their ongoing clinical

18  interactions with the patient.  That does not put them outside

19  of the standards of professional practice.  They are allowed

20  latitude in clinical decision-making.

21  *Q.*  Okay.

22        So if a doctor makes a deliberate choice to

23  prescribe addictive and dangerous controlled substances to

24  patients he has never seen, is that conduct outside the usual

25  course of professional medical practice?

1    **A.**   In my opinion, based on my experience, yes.

2    **Q.**   Okay.

3              And in the usual course of professional practice,

4    does a doctor always have to conduct a physical exam?

5    **A.**   A physical examination needs to be conducted.  It may be

6    conducted by that primary provider.  It may be conducted by a

7    colleague with whom the physician works.  It could -- we do

8    more and more telemedicine.  In my experience, that's where we

9    sit in a room and somewhere, in generally a more rural area,

10   there's another physician or provider with a patient who is

11   doing what we're asking.  And that's appropriate.  That's also

12   appropriate.  So there are many ways to do this.

13   **Q.**   Okay.

14              But if a doctor makes a deliberate choice to

15   prescribe addictive and dangerous controlled substances to

16   patients without ever giving them a physical exam, having

17   access to any of their medical records or communicating in any

18   way with a physician who is actually treating them, is that

19   outside the course of usual course of professional medical

20   practice?

21   **A.**   Yes.

22   **Q.**   Now, you said also part of standard or usual course of

23   professional medical practice is to take a medical history.

24              Now, can that medical history change depending on

25   the circumstances?

McCance–Katz – Redirect / Ault

1    **A.**  Yes, it can.

2    **Q.**  All right.

3              So I think as we saw yesterday, you might fill out a

4    different kind of medical history form if you're getting

5    opioid-dependent treatment than you would if you were going to,

6    say, see the dermatologist?

7    **A.**  Correct.

8    **Q.**  But if a doctor makes a deliberate choice to prescribe

9    addictive and dangerous substances based only on the 13

10   questions that are in that questionnaire in Exhibit 3A without

11   doing anything else, is that outside the usual course of

12   professional medical practice?

13   **A.**  Yes, it is.

14   **Q.**  And then I think another thing you said is that a physician

15   must conduct any necessary tests?

16   **A.**  Yes.

17   **Q.**  Are tests always necessary?

18   **A.**  No.

19   **Q.**  But if a doctor makes a deliberate choice to prescribe

20   addictive and dangerous controlled substances to patients

21   without ever even considering the possibility of performing any

22   tests, is that outside the usual course of professional medical

23   practice?

24   **A.**  That would be, if the physician never considered it.

25   **Q.**  Okay.

**McCance–Katz – Redirect / Ault**

1              And then I think you said the doctor needs to make a

2      diagnosis?

3      **A.**   Yes.

4      **Q.**   Is it always possible to make a diagnosis?

5      **A.**   It is possible to make a differential diagnosis.  A

6      differential diagnosis would be one of several possibilities,

7      and then there's a clinical evaluation to try to determine

8      which diagnosis is the correct one.  Is it possible to make the

9      correct diagnosis on one visit?  Very often not.

10     **Q.**   So it's a process?

11     **A.**   It is a process.

12     **Q.**   So if a doctor makes a deliberate choice to prescribe

13     addictive and dangerous controlled substances to patients

14     without ever diagnosing their medical condition, is that

15     outside the usual course of professional medical practice?

16     **A.**   Yes.

17     **Q.**   And then I think another thing you said was the doctor

18     needs to work with the patient to determine the course of

19     treatment; is that right?

20     **A.**   Yes.

21     **Q.**   Can a doctor decide that no action needs to be taken?

22     **A.**   They could.

23     **Q.**   Can a patient have input into what action, what course of

24     treatment, is going to take place?

25     **A.**   They need to be.  The individual who makes the decision,

**McCance–Katz – Redirect / Ault**

1    it's not the doctor's place to make that decision for the

2    patient, but to present the various treatment options and the

3    risks and benefits of each.

4    *Q.*   And if a doctor makes a deliberate choice to simply give

5    the patients the drug they want and to not consider any other

6    alternative treatments, is that outside the usual course of

7    professional medical treatment?

8    *A.*   That is outside the course of usual professional medical

9    practice.

10   *Q.*   So if a doctor makes a deliberate choice to write thousands

11   of prescriptions for addictive and dangerous controlled

12   substances to patients without ever seeing them, without every

13   conducting a simple physical exam, without ever conducting a

14   single laboratory test, without every making a single

15   diagnosis, without considering a single treatment option other

16   than giving them the drug that they have asked for, without

17   doing anything other than looking at the 13 questions on that

18   questionnaire, is that outside the usual course of professional

19   medical practice?

20   *A.*   In my opinion, it is, yes.

21   *Q.*   Thank you.

22            *THE COURT:*  Anything further?  Government?

23            Mr. Cohen.

24   ///

25   ///

**RECROSS—EXAMINATION**

**BY MR. COHEN:**

**Q.**  If a doctor does consider other treatment options, that's within the usual course of professional practice, right?

**A.**  Yes.

**Q.**  If a doctor does refer a patient to another physician for follow-up consultation, that is within the usual course of professional practice, right?

**A.**  It is.

**Q.**  If a doctor denies a prescription that a particular patient has asked for because he believes that there is not enough information to make that prescription, that's within the usual course of professional practice, right?

**A.**  Yes.

       **MR. COHEN:**  Thank you, I have nothing further.

**RECROSS—EXAMINATION**

**BY MR. CANNON:**

**Q.**  Dr. McCance-Katz, I just want to clarify something I asked you before, because obviously this is important and I want to make sure that we get the answers right.

       Now, I asked you questions about the model guidelines for the appropriate use of the Internet medical practice, correct?

**A.**  I believe you did.

**Q.**  And you didn't get those from Ms. Ault, right?  You found

1    those on your own research, right?

2    **A.**   Yes.

3    **Q.**   But you hadn't reviewed -- but you weren't aware of those

4    prior to being retained to testify as an expert in this case,

5    correct?

6    **A.**   That is correct.  I was asked to put together an opinion,

7    and I did some research.

8    **Q.**   So to give the opinion that you gave, even someone as

9    qualified as yourself had to go out and get additional -- do

10   additional research, right?

11   **A.**   I didn't need to do research to know what constitutes a

12   patient relationship.  I was looking to see whether there were

13   additional guidances on Internet prescribing.

14   **Q.**   Correct.

15           And you had to go out and do research, and you found

16   those and you gave those to Ms. Ault, right?

17   **A.**   I did.

18           **MR. CANNON:**  Thank you, no further questions.

19           **THE COURT:**  Anything further?

20           **MR. SABELLI:**  No, thank you, Your Honor.

21           **THE COURT:**  Ms. Ault?

22           **MS. AULT:**  No, Your Honor.

23           **THE COURT:**  Okay.

24           Doctor, thank you very much.

25           You may call your next witness.

```
 1            Ladies and gentlemen, you want to stretch for a
 2   minute?
 3            MS. AULT:  The United States calls Dr. Anat
 4   Benjamin.
 5            She took a small break, Your Honor.  She'll be here
 6   in a moment.
 7            THE COURT:  While we're waiting, the schedule next
 8   week is, Monday is a holiday.  For some, not for everybody, but
 9   for all of you it is, at least as far as I'm concerned.  So
10   there will be no court on Monday.  Among other things is they
11   turn off the oxygen in this building.
12                         (Laughter.)
13            THE COURT:  Saving the taxpayers maybe $25 or
14   something like that whatever it is.  Anyway, so there is no
15   court on Monday.  And on Tuesday we will start at 9:00.  On
16   Wednesday at 9:30.  And on Thursday at 9:00.  And no court on
17   Friday.  So it will be a three-day week.
18            THE CLERK:  Will the witness please come forward and
19   take the witness stand.
20                       ANAT BENJAMIN,
21   called as a witness for the government, having been duly sworn,
22   was examined and testified as follows:
23            THE CLERK:  Please state your full name, spell your
24   last name.
25            THE WITNESS:  Anat Benjamin, MD.
```

1                           DIRECT EXAMINATION

2      *BY MS. AULT:*

3      *Q.*  Can you spell your last name?

4      *A.*  B-E-N-J-A-M-I-N.

5      *Q.*  Dr. Benjamin, what's your occupation?

6      *A.*  I'm an ophthalmologist.

7      *Q.*  And what is an ophthalmologist?

8      *A.*  I'm an eye surgeon.

9      *Q.*  How long have you been an ophthalmologist?

10     *A.*  I've been an ophthalmologist since 1991.

11     *Q.*  And do you have a subspecialty within ophthalmology?

12     *A.*  My specialty is glaucoma and anterior segment surgery.

13     *Q.*  Have you ever practice any other kind of medicine?

14     *A.*  No, I have not.

15     *Q.*  Can you please describe generally where you received your

16     medical education and training?

17              *MR. COHEN:*  Objection, Your Honor, relevance for

18     this witness.

19              *THE COURT:*  Well, I'll allow it.

20              *THE WITNESS:*  I trained at Kings County Downstate in

21     Brooklyn.  I did my internship and residency and fellowship at

22     Kings County in Downstate.

23     *Q.*  And after finishing your residency and fellowship, where

24     did you go to work?

25     *A.*  I started working for an HIP, which is the Health Insurance

**Benjamin – Direct / Ault**

1   of Greater New York in Brooklyn.

2   **Q.**  Okay.

3            And how long did you work there?

4   **A.**  I worked there from 1996 till 2000.

5   **Q.**  And then what did you do?

6   **A.**  I -- at the same time, I was also doing private practice,

7   and then I continued with private practice.

8   **Q.**  So are you in private practice now?

9   **A.**  I am.

10  **Q.**  Throughout the course of your medical career, have you ever

11  written a prescription for someone you have never met?

12  **A.**  No, I have not.

13  **Q.**  Do you have a medical license?

14  **A.**  I do.

15  **Q.**  Where?

16  **A.**  New York State.

17  **Q.**  Any other medical licenses?

18  **A.**  No.

19  **Q.**  Do you have a DEA registration number?

20  **A.**  I do.

21  **Q.**  When did you get that?

22  **A.**  At -- around 1991 when I finished my medical school

23  training.

24  **Q.**  And at some point in time, did you respond to an ad in the

25  newspaper regarding possible employment?

**Benjamin – Direct / Ault**

1   **A.**  Around 2005, there was an ad in the New York Times.

2   **Q.**  Okay.

3           And what was the job that was advertised in the

4   paper?

5   **A.**  It was a job for reviewing medical records.

6   **Q.**  Okay.

7           And how did you respond to that ad?  By phone?  Fax,

8   e-mail?

9   **A.**  Probably by phone.

10  **Q.**  That's what you remember now?

11  **A.**  Yes.

12  **Q.**  Okay.

13          And did you speak to someone about the ad?

14  **A.**  Yes.  I spoke to somebody called Nuno B.

15  **Q.**  Okay.

16          Did that person have any other name, or did he just

17  call himself Nuno B.?

18  **A.**  This was the only name that I was given.

19  **Q.**  Have you ever heard of someone named Christopher Napoli?

20  **A.**  No, I have not.

21  **Q.**  Did Nuno B. describe the job?

22  **A.**  He said something about looking at a web site and then

23  patients were coming in with prescriptions from their doctors,

24  and I just had to make sure that in was no conflict in their

25  history.

**Benjamin – Direct / Ault**

1  Q.  Okay.

2          And was it your understanding that you would

3  actually be writing prescriptions for patients?

4  A.  No, it was not.

5  Q.  So he did not tell you that you would actually be writing

6  the prescription?

7  A.  Correct.

8  Q.  In fact, he told you somebody else would be writing the

9  prescriptions?

10  A.  Patients.

11          MR. COHEN:  Objection, Your Honor, leading.

12          THE COURT:  Sustained.

13  BY MS. AULT:

14  Q.  So it would --

15  A.  The patients would be coming --

16          THE COURT:  In this area, we should proceed by way

17  of what you recall and what was said and so forth.

18  BY MS. AULT

19  Q.  And so what do you recall Nuno B. telling you about who

20  would be writing the prescriptions?

21  A.  The patients' doctors.

22  Q.  Okay.

23          Were you asked to send some things to Nuno B.?

24  A.  I was.  Just, I'm assuming, my license and my DEA number.

25  Q.  Well, can I show you...

```
 1              MS. AULT:  Your Honor, may I approach the witness?

 2              THE COURT:  Yes.

 3    BY MS. AULT

 4    Q.  So I'm going to show you Exhibit 583, and if you could flip

 5    to the third page and tell me, is that what you -- is that what

 6    you sent in?

 7    A.  Yes.  That's a copy of my license number and my DEA

 8    certificate.

 9              THE COURT:  583 admitted.

10                    (Government Exhibit 583 was received in

11                    evidence.)

12              MS. AULT:  Thank you.

13              Special Agent Chin, can you put up 583, page number

14    4.

15              THE COURT:  My exhibit list indicates it's an

16    e-mail?

17              MS. AULT:  This is attached to an e-mail.

18              THE COURT:  So is it the e-mail and the attachment?

19              MS. AULT:  Yes, we would like to move the whole

20    exhibit in.

21              THE COURT:  Okay.

22    BY MS. AULT:

23    Q.  So what's displayed on the screen, is that what you are

24    looking at in front of you as 583?

25    A.  Yes.
```

1   **Q.**   And so what is this page?

2   **A.**   This is a page of a fax that I had sent in to Nuno B.

3   **Q.**   Is that your handwriting on the page?

4   **A.**   That is my handwriting.

5   **Q.**   All right.

6          And so it's addressed to Nuno B.; is that correct?

7   **A.**   Correct.

8   **Q.**   All right.  And there's a fax number on there, is that

9   where you sent this?

10  **A.**   Yes.

11  **Q.**   And where did you get that fax number?

12  **A.**   I was given it.

13  **Q.**   By whom?

14  **A.**   Nuno B.

15  **Q.**   All right.

16          And the date that's on there, December 19th, 2005,

17  is that the date that you faxed this in?

18  **A.**   Yes.

19          **MR. CANNON:**  Objection, the first page of this

20  exhibit may be properly admissible, but the following papers

21  would not be.

22          **THE COURT:**  I think I have to look at it, okay?

23          Could we wait just a minute?

24          **MS. AULT:**  Certainly.

25          **THE COURT:**  This is 583?

**Benjamin – Direct / Ault**

```
 1              Okay, you're objecting to the medical license from

 2   the --

 3              MR. CANNON:  I'm objecting.  What the government

 4   has --

 5              THE COURT:  You don't to have describe it.  I mean,

 6   my copy shows -- there are a lot of pages in 583, only some of

 7   which I think were -- are this witness'.

 8              Do you understand?  There are some pages in front of

 9   583 fax sheet.

10              MS. AULT:  There are, Your Honor.

11              THE COURT:  Well, okay, but as to those -- you're

12   objecting as to those.

13              MR. CANNON:  Correct, Your Honor.  I'm not objecting

14   to page 4 of the ten-page document that's been designated --

15              THE COURT:  Let's take this one step at a time.

16              MS. AULT:  So, Your Honor, what I could propose to

17   do is mark the three pages that pertain to Dr. Benjamin as

18   583A, we could move those into evidence.

19              THE COURT:  That's fine, that's a good way of

20   handling it.

21              MR. CANNON:  Those would be which pages?

22              THE COURT:  Well, it's the fax sheet and the medical

23   license and...

24              MR. CANNON:  So it would be pages 4, 5, and 6 of the

25   ten-page PDF?  We have no objection to those going into
```

Benjamin – Direct / Ault

1    evidence.

2              **MS. AULT:**  So we will mark those as 583A.

3              **THE COURT:**  Okay.  One minute.

4              583A is admitted.

5                        **(Government's Exhibit 583A was received in**

6                        **evidence.)**

7              **THE COURT:**  Okay.  We'll straighten that out at the

8    recess, okay.  Thank you.

9              **MS. AULT:**  Can we have page 4 again?

10   **BY MS. AULT:**

11   **Q.**  So, Dr. Benjamin, I had just asked you that date,

12   December 19th, 2005, is that on or about the date that you sent

13   this fax?

14   **A.**  That would be the date that I would have sent it out.

15   **Q.**  Okay.

16              Now, if I'll look over on the side, there is a --

17   kind of a fax line, and it says February 16th, 2005.

18              Is that when you sent this in?

19   **A.**  I don't know whose fax it came from.  But if it was from my

20   fax machine, I never set the dates on my fax machines, so that

21   would not be an accurate date.

22   **Q.**  Okay.

23              But the date you handwrote in there, you think

24   that's accurate?

25   **A.**  That would be the date.

**Benjamin – Direct / Ault**

1    **Q.**  Okay.

2           So if you could flip to the next page.

3           What is that?

4    **A.**  That is a copy of my New York state licensing.

5    **Q.**  Okay.

6           And underneath the copy of the New York state

7    license, next to where it says "signature," what is that?

8    **A.**  My signature.

9    **Q.**  Okay.

10          Do you know why your signature is on this page?

11   **A.**  I don't.

12   **Q.**  Do you remember, were you asked to send your signature in?

13   **A.**  I don't recall.

14   **Q.**  And then can you flip to the next page.

15          And what is that?

16   **A.**  That is a copy of my DEA certificate.

17   **Q.**  Okay.

18          And did Nuno explain why he needed your license,

19   your signature, and your DEA registration?

20   **A.**  No, but I'm assuming he just wanted to verify that I was a

21   physician.

22   **Q.**  Okay.

23          Did he tell you how this review process was going to

24   work?

25   **A.**  No.

**Benjamin – Direct / Ault**

1  *Q.*  Did you understand that it would involve a web site in some

2  form or fashion?

3               *MR. CANNON:*  Objection, Your Honor, it's leading.

4               *THE COURT:*  It's leading.  Sustained on that basis.

5               *THE WITNESS:*  He had showed me the web site.

6  *BY MS. AULT:*

7  *Q.*  I need to ask you another question.  Sorry, I know this is

8  very strange.

9               So did he show you anything in connection with your

10  discussion with him about responding to this job?

11  *A.*  He showed me a web site that I recall he said it had --

12  where the physicians came in, the physician who reviewed those

13  charts would come in from the -- from one side with a

14  different -- with a different password and ID, I guess --

15  *Q.*  Um-hmm.

16  *A.*  -- and looked at the records.

17  *Q.*  Okay.

18               But again, did you understand that you were being

19  asked to write prescription?

20  *A.*  No.

21  *Q.*  After you sent this information in to Nuno B., did you ever

22  hear from him again?

23  *A.*  I did not.

24  *Q.*  And did you ever do any of that review of medical records

25  for him?

 1    **A.**   I did not.

 2    **Q.**   Did you ever write any prescriptions for patients he

 3    referred to you?

 4    **A.**   I did not.

 5    **Q.**   Have you ever heard of someone named Daniel Johnson?

 6    **A.**   No.

 7    **Q.**   DJ Johnson?

 8    **A.**   No.

 9    **Q.**   How about is someone named Jack Palasea *(phonetic)*?

10    **A.**   No.

11    **Q.**   Someone named Jeffrey Entel?

12    **A.**   No.

13    **Q.**   Salvatore Lamorte?

14    **A.**   No.

15    **Q.**   Have you ever written prescriptions for any patients that

16    were referred to you by any of those gentlemen?

17    **A.**   No.

18    **Q.**   Have you ever done any work for any of those gentlemen?

19    **A.**   No.

20    **Q.**   Did it ever come to your attention that prescriptions were

21    being issued using your name and DEA number --

22             **MR. CANNON:**   Objection.  Now we are getting to a

23    point where this line of questioning goes beyond the

24    allegations alleged in the indictment.  I think we are talking

25    about things that occurred after 2006.

1           **THE COURT:**  It may or may not be relevant.

2           **MS. AULT:**  I believe it is relevant, Your Honor.

3           We are talking about things that did happen during

4     the course of the indictment.

5           **THE COURT:**  Okay.  It may come in subject to a

6     motion to strike.

7           **MR. CANNON:**  Your Honor, if anything after the end

8     of 2006, I would ask for a limiting instruction.

9           **THE COURT:**  Well, I don't know -- okay, fair enough.

10    All right.

11          So if the witness is going to testify about events

12    that occurred during the course of the conspiracy which is

13    alleged in the indictment, it comes in for the jury to consider

14    that in connection with the events alleged in the indictment,

15    okay?

16          If the evidence comes in, that is to say, if the

17    testimony is about events that occurred after the document --

18    the term of the indictment or the scope of the document, then

19    it can be received only for the purpose of -- it can't form an

20    independent basis for liability, that is to say, because an

21    event may have occurred, pardon me, after the term of the

22    indictment, the scope, the time of the indictment that's

23    alleged, I mean, the conspiracy that's alleged, then it can be

24    relevant to whether or not the events occurred with respect to

25    the indictment term, but it can't be the basis of independent

 1    liability.

 2            And I think what I need do is listen to the evidence

 3    and then give you an instruction after I've heard this

 4    evidence, give you an instruction as to what it means, because

 5    I think it's simply too vague, what I've said to you is simply

 6    not -- you know, I went to law school and it's even vague to me

 7    at this point.  So I think I'll try to -- I'll try to clarify

 8    it a bit.

 9            But the only thing you should be aware of when you

10    hear of events -- and I think it might be useful for the

11    Government to state what is the term of the conspiracy or term

12    that's alleged in the indictment, what are the dates.

13            **MS. AULT:**  November of 2004 through --

14            **THE COURT:**  Okay, November 2004 to?

15            **MS. AULT:**  December 2006.

16            **THE COURT:**  To December 2006.

17            So the allegation is that actions occurred within

18    that period of time which form the basis for liability of

19    criminal conduct.  That's the allegation, okay?

20            Now, what I'm saying is, there may be some testimony

21    as to what happened after December 2006.  And as to what

22    happened after December 2006, you can consider it, but you can

23    consider it only in connection with the events that occurred

24    between November of 2004 and December of 2006.  It relates back

25    to that period of time.  It doesn't form an independent basis

1   for liability.  But it's something you can consider, along with

2   everything else in this case which you're going to be asked to

3   determine.

4           Okay, maybe I helped, maybe I got a little bit

5   clearer on it.

6           **MR. SABELLI:**  The question I would ask is, the term

7   liability might not be --

8           **THE COURT:**  Well, what I mean by "liability" is --

9   you are going to be asked to determine whether or not the

10  Government has proven its case as it's alleged in the

11  indictment.  That's the decision that you are going to have to

12  make.  And that's what I mean by "liability."  That is to say

13  it can be considered by you for -- in connection with the

14  Government's charge that certain things did happen during the

15  term of indictment -- I mean after the conspiracy.

16          What happened afterwards may reflect upon your

17  decision as to what actually happened during the term.

18          I think that's about as good as it's going to get at

19  this point.

20          Go right ahead.

21          **MS. AULT:**  Thank you, your Honor.

22  **BY MS. AULT:**

23  **Q.**  Dr. Benjamin, did it ever come to your attention that

24  prescriptions were being issued using your name and DEA number

25  without your knowledge?

**Benjamin – Direct / Ault**

1   **A.**   September I got a letter from a patient --

2            **THE COURT:**   Okay, September when?

3   **BY MS. AULT:**

4   **Q.**   September of which year?

5   **A.**   2006.

6            I got a letter from a patient stating that she had

7   gotten my name from a company that told her that I had given

8   her a prescription for a diet pill.

9   **Q.**   Okay.

10           And had you given her a prescription for a diet

11  pill?

12  **A.**   No, I had not.

13  **Q.**   How you do know that you didn't give her a prescription for

14  a diet pill?

15  **A.**   I'm an ophthalmologist.  I don't write for most medications

16  except eye drops.

17  **Q.**   So you only write for medications that are in your

18  specialty?

19  **A.**   Correct.

20  **Q.**   Diet pills were not in your specialty?

21  **A.**   No.

22  **Q.**   What did you do when you got to letter?

23  **A.**   I called the patient.  She had her phone number on the

24  letter.  I called her up.  I wanted to find out how she got my

25  name and --

1          **MR. CANNON:**  Your Honor, I object to this entire

2     line of testimony.  There is no evidence that this letter or

3     these prescriptions is from Safescripts.

4          **THE COURT:**  Well, you're objecting on the basis that

5     it's hearsay?

6          **MR. CANNON:**  It's hearsay --

7          **THE COURT:**  It may be relevant.  You're saying it's

8     hearsay.

9          **MR. CANNON:**  It's hearsay.

10          **THE COURT:**  Okay, I think it's hearsay.  It is

11     hearsay.  Objection sustained.

12     *BY MS. AULT*

13     *Q.*  Okay.

14          So you called the patient?

15     *A.*  I called the patient.

16     *Q.*  Okay.

17          And what did you do then?

18     *A.*  Then I called the pharmacy, the number that she had given

19     me.

20     *Q.*  Okay.

21          What was the name of the pharmacy?

22     *A.*  It was E-Pharmacy Online.

23     *Q.*  Okay.

24          What did you do then?

25     *A.*  I called them up and I wanted to find out why a medication

1    was given with my name on it.

2    **Q.**  And --

3    **A.**  They told me that it was not me, that they had another

4    Dr. Anat Benjamin who was a male physician.

5    **Q.**  All right.

6    **A.**  But they were using my DEA number.

7    **Q.**  Okay.

8              And is a DEA number unique to a physician?

9    **A.**  It is.

10   **Q.**  All right.

11             And did they give you any more information than

12   that?

13   **A.**  They did not give me any more information.

14   **Q.**  Okay.

15             And then what did you do?

16   **A.**  I called the Queens District Attorney's Office to figure

17   out how to deal with this.  And then I sent a letter to the DEA

18   stating that I thought there was some kind of -- somebody using

19   my DEA number.

20   **Q.**  Okay.

21             And then did you do anything else?

22   **A.**  I met with the DEA agents who came to my office.  They

23   showed me some prescriptions that -- and they wanted to verify

24   that it was not my signature.  I verified that it was not my

25   signature.

**Benjamin – Direct / Ault**

1   **Q.**  Okay.

2            And then did you do anything else?

3   **A.**  No.

4   **Q.**  What happened to your DEA number?

5   **A.**  Oh, they suggested that I change my DEA number.  So I got a

6   new DEA number.

7   **Q.**  Do you remember when you did that?

8   **A.**  I don't have the exact date.

9   **Q.**  It would have been right around that September/October time

10  frame?

11  **A.**  Yes.

12  **Q.**  And again, that's 2006?

13  **A.**  Yes.

14  **Q.**  All right.

15           And did you ever send your license and your

16  registration to anybody else who wanted you to do something

17  with their web site?

18  **A.**  No, not -- no.

19  **Q.**  Okay.

20           So Nuno B. is the only one you sent this information

21  to?

22  **A.**  Correct.

23           **MR. CANNON:**  Objection, leading.

24  **BY MS. AULT**

25  **Q.**  Thank you, Dr. Benjamin.  Those are all the questions I

**Benjamin – Cross / Cannon**

```
 1   have for you.  I think the defense counsel will have some

 2   questions for you as well.
```

<u>**CROSS-EXAMINATION**</u>

*BY MR. CANNON:*

**Q.**  Good morning, Dr. Benjamin.

**A.**  Good morning.

**Q.**  I represent Chris Napoli, who is the Nuno B that the
Government is talking about.

         The first time that you talked to him was after you
responded to an ad in the *New York Times*?

**A.**  Correct.

**Q.**  And you read an ad in the *New York Times*.  And could you
tell the jury what that ad -- what was that ad asking?

**A.**  I don't have the *New York Times* ad with me, so I can't
really tell you.  I can just tell you that they were looking
for a physician.  And when I spoke to him, he explained to me
about the web site, what they wanted a physician to do.

**Q.**  Okay.  And did you actually have an opportunity to look at
the web site?

**A.**  I think I did.

**Q.**  And did you page through the web site?

**A.**  Did I?

**Q.**  Page through the web site?

         You indicated how a doctor would link into the web
site so you could look at medical records?

**Benjamin – Cross / Cannon**

1    **A.**  Yes.

2    **Q.**  And those medical records were questionnaires that the

3    patients would fill online, right?

4    **A.**  I don't remember the web site.

5    **Q.**  Okay.

6              And you had a brief conversation with Mr. Napoli,

7    right?

8    **A.**  Correct.

9    **Q.**  And then you sent him your medical -- your -- your

10   credentials?

11   **A.**  Correct.

12   **Q.**  And you didn't hear from him again?

13   **A.**  Correct.

14   **Q.**  He never called you for an interview?

15   **A.**  No.

16   **Q.**  There was simply no follow-up?

17   **A.**  No follow-up.

18   **Q.**  And you didn't hear anything about this at all, never heard

19   from Mr. Napoli again until you were called by the U.S.

20   Attorney in connection with this case, right?

21   **A.**  No, until I got a letter from a patient telling me that --

22   informing me that I had written a prescription for a

23   medication, which I did not.

24   **Q.**  Correct.  And when you got that letter from the patient,

25   there was nothing to connect that prescription to Mr. Napoli,

**Benjamin – Cross / Cannon**

1    was there?

2    **A.**  I didn't -- no, not as far as I know.

3    **Q.**  And you testified earlier that that prescription was

4    actually written by a pharmacy, E-Pharm Online?

5    **A.**  Correct.

6    **Q.**  It wasn't written by an organization called Safescripts?

7    **A.**  The only name I was given from the patient was E-Pharm

8    Online.

9    **Q.**  And you know of no connection between Mr. Napoli and

10   E-Pharm Online, do you?

11   **A.**  I'm not aware of.

12   **Q.**  And when you met with the agents on September 12, you

13   didn't tell them about your interview with Mr. Napoli, did you?

14   Well, calling it your conversation with Mr. Napoli?

15   **A.**  I think I did.

16          **MR. CANNON:**  If I could refresh her recollection,

17   Your Honor, with a report dated 9/13/07, which is --

18          **MS. AULT:**  I don't think she's testified that she

19   doesn't remember.

20          **THE COURT:**  Right.

21   **BY MR. CANNON:**

22   **Q.**  In your -- in your conversation with the DEA agents, are

23   you a hundred percent sure that you mentioned Mr. Napoli's name

24   on September 12th, 2007, when you had a conversation with --

25   **A.**  I never --

1              **MS. AULT:**  Objection.  Misstates her testimony.

2    **BY MR. CANNON**

3    *Q.*  Do you remember merging Chris Napoli's name when you talked

4    to the DEA Agent?

5    *A.*  I never knew Mr. Napoli's name.

6    *Q.*  Do you recall mentioning the name Nuno B?

7    *A.*  I -- yeah I did mention Nuno B.

8    *Q.*  And this is kind of back to -- did you ever follow -- did

9    you ever follow up with Mr. Napoli?

10   *A.*  I did not.

11   *Q.*  Did you have follow up with Nuno B?

12   *A.*  I did not.

13   *Q.*  Now, you called the number on the E-Pharm Online

14   prescription, right?

15   *A.*  Correct.

16   *Q.*  And you told them that you wanted to be taken off, right?

17              When you called the number on the E-Pharm Online

18   prescription company, what did you tell those people?

19   *A.*  I wanted to find out who had given this prescription to the

20   patient.  It wasn't me.

21   *Q.*  Do you recall who you talked to?

22   *A.*  I do not remember the name, but I did -- on the letter that

23   I sent to the DEA, I -- I took down the name that I had spoken

24   to -- whoever I had spoken to at the pharmacy.

25   *Q.*  Okay.  So you sent a letter to the DEA that contains the

**Benjamin — Cross / Cannon**

1   name of the person?

2   *A.*   And the phone number.

3   *Q.*   And the -- and the phone number.

4           And that letter that you sent to the DEA is in

5   addition to the letter that you sent with -- when you forwarded

6   the letter from your client, correct?

7   *A.*   Correct.  Well, maybe not in addition, but together.

8   *Q.*   Okay.  Do you recall if the person you spoke to was a

9   person by the name of Jennifer Russo?

10  *A.*   That is the name.

11  *Q.*   And so Jennifer Russo is the person you talked to at

12  E-PharmOnline.com, right?

13  *A.*   Correct.

14  *Q.*   And you never talked to anybody at Safescripts?

15  *A.*   No.

16  *Q.*   You never talked to anybody at Pharmacy USA?

17  *A.*   No.

18  *Q.*   And do you know of any connection between E-Pharm Online

19  and Safescripts?

20  *A.*   No.

21  *Q.*   Do you know of any connection between E-Pharm Online and

22  Pharmacy USA?

23  *A.*   No.

24  *Q.*   Do you know of any connection between Jennifer Russo and

25  Chris Napoli?

 1   **A.**  No.

 2   **Q.**  Do you know of any connection between Jennifer Russo and

 3   Nuno B?

 4   **A.**  No.

 5   **Q.**  And your patient's name was Melanie Frasier, correct?

 6   **A.**  The patient who sent me the letter was Melanie Frasier, not

 7   my patient.

 8   **Q.**  Okay.  Very good.

 9           **MR. CANNON:**  I have no further questions, Your

10   Honor.

11           **THE COURT:**  Anything else?

12           I think that's it.  Thank you very much.  You're

13   excused, Doctor.  Thank you for coming in.

14                    **(Witness excused.)**

15           **THE COURT:**  Okay.  Ladies and gentlemen, let's take

16   a recess.  We'll be in recess until a quarter of 11:00.

17   Remember the admonition given to you.  Don't discuss the case,

18   allow anyone to discuss it with you, form or express any

19   opinion.

20                 **(Recess taken at 10:25 a.m.)**

21              **(Proceedings resumed/jury in at 10:48 a.m.)**

22           **THE COURT:**  All right.  Let the record reflect that

23   all jurors are present and the parties are present.

24           Call your next witness.

25           **MS. AULT:**  Thank you, Your Honor.

```
 1              The United States calls Kenneth Thomson.

 2                         KENNETH THOMSON,

 3  called as a witness for the Government, having been duly sworn,

 4  was examined and testified as follows:

 5              THE CLERK:  Please state your full name, spell your

 6  last name for the record.

 7              THE WITNESS:  Kenneth Burton Thomson.  Thomson is

 8  spelled T-H-O-M-S-O-N.

 9                       DIRECT EXAMINATION

10  BY MS. AULT:

11  Q.  Mr. Thomson, where do you currently live?

12  A.  Greater Orlando, Florida.

13  Q.  Okay.  How long have you lived in Florida?

14  A.  Since 1993.

15  Q.  What do you do for a living?

16  A.  I'm an attorney.

17  Q.  How long have you been a practicing attorney?

18  A.  Since 1988.

19  Q.  What kind of law do you practice?

20  A.  Characterize it as, basically, business corporate

21  transactional work.

22  Q.  Okay.

23              And where do you work?

24  A.  I have my own firm.

25  Q.  As part of your practice, do you assist in the transfer of
```

**Thomson – Direct / Ault**

1   ownership of businesses?

2   *A.*   Yes, I do.

3   *Q.*   And what role do you play?

4   *A.*   Primarily, I act as what's known locally there as a

5   transaction closing attorney and escrow agent.

6   *Q.*   What does that mean?

7   *A.*   It means, basically, that I take contracts that have been

8   generated by business brokers in the central Florida area, that

9   have been given to the parties, the buyer and seller, they have

10  completed the contract and give it to me to flesh it out.  By

11  that I mean, if the contract requires a note, a promissory note

12  I do that.  Personal guarantees, security agreements,

13  noncompete agreements, whatever the contract calls for, I flesh

14  that out.

15  *Q.*   Okay.  And then as the escrow agent part of your job, what

16  do you do with that?

17  *A.*   I take all the incoming funds and I disburse them at

18  closing.

19  *Q.*   Okay.

20          **MS. AULT:**  Your Honor, may I approach the witness?

21          **THE COURT:**  Oh, yes.

22  **BY MS. AULT:**

23  *Q.*   Mr. Thomson, I'm showing you documents which have been

24  marked as Exhibits 124 through 129.

25          If you could just briefly take a look at those and

```
 1  let me know if they relate to a purchase or a sale that you

 2  acted as the closing attorney for?

 3  A.  Yes, they are documents that -- some of these I have

 4  generated, some were given to me.

 5  Q.  Okay.

 6          MS. AULT:  And so, Your Honor, we'd like to move 124

 7  through 129 into evidence.

 8          THE COURT:  Admitted.

 9          MR. CANNON:  If we could just have a brief minute,

10  Your Honor --

11          THE COURT:  Pardon?

12          MR. CANNON:  If we could just have a brief minute.

13          THE COURT:  Sure.

14          MR. CANNON:  These are extensive.

15          I'm trying to do it quickly and, of course, I'm

16  doing it inefficiently.

17          MS. AULT:  Your Honor, we could perhaps start with

18  128, which is already in evidence.

19          THE COURT:  Okay.

20  BY MS. AULT:

21  Q.  If you could find the document marked 128?

22  A.  Okay.

23  Q.  All right.  And so what business did this relate to?  What

24  was the name of the business that was either being bought or

25  sold?
```

**Thomson – Direct / Ault**

1   **A.**  This is a contract that was prepared by Sunbelt Business

2   Brokers for an asset purchase between SSFOP, LLC, which is

3   designated as buyer, and Discount U.S. Drugs, designated as the

4   seller.

5   **Q.**  Okay.  So was this for the sale of the business known as

6   Discount U.S. Drugs?

7   **A.**  It would be for the sale of the assets of the business of

8   Discount U.S. Drugs.

9   **Q.**  Okay.  Did you draft this contract?

10  **A.**  No, I did not.

11  **Q.**  Who did?

12  **A.**  The standard form was probably given to -- in this case I

13  would assume probably the -- the buyer.

14  **Q.**  Okay.  I'm going to ask you not to speculate.

15  **A.**  Okay.

16  **Q.**  So let me ask it this way:  Is this a standard asset

17  purchase contract and receipt that you have seen many times?

18  **A.**  Yes.

19  **Q.**  All right.  So this is kind of a form contract?

20  **A.**  It is a form contract.

21  **Q.**  Okay.  And what's the date of this contract?

22  **A.**  April 24, 2006.

23  **Q.**  Okay.  And I think -- and who is identified as the buyer?

24  **A.**  The buyer is an LLC called SSFOP.

25  **Q.**  And what was the agreed-upon purchase price?

**Thomson – Direct / Ault**

1   *A.*   $65,000.

2   *Q.*   Okay.  And how was that to be paid?

3   *A.*   There would be an earnest money deposit that would be

4   submitted to me, along with the contract for 10,000.  At a

5   later date, there would be an additional deposit of 15, and a

6   balance due at closing.

7   *Q.*   Okay.

8          Now, if you can flip to -- I think it's the eighth

9   page of that document, it should say "transition agreement" on

10  the top, or "transition arrangement"?

11  *A.*   Yes.

12  *Q.*   Is that part of the standard form contract?

13  *A.*   No.

14  *Q.*   Did you draft that document?

15  *A.*   No.

16  *Q.*   So is that a document that was given to you by one of the

17  parties?

18  *A.*   Yes.

19  *Q.*   Do you remember which one?

20  *A.*   No, I don't.

21  *Q.*   Okay.

22          *MS. AULT:*  Your Honor, we'd like to move on now

23  to some of the --

24          *THE COURT:*  Yeah, they're admitted, subject to a

25  motion to strike.

1              **MR. CANNON:**  Thank you, Your Honor.

2     **BY MS. AULT:**

3     **Q.**  If you could turn to Exhibit 124?

4              Now, what is this document?

5     **A.**  Well, it's a package of several documents with a title page

6     identifying that this is a purchase of corporate stock and the

7     parties who it's between, identifying the broker and

8     identifying myself as the closing attorney.

9     **Q.**  And is this for the same business that the asset purchase

10    contract was for?

11    **A.**  No, the -- the transaction was changed.

12    **Q.**  Okay.  But is it the same -- is the selling business, is it

13    -- is Discount U.S. Drugs the same entity that was involved in

14    the asset purchase contract we looked at as 128?

15    **A.**  Yes.  The -- the shareholder now of Discount U.S. Drugs is

16    selling their stock.  The entity is not selling its assets

17    anymore.

18    **Q.**  But the entity is the same?

19    **A.**  Yes.

20    **Q.**  All right.

21             And so can you briefly explain to us the difference

22    between the asset purchase, which was the subject of the first

23    document we looked at, and this purchase of corporate stock?

24    **A.**  Well, basically, there are just two ways that you would

25    what we generically say as sell a business.  And one would be

1    for the entity itself, let's say Discount U.S. Drugs, to simply

2    look at its balance sheet, identify all of its assets, put a

3    value on them and sell them.

4              At the end of the day, the entity still remains very

5    much intact and it has just sold away its ability now to

6    conduct business.  And that's the way this was originally set

7    up, apparently, from the standard asset purchase contract.

8              The other way would be for the shareholder or

9    shareholders to sell their stock in the corporation, which is

10   really nothing more than just simply a sale of a piece of paper

11   that says stock certificate, so many shares of stock.  The

12   parties put a value on it and it gets sold to the buyer.

13             The corporation, or the entity in this case, has

14   nothing to do with it.  It couldn't care less what's going on

15   over here between the shareholders because it didn't affect the

16   assets of the business.  It just affected the shareholders.

17   Q.  Okay.

18             So let me see if I get this right:  If you have a

19   purchase of corporate stock like what we have in 1- –– Exhibit

20   124, Discount U.S. Drugs remains as it was before, it's just

21   that the ownership changes?

22   A.  That's correct.

23   Q.  Okay.  But if we have a sale of assets, which is what we

24   saw in 128, that means that Discount U.S. Drugs sells off all

25   of its property?

Thomson – Direct / Ault

1   *A.*   Yes.

2   *Q.*   But it still remains as a separate and independent

3   business?

4   *A.*   Yes, but it's usually -- after the transaction it usually

5   dissolves and liquidates.

6   *Q.*   Okay.

7          So did you provide the parties with any advice about

8   how to structure this purchase?

9   *A.*   None whatsoever.

10  *Q.*   And so what was your role, again?

11  *A.*   Transaction closing attorney.

12  *Q.*   And so what --

13  *A.*   Escrow agent.

14  *Q.*   So what specifically did you do?

15  *A.*   Initially, I would have taken that standard asset purchase

16  contract, looked through it to see what I had to do.  In this

17  case there was, as I recall, very little.  There was no owner

18  note back.  So I would simply prepare what I would call the

19  closing document package, which would be several standard

20  documents that would almost be generic for any asset sale.

21         I would do a closing statement or I would reflect

22  all of the money that's coming in and all of the money that's

23  going out.  Put this in a little package and send it out to the

24  parties for their review.

25         Again, I'm not dictating what is in these forms, I'm

**Thomson – Direct / Ault**

1   submitting them for their review and their amendment, if they

2   wish.

3   Q.  Okay.  And so on this purchase of corporate stock document,

4   Exhibit 124, what is the closing date of that transaction?

5   A.  May 8th, 2006.

6   Q.  All right.  And who is listed as the selling shareholder?

7   A.  Howard M. Smith.

8   Q.  Okay.  And if you could look back at Exhibit 124 -- I mean,

9   sorry, 128, is that the same person who was listed as the

10  seller on the asset purchase contract?

11  A.  Howard Smith is signing as a principal of Discount U.S.

12  Drugs, he's an officer.

13  Q.  All right.  And then for the purchase of corporate stock,

14  who is listed as the purchaser?

15  A.  Tarkhenov Trading, LLC.

16  Q.  And if you go back to Exhibit 128, which is that asset

17  sale, who is signing on behalf of SSFOP, LLC?

18  A.  Well, I'm afraid I can't really make out the signature all

19  that well.

20  Q.  Okay.  That's fine.

21         Now, if we could go back to 124, which is the stock

22  purchase agreement, that first page, that cover page, did you

23  -- did you create that?

24  A.  Yes, I did.

25  Q.  All right.  And then if you could go to the second page?

1              Recharacterization of asset purchase contract and

2    receipt, is this something you created?

3    **A.**  Yes, I did.

4    **Q.**  And what is this?

5    **A.**  This is a recognition by the parties that they wish to

6    change the characterization of the transaction from an asset

7    sale to a stock sale.

8    **Q.**  Okay.  And who are the parties?

9    **A.**  Well, I'd have to read through this.  Just a moment.

10             From what I have indicated here that the

11   purchaser -- and I'm assuming the purchaser under the standard

12   asset purchase contract has assigned all of its rights and

13   interest in and to the contract, meaning the standard asset

14   purchase contract, to Tarkhenov Trading.  So they are becoming

15   the assignee and the purchaser, and Howard M. Smith is the

16   shareholder.

17   **Q.**  And so Howard M. Smith is selling his shares?

18   **A.**  Yes.

19   **Q.**  And he was the same one who was the principal of Discount

20   U.S. Drugs that was selling the assets?

21   **A.**  Yes.

22   **Q.**  All right.  And the shareholder in the stock purchase, it's

23   now Tarkhenov Trading that's buying the stock, and they have

24   been assigned the rights of SSNOP from this asset purchase

25   contract?

1   **A.**   Correct.

2   **Q.**   It's all probably as clear as mud.

3             Can you look at Exhibit 125?

4             Is this a document that you created?

5   **A.**   Yes, it is.

6   **Q.**   And what is this?

7   **A.**   This would be my –– my file cover sheet where I've

8   identified the transaction, my internal numbering, what type of

9   a file it is, who the parties are, and some general notes I've

10  made to myself.

11  **Q.**   Okay.  So let's go through the parties.

12             **MS. AULT:**  Can we blow up just this part?

13  **BY MS. AULT**

14  **Q.**   Who do you have listed as the seller?

15  **A.**   Howard Smith.

16  **Q.**   And who do you have listed as –– because there's two

17  different kinds of purchasers you have.  You have assignee

18  purchaser, who is that?

19  **A.**   That name is Christopher Latham.

20  **Q.**   Okay.

21             And then down at the bottom you have a purchaser

22  assignor, who is that?

23  **A.**   Christopher Napoli.

24  **Q.**   All right.

25             And then in the middle there is a listing/selling

Thomson -- Direct / Ault

1   broker, who is that?

2   **A.**   That would be the agent for the brokerage firm that brought

3   me the asset contract initially.

4   **Q.**   And who was that gentleman?

5   **A.**   That gentleman is David Ritt.

6   **Q.**   Now, I'd like for you to take a look at Exhibit 129.

7           Are these a series of e-mails that were sent to you?

8   **A.**   Yes, they are.

9   **Q.**   Okay.

10          And who are they from?

11  **A.**   From Christopher Napoli.

12  **Q.**   Okay.

13          And is he one of the parties that was identified on

14  that sheet that we saw earlier?

15  **A.**   Yes.

16  **Q.**   All right.

17          So in the first e-mail, what -- what is going on?

18  **A.**   This would -- I think this started with an e-mail from me

19  to Christopher Napoli, copied Howard Smith, and I just simply

20  say:  "Gentlemen, several items are attached for review, cover

21  letter, proposed closing agreement, closing documents,

22  preliminary settlement statements, wire instructions.  Please

23  let me know if that leaves you with any questions."

24          And then back from Christopher Napoli is:  "I sent

25  you an e-mail earlier, but it bounced back.  I think I omitted

**Thomson – Direct / Ault**

1    the B, here to go."

2    **Q.**  Does he attach anything to that e-mail?

3    **A.**  There is an attachment called "Transition Agreement

4    Between."

5    **Q.**  And can you identify which of the documents we saw that is

6    that transition agreement?

7    **A.**  If I went back to Exhibit 124, I believe.  There are a lot

8    of pages in this exhibit.  We referred to it earlier.

9    **Q.**  I think it's 128, actually.

10   **A.**  Oh, okay.

11           Yes.  It's Exhibit 128, a transition agreement for

12   sale of Discount U.S. Drugs, its full title.

13   **Q.**  Okay.

14           Now, there's a series of things that appear to be

15   transition agreements.  Can you tell which one of those he

16   attached to that e-mail?

17   **A.**  The fax across the top is not complete, but it's probably

18   this one dated April 24th.

19           **MR. CANNON:**  Objection, calls for -- this is

20   speculative testimony.

21           **THE WITNESS:**  I can't say with specificity which one

22   it is.

23   **BY MS. AULT:**

24   **Q.**  All right.

25           Can you go back to Exhibit 129, please.

**Thomson – Direct / Ault**

1          And so can you look at the second e-mail, it should

2    have the number "5859" on the bottom of the page.  And can you

3    tell us what was going on here?

4    **A.**  I'm being noticed by Chris Napoli that he's being advised

5    by his attorney that they need to buy the stock of Discount

6    U.S. Drugs instead of using the asset purchase contract.

7    **Q.**  Okay.

8    **A.**  And he is -- he, Chris Napoli, is informing that his

9    attorney is making the necessary changes and will be able to

10   settle Monday morning.

11   **Q.**  Okay.

12          And then if you can flip to the last e-mail?  What

13   happened there?

14   **A.**  Again an e-mail from Chris Napoli.  He is attaching a copy

15   of the closing documents prepared by his attorney and informing

16   that Howard has also received a copy and that two wires were

17   made into my trust account, one for 57,000 and one for $2200,

18   which said should go to Howard to cover security deposit for

19   the rent.

20   **Q.**  Okay.

21          If you could flip back to Exhibit 124, which is the

22   stock purchase agreement.  You said that you created the cover

23   sheet is that correct, right?

24   **A.**  Yes.

25   **Q.**  And the recharacterization of asset purchase contract?

**Thomson — Direct / Ault**

1    **A.**  Yes.

2    **Q.**  Now, the next page, the stock purchase agreement, did you

3    create that?

4    **A.**  I did not.

5    **Q.**  Okay.

6            So that's something that was given to you by one of

7    the parties?

8    **A.**  Yes.

9    **Q.**  Do you know who gave it to you?

10   **A.**  I have no specific recollection, sorry.

11   **Q.**  Okay.  That's fine.

12           Now, if you could turn to Exhibit 126?  I believe

13   you said -- testified that part of your job was also to act as

14   the escrow agent?

15   **A.**  That's correct.

16   **Q.**  Okay.

17           And so how -- how would you do that?

18   **A.**  As I think I said in one of those e-mails, I give my wiring

19   instructions to the parties, initially that's to the buyer, so

20   that the deposits, the earnest money deposit, the other

21   deposit, and in this case the closing funds, would all be wired

22   into my trust account.

23   **Q.**  Okay.

24           And the first page of Exhibit 126, what is that?

25   **A.**  This is a statement I get from Bank of America when they

**Thomson – Direct / Ault**

1    receive a wire.  And it indicates that "on April 25th, you

2    received $10,000."

3    *Q.*  And who sent the $10,000?

4    *A.*  The originator is PSA LLC.

5    *Q.*  And what was this $10,000 deposit for?

6    *A.*  That would have initially been the earnest money deposit

7    under the standard asset purchase contract.

8    *Q.*  Okay.

9              And that's for the purchase for the assets of

10   Discount U.S. Drugs?

11   *A.*  Yes.

12   *Q.*  All right.

13             Request you -- can you flip to the second page.  And

14   can you tell me what that is?

15   *A.*  This is an internal document that I use.  This is taking

16   the information I have received from my bank and putting it

17   into my firm's accounting software, indicating this is a

18   receipt, if you will.

19             And it indicates that I'm putting this $10,000 into

20   my trust account.

21   *Q.*  Okay.

22             And what date did you do that?

23   *A.*  This is dated April 25th, 2006.

24   *Q.*  Okay.

25             And that's the same $10,000 we just saw?

**Thomson – Direct / Ault**

1    **A.**  Yes.

2    **Q.**  All right.

3            And then under the description, what does it say

4    there?

5    **A.**  It says "Kevin Mullin (PSA LLC deposit.)"

6    **Q.**  And so what does that mean?

7    **A.**  I'm trying to identify what this is for.

8    **Q.**  Okay.

9            Is that the person or the entity that sent you the

10   money?

11   **A.**  Yes, it would be the remitter.

12   **Q.**  Okay.

13           And if you could flip to the next page, what is

14   that?

15   **A.**  This is the next step down in my internal accounting where

16   I would indicate for this file that I have opened -- I have put

17   in $10,000.

18   **Q.**  Okay.

19           And, again, it says there is Discount U.S. Drugs and

20   PSA LLC.  Why are those two notations in there?

21   **A.**  Discount Drugs would be the name of the file, the remitter

22   in this case, PSA LLC, for 10,000.

23   **Q.**  Okay.

24           And then if you could flip two more pages on to the

25   page that says 5798 at the bottom, what is this?

 1  **A.**  This is another one of my receipts for my Peach Tree

 2  Accounting internal accounting system where I have receipted

 3  $2200, came in by wire.  Under "Description," I have "Chris

 4  Napoli closing funds, discount" and then it probably got

 5  truncated, I probably said "Discount U.S. Drugs."

 6  **Q.**  And what date did this wire transfer come in?

 7  **A.**  This was May 5th, 2006.

 8  **Q.**  And again, Chris Napoli, is that the remitter of the

 9  funds --

10  **A.**  Yes.

11  **Q.**  -- to the person who sent them?

12  **A.**  Yes.

13  **Q.**  All right.

14          If you could flip to the next page?

15  **A.**  Again, the next step down into Discount Drugs' files, I've

16  indicated that $2,200 was received from.

17  **Q.**  I think that yours may be in a different order.

18          Are you looking at a page that says "5800" on the

19  bottom?

20  **A.**  5800.

21  **Q.**  So this is the next step in your accounting procedure?

22  **A.**  Yes, just like the previous one.

23  **Q.**  Okay.

24          And then can you go to the next page?

25  **A.**  5799?

**Thomson — Direct / Ault**

1  **Q.**  Yes.

2  **A.**  Yes.  This again is from my Peach Tree, the receipt of a

3  wire.  $57,658 on May 5th, 2006.  Remitter:  Chris Napoli.

4  I've indicated closing funds, again, Discount Drug.

5  **Q.**  Okay.

6        And the next page, I think should say 5801 on the

7  bottom?

8  **A.**  Yes.

9  **Q.**  All right.

10        And what is that?

11  **A.**  Again, my second step for the file, Discount Drugs received

12  $57,658.  Remitter, Christopher Napoli.

13        There is a "parens 2" after that because the program

14  that I have will not accept an exact name again.

15  **Q.**  Okay.

16  **A.**  So I have to designate it separately.

17  **Q.**  Okay.

18        If you could flip to the last page, which should

19  have "5803" on the bottom of it.

20  **A.**  Yes.

21  **Q.**  What is this?

22  **A.**  This is a printout of the file for Discount Drugs showing

23  all of the incoming funds and the disbursed funds.  The

24  incoming funds are dated, as we just went through, the 10,000,

25  the 57,000, and the 2200.

**Thomson – Direct / Ault**

1  **Q.**  Um-hmm.

2  **A.**  On May 8th of 2006 from my trust account, I have various

3  check numbers and payees that would have been paid at closing.

4  **Q.**  Okay.

5          And who are those payees?

6  **A.**  Just following through here, PSA LLC received $3488;

7  Ferrari Business Brokers, this is again a problem in the

8  program, but I have to match the disbursement exactly to the

9  income, so in this case his check was split according to this,

10  but I believe he received 10,000 in total.

11  **Q.**  Okay.

12          So you were just splitting up that $10,000 between

13  PSA and Ferrari Business Brokers?

14  **A.**  Well, I'm splitting it up because the program will only

15  allow me to remove, let's say, from the first 10,000, $10,000.

16  **Q.**  Okay.

17  **A.**  And I have to go through the list of payees at the time of

18  closing and kind of break that out so that you get at the

19  bottom, you get zero where I have disbursed everything that

20  came in.

21  **Q.**  Okay.

22  **A.**  It's a crazy system, but --

23  **Q.**  Okay.

24  **A.**  -- it works.

25  **Q.**  So what's the next block down?

1   **A.**   It starts with the $57,000 income.   3488 was given to

2   Ferrari Business Brokers.   $54,170 was paid to Howard M. Smith.

3   **Q.**   Okay.

4          And then the next block down?

5   **A.**   That comes under the $2200 deposit.   I paid myself 1800.   I

6   paid another attorney, Steven Broome, $160, who did a judgment

7   and lien search, probably back when we got the contract, to see

8   that any -- that there weren't any clouds on the title of the

9   assets that were anticipated being conveyed.

10          And finally PSA LLC received $240 of that.

11  **Q.**   Okay.

12          Can you flip back to Exhibit 124.

13          And I'd like for you to go to the end and see if you

14  can find a page that has "5760" on the bottom.

15          **MS. AULT:**   I think it's 42.

16          **THE WITNESS:**   Okay.

17  **BY MS. AULT**

18  **Q.**   Okay.

19          Can you the us what this document is?

20  **A.**   This is the first page of my four-page closing statement.

21  **Q.**   Okay.

22          And so what does this document explain?

23  **A.**   This identifies the parties.   The -- in this case, the

24  corporation whose stock was being sold.   It identifies all of

25  the incoming funds and the disbursed funds.   It is just simply

1    a breakdown of the money, the total money coming in, the total

2    money going out.

3    Q.  And so the total money coming in, are those the deposits

4    that we looked at before, the 10,000, the 2,200, and the

5    57,658?

6    A.  That's correct.

7    Q.  And can you explain how the money was disbursed?

8                 THE COURT:  Didn't he already do this?  Am I missing

9    something here?  I mean, is this --

10                MS. AULT:  All right, Your Honor, if I may?

11                THE COURT:  Well, is it not repetitive?

12                MS. AULT:  I will make it not repetitive, Your

13   Honor.

14   BY MS. AULT:

15   Q.  Under the line "PSA LLC," what notation do you have there?

16   A.  "Refund overpaid closing funds."

17   Q.  What does that mean?

18   A.  I'm not sure.

19   Q.  Okay.

20                Did any of the money to purchase either the stock or

21   the assets of Discount U.S. Drugs come from Tarkhenov Trading?

22   A.  No.

23   Q.  Did any of the money to purchase either the stock or assets

24   of Discount U.S. Drugs come from Christopher Latham?

25   A.  No.

Thomson – Cross / Cannon

```
 1   Q.  Did Chris Napoli ever tell you what he was planning to do
 2   with Discount U.S. Drugs after he bought either the assets or
 3   the stock?
 4   A.  No.
 5   Q.  Did anyone discuss with you how Discount U.S. Drugs would
 6   be operated after the sale?
 7   A.  No.
 8   Q.  Did anybody seek any advice from you about whether what
 9   they wanted to do with Discount U.S. Drugs was legal or not?
10   A.  No.
11   Q.  Did anyone associated with this purchase seek any advice
12   from you about running an Internet pharmacy?
13   A.  No.
14            MS. AULT:  Those are all the questions I have, Your
15   Honor.
16                      CROSS-EXAMINATION
17   BY MR. CANNON:
18   Q.  Good morning, Mr. Thomson.
19   A.  Good morning.
20   Q.  I'm Chris Cannon, and I represent Chris Napoli.
21            And I just want to make sure I understand how the
22   transaction works.
23            In Florida, is it common for an attorney to act as
24   an escrow officer would work in California?  If you understand
25   that question.
```

**Thomson – Cross / Cannon**

A.   It's -- it's common in the Central Florida area to be a

transaction closing attorney.

Q.   Okay.

          And a transaction closing attorney is the person who

makes sure the documents get prepared, makes sure they get

signed, holds the money, and says, okay, the money can get

paid, the documents are signed, the deal is closed; is that

right?

A.   Basically, yes.

Q.   So do you know what a title company is in California?

A.   No.

Q.   But so you -- and the term in Florida is a "transaction

closing attorney," right?

A.   Yes.

Q.   So the transaction closing attorney is an escrow person,

you are not a person who participates in the deal, right?

A.   That's correct.

Q.   You are kind of a neutral party who just makes sure that

the two parties that are negotiating at arm's length have

somebody in the middle to make sure that -- it's kind of like

hostage negotiation; is that a good way of describing it?

A.   Well, I have nothing to do with the transaction, the

creation of the contracts.

Q.   Okay.

A.   I'm really nothing more than a scrivener.

1    **Q.**  And you wouldn't give advice to any party in the

2    transaction?

3    **A.**  Absolutely not.

4    **Q.**  And it's really common in these transactions for the terms

5    of the deal to change as it's ongoing, correct?

6    **A.**  They can change, yes.

7    **Q.**  And there are many different reasons for the terms of the

8    sale to change, aren't there?

9    **A.**  Yes.

10   **Q.**  Nobody would really even have an obligation to tell you why

11   the terms are changing, because you are just the neutral party

12   holding the document and the money until the deal closes,

13   right?

14   **A.**  That's correct.

15   **Q.**  And in this case, did the transaction go through several

16   different phases, shall we say?

17   **A.**  Yes.

18   **Q.**  It was first going to be an asset purchase agreement?

19   **A.**  Yes.

20   **Q.**  And then it was going to be a stock sale, right?

21   **A.**  Correct.

22   **Q.**  And Chris Napoli's name is all over all the documents in

23   this case, right?

24   **A.**  Yes.

25   **Q.**  He wasn't hidden in any way?

1  **A.**  I'm sorry, I didn't --

2  **Q.**  He wasn't hidden in any way?

3  **A.**  No.

4  **Q.**  And the first person you talked to was Kevin Mullin, right?

5  Do you recall that?  Do you remember Ms. Ault showed you a

6  check from Kevin Mullin?

7          **MS. AULT:**  I believe that misstates the --

8          **MR. CANNON:**  I'm sorry.

9  **BY MR. CANNON**

10 **Q.**  Ms. Ault showed you an entry in your trust account

11 reflecting a check from Kevin Mullin that was the initial

12 deposit in this transaction?

13         **MS. AULT:**  That also misstates the testimony.

14         **MR. CANNON:**  Could you -- you can clarify, that's

15 fine.

16         **MS. AULT:**  I believe it's from PSA LLC.  He made a

17 notation of Kevin Mullin next to it.

18         **THE WITNESS:**  It was a wire transfer.  It wasn't a

19 check.

20 **BY MR. CANNON:**

21 **Q.**  Okay.  It was a wire transfer.

22         Why did you put the notation "Kevin Mullin" there?

23 **A.**  I can't tell you why I did at this point.

24 **Q.**  Okay, that's fine.

25         In addition to the Exhibit 124 that the Government

1   showed you, I'd like to mark for evidence as Defense Exhibit

2   3003.

3                    **(Defendant's Exhibit 3003 was marked for**

4                    **identification.)**

5            **MR. CANNON:**  And can you pull it up, please, Kevin?

6   *Q.*  Does that look like an earlier version of the deal from

7   your records?

8   *A.*  Yes.

9   *Q.*  And that's something kept in the ordinary course of your

10  business?

11  *A.*  Yes.

12  *Q.*  And it was turned over to the Government in response to a

13  subpoena?

14  *A.*  Yes.

15          **MR. CANNON:**  I would move Defense Exhibit 3003 into

16  evidence, Your Honor.

17          **THE COURT:**  Admitted.

18                    **(Defendant's Exhibit 3003 was received in**

19                    **evidence.)**

20          **MR. CANNON:**  Kevin, can you please pull up page 1 of

21  that document.

22  **BY MR. CANNON:**

23  *Q.*  Page 1, please.

24          Okay.  Is that page 1 of the document that you are

25  now looking at?

**Thomson – Cross / Cannon**

1   **A.**   Yes.

2   **Q.**   Are you looking at page 1 of the document on the screen,

3   not on the document in front of you?

4   **A.**   Both, they're the same.

5   **Q.**   Very good, thank you.

6          And does page 1 of Exhibit 3003 indicate who the

7   parties in the transaction are going to be?

8   **A.**   Yes, it does.

9   **Q.**   And does it indicate that the purchaser was going to be

10  Chris Napoli doing business as SSFOP LLC?

11  **A.**   Well, the purchaser would be SSFOP by Christopher Napoli as

12  officer, as president.  The purchaser would be SSFOP, LLC.

13  **Q.**   Okay.

14          And then was the purchaser going to assign the

15  contract to another entity?

16  **A.**   That would appear to be the case.

17  **Q.**   And do you recall if Tarkhenov Trading LLC was a Florida

18  LLC?

19  **A.**   I do not recall.

20  **Q.**   As a Florida transactional attorney, sometimes in your

21  experience would there be advantages to having a Florida LLC

22  being a party to a transaction?

23  **A.**   Certainly if it's -- if it's a Florida business doing

24  business in Florida, there would be benefits to that.

25  **Q.**   And just like there are benefits to doing a stock sale as

1    opposed to an asset sale, right?

2    **A.**   Yes.

3    **Q.**   And one of the reasons, and I'll be brief about this, that

4    there were -- there was going to be a stock sale in this case

5    is because if there's a stock sale, the corporation continues,

6    correct?

7    **A.**   Correct.

8    **Q.**   And that's important for regulatory reasons, right?

9    **A.**   Yes.

10   **Q.**   And if the corporation continues, the licenses continue,

11   right?

12   **A.**   That would be correct.

13             **MR. CANNON:**   And could you, Kevin, could you please

14   pull up Exhibit 129, page 2.  And, Kevin, if you could blow up

15   the part where he's talking about "another fork in the road,"

16   it's the first -- first e-mail.

17   **BY MR. CANNON:**

18   **Q.**   And did you get an e-mail from Chris Napoli telling you

19   that's why the deal was being changed from an asset sale to a

20   stock purchase sale is to deal with licensing issues?

21   **A.**   That's correct.

22   **Q.**   And he told you he had gotten that advice from his

23   attorney?

24   **A.**   That's correct.

25   **Q.**   You had no reason to question that?

1  *A.*   None.

2  *Q.*   The kind of thing that you see in these transactions all

3  the time?

4  *A.*   It happens, yes.

5  *Q.*   Okay.

6          *MR. CANNON:*  No further questions, Your Honor.

7          *THE COURT:*  Anything further?

8          *MR. SABELLI:*  No, Your Honor.

9          *MR. COHEN:*  No, Your Honor.

10         *MS. AULT:*  I do have a small amount of redirect,

11  Your Honor.

12                 **REDIRECT EXAMINATION**

13  *BY MS. AULT:*

14  *Q.*   Mr. Thomson, the Exhibit, 3003 that the defense has

15  marked --

16         *MS. AULT:*  And, Ms. Espinosa, can we get the ELMO?

17  *BY MS. AULT:*

18  *Q.*   What it say on the very top of the first page?

19  *A.*   It says "Draft" in capital letters and in parentheses below

20  it "for review purposes only.  Not to be executed by the

21  parties."

22  *Q.*   Okay.

23         And if you can flip through that, are any of the

24  pages of this document actually signed?

25         *MR. CANNON:*  And to the save time, Your Honor, we'll

```
 1    stipulate that it wasn't signed as a draft purchase agreement.
 2                 THE WITNESS:  No, I don't see any that were signed.
 3    BY MS. AULT:
 4    Q.  If you look at Exhibit 124, was that document signed?
 5    A.  Yes.  This document is signed.
 6    Q.  Okay.
 7    A.  Yeah.
 8    Q.  And on the cover page of that document, does Christopher
 9    Napoli's name appear anywhere?
10    A.  No.
11    Q.  If you flip to the second page, does Christopher Napoli's
12    name appear anywhere?
13    A.  No.
14    Q.  Flip to the third page, does Christopher Napoli's name
15    appear anywhere?
16    A.  No.
17    Q.  And then we'll flip through to page 17.
18    A.  Which?
19    Q.  Should be --
20    A.  Oh, 17 of the agreement.
21    Q.  Yes, there should be page numbers on the bottom.
22    A.  Yes.
23    Q.  Does Christopher Napoli's name appear there?
24    A.  No.
25    Q.  Flip to page 20, does Christopher Napoli's name appear
```

**Thomson − Redirect / Ault**

1    there?

2    **A.**   No.

3    **Q.**   Page 21, Christopher Napoli appear on that page?

4    **A.**   I don't have a page 20.

5    **Q.**   Oh, it should say "Addendum to the Stock Purchase

6    Agreement"?

7    **A.**   His name does not appear there.

8    **Q.**   Okay.

9            Flip to the next page the signatures to that

10   addendum.

11   **A.**   Not signed by anybody, no Christopher Napoli.

12   **Q.**   Okay.

13           And then if you could flip to where it says "Closing

14   Documents for the Stock Purchase Agreement"?

15   **A.**   Um−hmm.

16           **MS. AULT:**   One more page.

17   **BY MS. AULT:**

18   **Q.**   Does his name appear on that page?

19   **A.**   No.

20   **Q.**   And the Affidavit and Indemnity Agreement, does his name

21   appear there?

22   **A.**   No.

23   **Q.**   Or on the following page?

24   **A.**   No.

25   **Q.**   And then if you can flip to the end of −− or that closing

1    agreement for the Stock Purchase Agreement, does his name

2    appear --

3    **A.**  No.

4    **Q.**  Okay.

5           And, in fact, does his name appear in any of the

6    rest of this document?

7    **A.**  I don't believe so.

8              **MS. AULT:**  Thank you, Your Honor.

9              **THE COURT:**  Anything further?

10             **MR. CANNON:**  Just briefly, Your Honor.

11                    **RECROSS—EXAMINATION**

12   **BY MR. CANNON:**

13   **Q.**  Mr. Thomson, the deal was changed from an asset sale to a

14   stock purchase sale, right?

15   **A.**  It was changed.

16   **Q.**  And stock purchase sale, the stock was purchased Tarkhenov

17   Trading, right?

18   **A.**  Yes.

19   **Q.**  And Tarkhenov Trading was also anticipated to be part of

20   the asset sale, right?

21   **A.**  They were --

22   **Q.**  About you look at page 1 of Exhibit 3003, please.

23           Page 1.

24   **A.**  Page 1.  Yeah, they were -- Tarkhenov was the assignee,

25   yes.

Thomson – Recross / Cannon

1    *Q.*  Correct.

2           And so the deal that actually happened, Tarkhenov,

3    which was the assignee in the asset sale, became the purchaser

4    of the shares in the stock purchase sale, right?

5    *A.*  That would be appear to be the case.

6    *Q.*  So there would be no reason for Chris Napoli to sign any

7    documents in connection with the -- I'm sorry, there would be

8    no reason for Chris Napoli to sign any documents in connection

9    with the stock sale, correct?

10   *A.*  I don't know his capacity with Tarkhenov Trading.

11   Christopher Latham appears for that -- that LLC.

12   *Q.*  Correct.

13          And if you look at page 42 of Exhibit 1 -- is that

14   page 124 -- yeah, the Government's Exhibit 124, if you could

15   look at page 42 on the screen, please.

16          Okay.

17          So if you look at page 42 of Exhibit 124, I

18   believe --

19          *MR. CANNON:*  Is that correct, Kevin?

20   *BY MR. CANNON*

21   *Q.*  Exhibit 124, that shows the refund for the overpaid closing

22   of these to PSA LLC, correct?

23   *A.*  Yes, it does.

24   *Q.*  And that was the entity that Mr. Napoli was the control

25   person of?

1   **A.**   I can't say that directly, but could be.

2   **Q.**   Okay.

3            So looking at these documents, when you look at

4   these, do these look like typical business transaction

5   documents to you?

6   **A.**   Yes, basically.

7   **Q.**   Does it look like there was any attempt to hide Christopher

8   Napoli's involvement in this transaction?

9   **A.**   I can't say any more than what I just said.  It looks like

10  a typical transaction.

11  **Q.**   Okay.  No further questions, thank you.

12           **THE COURT:**   Thank you, Mr. Thomson.

13           Call your next witness.

14           **MS. BROWN:**   Your Honor, the United States calls

15  Carmine Catizone.

16                    **CARMINE CATIZONE,**

17  called as a witness for the Government, having been duly sworn,

18  was examined and testified as follows:

19           **THE CLERK:**   Please state your full name, spell your

20  last name for the record.

21           **THE WITNESS:**   Carmine Catizone, C-A-T-I-Z-O-N-E.

22                    **DIRECT EXAMINATION**

23  **BY MS. BROWN:**

24  **Q.**   What do you do?

25  **A.**   I am a pharmacist, and I'm also executive director of the

**Catizone – Direct / Brown**

 1  National Association of Boards of Pharmacy.

 2  *Q.*  And could you please describe your educational background?

 3  *A.*  I have a degree in pharmacy from the University of

 4  Illinois, as well as a master's degree in pharmacy

 5  administration from the University of Illinois.

 6  *Q.*  What did you do after earning your master's?

 7  *A.*  I began working with the National Association of Boards of

 8  Pharmacy as the test and measurements director.

 9  *Q.*  Did you also work as a pharmacist?

10  *A.*  Yes.  Prior to working with NABP, I was a practicing

11  pharmacist in both the retail setting, working for a large

12  chain, and working in hospitals as well.

13  *Q.*  Could I ask you to move the microphone a little closer to

14  you, please.  You are a little hard to hear.

15         And for how long did you practice as a pharmacist

16  before joining the National Association of Boards of Pharmacy?

17  *A.*  I practiced for 14 years.

18  *Q.*  And when did you join the National Association of Boards of

19  Pharmacy?

20  *A.*  1985.

21  *Q.*  And what is your current title there?

22  *A.*  I'm the executive director and secretary of the Board of

23  Directors.

24  *Q.*  When did you become the executive director?

25  *A.*  In 1988.

Catizone – Direct / Brown

1   **Q.**   What is the National Association of Boards of Pharmacy?

2   **A.**   The National Association Boards of Pharmacy is the

3   organization of all the state associations that regulate

4   pharmacists and pharmacies and protect the public health.  Our

5   association helps the states protect the public health.

6   **Q.**   When was it founded?

7   **A.**   It was founded in 1904.

8   **Q.**   And is it based in Illinois?

9   **A.**   Yes.

10  **Q.**   And the acronym for the National Association of Boards of

11  Pharmacy is NABP, right?

12  **A.**   Correct.

13  **Q.**   Okay.

14          And as executive director, could you describe some

15  of your duties briefly.

16  **A.**   Sure.

17          I oversee a staff of 130 people that are involved in

18  designing the national licensure examination for pharmacists,

19  that maintain a national clearing house of disciplinary actions

20  that record what a pharmacist does in every state and whether

21  or not that pharmacist can transfer a license to any state, as

22  well as accreditation programs for pharmacies, wholesale

23  distributors, and Internet pharmacies.

24  **Q.**   And have you published in the field of pharmacy practice?

25  **A.**   Yes.

1    **Q.**  Can you give an approximate number of your publication?

2    **A.**  Sure.

3            I have a published and presented over a hundred

4    chapters and books, articles or presentations before various

5    groups.

6    **Q.**  Can you give some examples of some of the types of things

7    that you have published?

8    **A.**  Sure.

9            I have a published on evaluating the competence of a

10   pharmacist, how to measure that.  I have a published on

11   pharmacy laws, covering all aspects of pharmacy practice, what

12   pharmacies do, what the responsibilities are.  Also published

13   in clinical aspects of pharmacy, what pharmacists should know

14   about medications and what pharmacists should do in treating

15   patients.

16   **Q.**  And in what types of publications you published pieces?

17   **A.**  They have appeared in the professional journals as well as

18   in national media and local print media as well.

19   **Q.**  Okay.

20           Have you appeared in the media discussing

21   professional pharmacy practice?

22   **A.**  Yes.

23   **Q.**  Can you briefly describe the nature of those media

24   appearances?

25   **A.**  Sure.

**Catizone – Direct / Brown**

1          Again, most of those appearances have been about

2   pharmacy practice and regulation, protecting the public health,

3   and most recently about Internet pharmacy.  I've appeared on

4   "CNN," "The Today Show," "Good Morning America," "Oprah," a

5   number of national and local new stations, as well as all of

6   the national evening news programs.

7   **Q.**  Okay.

8          Have you also testified previously before any

9   legislative bodies?

10  **A.**  Yes.

11  **Q.**  Could you describe that testimony, where you've testified?

12  **A.**  I've testified in every state except for Alaska, either

13  before the Boards of Pharmacy or before the State Legislature.

14  **Q.**  How about national legislative bodies?

15  **A.**  I've appeared several times before the U.S. Senate and

16  Congress, talking on Internet pharmacy and other practice

17  issues as well.

18  **Q.**  And have you also testified in court in administrative

19  hearings in the field of pharmacy practice?

20  **A.**  Yes.  I've testified in about 12 federal criminal

21  proceedings and about five administrative hearings for the Drug

22  Enforcement Administration.

23  **Q.**  And as executive director for the National Association of

24  Boards of Pharmacy, do you have some familiarity with Internet

25  pharmacies?

**Catizone − Direct / Brown**

1    **A.**  Yes.

2    **Q.**  And can you describe what the NABP does with respect to

3    reviewing and accrediting Internet pharmacies?

4    **A.**  Sure.

5          We began our research in Internet in 1995 when we

6    noticed a significant problem occurring with Internet

7    pharmacies.  We established an accreditation program in 1997

8    called the "Verified Internet Practice Site Program," whereby

9    we review all the policies and procedures that an Internet

10   pharmacy may be engaged in, as well as physically surveying

11   every aspect of that pharmacy to make sure they are in

12   compliance with all state and federal laws and regulations, as

13   well as all standards of practice.

14   **Q.**  And the -- are you familiar with the acronym, VIPPS,

15   V-I-P-P-S?

16   **A.**  Yes.  That refers to our "Verified Internet Pharmacy

17   Practice Site accreditation program.

18   **Q.**  Okay.

19          **MS. BROWN:**  Your Honor, at this time the United

20   States would offer Mr. Catizone as an expert in the field of

21   professional standards relating to pharmacy practice.

22          **THE COURT:**  You may proceed.

23          **MR. CANNON:**  I would have no objection.  I would ask

24   for a brief sidebar.

25          **THE COURT:**  No, I'm not going to do it right now.

1   BY MS. BROWN

2   Q.   First of all, who is covering your expenses for your travel

3   here?

4   A.   The U.S. Attorney's Office is paying for my air and hotel

5   and meals.

6   Q.   And outside of your travel expenses like air and hotel and

7   meals, how much are you charging for your testimony and work in

8   this case?

9   A.   I'm not charging any fee whatsoever.

10  Q.   Has the Government asked you to form an opinion in the

11  case?

12  A.   Yes.

13  Q.   Have you done so?

14  A.   Yes.

15  Q.   Okay.

16          Before we get into the details of that opinion, let

17  me ask some background questions.

18          What are you relying on for the basis of your

19  opinion today beginning with your personal training and

20  experience?

21  A.   I'm relying on my education, training as a pharmacist, and

22  also my experience, employment, and involvement with state

23  regulations for 27 years as test and measurement director and

24  executive director of the National Association of Boards of

25  Pharmacy.

**Catizone – Direct / Brown**

1   Q.   In your capacity as the executive director of the NABP,

2   have you worked with all state pharmacy boards?

3   A.   Yes.

4   Q.   And you are involved in the accreditation process for

5   pharmacies?

6   A.   Yes.

7   Q.   Are there also guidelines and standards that form part of

8   the basis for your opinion today?

9   A.   Yes.

10  Q.   Could you briefly describe some of those.

11  A.   There are standards of practice for pharmacists and

12  pharmacies that delineate how a pharmacist should comply, what

13  laws and regulations and what standards of care that

14  pharmacists and pharmacies should meet in order to provide care

15  to patients and other stakeholders they may serve.

16        There are also guidelines on our web site with our

17  accreditation program that talks about the various criteria and

18  what those criteria mean and how a pharmacy would comply with

19  the criteria and the laws and regulations.

20  Q.   And does the National Association of Boards of Pharmacy

21  maintain a database of statutes and regulation?

22  A.   Yes, we do.  We have ever single states laws and regulation

23  in a computer database that we access on a daily basis.

24  Q.   Have you also received items from the Government in

25  connection with forming your opinion --

 1   **A.**  Yes.

 2   **Q.**  -- in this case.

 3         And could you describe those?

 4   **A.**  I reviewed some video clips of undercover purchases.  I

 5   reviewed investigative reports prepared by the Government.  I

 6   reviewed patient records and information regarding the

 7   dispensing of prescriptions and prescribing of those

 8   prescriptions and those Internet orders.

 9         I also looked at standards of practice from other

10   organizations such as the Federation of State Medical Boards,

11   the American Medical Association.  I've reviewed the DEA

12   guidance document from 2001.  And I've reviewed the state laws

13   and regulations of all those states that may have regulations

14   or provisions with regard to Internet pharmacy, including North

15   Carolina, New York, Florida, California, Iowa, Indiana, West

16   Virginia, Texas, approximately 20 to 30 states that have

17   specific provisions on Internet.

18   **Q.**  Okay.

19         And of those states that you mentioned, the 20 or 30

20   that had specific provisions regarding Internet pharmacies,

21   were some of those enacted before 2005?

22   **A.**  Approximately 20 states had specific provisions prohibiting

23   the use of a questionnaire or cyberspace consultation as the

24   sole basis of the validity --

25         **MR. COHEN:**  Objection, Your Honor, this is legal

1    conclusion testimony.  It's not properly notice, it's not

2    properly given.

3            **MS. BROWN:**  Okay, I'll move on.

4    **BY MS. BROWN:**

5    **Q.**  Could you please give a short summary of your opinion as to

6    whether it's in the usual course of professional pharmacy

7    practice for a pharmacist to fill prescriptions written by a

8    doctor based solely on an online questionnaire?

9    **A.**  No.

10           **MR. CANNON:**  Your Honor, I'm going to object if he

11   expands upon that because in the disclosure that's been given,

12   it's in violation of Rule 704(b).

13           **THE COURT:**  You're saying the opinion is in

14   violation of 704(b) that he's about to give?

15           **MR. CANNON:**  Yes.

16           **MS. BROWN:**  I think he can provide the basis of his

17   opinion.  He's answered the question briefly, I think he can

18   provide the basis.

19           **THE COURT:**  Ladies and gentlemen, let's take our

20   recess now.  We'll be in recess until 1:00 o'clock.

21           Remember the admonition given to you.  Don't discuss

22   the case, allow anyone to discuss it with you, form or express

23   any opinion.

24           I'll see you at 1:00.

25                   **(Jury exits courtroom at 11:53 a.m.)**

**Proceedings**

```
 1              THE COURT:  Okay.  Let the record reflect the jurors

 2     have left.

 3              Okay.  What's the objection?

 4              MR. CANNON:  Your Honor, can we have a discussion

 5     outside the presence --

 6              THE COURT:  Why?  Why?  Why should it be outside --

 7     what you're doing is you're saying he's about to give an

 8     opinion which is beyond the scope of what he has said.  I think

 9     it's important -- if you're correct, he'll have to be

10     admonished.  If you're incorrect, then he doesn't have to be

11     admonished.

12              So I don't understand why it should be outside the

13     presence of the witness.  It seems to me it's key that it's in

14     his presence.

15              MR. CANNON:  That's fine, Your Honor.

16              Rule 704(b) --

17              THE COURT:  No, I know what 704(b) does.  What you

18     have to do is you have tell me why what he is going to say is

19     broader than the disclosure that has been given, because I

20     assume that's basis.

21              MR. CANNON:  There are two separate things.  The

22     first is, the disclosure that has been given is in violation of

23     704(b).  The disclosure that has been given says that these --

24              THE COURT:  Okay.  Well, that's a little late for

25     that right now.  So --
```

**Proceedings**

1          **MR. CANNON:**  Your Honor, this was raised earlier.

2          **THE COURT:**  Oh, well, did I rule on it?

3          **MR. CANNON:**  I believe the Court ruled that he was

4    not allowed to testify as to the defendant's state of mind,

5    which is forbidden --

6          **THE COURT:**  Fine.

7          **MR. CANNON:**  -- from 704(b), but the expert report

8    that he gave uses the term "knowingly."  So I want to be very

9    clear that he does not use the term "knowingly" when he's

10   testifying before the jury.

11         **THE COURT:**  All right.

12         **MS. BROWN:**  I don't expect --

13         **THE COURT:**  Okay.  So you understand that you cannot

14   testify as to the individual defendants or collective

15   defendants' state of mind.  You can't say what they knew and

16   what they didn't know.  You can say -- you can't relate it to

17   their particular knowledge.  That's up to the jury to find,

18   what they knew or what they didn't know.

19         **THE WITNESS:**  Yes, sir.

20         **THE COURT:**  Okay.

21         **MR. CANNON:**  The second, Your Honor, is that he was

22   noticed as a medical expert.  He's been testifying about state

23   regulations.  He cannot opine as to legal standards.  All he

24   can opine is as to medical standards, specifically as to

25   pharmacy standards.  That's what he was noticed to testify

1    about.

2          **MS. BROWN:**  I think he was opining about pharmacy

3    standards and the laws and regulations that they may --

4          **THE COURT:**  As they relate to pharmacy standards.

5          **MS. BROWN:**  Correct.

6          **THE COURT:**  Okay.  Thank you very much.  That will

7    be it.  Thank you.

8                    **(Luncheon recess taken at 11:55 a.m.)**

9                    **(The following proceedings were held**

10                   **outside the presence of the jury at 1:00**

11                   **p.m.:)**

12         **THE COURT:**  Okay, let the record reflect the jurors

13   are not present, the parties are.

14         Okay, Mr. Cohen?

15         **MR. COHEN:**  In a nutshell is this:  We received a

16   very anemic disclosure from this witness as to his opinions.

17   We've litigated the fact that this witness is confined to the

18   opinions that he set forth in this document.  Those do not

19   include any of the legal conclusions and the legal opinion

20   testimony that it seems he intends to elicit or to have

21   elicited.

22         And I think that the Court needs to be aware that

23   the Eighth Circuit, in 2009, specifically ruled that

24   Mr. Catizone's testimony cannot include the kinds of things

25   that it sounds like he is intending to testify about.

**Proceedings**

 1          **THE COURT:**  Well, when you say, "it sounds like he

 2   is intending to testify about," are you basing your

 3   prognostication clearly not on the disclosure, because it's

 4   your view that the disclosure limits it.  It's based upon his

 5   testimony at a prior trial.

 6          **MR. COHEN:**  It's based on upon what has already

 7   transpired this morning --

 8          **THE COURT:**  Really?

 9          **MR. COHEN:**  -- and the appearance that he intends to

10   testify about the law in a variety of jurisdictions, perhaps to

11   interpret the statutes that apply in this case.  You're right,

12   all I can do is put the Court on notice and alert the Court to

13   the fact that we will be objecting in the event --

14          **THE COURT:**  Well, I don't understand.  Let's say he

15   were to testify that he's been in a number of jurisdictions and

16   testified publicly and told people about these standards

17   publicly and so forth.  Why isn't that admissible to put people

18   on notice that this is -- these are -- this is what is expected

19   in connection with the standards.

20          **MS. BROWN:**  I think what Mr. Cohen, if I understand,

21   is objecting to is he doesn't want Mr. Catizone, as was

22   litigated in this Eighth Circuit case that Mr. Cohen referred

23   me to, to opine on -- almost as a legal expert as to what a

24   statute or standard means.  And I wasn't intending to do that.

25          He is going to talk about the California statutes,

1    as he did in the last trial, and the testimony, which I believe

2    was provided to the defense.  I was planning to ask him sort of

3    in his capacity as a pharmacy expert, not as a lawyer, what he

4    understand those statutes to mean as it relates to the

5    standards of professional pharmacy practice.  I don't believe

6    there's anything objectionable about that.

7                    *THE COURT:*  Okay.

8                    *MR. COHEN:*  The proof is in the pudding, Your Honor.

9                    *MS. BROWN:*  Well, I'll try not to stir the pudding

10   in a way that disturbs anybody.  But I think -- what he's

11   planning to testify to I don't think is problematic, but we'll

12   see.

13                   *THE COURT:*  Okay.  Let's proceed.

14                   **(Jury in at 1:04 p.m.)**

15                   *THE COURT:*  Okay.  Let the record reflect all jurors

16   are present.  You may proceed.

17                   *MS. BROWN:*  Thank you, Your Honor.

18                   <u>DIRECT EXAMINATION, CONTINUED</u>

19   *BY MS. BROWN:*

20   *Q.*  Mr. Catizone, right before we broke for the break, I had

21   asked you to give a short summary of your opinion, so let me

22   just go back to that.

23              In your opinion, briefly, is it within the usual

24   course of professional pharmacy practice for pharmacists to

25   fill prescriptions written by a doctor based solely on an

**Catizone – Direct / Brown**

1   online questionnaire?

2   *A.*  As a pharmacist, no.

3   *Q.*  Okay.  Let me ask you a few background questions about

4   pharmacy practice before we explore that opinion in some

5   detail.

6            Are pharmacies regulated?

7   *A.*  Yes, they are.

8   *Q.*  By whom?

9   *A.*  By the State Boards of Pharmacy in each state.

10  *Q.*  And you work with the various state boards of pharmacy in

11  your capacity with the NABP, correct?

12  *A.*  Yes.

13  *Q.*  And what is a State Board of Pharmacy?

14  *A.*  State Board of Pharmacy is constituted by a state

15  legislature --

16            *MR. CANNON:*  Your Honor, this is legal testimony

17  rather than medical testimony.

18            *THE COURT:*  No, I don't think it's legal testimony.

19  It's the testimony of a --

20            *MS. BROWN:*  I think it's appropriate testimony for

21  an expert to --

22            *THE COURT:*  -- describe the entities upon which he's

23  basing his opinion and his reason for it.

24            *MS. BROWN:*  Yes.  It's outside the, you know, common

25  knowledge of a juror what a State of Board of Pharmacy is.

Catizone – Direct / Brown

1  BY MS. BROWN

2  Q.  So, go ahead.

3  A.  A State Board of Pharmacy is constituted by the state

4  legislature, and their responsibility is to implement the laws

5  and regulations that the state legislature passes.  The State

6  Board of Pharmacy is specifically responsible to regulate

7  pharmacists and pharmacies.

8  Q.  Are you familiar with the term "controlled substance"?

9  A.  Yes.

10 Q.  And, briefly, what is a controlled substance?

11 A.  A controlled substance is a subset of prescription drugs.

12 Prescription drugs require a prescription from a doctor in

13 order to be dispensed, which is different than a product that

14 you can buy over the counter without a prescription.

15         And within that class of prescription drugs, there

16 are substances called controlled substances that have a strong

17 potential for abuse and addiction, that have different

18 requirements and additional requirements than other

19 prescription drugs.

20 Q.  Okay.  Can you briefly explain the five schedules for

21 controlled substances?

22 A.  The five schedules are based upon how potent and

23 how dangerous --

24         MR. COHEN:  Objection, nonresponsive.

25         MS. BROWN:  I asked --

**Catizone – Direct / Brown**

1           *THE COURT:*  Overruled.

2               *THE WITNESS:*  -- on how potent and how dangerous

3   those products are.  So a Schedule I controlled substance has

4   no medical value.  A product in Schedule I would be heroin.

5               Schedule II has a very significant potential for a

6   patient taking those drugs to become addicted to those products

7   or to abuse those products.  In this category, you see some of

8   the pain medications like Oxycodone.

9               Schedule III --

10          *MR. SABELLI:*  Your Honor, I'm sorry.  I'm going to

11  object.  This is beyond the scope.  It's also beyond a court

12  ruling that we had in this area.

13          *THE COURT:*  Proceed.

14          *THE WITNESS:*  Schedule III, again going down the

15  schedule, is less problematic than Schedule II but then again

16  more problematic than Schedules IV and V.  And Schedule III

17  include products like phentermine, which is used for weight

18  loss.  Schedule IV -- I'm sorry, it includes Phendimetrazine as

19  a Schedule III product.

20              Schedule IV are products like Valium and Xanax and

21  phentermine.  Schedule III -- I'm sorry.  And -- Schedule III,

22  I'm sorry, are Phendimetrazine, which is, again, less than a

23  Schedule II but more than a Schedule IV.

24              Schedule IV are products like Valium and Xanax and

25  phentermine.  And then Schedule V are products that you don't

 1   need a presumption for but you can buy through the pharmacy,

 2   but you have to sign certain documents and present

 3   identification.  And those are used to control diarrhea or bad

 4   coughs.

 5   **Q.**  According to the -- let's get into a little bit more of the

 6   bases for your opinion.

 7              According to the professional standards for practice

 8   of pharmacy, what does a pharmacist need to do prior to

 9   fulfilling a prescription?

10   **A.**  As a pharmacist, you have three areas that you must look at

11   when a prescription is presented to you.  One, you have to

12   establish that it's a valid prescription, that the doctor that

13   wrote that prescription was practicing within their scope of

14   practice.

15              So, for example, if you had a dentist and that

16   dentist was prescribing products that would -- may be used to

17   treat a cancer patient, that would raise a red flag, or if you

18   had an anesthesiologist and that anesthesiologist was

19   prescribing pain medications --

20              **MR. COHEN:**  Objection, Your Honor.

21              **MS. BROWN:**  I think he's giving an example of what

22   is required --

23              **THE COURT:**  Objection overruled.

24              **THE WITNESS:**  -- which may be outside that doctor's

25   scope, the pharmacist needs to examine that further.

```
 1              Within that whether or not it's a valid prescription
 2   examination, the pharmacist also has to establish that there
 3   was a legitimate relationship between the doctor and the
 4   patient.  And that relationship is established based upon the
 5   standards of practice.
 6              MR. CANNON:  Your Honor, this is quite a narrative,
 7   and I know -- could we have a question and answer process?
 8              MR. STEVENS:  I've asked him to go through what is
 9   required for a pharmacist to determine that a prescription
10   should be fulfilled.  He's going to -- he mentioned the three
11   steps and I believe he's explaining the first.
12              MR. SABELLI:  My understanding, Your Honor, is he's
13   explaining the second.  He's now about to give an opinion about
14   a valid doctor-patient relationship, which is the subject of
15   another witness' expert testimony, not this witness' expert
16   testimony.
17              MS. BROWN:  I think --
18              MR. SABELLI:  Objection.  Beyond the scope, Your
19   Honor.
20              MS. BROWN:  I'm not sure what it's beyond the scope
21   of, but Mr. --
22              MR. CANNON:  Beyond the scope of the noticed expert
23   opinion.
24              THE COURT:  Objection's overruled.
25              Go ahead.
```

**Catizone – Direct / Brown**

1          **THE WITNESS:**  So the basis for the pharmacist then

2     ascertaining that this is a valid prescription is that a

3     physical examination has occurred and that there's a medical

4     condition that that patient has and that the doctor has

5     prescribed the medication to treat that condition so that

6     there's a logical relationship between the examination, what

7     that doctor diagnosed the patient as having, and the medication

8     that was prescribed.

9          The second component is whether or not that

10    medication's appropriate for that patient from a clinical

11    perspective.  If a child comes in and the prescription is for

12    an adult dose, the pharmacist has to look at that and say this

13    medication is not appropriate for that patient, I need to

14    contact the doctor and make sure that this is either an

15    appropriate medication or to get that medication changed.

16         The third area is to look for any fraud or abuse

17    that may be happening with that prescription.  If that patient

18    stole the prescription pads or if that patient obtained that

19    prescription through some illegal means or if the pharmacist

20    suspects that there's some sort of fraud or diversion going on,

21    as a pharmacist, you have to look at that situation, examine

22    that situation, and then make a decision to not fill that

23    prescription if there's a fraud or abuse, as well as to notify

24    the legal authorities that something here is occurring that

25    could be a fraud or abuse case.

**Catizone – Direct / Brown**

1  *BY MS. BROWN*

2  *Q.*   Okay.  Let's go back to the first aspect, making sure that

3  there's a valid prescription.  I think one of the things you

4  mentioned is a face-to-face examination or meeting --

5           *MR. COHEN:*  Objection, misstates the testimony.

6  *BY MS. BROWN:*

7  *Q.*   Is that not what you mentioned or is that what you

8  mentioned?

9  *A.*   Yes.

10           *MR. COHEN:*  Objection, leading.

11           *THE COURT:*  Overruled.  Overruled.

12           *THE WITNESS:*  Yes, I mentioned that.

13  *BY MS. BROWN:*

14  *Q.*   Okay.  Now, that's a necessary component of a

15  doctor-patient relationship, correct?

16           *MR. COHEN:*  Leading, Your Honor.

17           *THE COURT:*  Overruled.

18           Go ahead.

19  *BY MS. BROWN:*

20  *Q.*   Could you explain -- I'm sorry.

21           Is that a necessary component of a doctor-patient

22  relationship?

23  *A.*   Based upon the standards of practice for a pharmacist, yes.

24  *Q.*   Okay.  So how does that necessary component, the

25  doctor-patient relationship, relate to the standards of

**Catizone – Direct / Brown**

 1  professional pharmacy practice?

 2  *A.*   If that relationship doesn't exist or if it's not valid,

 3  then based upon the standards of practice, a pharmacist should

 4  not and cannot fill that prescription because that prescription

 5  is not valid.

 6  *Q.*   Okay.  How do the responsibilities of a doctor and a

 7  pharmacist relate with respect to prescription medication?

 8  *A.*   They work in tandem.  The doctor has to have that valid

 9  relationship, and then the pharmacist has a corresponding

10  responsibility to ascertain that relationship before dispensing

11  that prescription and, as a pharmacist then, examine those

12  three areas that I mentioned earlier.

13  *Q.*   Let's take the second area that you mentioned, which I

14  think was ensuring that a medication is clinically appropriate.

15          Are you familiar with the term "drug utilization

16  review"?

17  *A.*   Yes, I am.

18  *Q.*   Could you explain that, briefly?

19  *A.*   Sure.  Again, the standards of care for a pharmacist

20  require that before a prescription is dispensed to a patient,

21  the pharmacist has to conduct a drug utilization review.  And

22  what that means is they look at the patient information that

23  they have, they look at other medications the patient's taken,

24  they look at any allergies, food, or medicine that the patient

25  may have, and they have to evaluate that prescription to say,

 1   is this the appropriate prescription and medication for that

 2   patient.  If not, they have to take steps to fix that so that

 3   the patient's not harmed.

 4   **Q.**  Does the requirement that a pharmacist ensure that a

 5   medication is clinically appropriate also relate to the scope

 6   of the doctor's practice and the medicine being prescribed?

 7   **A.**  Yes.  That's a primary requirement or standard of care that

 8   the pharmacist must look at to make sure that the physician, in

 9   simple terms, knows what they're doing in regard to the patient

10   and really has the ability within their scope to write the

11   right medication for that patient.

12   **Q.**  Okay.  So if, for example, an anesthesiologist is issuing

13   many, many prescriptions for weight loss drugs, how would that

14   circumstance relate to the standards of professional pharmacy

15   practice?

16          **MR. COHEN:**  Objection, Your Honor.  This is

17   specifically what we've litigated and it's beyond the scope of

18   this expert's notice.

19          **THE COURT:**  Don't know that it's beyond the scope.

20          Let me see the proffer.

21          **MS. BROWN:**  The notice?

22          **THE COURT:**  Yeah, okay.

23          **MS. BROWN:**  And just to be clear, the disclosures

24   that the Government provided supplementing that also included

25   his prior testimony and many of --

1          **THE COURT:**  Oh, it did?

2          **MS. AULT:**  It did.

3          **THE COURT:**  Prior testimony?

4          **MS. AULT:**  Yes, Your Honor.

5          **MR. COHEN:**  In all 12 cases in which he's testified?

6          **MS. AULT:**  We specifically disclosed -- on

7    March 9th, 2012, we reproduced expert disclosures.  As part of

8    that, we reproduced the expert report in addition to the

9    testimony he gave at the previous trial.

10          **THE COURT:**  Okay.

11          **MR. COHEN:**  And this is a different issue, Your

12    Honor, this is --

13          **THE COURT:**  I don't know that it's a different --

14    you're saying this is a notice issue and the Government has

15    just said they gave you this witness' prior testimony.

16          **MR. COHEN:**  Yes.

17          **THE COURT:**  Do you want me to stop and review that

18    prior witness' testimony, because you're on notice that that's

19    what his testimony would be.

20          **MR. COHEN:**  Your Honor, the issue is --

21          **THE COURT:**  Well, I can stop it now.

22          **MR. COHEN:**  I think this needs to be done at side

23    bar, frankly.

24          **THE COURT:**  Side bar?

25          **MR. COHEN:**  Yes, Your Honor.

```
 1              THE COURT:  Okay.  Ladies and gentlemen, talk.

 2                       (Side bar held.)

 3              THE COURT:  Mr. Cohen.

 4              MR. COHEN:  Your Honor, I'm using "notice" so as not

 5   to telegraph the issue to the jury.  What I mean is that we

 6   specifically litigated the propriety of this expert testifying

 7   to the facts of this particular case and rendering an opinion

 8   on the facts of this particular case.  The Government can say

 9   that was simply an example that they chose out of thin air, but

10   when they --

11              THE COURT:  Oh, no.  He can testify as to the facts

12   in this particular case.  What he can't say is -- he can say --

13   every expert can say, given a hypothetical set of facts, do you

14   find it to be within or without -- there is no -- otherwise,

15   the testimony is irrelevant if it's not tied to a specific --

16   what he can't say is that those facts are true; that is, that

17   there was a prescription for anesthesiology or there was this

18   or there was that, he can't say that.

19              He can say, however, given a set of facts, a

20   hypothetical set of facts, X, I believe this is -- this is

21   outside the scope of professional practice.  That he can say,

22   and that -- I'll take that one to the bank, because that's the

23   whole foundation of experts.

24              Every expert can come in and give an opinion on a

25   basic -- on a set of hypothetical facts.  What they can't --
```

 1    okay, if you've got notice -- I thought you were making a

 2    different argument.  If I knew you were making this argument,

 3    we wouldn't have had a side bar, but if you are making the

 4    notice argument -- anyway.  Good afternoon, everybody.

 5            **MR. CANNON:**  I just want to make sure that the

 6    record is clear on what this notice was.

 7            **THE COURT:**  It was the testimony in the prior case.

 8            **MR. CANNON:**  Correct, just the testimony in the

 9    prior case.  We weren't given notice of the testimony in the

10    other --

11            **THE COURT:**  I don't care about that.  I was here for

12    the prior case, and if you were given notice of that,

13    officially given notice of that, then that's within the scope

14    of the disclosure.

15            Really, let's try to move on a bit.  I mean, I don't

16    mind objections, you certainly have a right to make objections,

17    but whether it's -- experts all -- it's an artificial thing

18    with experts.  On a leading objection, it's absolutely

19    artificial.

20            **MR. COHEN:**  Fine, but this is what we litigated.

21    The issue is they can -- if there happened to be an

22    anesthesiologist named Joseph Carozza, who, for example, issued

23    these prescriptions, where is the line between the hypothetical

24    and the facts?

25            **THE COURT:**  Great, I've got that.  It's on the

**Catizone – Direct / Brown**

```
1    record.  I understand that.  And so -- I could be wrong.  And
2    if I'm wrong, then a court will say I'm wrong if there is a
3    conviction in the case.  But, anyway, I think it's a proper
4    line of questioning.  Okay.
5              MS. AULT:  Thank you, Your Honor.
6                     (Side bar concludes.)
7              THE COURT:  You may proceed.
8                 DIRECT EXAMINATION, CONTINUED
9    BY MS. BROWN:
10   Q.  Did you finish your response to the last question?
11             THE COURT:  Well, nobody remembers it.
12             (Laughter.)
13             THE COURT:  Let's just go back.  We'll get the court
14   reporter to read it back.
15             (Question read back as follows:
16                  "So, if, for example, an
17                  anesthesiologist is issuing many, many
18                  prescriptions for weight loss drugs,
19                  how would that circumstance relate to
20                  the standards of professional pharmacy
21                  practice?"
22             THE WITNESS:  As a pharmacist, as that patient
23   brings in a prescription, the pharmacist, from the clinical
24   perspective, would look at the scope of that doctor's practice.
25   So if the doctor is an anesthesiologist, the pharmacist then
```

**Catizone – Direct / Brown**

1   would assume and be able to judge what types of medications

2   perhaps reply being prescribed.

3           You would expect that outside of surgery or a

4   surgical procedure, the patient may be nauseated or maybe the

5   patient may be a bit anxious after the surgery and that the

6   anesthesiologist would prescribe medications to treat those two

7   conditions.

8           To see an anesthesiologist's prescription for weight

9   loss wouldn't fit within that scope of practice because the

10  pharmacist would have to ask the clinical question, how is an

11  anesthesiologist treating a patient for weight loss when their

12  specialty and scope of practice is supposed to be preparing a

13  patient for surgery and then helping a patient after surgery to

14  recover.  That would be a question the pharmacist would have to

15  ask and would have to substantiate with the anesthesiologist.

16  *Q.*  So would that be one of the red-flag-type situations that

17  you mentioned in your earlier testimony?

18  *A.*  Yes.

19  *Q.*  Okay.

20          One of the pharmacist's other responsibilities that

21  you mentioned, I think it was the third aspect, was ensuring

22  that there's no fraud or diversion going on with the

23  prescription.  Could you explain a little bit what you meant by

24  that and how that relates to the professional standards of

25  pharmacy practice?

 1    **A.**  Again, the pharmacist has to look at each and every

 2    prescription to make sure that patient obtained that

 3    prescription in a legal way.  If they suspect that the patient

 4    was involved in stealing prescription pads or perhaps had done

 5    something to misrepresent a condition or disease in order to

 6    get medications, or the patient may be abusing that medication

 7    or may be getting that medication to sell on -- to sell and

 8    divert that medication, the pharmacist also has to look for

 9    those by interacting with a patient, looking at the

10    prescription, and then looking at the information they may have

11    on that patient and that doctor in their pharmacy records.

12    **Q.**  Does a pharmacist need to have certain background

13    information about the doctor and the patient before the

14    pharmacist can dispense medication?

15    **A.**  Yes.

16    **Q.**  How does that requirement play out in a city like New York

17    or Chicago where there are many, many, I don't know, millions

18    of people?

19    **A.**  That standard of practice, whether it's a small pharmacy

20    where the pharmacist knows all the patients and doctors, or

21    whether it's a large chain that may have pharmacies in many

22    cities and many states and may operate in a large city, the

23    pharmacist still must ascertain that that relationship exists

24    between the doctor and patient and that's a legitimate patient.

25                Now, in a large city or a large chain, they have

**Catizone – Direct / Brown**

 1    accumulated information on those doctors and the pharmacist

 2    also has to obtain some information on that patient.

 3              If they don't obtain that information, if they don't

 4    examine that prescription and examine that doctor and patient,

 5    they are not meeting those standards of practice that every

 6    pharmacy and every pharmacist have to follow.

 7    *Q.*  Can you -- tell me this:  Does a pharmacist have to

 8    question a patient every time the patient comes in to pick up a

 9    prescription?

10    *A.*  No.

11    *Q.*  And why not?

12    *A.*  If the pharmacist has substantiated that this is a valid

13    prescription and it's appropriate for the patient and when the

14    patient's getting that prescription filled, they are monitoring

15    it and making sure they are taking it as they should, and the

16    patient doesn't have complaints or there is not other

17    medications that are being prescribed for the patient that may

18    indicate something else is going on, then there is no need for

19    the pharmacist to question the patient.

20    *Q.*  How about, does the pharmacist have to call a doctor every

21    time a prescription is presented?

22    *A.*  The pharmacist has to call a doctor every time there is a

23    question about that prescription.  Whether it's a valid

24    prescription, whether it's right for the patient, or whether

25    something has changed with that patient that would raise a

Catizone – Direct / Brown

1    question in that pharmacist's mind, they have to call.

2    *Q.*  Can you give an example of a type of circumstance in which

3    a pharmacist, acting in accordance with the professional

4    standards of pharmacy practice, would have a duty to inquire of

5    the patient or the doctor?

6    *A.*  Sure.

7            The two areas that we talked about earlier, whether

8    or not they believe that it wasn't a valid prescription, that

9    that relationship didn't exist, or if they suspected fraud.

10           The other area would be, let's say a patient comes

11   in and gets a prescription for Valium and then a few days later

12   gets a prescription for Xanax.  The pharmacist would look at

13   those prescriptions and say, these are basically the same

14   medications to treat the same conditions, and if this patient

15   takes both medications at the same time, they could have a

16   serious reaction to those medications.

17           They would also ask themselves, why are they being

18   prescribed basically the same types of medication within a few

19   days?  That type of situation would necessitate the pharmacist

20   stopping the process and calling the doctor to ascertain what's

21   going on with this patient and whether or not that patient

22   should be getting those two prescriptions.

23   *Q.*  Does the fact that a prescription may be for a controlled

24   substance have any relevance to the pharmacist's duties to act

25   in accordance with the usual standards of professional

**Catizone – Direct / Brown**

 1   practice?

 2   **A.**   Yes.

 3   **Q.**   How so?

 4   **A.**   A controlled substance is a very special medication because

 5   of what I mentioned earlier, the ability it has to cause

 6   addiction or abuse and the dangerous nature of that medication.

 7   So when a controlled substance is prescribed, the pharmacist

 8   has an extra responsibility to make sure that it's a valid,

 9   that it's safe, and that the patient's taking it as was

10   prescribed.

11   **Q.**   Okay.

12           Is there any significance to the quantity of pills

13   in a prescription in terms of a pharmacist's duty to inquire in

14   response to potential red flags?

15   **A.**   Yes.

16   **Q.**   Could you explain that?

17   **A.**   Again, what that pharmacist has to look within the four

18   corners of that prescription about every detail on that

19   prescription and particularly with controlled substances.

20           So if they see a prescription from a dentist for a

21   patient for a pain medication, then they should realize that

22   that pain medication should be for a very limited time period.

23           If they see a prescription for a large quantity of

24   pain medications, with refills, that would be a red flag.

25           Similarly, if a patient's taking medications for

**Catizone – Direct / Brown**

1   weight loss, it's quite clear what that standards of care are

2   for weight loss.  Those medications are supposed to be used for

3   a very limited time period and they are not supposed to be

4   refilled until further evaluation has been done by that

5   patient.

6           So if a pharmacist saw a prescription or weight loss

7   medications, for large quantities, and saw those medications

8   being refilled time and time again, that would violate

9   standards of practice and that would be something that the

10  pharmacist should notice and should talk with the doctor and

11  patient about.

12  *Q.*  Okay.

13          Is there any significance to the physical appearance

14  of a person getting prescription medication --

15  *A.*  Yes.

16  *Q.*  -- in terms of a pharmacist's duty to inquire?

17  *A.*  Yes.

18  *Q.*  Could you explain that?

19  *A.*  Sure.

20          When the pharmacist dispenses the prescription or

21  takes in the prescription, there is an opportunity to observe

22  the patient and interface with that patient.  So if, for

23  example, the patient was receiving a medication for an eye

24  infection and the pharmacist, in talking and looking at the

25  patient, didn't detect an eye infection, the pharmacist should

**Catizone – Direct / Brown**

1    talk to that patient, because taking that medication could

2    really damage their eyes and damage their sight.

3           Similarly, if a pharmacist saw a prescription for

4    weight control and the patient didn't seem obese or didn't meet

5    the requirements that are in the literature and standards of

6    care for using medications to treat obesity, the pharmacist

7    should have a question there and again talk to the doctor and

8    talk to the patient.

9    *Q.*  Okay.

10          Under the standards of professional pharmacy

11   practice, can a pharmacist just look at the four corners of a

12   prescription, rely on the information therein, and just

13   dispense the medication?

14   *A.*  No.

15   *Q.*  Why not?

16   *A.*  The pharmacist is responsible by -- through the standards

17   of care for everything on that prescription, and everything on

18   that prescription is important to the pharmacist making a

19   decision about whether they should dispense that prescription

20   or not.

21   *Q.*  Okay.

22          In your opinion, is it within the usual course of

23   professional pharmacy practice for a pharmacist to dispense

24   medication based upon a patient's selection of the drugs they

25   want without a doctor having made that assessment?

**Catizone – Direct / Brown**

```
 1   A.  No.

 2   Q.  And is it within the usual standards of pharmacy practice

 3   for a pharmacist to dispense medication when it's the patient

 4   rather than a doctor that's chosen the dosage of the

 5   medication?

 6   A.  No.

 7   Q.  How about when it's the patient rather than the doctor

 8   that's chosen the quantity of medication?

 9   A.  No.

10   Q.  Does the State of California have regulations governing the

11   standards of pharmacy practice?

12   A.  Yes.

13   Q.  Okay.

14           I'm showing you what has been marked as 710, 711 and

15   also I'm going to take up 716.

16           MS. BROWN:  Permission to approach.

17                   (Handing exhibits to witness.)

18   BY MS. BROWN:

19   Q.  If you could look first at 710 and 711.

20   A.  Okay.

21   Q.  And are you familiar with those?

22   A.  Yes, I am.

23   Q.  And what are those exhibits?

24   A.  Um, these are regulations or requirements that talk to the

25   standards of care in the Medical Act as well as in the Pharmacy
```

 1    Act.

 2    *Q.*   In the State of California?

 3    *A.*   In the State of California.

 4    *Q.*   And do those statutes, do they help to inform the standards

 5    of professional pharmacy practice in your opinion and as set

 6    forth by the National Association of Boards of Pharmacy?

 7    *A.*   Yes.

 8            *MS. BROWN:*   We would move to admit 710 and 711 as

 9    California State statutes relevant to his opinion.

10            *MR. CANNON:*   Objection.

11            *THE COURT:*   I'll have them marked for ID,

12    identification.

13            *MS. BROWN:*   I'd like to display them --

14            *THE COURT:*   Yeah.

15            *MS. BROWN:*   -- as a demonstrative.

16            *THE COURT:*   I think you have to ask him a further

17    question whether his opinion is based in part on the document.

18    *BY MS. BROWN:*

19    *Q.*   Is your opinion based in part on the California State

20    statutes that have been presented to you?

21    *A.*   Yes.

22    *Q.*   Okay.

23            *MS. BROWN:*   For demonstrative purposes, then, I

24    would ask Special Agent Chin to pull up 710, page 1, and

25    paragraph A, if you could blow that up.

Catizone – Direct / Brown

 1   *BY MS. BROWN:*

 2   *Q.*   Could you please read that?

 3   *A.*   "No person or entity may prescribe, dispense or furnish or

 4   cause to be prescribed, dispensed or furnished dangerous drugs

 5   or dangerous devices as defined in Section 4022 on the Internet

 6   for delivery to any person in this state without an appropriate

 7   prior examination and medical indication except as authorized

 8   by Section 2342."

 9   *Q.*   I think it says 2242.

10   *A.*   Oh.

11   *Q.*   But in any event, if you could go to 711, Exhibit 711, page

12   1, please.

13              And again, paragraph A?

14   *A.*   "No person or entity shall dispense or furnish or cause to

15   be dispensed or furnished dangerous drugs or dangerous devices

16   as defined in Section 4022 on the Internet for delivery to any

17   person in this state without a prescription issued pursuant to

18   a good-faith prior examination of a human or animal for whom

19   the prescription is meant.

20              "If the person or entity either knew or reasonably

21   should have known that the prescription was not issued pursuant

22   to a good-faith prior examination of a human or animal or if

23   the person or entity did not act in accordance with Section

24   1761 of Title 16 of the California Code of regulations."

25   *Q.*   Okay.

**Catizone – Direct / Brown**

1          So in your capacity as an expert on pharmacy

2    practice, and understanding that you're not a lawyer, can you

3    explain what you understand those two statutes to mean in terms

4    of the professional standards of pharmacy practice?

5                    **MR. COHEN:**  Objection, Your Honor.

6                    **THE COURT:**  Overruled.

7                    **THE WITNESS:**  Those two sections set the standards

8    for pharmacists being able to decide what is a valid

9    prescription from both the doctor prescribing and the

10   pharmacist dispensing.  And it sets forth the requirement that

11   a physical examination has to take place in order for that

12   prescription to be a prescription that the pharmacist can

13   dispense.

14   **BY MS. BROWN**

15   **Q.**  Okay.

16          Are those two statutes consistent with the general

17   standards of professional pharmacy practice you've testified

18   about today?

19   **A.**  Yes.

20   **Q.**  Okay.

21          And do you know approximately when those statutes

22   were enacted?

23   **A.**  These were enacted in 2002, I believe.

24   **Q.**  Okay.

25          Looking at, I believe it's 711, which is up on the

**Catizone – Direct / Brown**

 1    screen, it says "A good-faith prior examination."  Is it your

 2    opinion that a good-faith prior examination means an in-person

 3    physical examination?

 4            **MR. COHEN:**  Objection, Your Honor, legal conclusion

 5    and relevance.

 6            **THE COURT:**  Well, I think he's giving his opinion as

 7    to what is meant by that.

 8            **MS. BROWN:**  Exactly.

 9            **THE COURT:**  He may do so.

10            **THE WITNESS:**  As a pharmacist I would interpret that

11    to mean that it had to be a physical face-to-face examination.

12    **BY MS. BROWN:**

13    **Q.**  Okay.

14            In your opinion, as an expert on pharmacy,

15    consistent with the usual standards for professional pharmacy

16    practice, can a good-faith prior examination mean analyzing a

17    patient's medical needs based entirely on an online

18    questionnaire?

19            **MR. COHEN:**  Same objection.

20            **THE COURT:**  Same ruling.

21            **THE WITNESS:**  Based upon the information here as

22    well the guidelines that have been issued by the American

23    Medical Association, the Federation of State Boards of Medicine

24    that have indicated that the standards of practice are not met

25    by a questionnaire or cyberspace consultation alone, it would

**Catizone – Direct / Brown**

1    be my opinion that a questionnaire or cyberspace consultation

2    would not meet the standards of practice.

3    **BY MS. BROWN**

4    *Q.*   And is your opinion that a cyberspace consultation alone

5    would not meet the standards of practice for issuing a

6    prescription also based on your training and experience and

7    education in the field of pharmacy?

8    *A.*   Yes.

9    *Q.*   Okay.

10              Do the standards governing professional pharmacy

11   practice vary when the Internet is involved in the prescription

12   process?

13   *A.*   No.

14   *Q.*   Why not?

15   *A.*   The standards apply across all practice settings, whether

16   it's an Internet pharmacy, a brick-and-mortal pharmacy, or a

17   hospital pharmacy.  The patient receives and should receive the

18   same care in any pharmacy setting.

19   *Q.*   Okay.

20              Is it your opinion that all Internet pharmacies are

21   operating outside the scope of professional pharmacy practice?

22   *A.*   No.

23   *Q.*   And the VIPPS certification process that I believe you

24   testified about earlier, can you explain that?  What is

25   required for a pharmacy to be VIPPS certified by the National

 1   Association of Boards of Pharmacy?

 2   **A.**   The pharmacies have to meet three criteria:  One, they have

 3   to be in compliance with all federal and state laws; two, they

 4   have to adhere to standards of practice that pertain to

 5   traditional brick-and-mortar practice as well as Internet

 6   practice.

 7           And an Internet practice, some of the differences

 8   are that much of the information that's exchanged between

 9   patients and pharmacy is via the Internet.  So the Internet has

10   to have extra security provisions in place to make sure that

11   information isn't compromised.  And then every VIPPS pharmacy

12   must be physically visited by our surveyors to ensure that what

13   they've told us on paper is the actually happening in that

14   pharmacy.

15   **Q.**  And if you could take a look at 716, which you have in

16   front of you?

17           And as executive director of the National

18   Association of Boards of Pharmacy, are you familiar with that

19   document?

20   **A.**  Yes, I am.

21   **Q.**  And are those the VIPPS criteria that you just testified

22   about?

23   **A.**  Those are some of the criteria, yes.

24   **Q.**  Okay.

25           And do the VIPPS criteria form part of the basis of

1    your opinion today?

2    **A.**   Yes.

3    **Q.**   Okay.

4            **MS. BROWN:**   If I could display Exhibit 716, page 1.

5    **BY MS. BROWN**

6    **Q.**   If I could have you read No. 5, the whole part where it

7    says "Prescription."   Thank you.

8    **A.**   "Qualifying VIPP pharmacies, in accordance with applicable

9    state and federal laws and regulations, must maintain and

10   enforce policies and procedures that ensure the integrity,

11   legitimacy, and authenticity of the prescription drug order and

12   seek to prevent prescription drug orders from being submitted,

13   honored, and filled by multiple pharmacies; maintain and

14   enforce policies and procedures that assure that prescription

15   medications are not prescribed or dispensed based upon

16   telephonic, electronic, or online medical consultations without

17   there being a preexisting patient-prescriber relationship that

18   has included an in-person physical examination.

19   **Q.**   When did the National Association of Boards of Pharmacies

20   adopt the VIPPS standards?

21   **A.**   1997.

22   **Q.**   And has the provision that you just read changed since

23   then?

24   **A.**   It has not changed substantively since 1997.

25   **Q.**   How does the VIPPS standard inform your opinion that it

1  would be outside the usual course of professional pharmacy

2  practice for a pharmacist to dispense medication based solely

3  on a customer's online questionnaire?

4  **A.**  The standard clearly articulates what the requirement is

5  and what constitutes a valid prescription.  And that criteria

6  is done based upon state laws and regulations, standards of

7  care, and the observations that we have made on pharmacy

8  practice over time.

9  **Q.**  Okay.

10          How do VIPPS certified pharmacies generally receive

11  prescriptions?

12  **A.**  In order to be certified and accredited, an Internet VIPPS

13  pharmacy cannot accept prescriptions from patients.  They

14  cannot allow patients to select medications off of a list, and

15  they cannot allow patients to determine the strength, the dose,

16  and the quantity.

17          For a VIPPS pharmacy, the prescription must come

18  directly from the doctor either via fax, via phone, or via hard

19  copy that the patient provides to -- the doctor provides to the

20  pharmacy.

21  **Q.**  And how do VIPPS certified pharmacies verify that the

22  prescription are valid?

23  **A.**  They have the same responsibility as traditional

24  pharmacies:  They have to make sure it's a doctor operating

25  within their scope; have to make sure that relationship exists;

1    they have to make sure it's an appropriate medication for the

2    patient without any fraud or abuse.

3            And if it requires calling the doctor because

4    they've not validated that doctor prior to that, they have to

5    call the doctor.  If the patient is also questionable or hasn't

6    been validated by the Internet pharmacy, they have to validate

7    that patient before they can dispense the prescription.

8    *Q.*  At VIPPS certified pharmacies, are the prescription based

9    solely on online questionnaires?

10   *A.*  No.

11   *Q.*  Do VIPPS certified pharmacies allow patients to self-report

12   things, like whether their blood pressure is normal, without a

13   doctor or nurse having actually tested the patient's blood

14   pressure?

15   *A.*  No.

16   *Q.*  Do VIPPS certified pharmacies allow patients to select the

17   type, dosage, and quantity of medication they want without a

18   doctor having made that selection?

19   *A.*  No.

20   *Q.*  If an online questionnaire doesn't ask a patient for a

21   medical complaint or a problem to be addressed and just permits

22   the patient to select the type or quantity of medication, is it

23   within the usual course of professional pharmacy practice for a

24   pharmacist to go ahead and fill that prescription?

25   *A.*  No.

**Catizone – Direct / Brown**

1    *Q.* Now, assume an online questionnaire's customer agreement

2    form says that the customer agrees to waive a physical exam by

3    the prescribing doctor.  Does filling a prescription written

4    pursuant to that agreement comport with the usual standards of

5    professional pharmacy practice?

6    *A.* No.

7    *Q.* Is it within the usual course of professional pharmacy

8    practice for a single pharmacist to be filling several hundred

9    prescription orders a day?

10   *A.* No.

11   *Q.* Now, assuming that a doctor is anesthesiologist prescribing

12   diet pills to a patient across the country who he's never seen

13   in person or weighed, would it be within the usual course of

14   professional pharmacy practice to fill that prescription?

15   *A.* No.

16   *Q.* If a pharmacist is getting hundreds of prescriptions a day

17   from anesthesiologists licensed only in one state, for diet

18   pills prescribed to customers all over the United States, would

19   it be within the usual course of professional pharmacy practice

20   for a pharmacist to fill those prescriptions?

21            *MR. COHEN:*  Objection, your Honor.

22            *THE COURT:*  Overruled.

23            *MS. BROWN:*  I think I asked it in the form a

24   hypothetical.

25            *THE WITNESS:*  No.

**Catizone – Direct / Brown**

 1    *BY MS. BROWN*

 2    *Q.*  Have you reviewed the video of an undercover purchase made

 3    on February 24th, 2006, from Safescripts Online?

 4    *A.*  Yes.

 5    *Q.*  And --

 6            *MS. BROWN:*  If I could have 3A?

 7    *BY MS. BROWN*

 8    *Q.*  Are those screen shots from the video that you watched?

 9            *MR. SABELLI:*  Your Honor, I'm going to object only

10    because I've noticed these screen shots are not complete.  I

11    have no problem with the full screen shots coming in, I have no

12    problem with this exhibit, but I want it noted these exhibits

13    are not full screen shots.

14            *THE COURT:*  Go ahead.

15            *THE WITNESS:*  Yes.

16            *MS. BROWN:*  Okay.

17            *THE COURT:*  So did you review the video, or did you

18    review the pieces of paper?

19            *THE WITNESS:*  The video, sir.

20    *BY MS. BROWN*

21    *Q.*  And those screen shots from the video, are they from the

22    video that you reviewed?

23    *A.*  Yes.

24            *MR. SABELLI:*  I'm going to object, just because it

25    misstates.  They are not complete --

```
 1                    THE COURT:  They are not the full --

 2                    MR. SABELLI:  Correct.

 3                    THE COURT:  They are not the full sheet.

 4                    MR. SABELLI:  Correct.  Thank you, Your Honor.

 5                    With that understanding, I have no objection.

 6                    THE COURT:  Great, okay.

 7       BY MS. BROWN:

 8       Q.  Okay.

 9                    Taking a look at I think it's page 3 -- sorry, 4 --

10       nope, 5, I apologize.  6, okay, there we go.

11                    All right.  You've reviewed the video in this case,

12       correct?

13       A.  Yes.

14       Q.  Okay.

15                    Assuming that a prescription is written pursuant to

16       an online questionnaire like the one that you saw in the video,

17       with questions similar to that, would that be within the usual

18       course of professional pharmacy practice for a physician -- I'm

19       sorry, for a pharmacist to dispense a prescription written

20       pursuant to such a questionnaire?

21       A.  No.

22                    MS. BROWN:  Nothing further, Your Honor.

23                    THE COURT:  Cross?

24                    MR. CANNON:  Excuse me, this will just take me one

25       minute.  I want to get organized so I'm not stumbling around.
```

<u>**CROSS-EXAMINATION**</u>

***BY MR. CANNON:***

*Q.*  Good afternoon, Mr. Catizone.

*A.*  Good afternoon.

*Q.*  Now, you've been with the National Association of Boards of Pharmacy since 1985, correct?

*A.*  Yes, sir.

*Q.*  And you were hired originally as a pharmacy tech, right?

*A.*  No, sir.

*Q.*  What were you hired as?

*A.*  The test and measurements director.  I was hired to oversee the national examination and the national law examination.

*Q.*  And it's fair to say that the National Association of Boards of Pharmacy, when you were hired in 1985, was a relatively small organization, right?

*A.*  Yes, sir.

*Q.*  And you were named executive director in 1988, correct?

*A.*  Yes, sir.

*Q.*  And the organization has grown since then, hasn't it?

*A.*  Yes, sir.

*Q.*  And it's spun off other organizations, too, hasn't it?

*A.*  Yes, sir.

*Q.*  One of those is the Pharmacy Technician Certification Board, correct?

*A.*  No, sir.

**Catizone — Cross / Cannon**

1   *Q.*   What does "PTCB" stand for?

2   *A.*   That is the Pharmacy Technician Certification Board.

3   *Q.*   And that's a related party to the -- just want to make sure

4   I say this right -- the Pharmacy -- the National Association of

5   Boards of Pharmacy?

6   *A.*   It's a separate organization that was founded, and then

7   they asked us at NABFP to become a part of that organization.

8           The only organization that was spun off of NABP was

9   the American Council on Pharmaceutical Education, which is the

10  accrediting body for all colleges of pharmacy in the United

11  Stated.

12  *Q.*   I see.

13          So you are the executive director however of the

14  National Association of Boards of Pharmacy, right?

15  *A.*   Yes, sir.

16  *Q.*   And you sign their tax return, right?

17  *A.*   Yes, sir.

18          **MR. CANNON:**   Your Honor, if I could have marked as

19  Defense Exhibit 2004 the Form 990 that the National Association

20  of Boards of Pharmacy has to file with the IRS.

21          3004 for the record.

22  **BY MR. CANNON**

23  *Q.*   And you signed that document, right?

24  *A.*   Yes, sir?

25  *Q.*   And you're the director of that organization, correct?

```
 1   A.  Yes, sir.

 2          MR. CANNON:  And I would also like to mark for

 3   identification Exhibit No. 3005, the screen shot of the

 4   Pharmacy Technician Certification Board.

 5   BY MR. CANNON

 6   Q.  That indicates that you are the executive director of that

 7   organization also, correct?

 8   A.  No, sir.

 9   Q.  Doesn't?

10   A.  No, sir.

11   Q.  What did does --

12          MR. CANNON:  Could you please pull it up?

13          MS. BROWN:  That hasn't been admitted.

14          THE COURT:  Hasn't been admitted.

15   BY MR. CANNON:

16   Q.  Is that an accurate copy of the web page of the Pharmacy

17   Technician Certification Board?

18   A.  Yes, sir.

19   Q.  And does it indicate Carmine Catizone, executive director?

20   A.  No, sir.

21   Q.  I'm sorry.

22          Does it indicate that you are the certification

23   council chair?

24   A.  Yes, sir.

25   Q.  And you are also the director of the National Association
```

 1   of Boards of Pharmacy?

 2   *A.*  Yes, sir.

 3   *Q.*  So you get paid from both organizations, right?

 4   *A.*  No, sir.

 5   *Q.*  Well, if you would look at page -- excuse me, that Form 990

 6   that I handed you, that's a true an accurate copy of the Form

 7   990 that you signed and was filed with the IRS, correct?

 8   *A.*  I haven't had a chance to review all the pages, but I'll

 9   make -- I'll assume that it is and trust you, maybe that's a

10   mistake, but I'll do that anyways.

11   *Q.*  Okay, thank you.

12           *MR. CANNON:*  Well, Your Honor, at this time I'd move

13   Exhibit 3004.

14           *THE COURT:*  Don't know that the tax return comes in.

15   Ask him a question.

16           *MR. CANNON:*  I would like to publish some things to

17   the jury.

18           *THE COURT:*  Ask him the questions.  All right.

19   We're not getting income tax returns in for witnesses who

20   appeared here unless there is something relevant.

21   *BY MR. CANNON:*

22   *Q.*  If you look at Exhibit 3004, if you look at page 7 --

23   *A.*  Yes, sir.

24   *Q.*  -- that lists the salaries of the officers, directors,

25   trustees, and key employees and highest compensated employees,

```
 1   doesn't it?

 2   A.  Yes, sir.

 3   Q.  And that lists your salary, correct?

 4   A.  Yes, sir.

 5   Q.  And for 23 hours a week, you earn $491,000 a year, correct?

 6   A.  No, sir.

 7   Q.  Well, with the addition of the 47,974?

 8   A.  The 23 hours, this reflects what I do with NABP.  There is

 9   an additional time with the foundation, for which that is also

10   included, because this is a consolidated tax form for the

11   association and foundation, and I do work more than 23 hours.

12   Q.  Well, this is a document that you signed.

13   A.  Yes, sir.

14   Q.  You filed it with the IRS.  And this document says that you

15   have worked 23 hours a week, right?

16   A.  Yes, sir.

17   Q.  And it says for that, you get 491496 plus 49974, correct?

18   A.  Yes, sir.

19   Q.  What's the additional 499744 for?

20   A.  Those are benefits, health care, dental coverage, and other

21   benefits that are provided to all the other employees.

22   Q.  And if you look at the next page, page 8.  You look at the

23   other employees, the next highest paid employee is -- works 35

24   hours a week; right?

25   A.  Yes, sir.
```

**Catizone – Cross / Cannon**

1  *Q.*  And he gets 179, right?

2  *A.*  Yes, sir.

3  *Q.*  And the next highest paid employee gets 180, right?

4  *A.*  Yes, sir.

5  *Q.*  And he also works 35 hours a week?

6  *A.*  Yes, sir.

7  *Q.*  And so you make more than twice what that two next highest

8  compensated employees make, right?

9  *A.*  Yes, sir.

10  *Q.*  And you reported to the IRS that that's for 23 hours a week

11  of work a week, right?

12  *A.*  Yes, sir.

13        23 hours with NABP, 12 hours with the foundation so

14  that I work 35 hours because our employees are all supposed to

15  work 35 hours, but we far exceed the 35 hours.

16  *Q.*  I see.

17        Now, when you say your employees are supposed to

18  work extra time, of course, you comply with all federal

19  employee wage and hour standards, right?

20  *A.*  Yes, sir.

21  *Q.*  So when you say your employees are entitled to work more

22  than you report to the IRS --

23        *THE COURT:*  Well, I'm not going to allow questions

24  of this type.  Let's move on to a different subject, would you?

25  *BY MR. CANNON:*

**Catizone — Cross / Cannon**

1  *Q.*  Now if you turn to page 19.

2           *THE COURT:*  Nine?

3           *MR. CANNON:*  Nineteen.

4  *BY MR. CANNON:*

5  *Q.*  That indicates that the National Association of Boards of

6  Pharmacy is carrying a liability at 775,000 for deferred

7  compensation, right?

8           *MS. BROWN:*  I don't think I have a page 19.

9           *THE WITNESS:*  I don't have a page 19 either, sir.

10          *MR. CANNON:*  We'll get you one in a minute, sorry

11  about that.

12          Page 3, Schedule D.

13          *MS. BROWN:*  If I could approach, I think I could

14  find the document.

15          *THE COURT:*  Go ahead.

16          *THE WITNESS:*  I'm familiar with that line item.

17  *BY MR. CANNON:*

18  *Q.*  Okay.

19  *A.*  So I don't need the document to talk about it.

20  *Q.*  Okay.

21          And a lot of that deferred compensation is for you,

22  correct?

23  *A.*  It's held by the association if I meet certain conditions

24  of employment.

25  *Q.*  Yeah.

**Catizone — Cross / Cannon**

1          So it's a contingent bonus that you didn't to have

2    pay taxes up front but upon your retirement you get, right?

3    *A.*  If I meet certain conditions, sir.

4    *Q.*  That's correct.

5          And so since you are the executive director, you've

6    set those conditions but they have to be approved by the board,

7    right?

8    *A.*  No, sir.  The board has separate legal counsel that sets

9    those conditions and I have to adhere to them.

10          *MS. BROWN:*  Your Honor, I'm going to object.  I

11    don't see how this is relevant for impeaching of the witness'

12    testimony on direct.

13          *THE COURT:*  Do you have any other questions along

14    this line?

15          *MR. CANNON:*  A couple more.

16          *THE COURT:*  I'm going to stop it here.  You can make

17    an offer of proof outside the presence of the jury as to your

18    other questions on compensation from this organization.

19          *MR. CANNON:*  Could I ask him one more?  Because on

20    page 23 -- 27 there is another significant item that goes to

21    the relationship between this entity and PTCB.

22          *MS. BROWN:*  We don't have the same numbers that you

23    have.

24          *MR. CANNON:*  Okay.  It's page 2, Schedule L.

25          *THE WITNESS:*  I'm familiar with that number.  I

 1   don't need to see it.

 2   **BY MR. CANNON**

 3   *Q.*   Is that a $714,000 related entity reporting?

 4   *A.*   Yes, sir.

 5   *Q.*   And that's to a related entity that you are connected with,

 6   correct?

 7   *A.*   Yes, sir.

 8   *Q.*   That's all the financial questions I have at this point.

 9            So you have substantial positions of responsibility

10   at these two organizations, PTCB and the National Association

11   of the Boards of Pharmacies, correct?

12   *A.*   Yes.  The position with PTCB is I oversee --

13   *Q.*   You can answer that "yes" or "no."

14   *A.*   Yes.

15   *Q.*   Now, you're not a Ph.D., right?

16   *A.*   No, sir.

17   *Q.*   You're not an MD?

18   *A.*   No, sir.

19   *Q.*   You're a DP -- what is that?  What's the official title

20   that you have?

21   *A.*   I can answer it more than "yes" or "no," right?

22            DPH.

23   *Q.*   DPH, thank you very much.

24            And you've testified -- when the Government was

25   asking you questions, you talked about publications, articles,

**Catizone — Cross / Cannon**

1  chapters in books, things like that, right?

2  *A.*  Yes, sir.

3  *Q.*  Now, the publications that you have, they are basically

4  interviews and on "Good Morning America" or "Oprah" or "USA

5  Today," something like that, right?

6  *A.*  No, sir.

7  *Q.*  Have you had any peer-reviewed publications?

8  *A.*  Yes, sir.

9  *Q.*  Do you have a CV?

10  *A.*  Yes, sir.

11  *Q.*  Did you bring it with you?

12  *A.*  It's been filed with the Government.  I don't have it

13  physically with me.

14  *Q.*  When did you file it with the Government?

15  *A.*  I'm sorry.  It's been submitted in different cases.  I'm

16  not sure if it was actually requested here, but...

17  *Q.*  So you've testified in a lot of different cases for the

18  Government, haven't you?

19  *A.*  Yes, sir.

20  *Q.*  And I think on direct you said you have testified in 12

21  different cases?

22  *A.*  Approximately, sir.

23  *Q.*  And it's hard to tell what you got in one case and what you

24  got in another case, right?

25  *A.*  No, sir.

**Catizone – Cross / Cannon**

1  **Q.**  You have really good recollection of exactly what you got

2  in this case?

3              **THE COURT:**  What is --

4              **THE WITNESS:**  I don't know what you mean by "got."

5  **BY MR. CANNON:**

6  **Q.**  You have a very good recollection of exactly which

7  documents you received --

8              **THE COURT:**  No, no, wait.  Start over, okay.

9              What do you mean by "got"?

10             **MR. CANNON:**  I was trying to better define that

11 term, Your Honor.

12             **THE COURT:**  In connection with what?

13 **BY MR. CANNON:**

14 **Q.**  Before you came to testify today in this case, the

15 Government gave you a series of documents, correct?

16 **A.**  Yes, sir.

17 **Q.**  And do you have a perfect recollection of what those

18 documents were?

19 **A.**  I've listed all the documents.  I store the documents

20 separately, and I reviewed all the documents prior.  Whether or

21 not I have a perfect recollection, I could not honestly say

22 that, but I have a recollection of those documents and the

23 content within those documents.

24 **Q.**  Okay.

25             Could you please list those documents for me.

 1   **A.**   Um, I think I mentioned them earlier in general, that it

 2   was the --

 3   **Q.**   Could you list them specifically?

 4   **A.**   Not the actual -- not the actual titles of those documents.

 5   **Q.**   Could you give the specific title of one of the documents

 6   that you reviewed before coming to court to testify today?

 7   **A.**   Sure.  It was the video clips of the Safescripts undercover

 8   purchase.

 9   **Q.**   Okay.

10            So we've got videos.  Okay.

11            What else?

12   **A.**   I have a looked at the investigative reports filed by the

13   DEA agents.

14   **Q.**   When you say "investigative reports filed by the DEA

15   agents," could you give me the name of who wrote that

16   investigative report?

17   **A.**   Yes, DEA Agent Bridgers.

18   **Q.**   And how many Bridgers reports did you review?

19   **A.**   I reviewed one report, sir.  It was 187 pages.

20   **Q.**   Are you sure that was an investigative report, or was it a

21   report regarding the execution of the search warrant on Mail

22   Meds?

23            **MS. BROWN:**   Your Honor, he's testifying not --

24            **THE COURT:**   They may be the same, one in the same.

25            **THE WITNESS:**   It was the report for the search

 1  warrant, sir.  I just classified it as an investigative report.

 2          **THE COURT:**  That's a form of investigative report.

 3  **BY MR. CANNON:**

 4  **Q.**  Okay.

 5          So the execution of a search warrant on Mail Meds,

 6  you are pretty confident that's what it was?

 7  **A.**  I don't know, sir.  If there is some semantics here, I can

 8  tell you it was a report that involves the search warrant.  And

 9  I can't remember the exact wording of that, but yes.

10  **Q.**  Okay.

11          And would you remember if Chris Napoli's name was

12  ever mentioned in that report?

13  **A.**  Yes.  Napoli was in that report.

14  **Q.**  How many times?

15  **A.**  I don't know, sir.

16  **Q.**  What did that report say Napoli did?

17  **A.**  It indicated of his involvement with the --

18  **Q.**  Specifically.

19  **A.**  In general, sir, I can relate that he was involved --

20  **Q.**  No, just specifically.

21          **THE COURT:**  You know, you have to let him answer the

22  question.

23          **MR. CANNON:**  Okay.

24          **THE COURT:**  And you can't interrupt him.  You

25  shouldn't interrupt me.  You should allow him to answer his

 1    questions so the court reporter is able to write down what he

 2    says and able to write down what you say.

 3              *MS. BROWN:*  Two objections I would like to impose:

 4    One is that this is getting argumentative; secondly, and more

 5    importantly, I think, whether Mr. Catizone has a verbatim

 6    recollection or a photographic memory of a 187-page document is

 7    totally irrelevant.

 8              *THE COURT:*  What else do you want to ask?

 9    *BY MR. CANNON:*

10    *Q.*  Now, Mr. Catizone, in addition to this report from Agent

11    Bridgers, did you review another -- any other Government

12    reports?

13    *A.*  Yes, sir.

14    *Q.*  What were those other Government reports that you reviewed?

15    *A.*  Again, I classified them as, in general, investigative

16    reports.  They may have been --

17    *Q.*  Could you give me some --

18              *THE COURT:*  I'm telling you, I'll caution you again,

19    please allow him to finish his answer.

20              *MR. CANNON:*  Okay.

21              *THE COURT:*  Before you jump in.

22    *BY MR. CANNON:* kg

23    *Q.*  Mr. Catizone, could you please give me a specific

24    definition of a report that you interviewed before coming --

25    I'm sorry, a report that you reviewed before coming here to

**Catizone — Cross / Cannon**

1  testify today?

2  *A.*  I classified them all as investigative, sir.  I don't have

3  a specific title beyond that.  I looked at the content of the

4  reports to form my opinion.  I didn't categorize them by title

5  or by what the exact words were.

6  *Q.*  Okay.

7          And you testified earlier that you testified in 12

8  separate cases for the Government, right?

9  *A.*  Approximately, sir.

10  *Q.*  And, in addition, you've appeared on television multiple

11  times?

12  *A.*  Yes, sir.

13  *Q.*  You've been cross-examined by much more talented lawyers

14  than me?

15  *A.*  Yes, sir.

16  *Q.*  And you know how to testify?

17  *A.*  I've never had professional training, sir.  I just simply

18  say the truth when I'm on the witness stand.

19  *Q.*  But you're the spokesman for the National Association of

20  Boards of Pharmacy, right?

21  *A.*  Yes, sir.

22  *Q.*  And you're the executive director?

23  *A.*  Yes, sir.

24  *Q.*  And the that organization, while it's a 501(1)(c)(3)

25  organization, which you describe as a chartable organization

```
 1   other times, doesn't really donate money to charity, does it?

 2   A.   That's not true, sir.

 3   Q.   It's an educational organization, right?

 4   A.   It's charitable and educational.  Last we're we donated

 5   $1.5 million to charitable --

 6   Q.   Can you show me where that is in the tax return?

 7   A.   I don't have it -- I don't know where it is in the tax

 8   return, but I can bring documentation and show it to you that

 9   we have on hand.

10   Q.   Well, the 990 is the form you filed with the IRS?

11              THE COURT:   We're not actually -- this is all

12   collateral.  All right?

13   BY MR. CANNON:

14   Q.   Now, when you testified in the past, let's say -- talk

15   about this organization, okay, because the National Association

16   of Boards of Pharmacy is this organization that you are

17   executive director, right?

18   A.   Yes, sir.

19   Q.   Has two other reasonably compensated employees?

20   A.   Yes, sir.

21   Q.   And 10 or 15 other employees?

22   A.   No.  We have 120 employees, sir.

23   Q.   But 10 percent of the total compensation of the

24   organization goes to you, right?

25   A.   Um, it's a $25 million organization.  So if 400,000 goes to
```

 1   me, I'm not sure what --

 2   Q.  When you say it's a $25 million organization, 15 million of

 3   that is sitting in the bank, isn't it?

 4              THE COURT:  This is -- okay.

 5              Ladies and gentlemen, we are going to take a

 6   few-minute recess.

 7              Counsel, I actually thought that you were moving off

 8   the issue of the financial situation, the tax returns and so

 9   forth.  That's what I thought.  I thought that's what you told

10   me.

11              MR. CANNON:  That --

12              THE COURT:  Now, if you want to pursue this line of

13   questioning, I'll do it outside the presence of the jury.  If

14   you are going to move on to another subject, then I won't

15   excuse the jury.  So you tell me what you want to do.

16              MR. CANNON:  Your Honor, I'm happy to move on to

17   another subject.

18              THE COURT:  All right.  So let's do that, thank you.

19   BY MR. CANNON:

20   Q.  Now, you testified about the VIPPS program before, correct?

21   A.  Yes, sir.

22   Q.  And that's a program that's administered by the National

23   Association of Boards of Pharmacy, right?

24   A.  Yes, sir.

25   Q.  And in 2005 and 2006, how many pharmacies were members of

 1   the VIPPS program?

 2   **A.**   If my memory serves me correct, about seven or eight, sir.

 3   **Q.**   And there are maybe 10 or 15 today?

 4   **A.**   No, sir.

 5   **Q.**   How many are there today?

 6   **A.**   Thirty-two.

 7   **Q.**   There are 32 today.

 8            And how many pharmacies are there in the United

 9   States today?

10   **A.**   Brick-and-mortar, sir?

11   **Q.**   How many pharmacies are there in the United States today,

12   all types?

13   **A.**   85,000.

14   **Q.**   And there are 32 VIPPS certified pharmacies.  So those

15   VIPPS certification standards you talked about are —— have been

16   adopted by 32 employee —— pharmacies right?

17   **A.**   The 32 that we verified, sir.

18   **Q.**   And the National Association of Boards of Pharmacy works to

19   educate Congress and state legislatures, right?

20   **A.**   Yes, sir.

21   **Q.**   And one of the ways you try to legislate them is to adopt

22   standards, right?

23   **A.**   I'm sorry, you said "legislate"?

24   **Q.**   You've tried to convince various legislatures to adopt the

25   VIPPS standards to certify pharmacies?

**Catizone − Cross / Cannon**

1   **A.**  No, sir.

2   **Q.**  You've testified in support of the VIPPS standards?

3   **A.**  I've testified in support but not asked for those to be

4   legislated, sir.

5   **Q.**  You have actually drafted proposed legislation to convince

6   states to adopt to VIPPS standards, haven't you?

7   **A.**  No, sir.  The states have asked for assistance as to what

8   the standards should be and we've drafted general standards,

9   but we have always recommended that they not mention programs

10  specifically because it would be an unconstitutional delegation

11  of their state authority.

12  **Q.**  I see.

13          Now, the standards of pharmaceutical practice have

14  changed greatly over the time that you have worked for the

15  National Association of Boards of Pharmacy, correct?

16  **A.**  They've changed, but not greatly, sir.

17  **Q.**  Well, when you started with the National Association of

18  Boards of Pharmacy in 1985, the Internet didn't exist, did it?

19  **A.**  No, sir.

20  **Q.**  And I think you testified on direct examination that you

21  started looking at the Internet in 1995, correct?

22  **A.**  Yes, sir.

23  **Q.**  And you started surveying the Internet?

24  **A.**  Yes, sir.

25  **Q.**  And you started surveying pharmacies on the Internet?

1    **A.**  Yes, sir.

2    **Q.**  And when you were surveying those pharmacies on the

3    Internet, you surveyed almost 500 Internet pharmacies by 1989,

4    correct?

5    **A.**  I believe so.

6    **Q.**  And it's been -- and it's been an element of your focus on

7    Internet pharmacies, right?

8    **A.**  Yes, sir.

9    **Q.**  You've testified in 49 states now?

10   **A.**  Yes, sir, on various topics.

11   **Q.**  Various topics.

12            And you've testified before the US Congress?

13   **A.**  Yes, sir.

14   **Q.**  And you have's testified in 12 trials about Internet

15   pharmacies, correct?

16   **A.**  Yes, sir.

17   **Q.**  Could you give me a list of those trials?

18            **THE COURT:**  Well, I don't -- this is a --

19            **MS. BROWN:**  I don't think it's a relevant, Your

20   Honor.

21            **THE COURT:**  Well, I don't know.  I think that it's

22   something that we can discuss at sidebar.

23   **BY MR. CANNON:**

24   **Q.**  Okay.

25            Let's say you've been used by the Government in

1   Minnesota to testify, right?

2   **A.**  Yes, sir.

3            **MS. BROWN:**  I would object to the use of the term

4   "used."

5            **THE COURT:**  Sustained.

6   **BY MR. CANNON:**

7   **Q.**  You've testified for the Government in Minnesota?

8   **A.**  Yes, sir.

9   **Q.**  For the Government in Boston?

10  **A.**  Yes, sir.

11  **Q.**  For the Government in San Diego?

12  **A.**  No, sir, I don't recall that.

13  **Q.**  And you've testified in nine other places for the

14  Government, right?

15  **A.**  Yes, sir.

16  **Q.**  And you have never testified for a defendant, have you?

17  **A.**  That's not correct, sir.

18  **Q.**  Have you testified for a defendant in an Internet pharmacy

19  case?

20  **A.**  Not Internet.  Other cases, sir.

21  **Q.**  And the other cases you are talking about are civil cases?

22  **A.**  No, sir.  They are administrative hearing cases before

23  Boards of Pharmacy.

24  **Q.**  Okay.

25            In administrative hearing cases before Boards of

**Catizone – Cross / Cannon**

1   Pharmacy.  So not court cases, right?

2   **A.**  No, sir.

3   **Q.**  Now, you prepared an expert report in the case, correct?

4   **A.**  Yes, sir.

5   **Q.**  And in that expert report --

6         **MR. CANNON:**  Your Honor, I'd like to put this up on

7   the ELMO just for demonstrative purposes.

8         **THE COURT:**  Wait -- no.  Are you asking that it be

9   introduced?

10        **MR. CANNON:**  No, Your Honor.

11        **THE COURT:**  Okay, well...

12        **MR. CANNON:**  Just want to ask him questions about

13  the report.

14        **THE COURT:**  I think you can ask him questions about

15  the report.  Hand him his report, and you can ask him

16  questions.

17  **BY MR. CANNON**

18  **Q.**  In your expert report, you said you reviewed material?

19  **A.**  Yes, sir.

20  **Q.**  And I think we went over that material, right?

21  **A.**  Yes, sir.

22  **Q.**  And you could remember you had reviewed a report by Agent

23  Bridgers and two videotapes?

24  **A.**  Sir, I also reviewed state statutes and I also then

25  reviewed other information related to the dispensing of those

**Catizone — Cross / Cannon**

1   prescriptions.

2   *Q.*  Okay.

3           You related information relating to the dispensing

4   of prescriptions, but that wasn't case-specific information,

5   right?

6   *A.*  I don't understand the question, I'm sorry.

7   *Q.*  Okay.

8           The case-specific information that you reviewed

9   before coming to testify today was two videotapes and Agent

10  Bridgers' report?

11  *A.*  And the statutes from the various states.

12  *Q.*  Correct.

13          So the case-specific information relating to what's

14  happening in this courtroom is Agent Bridgers' report and two

15  videotapes, right?

16  *A.*  I reviewed the other material prior to this testimony.

17  *Q.*  When you're saying "the other material," could you please

18  define what the other material is?

19  *A.*  Patient information about the dispensing of the products

20  and information about the doctors.

21  *Q.*  But that's not specifically related to this case.  Those

22  are statutes, right?

23  *A.*  Yes, sir.

24  *Q.*  Okay.

25          So just so we're clear, and you looked at two

**Catizone – Cross / Cannon**

1   videotapes of undercover purchases in the case, correct?

2   **A.**   Yes, sir.

3   **Q.**   And you didn't look at the statistics as to how many

4   prescriptions Safescripts issued?

5   **A.**   No, sir.

6   **Q.**   You didn't look to see how many prescriptions were denied?

7   **A.**   No, sir.

8   **Q.**   You didn't look at the actual questionnaires in volume to

9   see whether people had accurately filled them out?

10  **A.**   No, sir.

11  **Q.**   You didn't look to see if the individuals had been able to

12  call that doctor listed on the prescription bottle?

13  **A.**   No, sir.

14  **Q.**   You didn't do any of those things, right?

15  **A.**   No, sir.

16  **Q.**   And so as you continue in your report, you talk about you

17  reviewed material and documents concerning the operation and

18  dispensing of prescription drugs by a network of Internet drug

19  outfits.

20          So this network of Internet drug outlets that you

21  are talking about specific to this case, what entities were

22  composing that network?

23  **A.**   They -- they are listed in the report.  I can't identify

24  all of them.  But in preparations for the trial, I reviewed the

25  process and operation of those entities, sir.

1    *Q.*  Okay.

2           So you can't give us the names of those entities?

3    *A.*  Not from recollection, sir.

4    *Q.*  Okay.

5           And you said "and pharmacies."  Do you know what

6    pharmacies?  What -- could you give me the name of pharmacies

7    about which you reviewed information?

8    *A.*  The Safescripts pharmacy, the Kwic Fill pharmacy, and a few

9    others that I don't remember right now.

10   *Q.*  And in connection with Safescripts and Kwic Fill, did you

11   review any information other than those two videotapes and

12   Bridgers' report?

13   *A.*  Not for this case, sir.

14   *Q.*  Okay.

15          And so it says, "In my expert opinion that those

16   Internet sites."  Which Internet sites are you talking about?

17   *A.*  The Internet pharmacies that were contained in the

18   undercover video clips.

19   *Q.*  And once again your review was limited to those Internet

20   sites on the videotapes that you looked at?

21   *A.*  Yes, sir.

22   *Q.*  And you talked about -- so -- and pharmacists, what

23   pharmacists did you review?

24          ***MS. BROWN:***  Objection.  I think that misstates the

25   testimony.  I don't think he testified about pharmacists.

Catizone – Cross / Cannon

1    *BY MR. CANNON*

2    *Q.*   You said, "It is my expert opinion that these Internet

3    sites, pharmacies, pharmacists."

4              So what pharmacists are you referring to?

5    *A.*   Sure.

6              There were two pharmacists in North Carolina that

7    were part of a network and that were summarily suspended and

8    revoked by the North Carolina Board of Pharmacy for their

9    activities in the case, and those were if pharmacists that I

10   was referring to.

11   *Q.*   Do you know their names?

12   *A.*   Not offhand, sir.

13   *Q.*   And it says "and the individuals."  Could you name the

14   individuals who were -- showed up in the material you were

15   looking at?

16   *A.*   I can name some of them, sir.

17             It was Mr. Russo, Mr. Napoli.  There were some other

18   individuals, but those are the names that come to mind right

19   away, sir.

20   *Q.*   Okay.

21             And you say "who own or are responsible for."  Could

22   you tell which it is?

23   *A.*   In some cases, there were -- Mr. Russo or others owned the

24   enterprises that they established.  In other cases, the

25   pharmacists who were convicted and lost their license were

```
 1   responsible for those activities, and that's the distinction I
 2   made.
 3   Q.   And once again, you are talking about "in some cases" and
 4   "in other cases," but you can't recall specific information
 5   about a particular case, right?
 6            THE COURT:  Well, wait, you can't recall specific
 7   information about specific case?
 8            MR. CANNON:  About a specific pharmacy and a
 9   specific instance.
10            THE WITNESS:  I can, sir.  I can recall specifics
11   about the cases that were in the report.
12   BY MR. CANNON
13   Q.   Okay.
14            So you say the operation of those -- and then you
15   continue on, from the information that you reviewed, which we
16   talked about before, you're able to ascertain that the
17   entities, but you didn't specify an entity, right?
18   A.   No, sir.
19   Q.   Okay.
20            They say "under review distributed prescription
21   medications."  Now, one of those medications was phentermine,
22   could you give me the list other of other medications they
23   distributed ed?
24   A.   Phendimetrazine, alprazolam, Valium.  There were some
25   prescriptions for Soma, and there were some other prescriptions
```

1    for tramadol, I believe, sir.

2    **Q.**   And how do you remember that fact?

3    **A.**   From the reports.

4    **Q.**   From the reports, okay.

5    **A.**   In which the reports listed that they had to spend

6    8 million dosage forms of those products and another 4 million

7    dosage forms.  So based on upon that report and the specifics

8    of that case, I remembered those numbers, those totals, and

9    those drugs.

10   **Q.**   And you're saying "reports."  I thought you earlier said

11   you just remembered one Agent Bridgers' report.

12   **A.**   I think there were two reports, sir.

13   **Q.**   So now you think there are two reports?

14   **A.**   There were two reports I reviewed.

15   **Q.**   Okay.

16   **A.**   I'm not -- two reports, sir.

17   **Q.**   Okay.

18                Now -- and you concluded your report and you knew

19   that Safescripts was closing down at the time you were writing

20   your report, right?

21   **A.**   No, sir.

22   **Q.**   You didn't?

23   **A.**   No, sir.

24   **Q.**   Well, the Bridgers' report that you talked about, wasn't it

25   a report for the execution of a search warrant?

1   **A.**  Yes, sir.

2   **Q.**  And a search warrant?

3   **A.**  Yes, sir.

4   **Q.**  So, if you're going to search and seize, it's hard to

5   continue operating, isn't it?

6          **MS. BROWN:**  Your Honor, I think that calls for a

7   legal conclusion.  He is not a lawyer, and he wouldn't know

8   whether a search and seizure warrant necessarily closes down a

9   business.

10          **THE COURT:**  Well —

11          **MS. BROWN:**  And it's irrelevant.

12          **THE COURT:**  I think it's irrelevant.

13          **MR. CANNON:**  Your Honor —

14          **THE COURT:**  On that basis, the objection's

15   sustained.

16   **BY MR. CANNON:**

17   **Q.**  In your report, did you say that the actions, the

18   unspecified actions that you were talking about, represent an

19   imminent danger to the public?

20   **A.**  Yes, sir.

21   **Q.**  Did you know of any ongoing actions when you wrote that?

22   **A.**  Not sure what you mean by that, sir.

23   **Q.**  On going, continuing operation?

24   **A.**  Yes.

25   **Q.**  You did?

```
 1              What was the continuing operation that you knew at
 2    the time you said there was an imminent danger?
 3    A.  I wasn't sure which pharmacies in the enterprise were still
 4    operating and which pharmacies had been shut down.
 5    Q.  Okay.
 6              Now, you just used this term "enterprise."  So you
 7    knew -- you seem to be coming up with new facts?
 8              THE COURT:  Well, now --
 9              MS. BROWN:  Objection, that misstates the testimony.
10              THE COURT:  Well, first of all, it's argumentative.
11              You know what, I think we are going to take a little
12    break.  We will be in recess until 20 to 3:00.
13              Remember the admonition given to you, don't discuss
14    the case, allow anyone to discuss it with you, form or express
15    any opinion.
16              (Jury exits courtroom at 2:20 p.m.)
17              THE COURT:  Okay.  Let the record reflect the jurors
18    have retired.
19              Clearly, to say to a witness "you seem to be coming
20    up with new facts," I don't even know what the new facts are,
21    but if new facts are that he used the word "enterprise,"
22    that's -- I don't know that that's a new fact or not a fact.
23              But it's pure argument.  It's pure argument.  You
24    cannot argue with the witness.  And most of what you've done is
25    an argument with the witness.  Certainly you can test his
```

1    recollection.  He said he read a hundred -- some report that is

2    147 or 187 pages, and then you're asking him questions about

3    what's in the report, I guess.  I guess that's what you're

4    asking him.

5              And, you know, I think you probably could ask him

6    that.

7              MR. COHEN:  Your Honor, I would request that

8    Mr. Catizone not be present.

9              THE COURT:  Sure, okay.  Certainly.  Step down.

10             You know, I just think basically you have to give

11   some thought to how you want to proceed on cross-examination,

12   because you are inviting all sorts of things coming into

13   evidence that I'm not sure would probably be -- if the

14   Government had attempted to do it, it wouldn't be permitted.

15   So you're doing it.

16             Then when you start inviting questions on what's in

17   the report and so forth, the Government is entitled to go back

18   in the report and say, well, did you consider this, did you

19   know about that, did you know about that.

20             I just don't know that you have thought through your

21   examination, that's what I'm saying.  Because when you ask a

22   question, it invites not only a response from the witness, it

23   invites the Government to go back and clarify any impressions

24   that you have created by your examination.

25             So a lot that has been kept out of evidence can come

 1    back by your opening the door.  My strong suggestion is that

 2    you take the next few minutes and you figure out what your

 3    examination ought to be.

 4             **MR. CANNON:**  Your Honor, I will do that.  I would

 5    just like the Court to understand that I've been trying to be

 6    careful not to open the door.

 7             **THE COURT:**  You failed in that regard.  You have

 8    failed.

 9             **MR. CANNON:**  Your Honor, the warrant that he's --

10    the affidavit that he's talking about is a seizure warrant.

11             **THE COURT:**  What difference does it make?  What

12    possible difference does it make that he read through a report?

13    Maybe it was the seizure report, maybe it was X, Y, or Z.  But

14    as soon as you start asking him questions about it, the

15    Government may be entitled to go back and see what else is in

16    that report that in some way relates to his opinion.

17             Now, do you want the report in evidence?  Is that

18    what you're seeking?

19             **MR. CANNON:**  No, Your Honor.  But what I'm saying is

20    this witness is making things up on the stand.  The seizure

21    report that he's talk --

22             **THE COURT:**  He making things up?  If he's made

23    something up, fine, you are entitled to ask him about what he

24    has made up.  I'm not foreclosing you from any line of

25    cross-examination.

 1                I'm just saying that you are clearly, in the Court's

 2     mind, and I'm just sitting here watching now -- I've now

 3     listened to all these cross-examinations, this is now the

 4     second trial I've gone through, and I haven't heard an

 5     examination, which basically invites the Government to take

 6     their investigative report and put in it in front of the jury,

 7     especially when we're talking about an expert witness who has

 8     an opinion based upon a set of facts that was posited to him by

 9     the Government in front of the jury.

10                That's the thing that mystifies me about this

11     interrogation is that he doesn't come up with an opinion.  He's

12     giving an opinion based upon what the Government has said.  He

13     doesn't say, I base my -- though it was information he

14     received.

15                Now, if you want to question that, I'll let you go

16     ahead because it's cross-examination.  But I'm telling you and

17     your co-counsel that all this is opening up the door to -- the

18     door to the Government coming in and, I don't know, putting in

19     other things that are in that investigative report.

20                **MR. SABELLI:**  Your Honor --

21                **THE COURT:**  I only say it because we have about ten

22     minutes and you might want to spend the time fruitfully in a

23     discussion as to how you think you want to proceed in this

24     cross-examination.

25                Up to you, Mr. Sabelli.  You want to say something,

 1   go ahead, it's a record.

 2          **MR. SABELLI:**  Only that I think Mr. Cohen and I have

 3   not been party to this examination.  We'll speak with

 4   Mr. Cannon now and hopefully we will be able to work it out.

 5          **THE COURT:**  Fine.

 6          **MR. SABELLI:**  If there is any notion of opening the

 7   door with respect to Mr. Johnson or Dr. Carozza, we would like

 8   to be heard on that before that happens.

 9          **THE COURT:**  Well, I don't know that -- I don't know

10   that I -- it may very well open the door as to them.  I don't

11   know how that works with three co-counsel -- three counsel in a

12   case.  Maybe I can give some instruction that it's limited to

13   Mr. Napoli.  Maybe I can.  I don't even know.

14          **MR. SABELLI:**  We need to look at the affidavit.

15          **THE COURT:**  Okay, you have that.

16          **MR. SABELLI:**  Yes, but neither Mr. Cohen nor I have

17   seen it.

18          **THE COURT:**  Okay.  Take the time and look at.

19          **MR. CANNON:**  Your Honor, I will speak to my

20   co-counsel.  I would just like hear the tape, that it is not

21   the investigative report, as Mr. Catizone referred to.  It's a

22   seizure warrant --

23          **THE COURT:**  I don't care what it is.

24          **MR. CANNON:**  -- from a third party.

25          **THE COURT:**  It could be from Zeus.  It didn't make

```
 1   any difference.  That's what you are questioning him on.  I
 2   don't care.  It's just that it wouldn't come in.  You got that
 3   point, right?  So you are starting to ask him a lot of
 4   questions in which it now can come in.
 5           MR. CANNON:  Your Honor, I was simply trying to test
 6   his recollection of specific events, and he was unable to give
 7   me a recollection of a specific event.  That's all I was trying
 8   to do.
 9           I wasn't trying to open the door to allow him --
10   allow specific events to come in.
11           THE COURT:  We are in recess.
12           MS. AULT:  There is an issue with the witness who is
13   coming up after the break that we would like to raise with the
14   Court.
15           THE COURT:  How long is this going to take place --
16   no, I'll do that.
17                   (Recess taken at 2:26 p.m.)
18                   (Proceedings resumed at 2:42 p.m)
19           THE COURT:  Okay, we're back on the record.
20           What are we dealing with right now?
21           MS. AULT:  Your Honor, we anticipate that after
22   Mr. Catizone gets off the stand, a witness will testify who is
23   going to be Linda Stocum.  She is a diversion investigator from
24   Florida who did the inspection of U.S. Discount Drugs.
25           During that inspection, she spoke with both Brandon
```

```
 1    Winstead at the pharmacy and then subsequently spoke as, not

 2    for the truth of the matter asserted, because many of them were

 3    lies, also as co-conspirator statements since the statements

 4    were made in furtherance of the conspiracy.

 5            They were trying to keep Discount U.S. Drugs open,

 6    hide Christopher Napoli's identity, and then reopen the

 7    pharmacy after it was should down so we need their statements

 8    in furtherance of the conspiracy.  Also statements made to

 9    conceal the identity of one of though their co-conspirators,

10    Christopher Napoli.

11            So we believe they are admissible under multiple

12    exceptions to the hearsay rule, but we anticipated the defense

13    would be objecting and so we are bringing it to the Courts

14    attention.

15            MR. COHEN:  And the Government anticipated very

16    correctly, we had no notice whatsoever until this moment of the

17    Government's intention to introduce any co-conspirator

18    statements under 801D2E.  We have not had an opportunity to

19    review those statements, let alone litigate their admissibility

20    as co-conspirators statements.

21            There is a clear Local Rule at a minimum requiring

22    those advance notice of those statements with which the

23    Government has not even attempted to comply.  On top of that,

24    there are *Crawford* issues associated with this particular

25    testimony the Government intends to elicit.
```

```
 1              MS. AULT:  Your Honor, we don't believe there are
 2   proper issues and they are not testimonial statements.  They
 3   are statement that were made to an investigator when she went
 4   to go --
 5              THE COURT:  What about notice on the --
 6              MS. AULT:  Your Honor, the statements were disclosed
 7   to the defense on November 10th of 2010.  So almost two years
 8   ago.
 9              MR. COHEN:  Not as co-conspirator statements.
10              What Ms. Ault is saying is that we got DEA 6s of
11   interviews that were conducted.  We got millions of pages of
12   DEA 6s of interviews that were conducted.  They were never
13   disclosed --
14              THE COURT:  I don't know they have to be.
15              MR. COHEN:  Yes, they do.
16              THE COURT:  They do?
17              MR. COHEN:  Yes.
18              THE COURT:  Okay.  Then you'll have to show me the
19   rule which says that they have be identified as such.  And
20   meanwhile, I mean, I think this is an important subject.  So if
21   we don't call this witness today --
22              MS. AULT:  She's lives if Florida, Your Honor.
23              THE COURT:  Well, we all live somewhere.  That's
24   callous on my part, but it's now quarter of 3:00 and we have
25   this witness to try to conclude today.
```

1        **MS. BROWN:**  We briefed this extensively in the

2   certain that case before Judge Alsup.  So we can give the Court

3   some citations either this afternoon or  --

4        **THE COURT:**  We'll do that.

5        **MS. AULT:**  It was briefed in this case as well, and

6   the Court ruled that we did not have to provide notice of our

7   co-conspirators.

8        **MR. SABELLI:**  It sure wasn't briefed when I was in

9   the case, I don't recall any of it.

10        **MR. COHEN:**  Or I.

11        **THE COURT:**  Well, was I on the case?

12              **(Laughter.)**

13        **THE COURT:**  Anyway, I just think that -- I just

14   think that the argument -- if the argument is that they are --

15   had notice arguments, that's one category.

16        If it's that it's not admissible, that's another

17   category, though as the statements were characterized by the

18   Government, they would be admissible.  As a statement that is

19   offered that conceals or otherwise misleads or arguably

20   conceals or misleads are statements in the furtherance of a

21   conspiracy as a matter of law, it would come in.  That is to

22   say it's a legal basis for it.

23        So it is -- is it broader than that?  Do I have to

24   look at the notice requirements or the evidentiary foundation

25   for its admission ability?

1          **MR. SABELLI:**  The purpose of the notice requirement

2    is so that we can determine whether or not there is valid

3    objections.

4          **THE COURT:**  Now you know what they are.

5          **MS. BROWN:**  No, no, we don't.  For example, they

6    there may be separate conspiracies that don't involve Daniel

7    Johnson or Joseph Carozza.

8          **THE COURT:**  Sounds complicated enough that, at the

9    very least, I think I won't call -- if you are going to call

10   this witness, have her come back on Tuesday and so forth.

11         Sorry, everything has its inconveniences and that's

12   one of them.

13         Do you have another witness anyway?

14         **MS. AULT:**  We do, Your Honor.

15         **THE COURT:**  All right.  Okay, let's go.

16              **(Jury enters courtroom at 2:47 p.m.)**

17         **THE COURT:**  Okay.  Let the record reflect all jurors

18   are present, the parties are present.

19         And you may continue.

20         **THE CLERK:**  Will the witness please resume the

21   witness stand.

22              <u>**CROSS EXAMINATION, CONTINUED**</u>

23   **BY MR. CANNON:**

24   **Q.**  Good afternoon, Mr. Catizone.

25         So let's start at the beginning and I'll wrap up

**Catizone − Cross / Cannon**

1   very quickly, I think.

2           You've had a particular interest in Internet

3   pharmacies since at least 1995, correct?

4   *A.*  Yes, sir.

5   *Q.*  It's been a focus of your attention?

6   *A.*  Your.

7   *Q.*  You've testified about Internet pharmacies on many

8   occasions?

9   *A.*  Yes, sir.

10  *Q.*  And you've testified in support of changing the law about

11  Internet pharmacies?

12  *A.*  Yes, sir.

13  *Q.*  And one of the times that you testified was before the --

14  before the Government Reform Committee of the House of

15  Representatives on March 18th, 2004.

16          Do you recall that?

17  *A.*  Yes, sir.

18  *Q.*  And do you recall testifying about trying to come together

19  to close regulatory loopholes about how Internet pharmacies

20  operate?

21  *A.*  Yes, sir.

22  *Q.*  And have you been working hard to close what you referred

23  to as "regulatory loopholes"?

24  *A.*  Yes, sir.

25  *Q.*  And the law has changed over time, hasn't it?

Catizone — Cross / Howell Neubert

```
 1    A.   The federal law changed yes, sir.

 2              MR. CANNON:   No further questions.

 3                   CROSS-EXAMINATION

 4    BY MS. NEUBERT:

 5    Q.   Good afternoon, Mr. Catizone.

 6    A.   Good afternoon.

 7    Q.   My name is Nicole Howell Neubert --

 8              MS. NEUBERT:   How is that?

 9              THE COURT:   Better.

10    BY MS. NEUBERT:

11    Q.   Mr. Catizone, you were asked by the Government to review a

12    number of materials that have been discussed at length,

13    correct?

14    A.   Yes.

15    Q.   And subsequent to that, you wrote a letter to Agent

16    Bridgers, dated March 16th of 2011; is that right?

17    A.   Yes.

18    Q.   Okay.

19              And where your signature block appears at the end of

20    that -- at the end of that letter, there are some letters after

21    your name.  One of them is "MS" and that's stands for master's

22    of science degree; is that correct?

23    A.   Yes.

24    Q.   Okay.

25              And then there is an "R.Ph."
```

1          What does that refer to?

2     **A.**  That refers to my legal status in the state of Illinois as

3     a registered pharmacist.  Gives me my ability to practice in

4     the state of Illinois.

5     **Q.**  So that's a registered pharmacist?

6     **A.**  Yes.

7     **Q.**  Okay.

8               And then after that, there is a "D.Ph."

9               What does that stand for?

10    **A.**  That's the doctor of pharmacy designation that the state of

11    Oklahoma, the Board of Pharmacy, conferred upon me.

12    **Q.**  Okay.

13              So that conferred upon you by the Oklahoma State

14    Board of Pharmacy?

15    **A.**  Correct.

16    **Q.**  Is that right?

17              That is an honorary degree, is it not?

18    **A.**  It's not a degree.  It's a honorary designation.

19    **Q.**  A designation.

20              Okay.  So it's not a degree?

21    **A.**  Correct.

22    **Q.**  Okay.

23              So what that means is that you didn't have to

24    complete any coursework in order to get that designation; is

25    that right?

Catizone – Cross / Howell Neubert

 1  **A.**  Correct.

 2  **Q.**  And the Oklahoma State Board of Pharmacy is not an

 3  institution of higher learning, correct?

 4  **A.**  Correct.

 5  **Q.**  You do not have a doctorate; is that right?

 6  **A.**  No, that's right.  I don't have a doctorate.

 7  **Q.**  That's right, you do not.  Thank you for correcting my

 8  double negative.

 9         You are you aware of a degree called a doctor of

10  pharmacy degree?

11  **A.**  Yes.

12  **Q.**  And, as I understand it, that degree is currently required

13  in order to become a licensed pharmacist in most states; is

14  that right?

15  **A.**  For new graduates, yes.

16  **Q.**  For new graduates; is that right?

17  **A.**  Yes.

18  **Q.**  Okay.

19  **A.**  Anyone who's graduated prior to 2005 can still hold a

20  bachelor of science degree and be recognized by the state and

21  qualified to practice pharmacy.

22  **Q.**  Okay.

23         You do not have a doctor of pharmacy degree; is that

24  right?

25  **A.**  Correct.

**Catizone – Cross / Howell Neubert**

1    **Q.**  And you did not attend medical school?

2    **A.**  No.

3    **Q.**  You are not a medical doctor?

4    **A.**  No.

5    **Q.**  You cannot practice medicine; is that right?

6    **A.**  Correct.

7    **Q.**  Or treat patients.

8    **A.**  As a pharmacist I can, but not as a physician.

9    **Q.**  You cannot treat patients as a physician, correct?

10   **A.**  Correct.

11   **Q.**  You are not an anesthesiologist?

12   **A.**  No.

13   **Q.**  You have never been the director of a department of

14   anesthesiologist?

15   **A.**  No.

16   **Q.**  Or the director of a department of respiratory therapy?

17   **A.**  No.

18   **Q.**  Or the director of a surgical intensive care unit?

19   **A.**  No.

20   **Q.**  You've never done any of those things?

21   **A.**  Yes, I've not done any of those things.

22   **Q.**  Okay.

23            Now, with regard to the National Association of

24   Boards of Pharmacy for which you serve as executive director,

25   that organization is a private organization, right?

**Catizone – Cross / Howell Neubert**

 1   A.   Yes.

 2   Q.   It does not have any legal authority to legislate any law?

 3   A.   Correct.

 4   Q.   That means it cannot -- it cannot pass any laws that are

 5   binding on anyone, right?

 6   A.   Correct.

 7   Q.   And you talked some about VIPPS certification, right?

 8   A.   Yes.

 9   Q.   Which is a process that your organization invented, right?

10   A.   Developed, based upon research and based upon input from a

11   number of stakeholders yes.

12   Q.   But it's something that your organization created.  The

13   VIPPS certification is a creation solely of the National

14   Association of Boards of Pharmacy?

15   A.   It was in partnership with the Food and Drug

16   Administration, the Drug Enforcement Agency, the State Boards

17   of Pharmacy and consumer groups.  Based on their input, we put

18   all that together and created the VIPPS program.

19   Q.   So the answer is yes, your organization created it?

20   A.   Yes.

21   Q.   And I believe on direct testimony, you -- or on direct

22   examination, you testified that a pharmacy can be both

23   certified and accredited by VIPPS.

24        What's the difference between certified and being

25   accredited by VIPPS?

**Catizone — Cross / Howell Neubert**

1    **A.**  I don't recall saying that, but I can clarify it.

2            Accreditation is the process that we have, sometimes

3    it's referred to as certification, but really certification

4    under -- and accreditation is one in the same thing, so it may

5    have just been a misspeaking.

6    **Q.**  That's right, because it's just one thing, right?  Just

7    VIPPS certification?

8    **A.**  It's VIPPS accreditation, is the actual name.  But

9    certification is another name for it.

10   **Q.**  Okay, my mistake.

11           So you would prefer to call it VIPPS accreditation?

12   **A.**  Yes, please.

13   **Q.**  Which is no different than VIPPS certification?

14   **A.**  Technically accreditation is for a site, certification is

15   for an individual, but many people don't understand the

16   difference between the two and they will use them

17   interchangeably.  It's not wrong, but it's technically not

18   correct.

19   **Q.**  Okay.

20           But both VIPPS certification and VIPPS accreditation

21   is simply a statement that if it's the individual or the web

22   site has fulfilled VIPPS criteria, right?

23   **A.**  Yes.

24   **Q.**  Created by your organization?

25   **A.**  Yes.

```
 1   Q.  Okay.

 2           And paid a fee to your organization for that

 3   accreditation?

 4   A.  Yes.

 5   Q.  Okay.

 6           And in terms of online pharmacies, that fee ranges

 7   from as much as $8000 for an initial registration fee, correct?

 8   A.  For a large operation, yes.

 9   Q.  And as much as $5000 per year for a renewal fee?

10   A.  No.  It's actually $3000 for one pharmacy for a three-year

11   period and then $5000 depending upon how many operations they

12   have for a three-year period and $8000 for the larger

13   operations for a three-year period.

14   Q.  Okay.

15           So my question was, it could be as much as $5000 for

16   a renewal fee, right?

17   A.  For three years, not for a year.

18   Q.  But for a renewal fee could be at much as $5000, right?

19   A.  Yes, yes.

20   Q.  Okay.

21           In 2006, there were only 12 VIPPS certified

22   pharmacies; is that correct?

23   A.  Yes.

24   Q.  And of those 12, only two were retail pharmacies, right?

25   Meaning a pharmacy where just an average person could go online
```

**Catizone — Cross / Howell Neubert**

1   and fill a prescription without having a membership to that

2   particular pharmacy?

3   *A.*   No, there were more than two.  I think probably about half

4   of the pharmacies at that time were.

5   *Q.*   Your testimony is that half of the VIPPS certified

6   pharmacies in 2006 were retail pharmacies?

7   *A.*   No.  I think you're using two terms here, so if I can

8   clarify those terms.

9   *Q.*   Well, no --

10  *A.*   Because I don't understand the question.

11  *Q.*   Let me rephrase the question.

12  *A.*   Sure.

13  *Q.*   So when I say "retail pharmacy," what I mean by that is a

14  pharmacy where an online pharmacy where I could just go online

15  and fill a prescription written by any doctor without having to

16  be a member of that particular pharmacy, that's what I mean by

17  retail; is that clear?

18  *A.*   Yes.

19  *Q.*   Okay.

20          So in 2006, then, of the 12 VIPPS certified

21  pharmacies, isn't it true that only two of them were of the

22  type I just described?

23  *A.*   No.

24  *Q.*   Okay.

25          How many were there, then?

**Catizone – Cross / Howell Neubert**

1    *A.*  I mentioned earlier, I think about half.  The membership

2    site that were --

3    *Q.*  Okay.  About half, okay.

4              And those would be CVS, right?

5    *A.*  Yes.

6    *Q.*  Walgreens?

7    *A.*  Yes.

8    *Q.*  And what were the other?

9    *A.*  Drugstore.com.

10   *Q.*  Okay.

11   *A.*  And there were 200 more independents whose names I can't

12   recall from 2006.  But there were other independent pharmacies

13   that were involved in this.

14   *Q.*  Okay.

15             So we can agree, then, that there were only six

16   VIPPS certified online pharmacies in 2006?

17   *A.*  No, there were 12.

18   *Q.*  I'm sorry.

19             Six that were certified retail pharmacies.  In the

20   way that we talked about what retail meant?

21   *A.*  Retail doesn't mean that -- you're saying that as a

22   consumer, as a retail pharmacy, what distinguishes is you could

23   go in and actually get a prescription filled whether you are a

24   member.

25             All the pharmacies, the Internet pharmacies, hold

**Catizone – Cross / Howell Neubert**

1    licenses as retail pharmacies.  Of the 12, I'm only aware that

2    two of those required you to be a member of a health care plan

3    like Medco.com was a pharmacy where you couldn't go to that web

4    site to get it filled.

5              All of the other VIPPS pharmacies that were

6    accredited beyond those two allowed you to go to their web site

7    and fill a prescription without being a member of that group.

8    In 2006, that's my best recollection.

9              It was more than two pharmacies restricting to

10   membership, less than two.

11   **Q.**  Fair enough.

12             There were less than 10?

13   **A.**  Yes, yes.

14   **Q.**  Okay.

15             Now, in addition to the kinds of media activities

16   that you participate in, testifying on "The Today Show" and

17   "Oprah," in addition to that, I think you talked about some

18   publications that you participated in.

19   **A.**  Yes.

20   **Q.**  And you described some for Ms. Brown.

21             In addition to the ones that you described for the

22   Government, isn't it true that in 2002, you had published a

23   chapter in a book called "Full Preparation, the Pfizer Guide to

24   Careers in Pharmacy"?  Do you recall that?

25   **A.**  Yes.

 1   **Q.**  And that was published by the Pfizer Pharmaceutical Group;

 2   is that right?

 3   **A.**  Yes.

 4   **Q.**  Do you recall that the forward for that book was written by

 5   the director of external relations for the Pfizer

 6   Pharmaceutical Group?

 7   **A.**  I haven't reviewed it, but if you say so, then I would say

 8   yes.

 9   **Q.**  Okay.

10           Were you -- were you paid for your authorship of

11   that chapter?

12   **A.**  No.

13   **Q.**  You just did that on your own?

14   **A.**  Yes, because it was a guide for students interested in

15   becoming a pharmacist.  So I provided my time for no charge.

16   **Q.**  Okay.

17           So you provided your time for no charge to the

18   Pfizer Pharmaceutical Group?

19   **A.**  Correct.

20   **Q.**  And Pfizer is the world's largest drug manufacturer; is

21   that right?

22   **A.**  I believe so.  I'm not certain.

23   **Q.**  So you've testified at some length today about your opinion

24   about a pharmacist's responsibilities, right?

25   **A.**  Yes.

Catizone -- Cross / Howell Neubert

```
 1   Q.  And your opinion basically, as I understand it, is that in
 2   order for a pharmacist to -- to fill a prescription within the
 3   usual course of pharmacy practice, it needs to be a valid
 4   prescription, right?
 5   A.  Yes.
 6   Q.  And if it's not valid, a pharmacist shouldn't fill it?
 7   A.  Correct.
 8   Q.  A pharmacist -- we can agree that a pharmacist is not a
 9   doctor --
10   A.  Yes.
11   Q.  -- right?
12           And a pharmacist doesn't go to medical school?
13   A.  Correct.
14   Q.  And a pharmacist does not get training in internal
15   medicine?
16   A.  Correct.
17   Q.  A pharmacist does not get training in surgery.
18   A.  The general pharmacist, yes.
19   Q.  Okay.
20           Or in radiology?
21   A.  Correct.
22   Q.  Or obstetrics?
23   A.  Correct.
24   Q.  Or in any medical specialty?
25   A.  Correct.
```

 1   **Q.**  And a pharmacist is not licensed to decide what

 2   prescriptions a patient should get, correct?

 3   **A.**  No.

 4   **Q.**  That's what doctors do?

 5   **A.**  No.  The doctors perform diagnosis and select the

 6   medication for the patient.  The pharmacist, based upon

 7   standards of practice, is responsible for determining whether

 8   or not it's the right prescription for that patient.

 9   **Q.**  So my question was, a pharmacist does not decide what

10   prescription a patient gets, right?

11   **A.**  The answer is two-fold in that the doctor decides or

12   selects the medication, but the pharmacist has a responsibility

13   to decide if that patient should get that medication.

14   **Q.**  So is it your testimony, then, that a pharmacist's role is

15   to second-guess the diagnosis and prescribing decision of a

16   physician?  Is that your testimony?

17   **A.**  No.  The role of the pharmacist is to supplement and assist

18   the doctor in those decisions.  And there have been court

19   cases, **Hempel vs. Walmart** in the state of Illinois, where they

20   maintain that the pharmacist --

21          **MR. CANNON:**  Objection, Your Honor, this is legal

22   testimony.

23          **THE COURT:**  All right.  Leaving the case out, you

24   may continue with your answer.

25          **THE WITNESS:**  The pharmacist has the responsibility

1    to double-check and ensure that the physician's choice of

2    medications for that patient is correct.

3    **BY MS. NEUBERT:**

4    *Q.*  So it is your testimony that a pharmacist's role is to

5    second-guess the prescribing decision that a doctor has made?

6    *A.*  In the best interest of the patient, yes.

7    *Q.*  Okay.

8            You are aware, are you not, that a licensed doctor

9    can prescribe medication to any patient that that doctor feels

10   is -- is medically appropriate for whatever medical reason,

11   right?

12   *A.*  Within their scope of practice, yes.

13   *Q.*  Now, that wasn't my question.

14           A licensed doctor --

15   *A.*  You asked if I was aware, then I would have to say no, I'm

16   not aware of that.

17           **THE COURT:**  Clarification.

18           When you say "can," do you mean can lawfully?

19   Can -- what do you mean by "can"?  He has a physical ability of

20   writing a prescription.  So if the question is:  Does he have

21   the ability to write a prescription, which I'm sure isn't your

22   question, the answer would be "yes," but otherwise...

23           **MS. NEUBERT:**  I would be glad to clarify.

24           **THE COURT:**  Okay, thank you.

25   **BY MS. NEUBERT:**

**Catizone — Cross / Howell Neubert**

1   *Q.*  A licensed doctor is allowed under his or her medical

2   license to prescribe a medication for any patient to treat any

3   condition; is isn't that right?

4   *A.*  Yes.

5   *Q.*  Regardless of his or her specialty?

6   *A.*  No.

7   *Q.*  And what do you base that opinion on?

8   *A.*  My years of practice as a pharmacist, my understanding of

9   the pharmacy practice laws and regulations, as well as my

10  interactions with the medical boards.

11  *Q.*  Okay.

12          So I just want to make sure that it's completely

13  clear.  So it's your opinion that a licensed physician is not

14  allowed by law to the prescribe any medication for any patient

15  if that's not in his or her specialty?

16  *A.*  If the question is asking whether or not they can do this,

17  if the prescription is outside their scope or the prescription

18  would kill or harm the patient, then the were is no.  So they

19  can't write any prescription for any condition, it's just not

20  allowed.

21  *Q.*  Okay.

22          That wasn't my question.

23  *A.*  Theoretically the answer is yes, the physician can write a

24  prescription for any patient, for any condition, but the other

25  caveats are there the other requirements of standards of care.

 1    Q.   And my question is just this:  Can we agree that a licensed

 2    physician is allowed by law to write a prescription for a

 3    patient for any condition that that doctor feels is

 4    appropriate?

 5              THE COURT:   You know, I have a concern here, because

 6    he's not an expert, he is not being called as an expert on

 7    medical practice, he's being actually called as an expert on

 8    pharmaceutical practice.

 9              MS. NEUBERT:   And my objection, Your Honor -- I'm

10    sorry.

11              THE COURT:   So I think this is beyond the scope of

12    this witness'...

13              MS. NEUBERT:   Well, I certainly would have agreed to

14    that, Your Honor, on his direct examination, but he was allowed

15    to go on and on about what his understanding about what doctors

16    are allowed to do and not allowed to do, and this is just

17    cross-examination.

18              THE COURT:   I thought he was expressing it.  Maybe I

19    didn't hear it, but I thought he was expressing an opinion, or

20    a series of opinions, as to what's the appropriate

21    pharmaceutical practice.

22              MS. NEUBERT:   And that's what I'm attempting to

23    cross-examine.

24              THE COURT:   I thought you were actually asking him

25    questions about the doctor's practice.  I really don't want to

1    interfere with your examination, but, I mean, I think it's -- I

2    think it is beyond the scope of what this witness was offed to

3    testify.

4              Now, if you say it's appropriate for cross, maybe

5    it's appropriate for cross.  I don't know.

6              **MS. BROWN:**  I would just like to also note that I

7    think this may be opening the door to the area the defense

8    objected to him testifying to, because she is asking him about

9    what a doctor is allowed to do under the law, which is not what

10   he testified about on direct examination.

11             **THE COURT:**  I think this does -- in light of the

12   objection raised by the defense, I think you have to combine,

13   if I may suggest, combine your examination to this witness'

14   understanding of appropriate pharmaceutical practices.

15             **MS. NEUBERT:**  Very well, Your Honor.

16   **BY MS. NEUBERT:**

17   **Q.**  I believe on direct examination you testified that a

18   pharmacist is not to fill a prescription if, in that

19   pharmacist's judgment, the physician is writing a prescription

20   that is outside what the pharmacist believes is that

21   physician's specialty; wasn't that your opinion?

22   **A.**  Scope on practice, yes.

23   **Q.**  Okay.

24             And that is your testimony, that a pharmacist's duty

25   to determine whether or not a physician is appropriately

**Catizone – Cross / Howell Neubert**

1    prescribing a drug based on what the pharmacist believes is

2    that physician's specialty?

3    *A.*   Scope of practice, yes.

4    *Q.*   Scope of practice.  All right.

5              Would it be your testimony, then, that a

6    psychiatrist is not allowed to write a prescription for -- I'm

7    sorry, let me not ask it that way -- that a pharmacist should

8    not fill a prescription for an antibiotic that a psychiatrist

9    has written for a patient's sore throat?

10   *A.*   I believe it was my testimony that that would be cause for

11   the pharmacist to have a conversation and interact with the

12   doctor before making a decision.  So from the pharmacy standard

13   of practice, it's not a "do not dispense."  It's "a talk to the

14   doctor to ascertain whether or not it's an appropriate

15   prescription."

16   *Q.*   Appropriate in -- so if it's a psychiatrist, and a

17   psychiatrist is prescribing an antibiotic, according to your

18   opinion before, that would be outside the scope of that

19   doctor's specialty and so it would be per se inappropriate --

20   an inappropriate prescription, right?

21             *MS. BROWN:*   Objection, I think that misstates his

22   testimony about his opinion.

23             *THE COURT:*   Go ahead.

24             *THE WITNESS:*   I can't say in that case, because I

25   don't know what antibiotic is being prescribed by that

**Catizone – Cross / Howell Neubert**

 1  psychiatrist and what that patient's condition may be.  It

 2  would be the pharmacist's responsibility upon the based upon

 3  standards of care, if they thought that was inappropriate, to

 4  call that psychiatrist and ascertain whether or not it was a

 5  valid legitimate prescription.  That's what I testified to.

 6  *BY MS. NEUBERT:*

 7  *Q.*  Okay.

 8          So it's your opinion, then, that a pharmacist in the

 9  usual course of pharmacy practice, in that situation we just

10  described where a psychiatrist has prescribed an antibiotic, it

11  would be in the normal course of professional practice for a

12  pharmacist to call the psychiatrist to inquire about the

13  prescription for an antibiotic?

14  *A.*  If the pharmacist had doubts about the prescription, yes.

15  *Q.*  And the doubts in that situation would be simply based on

16  the fact that it's a psychiatrist and an antibiotic, right?

17  *A.*  No.  Because it may be outside the scope of practice of

18  that psychiatrist.

19  *Q.*  Right.

20          But that's what I just asked.  So the concern of the

21  pharmacist in the hypothetical is simply that it's a

22  psychiatrist prescribing an antibiotic?

23  *A.*  For that specific example, yes.

24  *Q.*  And it's your testimony that it would be outside the course

25  of pharmacy practice for that pharmacist to not call that

1   psychiatrist to inquire about the anti-biotic prescription?

2   *A.*   Again, if the pharmacist suspected that that was outside

3   the scope and not appropriate for that patient, yes.

4   *Q.*   Okay, thank you.

5                    *THE COURT:*   Anything further?

6                    *MR. SABELLI:*   Yes, Your Honor, thank you.

7                            <u>CROSS-EXAMINATION</u>

8   *BY MR. SABELLI:*

9   *Q.*   Good afternoon.

10  *A.*   Good afternoon.

11  *Q.*   My name is Martin Sabelli.   I represent DJ Johnson.

12           I want to start by asking a couple questions

13  about -- or a few questions about your education and training

14  that haven't been covered.

15           As I understand it, not just yours but pharmacists

16  in general, would you agree with me that pharmacists in general

17  are trained just about in the same way across all 50 states in

18  the United States?

19  *A.*   Yes.

20  *Q.*   Okay.

21  *A.*   Educated.

22  *Q.*   I'm sorry?

23  *A.*   Educated.

24  *Q.*   Educated, I'm sorry.   Thank you.

25           They go through a formal education process that's

**Catizone – Cross / Sabelli**

1    fairly similar across all 50 states?

2    **A.**   Yes.

3    **Q.**   And that has what you guys call a didactic component?

4    **A.**   Yes.

5    **Q.**   Which means a classroom component?

6    **A.**   Yes.

7    **Q.**   And that's about five years long?

8    **A.**   It varies, but it's somewhere between five and eight years.

9    **Q.**   Five and eight years, okay.

10   **A.**   Yes.

11   **Q.**   And there is also what you call an on-the-job component?

12   **A.**   An experiential component.

13   **Q.**   Experiential component.

14   **A.**   Yes.

15   **Q.**   And how long is that?

16   **A.**   That's generally one year.

17   **Q.**   So to get licensed, to get to the place where you're a

18   pharmacist and practicing as a pharmacist, fair to say you need

19   to be educated both in the classroom and on the job for

20   something like five to eight or nine years, something like

21   that?

22   **A.**   Yes, sir.

23   **Q.**   And it's through that process that you learn what the rules

24   are about being a pharmacist?

25   **A.**   Yes, sir.

**Catizone – Cross / Sabelli**

 1   *Q.*  So, for example, when are in the classroom as a pharmacist,

 2   you take classes on the law or legal aspects of being a

 3   pharmacist?

 4   *A.*  Classes and it's a integrated into the instruction for the

 5   clinical classes as well.

 6   *Q.*  It's integrated into the clinical as well?

 7   *A.*  Into the curriculum, yes, sir.

 8   *Q.*  Because that's something that pharmacists need to learn

 9   about?

10   *A.*  Yes, sir.

11   *Q.*  And that is how you first were exposed to what you've

12   talked to us today as being the ethical or correct practices of

13   a pharmacist?

14   *A.*  Yes, sir.

15   *Q.*  You didn't know that before you trained as a pharmacist?

16   *A.*  No.

17   *Q.*  And you didn't know any of that before you were educated as

18   a pharmacist?

19   *A.*  No, sir.  Correct, sir.

20   *Q.*  And along the way –– let me back up.

21        After becoming a pharmacist, after being licensed to

22   be a pharmacist, you actually practice as a pharmacist?

23   *A.*  Yes, sir?

24   *Q.*  And there you learned more about what a pharmacist should

25   and shouldn't do.

**Catizone – Cross / Sabelli**

1    *A.*  Yes, sir.

2    *Q.*  And then you sort of went into this other role, which is

3    sort of a public role being the public face of pharmacist in a

4    sense, right?

5    *A.*  Of the State Boards.

6    *Q.*  Of the State Boards, right?

7    *A.*  Yes, sir.

8    *Q.*  In that process, you also learned more about what it takes,

9    what a pharmacist is supposed to do and not supposed to do?

10   *A.*  Yes, sir.

11   *Q.*  And I think you told us that you -- if I got it down

12   correctly, you interact with medical boards?

13   *A.*  Yes, sir.

14   *Q.*  And it's through this process of education, on-the-job

15   training, interaction with medical boards, legal and law

16   classes, that you've developed the body of knowledge that

17   you've come here to share with us?

18   *A.*  Yes, sir.

19   *Q.*  Okay.  All right, okay.

20         Now, is the education or training you receive as a

21   pharmacist, is there any component in which a pharmacist is

22   taught -- taught to rely upon the judgment of a business owner

23   in order to make an ethical judgment about what the pharmacist

24   should or should not do?

25   *A.*  Can you repeat the question, please?  I didn't understand

Catizone – Cross / Sabelli

1     it.

2     **Q.**  Is there any component of your -- of the pharmaceutical

3     training, whether it's in the classroom or on the job,

4     everything we just talked about, in which a pharmacist is

5     taught that in making a decision about how to be a pharmacist,

6     how to dispense drugs or not dispense drugs, that that

7     pharmacist should depend upon the judgment of another person,

8     specifically a business person?

9     **A.**  They're taught not to rely on that individual or that

10    recommendation if it's contrary to what they have to do as a

11    pharmacist or what they may know of the laws and regulations.

12    **Q.**  In other words, they are taught to rely on their own

13    judgment?

14    **A.**  Their judgment and knowledge of the laws and requirements.

15    **Q.**  A pharmacist is taught to rely on his or her own judgment,

16    based upon his or her own training and experience and

17    knowledge?

18    **A.**  Yes, sir.

19    **Q.**  And similarly, a pharmacist is not taught to rely upon the

20    judgment of a web designer or a computer programmer; is that

21    correct?

22    **A.**  Yes, sir.

23    **Q.**  A pharmacist is trained to rely on his or her own judgment

24    about how to dispense medications?

25    **A.**  Yes, sir.

**Catizone – Cross / Sabelli**

1    *Q.*  And especially controlled substances?

2    *A.*  Yes, sir.

3    *Q.*  Okay.

4            And, in fact, it would be wrong for a pharmacist to

5    depend upon the judgment of a computer programmer or a business

6    person in making a decision about dispensing or not dispensing

7    a controlled substance, wouldn't it?

8    *A.*  When you say "wrong," I think there is the ability for

9    input for that pharmacist listen to it, but if the decision is

10   contrary to what that pharmacist knows and the judgment, then

11   it would be wrong for that pharmacist to rely on that.

12   *Q.*  Bottom line is the pharmacist relies on his or her own

13   judgment; is that correct?

14   *A.*  Yes, sir.

15   *Q.*  Based upon all these years of training and experience that

16   he or she has received?

17   *A.*  Yes, sir.

18   *Q.*  Okay.

19           And fair to say that you are sort of on the cutting

20   edge of all that, that's -- you are one of the most, let's put

21   it this way, trained, educated, and knowledgeable people about

22   the guidelines in this respect?

23   *A.*  I do my best to stay current.

24   *Q.*  Okay.

25   *A.*  Yes.

**Catizone — Cross / Sabelli**

1    *Q.*  And one of the reasons that you do your best to stay

2    current and know about all this stuff is that you are the

3    public face of pharmacies?

4    *A.*  No, sir.  Of the State Boards of Pharmacy.

5    *Q.*  I'm sorry -- of the State Boards?

6    *A.*  Yes, sir.

7    *Q.*  Thank you for correcting me.

8             And one of the things you do as the public face of

9    these State Boards is you do outreach to the public?

10   *A.*  Yes, sir.

11   *Q.*  And you teach them about what are proper practices and not

12   proper practices?

13   *A.*  Yes, sir.

14   *Q.*  You also do outreach to pharmacists and pharmacies and you

15   teach them the same thing?

16   *A.*  Yes, sir.

17   *Q.*  You teach them about proper practices and improper

18   practices?

19   *A.*  Yes, sir.

20   *Q.*  And in your experience, it's fair to say that there is a

21   fair number of people in the public who don't understand what

22   you understand regarding the ethical or -- let me back that up.

23   It's getting to be a confusing question.

24             Is it fair to say that in your experience, in your

25   job, you run across a fair number of people in the public who

1   don't know about the kinds of rules and legislations that you

2   have testified here to today?

3   **A.**  Yes, sir.

4   **Q.**  And it's fair to say there are a number of pharmacists that

5   you run across who also don't know about the rules and

6   regulations that you've testified about today?

7   **A.**  Yes.

8   **Q.**  All right.

9          Now, by the way changing subjects, a pharmacist, for

10  example, a pharmacist at Walgreens, doesn't necessarily staff

11  the cashier also, right?

12  **A.**  It would vary depending upon the pharmacy and store, sir.

13  **Q.**  So it's perfectly legal, isn't it, for a pharmacist at

14  Walgreens to do what ever he or she needs to do in the back and

15  allow somebody else to hand over a controlled substance or a

16  prescription medication to somebody buying it?

17  **A.**  By -- can you explain for me what you me by "hand over"?

18  Because that pharmacist has to oversee and supervise that

19  medication dispensing, and by law the technician or the person

20  handing it over cannot counsel or talk to the patient about

21  that medication.  That's the pharmacist's responsibility.

22         But if it's simply providing it to the patient after

23  the pharmacist has checked everything, the answer is yes.

24  **Q.**  Okay.

25         So, in other words, a pharmacist at Walgreens can

**Catizone – Cross / Sabelli**

 1  check everything, make sure the prescription is valid, make

 2  sure the medication is appropriate, everything you have

 3  described for us, and then he or she can leave it in a box in

 4  the front and the cashier can hand it over?

 5  *A.*  If the cashier has validated that it was for the patient

 6  picking up the medication, yes.

 7  *Q.*  It's the right person?

 8  *A.*  Yes.

 9  *Q.*  And there is nothing wrong with the pharmacist employing

10  employees or technicians to perform other functions within the

11  pharmacy?

12  *A.*  Under the direct supervision, yes.

13  *Q.*  Under direct supervision?

14  *A.*  Yes, sir.

15  *Q.*  Okay.  Thanks.

16          Now, changing gears.  You have told us you have

17  testified before Congress?

18  *A.*  Yes, sir.

19  *Q.*  And you testified before Congress in March of 2004?

20  *A.*  A number of times, sir, but I don't recall that one

21  specifically, but yes.

22  *Q.*  Do you recall testifying before the Committee on Government

23  Reform on March 18th, 2004?

24  *A.*  Yes, sir.

25  *Q.*  Okay.  All right.

**Catizone – Cross / Sabelli**

1              And you testified that day because Congress or that

2     committee was considering a bill?

3     *A.*  Yes, sir.

4     *Q.*  And that bill had to do with Internet prescribing?

5     *A.*  Yes, sir.

6     *Q.*  And one of the provisions of that bill had to do with

7     whether or not there had to be a face-to-face examination by a

8     doctor before a doctor could prescribe a controlled substance;

9     isn't that correct?

10    *A.*  Yes, sir.

11    *Q.*  Okay.

12             And that bill was colloquially known as, or commonly

13    known as, the Ryan Haight Act?

14    *A.*  Yes, sir.

15    *Q.*  And you went there to testify as an expert to the Ryan

16    Haight Act?

17    *A.*  Yes, sir.

18    *Q.*  And your mission your day was to convince Congress that the

19    Ryan Haight Act should be passed?

20    *A.*  To support passage of.

21    *Q.*  You thought it was a good bill?

22    *A.*  Yes, sir.

23    *Q.*  And there was in March of 2004, more or less?

24    *A.*  Yes, sir.

25    *Q.*  And you sat down in front of this committee; is this right?

 1   **A.**   Yes, sir.

 2   **Q.**   And you read a prepared statement?

 3   **A.**   Yes, sir.

 4   **Q.**   In other words, it wasn't something you did on the fly, you

 5   had prepared that statement?

 6   **A.**   Yes, sir.

 7   **Q.**   And you chose your words very carefully for that statement?

 8   **A.**   Yes, sir.

 9   **Q.**   And you knew you had to have in impact on this committee

10   because this was an important bill?

11   **A.**   Yes, sir.

12   **Q.**   So to words you used before Congress that day were words

13   that you chose carefully to make the right kind of impression

14   with Congress?

15   **A.**   Yes, sir.

16   **Q.**   To deliver the right message?

17   **A.**   Yes, sir.

18   **Q.**   And at a key moment in time?

19   **A.**   Yes, sir.

20   **Q.**   When the Congress was considering changing the law?

21   **A.**   Yes, sir.

22   **Q.**   Okay.

23           And in your comments or in your prepared statement

24   to the committee, you explained to the committee that you were

25   there to address the issue of the patient-prescriber

```
 1   relationship; is that right?
 2   A.  Oh, yes, sir.
 3           I'm sorry, I was waiting for the question.
 4   Q.  I was waiting for your answer.
 5   A.  Oh.
 6   Q.  And you were there to support the proposed revisions in the
 7   law, correct?
 8   A.  Yes, sir.
 9   Q.  And some of these proposed revisions identified and defined
10   a qualifying medical relationship?
11   A.  Yes, sir.
12   Q.  And specifically they defined a medical -- qualifying
13   medical relationship between a patient and a prescriber to
14   require an in-person medical evaluation?
15   A.  Yes, sir.
16   Q.  Now, that wasn't the law in 2004?
17   A.  It wasn't federal law, but it was state law, sir.
18   Q.  I'm talking about federal law.  It wasn't federal law?
19   A.  Correct.
20   Q.  Okay.
21           And we'll leave state law aside for the moment,
22   okay.
23           With respect to federal law, it wasn't federal law?
24   A.  Correct.
25   Q.  In 2004?
```

**Catizone – Cross / Sabelli**

1   **A.**   Correct.

2   **Q.**   Didn't become federal law until 2008?

3   **A.**   With the passage, yes.

4   **Q.**   Okay.

5          So let's stay in the period before 2008, okay?

6   **A.**   Sure.

7   **Q.**   All right.

8          Or let's stay in the period 2004 through 2006.  Are

9   you with me on that?

10  **A.**   Yes, sir.

11  **Q.**   All right.  Okay.

12         Now, you and your organization strongly supported

13  this change in the law?

14  **A.**   Yes, sir.

15  **Q.**   Okay.

16         And your concern was with what you considered to be

17  illegal or rogue sites?

18  **A.**   Yes, sir.

19  **Q.**   And one of your concerns about these illegal or rogue sites

20  was that some of them were extremely knowledgeable about state

21  and federal laws?

22  **A.**   Yes, sir.

23  **Q.**   And you told Congress that they were so extremely

24  knowledgeable about state and federal laws that they would

25  locate their operations to those states or areas where their

 1   activities are not specifically prohibited?

 2   **A.**   Yes, sir.

 3   **Q.**   That's what you told Congress?

 4   **A.**   Yes, sir.

 5   **Q.**   And you told Congress that the activities of these illegal

 6   or rogue sites, as you called them, may not specifically have

 7   been prohibited at that point in time?

 8   **A.**   Yes, sir.

 9   **Q.**   What you said exactly was "The operators of illegal and

10   rogue sites are extremely knowledgeable about state and federal

11   laws, and will locate their operations to those states or areas

12   where their activities are not is specifically prohibited and

13   may, in fact, fall within a regulatory gray area."

14           Is that correct?

15   **A.**   Yes, sir.

16   **Q.**   By the way, were you sworn when you made that statement; do

17   you recall?

18   **A.**   Yes, sir.

19   **Q.**   Okay.

20           And you used the term "a regulatory gray area"?

21   **A.**   Yes, sir.

22   **Q.**   By the way, when you prepare these statements, do you run

23   them by other people in your organization or do you draft them

24   yourself?

25   **A.**   They go before my Executive Committee which functions as a

1    Board of Directors.

2    **Q.**  So who drafts them initially?

3    **A.**  Could be prepared by myself or other pharmacists we have on

4    staff and then I prepare the final copy.

5    **Q.**  You prepare the final copy?

6    **A.**  Yes, sir.

7    **Q.**  And then you present it to your executive board?

8    **A.**  Yes, sir.

9    **Q.**  And they have to approve it?

10   **A.**  Yes, sir.

11   **Q.**  Fair to say it's a big deal to go before Congress?

12   **A.**  I believe so, sir, yes.

13   **Q.**  And you recommended to Congress that Congress pursue the

14   ability to do nationwide injunctive relief, correct?

15   **A.**  Yes, sir.

16   **Q.**  And that's because, according to you, nationwide injunctive

17   relief would cease these practices and allow states to work

18   together to close regulatory loopholes and eliminate safe

19   havens within the United States for illegal and rogue sites;

20   Is that correct?

21   **A.**  Yes, sir.

22   **Q.**  In other words, you were telling Congress there are safe

23   havens in the United States for these rogue sites?

24   **A.**  Yes, sir.

25   **Q.**  And we need to close the loopholes?

**Catizone – Redirect / Brown**

1   **A.**  Yes, sir.

2   **Q.**  We need to change the laws?

3   **A.**  Change the federal law to codify what existed in state law.

4   **Q.**  And what you said exactly was that "nationwide injunctive

5   relief will cease these practices and allow states to work

6   together to close regulatory loopholes and eliminate safe

7   havens within the United States for illegal and rogue sites."

8           Those were your words, sir?

9   **A.**  Yes, sir.

10  **Q.**  Thank you.

11          I have one more question, and I'm sure the Court's

12  not going to allow me to ask it.  It's about "It's a Wonderful

13  Life."  Maybe I can talk to him in the hallway.

14          Thank you.

15          **MS. BROWN:**  I have a hopefully brief redirect, Your

16  Honor.

17                  <u>**REDIRECT EXAMINATION**</u>

18  **BY MS. BROWN:**

19  **Q.**  You were asked about the Ryan Haight Bill and your

20  testimony in 2004, correct?

21  **A.**  Yes, sir -- yes.

22  **Q.**  Who is Ryan Haight?

23  **A.**  Was a the teenager who ordered --

24          **MR. CANNON:**  Objection, relevance, Your Honor.  Also

25  object on 403 grounds.

```
 1                    MS. BROWN:  I think they opened the door, Your

 2     Honor.  I think --

 3                    THE COURT:  Well, I don't know they opened the door

 4     to who is Ryan Haight.

 5                    MR. SABELLI:  We don't have an objection.

 6                    THE COURT:  Pardon?

 7                    MR. SABELLI:  I don't have an objection.

 8                    THE COURT:  One does, one doesn't.

 9                         (Laughter.)

10                    MR. SABELLI:  If it makes it easier, I object.

11                         (Laughter.)

12                    MS. NEUBERT:  I object too.

13                    THE COURT:  Let's ask a question.

14     BY MS. BROWN:

15     Q.  You were asked about a change in federal law, correct?

16     A.  Correct.

17     Q.  In your view -- well, let me ask this:  Did the change in

18     federal law that you were asked about have any impact on your

19     view as to whether it was in 2005, in 2006, within the usual

20     course of professional pharmacy practice for prescriptions to

21     be issued by a pharmacist based solely on a doctor's review of

22     an online questionnaire like we saw in Exhibit 3A?

23     A.  No.

24     Q.  And why is that?

25     A.  What we address and in the testimony and what the law
```

**Catizone – Redirect / Brown**

 1   addressed was there are a number of facets in a regulatory gray

 2   area that the Internet pharmacies were operating besides just

 3   not having a valid prescription.

 4            So they would locate in states perhaps where

 5   inspections weren't occurring of those pharmacies or some of

 6   the other operations of that Internet pharmacy wasn't

 7   specifically regulated by that state.

 8            For example, they may tell the State Board of

 9   Pharmacy that they were going to operate a retail business that

10   had both Internet and patients walking into the pharmacy, when,

11   in fact, they were only going to operate an Internet pharmacy.

12            States didn't have the authority, once that license

13   was issued, to go and revoke that license unless they went to a

14   full hearing and went through a very expensive process to do

15   that.

16            What that Ryan Haight Act did was codify it from a

17   national stance so that if something occurred in one state and

18   the state didn't have the ability for other reasons beyond just

19   a valid prescription, the Federal Government, federal agencies,

20   could go after that pharmacy and then that pharmacy wouldn't be

21   able to operate in any states.

22            It also gave additional penalties to the Federal

23   Government that it didn't have before against these Internet

24   pharmacies, because regulation of pharmacies, pharmacists, and

25   doctors is constitutionally provided to the states and

**Catizone – Redirect / Brown**

 1   therefore wasn't needed at the federal level until the Internet

 2   occurred and then the federal agencies wanted the extra

 3   authority and the codification of state requirements in federal

 4   acts so they could act as well as the states.

 5   *Q.*  Let me ask you this:  I think on Mr. Sabelli's cross, you

 6   were asked about distinction prior to the Ryan Haight Act

 7   between federal law and state law.

 8          Do you recall that?

 9   *A.*  Yes.

10          *MR. SABELLI:*  Your Honor, I didn't ask about any

11   such distinction.

12          *MS. BROWN:*  I think he --

13          *THE COURT:*  Go ahead and ask him.

14   *BY MS. BROWN:*

15   *Q.*  Okay.

16          You said something to the effect of in response to

17   one of Mr. Sabelli's questions, and correct me if I'm getting

18   this wrong, that prior to the Ryan Haight Act, federal law did

19   not -- and I'm summarizing -- specifically require a

20   face-to-face medical examination?

21          *MR. SABELLI:*  Your Honor, that misstates the

22   testimony.

23          *MS. BROWN:*  I'm not trying to.  I'm trying to --

24          *THE COURT:*  Just ask the question.

25          *MS. BROWN:*  Okay.

Catizone – Redirect / Brown

1   *BY MS. BROWN:*

2   *Q.*   In your view, prior to the Ryan Haight Act, did federal law

3   incorporate or in any way rely on state laws?

4   *A.*   Yes.

5               *MR. SABELLI:*   That's leading, Your Honor.

6               *THE COURT:*   Overruled.

7   *BY MS. BROWN*

8   *Q.*   How so?

9               I'm sorry.  You should answer the question and then

10  how so?

11  *A.*   Under federal law, specifically the Food Drug and Cosmetic

12  Act, the requirement is that a pharmacy and pharmacists must

13  dispense medication based upon a valid prescription.

14               The definition of a valid prescription was reserved

15  for the states, because it's the states that regulate the

16  practices of medicine pharmacy, nursing, and the other

17  professions.  So therefore, there is the interplay between the

18  federal general requirement that says you need a valid

19  prescription, but legally and constitutionally we're going to

20  defer to the states to define what is a legal prescription.

21               *MR. CANNON:*   This is legal testimony.

22               *THE COURT:*   You opened the door, you asked all sorts

23  of questions about it.  The door is open to this witness giving

24  his opinion as to what the law was and whether it changed and

25  so forth.  That was the thrust of Mr. Sabelli's cross.

```
 1              Okay, go ahead.
 2    BY MS. BROWN:
 3    Q.   You testified about how the FDA, the Federal -- I'm sorry,
 4    the Food Drug and Cosmetic Act incorporated or relied on state
 5    laws.  Does that same principle also obtain with respect to the
 6    Controlled Substances Act?
 7    A.   Yes.
 8    Q.   And in 2001, were you aware that the DEA issued some
 9    guidelines regarding what constituted a valid prescription and
10    a valid physician-patient relationship?
11    A.   For Internet practice, yes.
12    Q.   And could you explain what that was?
13    A.   The DEA guidance document, which is binding in terms of
14    standards of practice for pharmacists, specifically stated that
15    the pharmacist, in order to dispense a controlled substance,
16    had to ensure that there was a legitimate medical condition,
17    and that medical condition was defined as legitimate by a
18    face-to-face in-person examination, that there was a
19    relationship between the medications prescribed and the
20    patient's condition, and that the medication then was
21    appropriate for that patient to be dispensed.
22              That standard was put in place in 2001 across all
23    states and all pharmacies.
24    Q.   Okay.
25              And with respect to the 2006 time frame, was it
```

```
 1   within the usual course of professional practice for a

 2   prescription to be issued based solely on an online

 3   questionnaire?

 4   A.  No.

 5   Q.  Did the change in federal law in any way affect or modify

 6   the usual course of professional pharmacy practice?

 7   A.  No.

 8   Q.  You mentioned regulatory gray areas when Mr. Sabelli was

 9   crossing you.  Was the use of an online questionnaire to

10   generate a prescription back in 2006 such a gray area, in your

11   view?

12   A.  No.

13           THE COURT:  Mr. Cannon?

14           MR. CANNON:  No questions, Your Honor.

15           THE COURT:  Mr. Sabelli?

16                    RECROSS-EXAMINATION

17   BY MR. SABELLI:

18   Q.  Mr. Catizone, did I understand you to say that -- that your

19   view of the -- what you called a 2001 standard was based upon

20   the Food, Drug and Cosmetic Act?

21   A.  No, sir.  It was a DEA guidance document and it applied to

22   the Controlled Substances Act.

23   Q.  So it was some sort of material that you got from the DEA?

24   A.  The DEA issued to everyone, sir.

25   Q.  When you say "everyone," you mean pharmacists?
```

 1   **A.**  Pharmacists, physicians, anyone that has a registration

 2   with the DEA was issued that guidance.

 3   **Q.**  Okay.

 4           How about to computer programmers?

 5   **A.**  I can't answer that, sir.  I'm not sure if they would

 6   receive it or not.

 7   **Q.**  Now, Mr. Catizone, the last question that Ms. Brown asked

 8   you, if I heard you correctly, and please correct me if I'm

 9   wrong, she asked you something like whether or not an in-person

10   or face-to-face medical examination -- and if I've gotten it

11   wrong, Counsel, please correct me -- was one of the gray areas

12   that you thought existed in 2004?

13           **MS. BROWN:**  I don't think that was the question.

14           **THE COURT:**  What do you think.

15   **BY MR. SABELLI**

16   **Q.**  That's what thought, but maybe I misheard.

17   **A.**  I believe she asked whether or not the issuance of

18   prescription based solely on a questionnaire was one of the

19   regulatory gray areas.  And my answer was no, that wasn't.

20   **Q.**  And when she asked you about the issuance of a prescription

21   based solely on a questionnaire you understood that to mean the

22   issuance of a prescription without a face-to-face medical

23   examination; isn't that correct?

24   **A.**  Yes, sir.

25   **Q.**  "Solely on a questionnaire" means without a face-to-face

**Catizone – Further Redirect / Brown**

1   medical examination?

2   **A.**  Yes, sir.

3   **Q.**  And what you were telling Congress in 2004 was that the law

4   needed to be changed to require a face-to-face medical

5   examination before a controlled substance could be prescribed;

6   isn't that correct?

7   **A.**  Yes, sir.

8   **Q.**  Okay.  Thank you.

9                    <u>**FURTHER REDIRECT EXAMINATION**</u>

10  *BY MS. BROWN:*

11  **Q.**  Very briefly, in your view, before 2008 did the law require

12  there to be a face-to-face examination?

13              **MR. SABELLI:**  Calls for a legal conclusion.

14              **MS. BROWN:**  The door has been opened, Your Honor.

15              **THE COURT:**  It's proper.

16              **THE WITNESS:**  Yes.  Our support of it in a federal

17  statute was, one, to provide additional penalties through

18  federal agencies and federal laws and to put into the federal

19  statutes what already existed in state statutes.

20              **MR. SABELLI:**  Did I hear you --

21              I'm sorry, Counsel.

22  *BY MS. BROWN*

23  **Q.**  And did the state statutes get incorporated into the

24  federal law as it existed prior to 2008?

25  **A.**  Yes.

## <u>FURTHER RECROSS–EXAMINATION</u>

**BY MR. SABELLI:**

**Q.**  Mr. Catizone, did I just hear you say that what you were really asking for were additional penalties?

**A.**  No, sir.

What I respond was, by having that provision in federal law, it would give the Federal Government the ability to also prosecute those individuals along with the state and provide additional penalties or sanctions against those pharmacies and pharmacists.

**Q.**  Mr. Catizone, would you agree with me that what you were telling Congress in 2004 was federal law did not prohibit the issuance of prescription based on -- without a face-to-face medical examination; is that correct?

**A.**  No, sir.

**Q.**  Okay.

**THE COURT:**  I think there were a couple of negatives in that.

**MR. SABELLI:**  Yeah, it's my fault.  There's no question it's my fault.  It's the end of a long, long day.  So I withdraw that question if that makes it easier.

**BY MR. SABELLI**

**Q.**  I'm showing you what has been marked Defense 2503.

**MS. BROWN:**  May I have a copy, please?

**MR. SABELLI:**  This is the only copy I have.  You're

```
 1    welcome to it.

 2              THE CLERK:  So you do not have one for the Court?

 3              MR. SABELLI:  I did not anticipate I would be doing

 4    this today.

 5              Perhaps someone can give me an extra copy?  It's the

 6    March testimony.

 7              MR. SABELLI:  Your Honor, I'm handing Mr. Catizone

 8    what's been marked 2503.

 9    BY MR. SABELLI:

10    Q.  Mr. Catizone, do you recognize those as your comments to

11    the House Committee on Government Reform on March 18th, 2004?

12    A.  Yes, sir.

13    Q.  Okay.  All right.

14              And would you please turn to what is -- these are

15    unmarked -- unnumbered pages, rather -- what would be page 4 of

16    Exhibit 2503, please.

17              On that page or any other page in your comments, do

18    you see the words "additional penalties"?

19    A.  No, sir.

20    Q.  You didn't tell Congress about additional penalties?

21    A.  I did, sir.

22    Q.  Okay.

23              Did you tell Congress on March 18th, 2004, about

24    additional penalties?

25    A.  No, sir.
```

**Catizone – Further Recross / Sabelli**

1    *Q.*  About the need for additional penalties?

2    *A.*  Not on that date, no.

3    *Q.*  What you told Congress on March 18, 2004, was that the law

4    did not -- the federal law did not explicitly or specifically

5    prohibit prescriptions issued without a face-to-face medical

6    examination?

7    *A.*  I don't believe I said that, sir.  I don't think the

8    testimony says that.  And in private conversations with the --

9    *Q.*  I'm sorry, sir.  There is no question pending, okay?

10             Is it true that you and your organization on

11   March 18th, 2004, strongly supported the Ryan Haight Act?

12   *A.*  Yes, sir.

13   *Q.*  And, in your opinion, the Ryan Haight Act, one of the

14   reasons you supported the Ryan Haight Act was because it would

15   have allowed states to bring civil action to enjoin the

16   practices of illegal Internet sites?

17   *A.*  Yes, sir.

18   *Q.*  And to obtain injunctions against their operations?

19   *A.*  Yes, sir.

20   *Q.*  And you made this recommendation to Congress because in

21   your experience and in your organization's experience, the

22   operators of illegal and rogue sites are extremely

23   knowledgeable about state and federal laws and will locate

24   their operation to those states or areas where their activities

25   are not specifically prohibited and may, in fact, fall within a

 1    regulatory gray area?

 2    **A.**   Yes, sir.

 3    **Q.**   And you described those areas as safe havens within the

 4    United States for illegal or rogue sites?

 5    **A.**   Yes, sir.

 6            **MR. SABELLI:**   Thank you very much.

 7                  <u>**FURTHER REDIRECT EXAMINATION**</u>

 8    **BY MS. BROWN:**

 9    **Q.**   In 2001, in the DEA guidance that you talked about

10    previously, did the -- that guidance that will form part of the

11    basis of your opinion that you've testified about today, did

12    that require that a prescription be issued for a legitimate

13    medical purpose by a practitioner acting within the usual

14    course of his professional practice?

15    **A.**   Yes.

16    **Q.**   And did that standard, in your view, incorporate various

17    state standards?

18    **A.**   Yes.

19    **Q.**   And was the point of your testimony to try to make it

20    easier to prosecute under federal law so there wouldn't have to

21    be an argument about what "usual course of professional

22    practice" means?

23    **A.**   It was a number of things, yes.  It was that, to provide

24    additional tools for enforcement.  It also talked about

25    Internet sites in my testimony, credit card companies, and the

1  inability of the states to handle those activities because of a

2  pharmacy moving from state to state, and that this national

3  injunctive relief would allow pharmacists -- pharmacy boards,

4  and the Federal Government to prosecute these multi-state

5  operations and go after the Internet sites, the credit card

6  operators, and any other individuals that may be advertising or

7  involved in these processes.

8  *Q.*  So did the change in law in 2008 change -- did it actually

9  change that standards for issuance of a valid prescription?

10          **MR. SABELLI:**  Your Honor, we are way into legal

11  opinions here.

12          **MS. BROWN:**  I think the defense opened the door.

13          **MR. SABELLI:**  That's a fine.  If I'm able to ask

14  about them, I'm happy with that.

15          **MS. BROWN:**  I think they have been --

16          **THE COURT:**  Wait a minute.  The test of whether

17  something's admissible is not a function of the happiness of

18  the counsel --

19                  **(Laughter.)**

20          **THE COURT:**  -- who wants to ask these questions.

21          The question is whether or not the Ryan Haight

22  Act -- as I understood, your question is was the Ryan Haight

23  Act what, a change in the law?

24          **MS. BROWN:**  Or merely a codification of what had

25  previously existed.

**Catizone – Further Redirect / Brown**

1          ***THE WITNESS:***  It did not change state law.

2          ***MR. SABELLI:***  I'm sorry, objection, Your Honor.

3          For the record, and perhaps more than for the

4   record, we did object to legal opinions.  Those objections were

5   overruled by the Court.  I'm happy to go into legal --

6          ***THE COURT:***  I think what he's doing is he's giving

7   his opinion as to whether or not he was urging the enactment of

8   this legislation for the purpose of changing the law with

9   respect to the standard that is used in connection with the

10  standard of medical practice.

11         ***MS. BROWN:***  I'll ask it that way.

12         ***THE COURT:***  That's the question.

13  ***BY MS. BROWN:***

14  ***Q.***  So was your purpose to try to change the law and to change

15  the standards that were in existence already?

16  ***A.***  No.

17  ***Q.***  What was your purpose?

18  ***A.***  It was a number of different things.  When I testified --

19  and if you read the full testimony, some of the requirements of

20  the Ryan Haight Act were to post a list of pharmacies that

21  consumers could use.  We supported that provision.  That's not

22  in state law.  Currently it's not a requirement in federal or

23  state law.

24         There were also provisions addressing the

25  advertising, the Internet service providers, credit card

Catizone – Further Recross / Sabelli

1    processors, various aspects that would fall outside of the

2    regulatory scope of a State Board of Pharmacy that deals

3    specifically with what the pharmacist standards are and

4    responsibilities are, and we supported those provisions as

5    well.

6            As I mentioned earlier, we supported having another

7    tool for law enforcement officials to go after Internet sites

8    that were not meeting the standards or practicing illegally

9    that would allow both the state and the Federal Government to

10   now take action against these sites.

11           So from that perspective, we welcomed the

12   involvement of the Federal Government and these additional

13   areas that they were trying to address that the states have no

14   legal authority to address.

15   *Q.*  So before 2008, just to summarize, would it have been

16   within the usual course of professional practice for a

17   prescription to be issued based entirely upon an online

18   questionnaire?

19   *A.*  No.

20                   **FURTHER RECROSS EXAMINATION**

21   *BY MR. SABELLI:*

22   *Q.*  Good afternoon, Mr. Catizone.  How are you?

23                   **(Laughter.)**

24   ///

25   *BY MR. SABELLI:*

**Catizone – Further Recross / Sabelli**

1    **Q.**  Okay.

2              Would you tell me what that phrase "proposed

3    revisions" means to you?

4    **A.**  Revisions that are proposed.

5    **Q.**  Okay.

6              "Revision" means a change, right?

7    **A.**  Yes, sir.

8    **Q.**  And "proposed" means something that is somebody is to

9    consider and decide whether or not to implement?

10   **A.**  Yes, sir.

11             **MR. SABELLI:**  Your Honor, at this point may I show

12   the actual testimony and publish it to the jury, since we are

13   parsing language here?

14             **THE COURT:**  I don't know what is in the testimony.

15             **MR. SABELLI:**  I can hand a copy to the Court.

16             **THE COURT:**  Well, I'm not going to sit and read it

17   right now.  If you have a specific question as it relates to a

18   specific thing that the witness said, I'm sure you can inquire.

19   **BY MR. SABELLI:**

20   **Q.**  Did you use the following words with the United States

21   Congress, specifically the House Committee on Government

22   Reform, on March 18th, 2004, sir?

23             "NABP applauds the sponsorship of HR3880 for

24   addressing the patient-prescriber relationship and supports the

25   language of the bill.

1              "The proposed revisions, which identify and define a

2    qualifying medical relationship, will close a regulatory

3    loophole exploited by rogue and illegal Internet sites.

4              "Equally as important, the proposed requirement of

5    an in-person medical evaluation will not adversely impact the

6    practices of telemedicine and telepharmacy."

7              Were those your words?

8    **A.**  Yes, sir.

9    **Q.**  You chose the words "proposed revisions," correct?

10   **A.**  Yes, sir.

11   **Q.**  And the words "proposed requirement"?

12   **A.**  Yes, sir.

13   **Q.**  And at the end of that paragraph that I just read to you,

14   you were assuring the House Committee on Government Reform that

15   this proposed requirement of an in-person medical evaluation

16   would not adversely impact the practices of telemedicine and

17   telepharmacy?

18   **A.**  Yes, sir.

19   **Q.**  Meaning that this proposed requirement wouldn't have a

20   negative impact on legitimate, what you consider to be

21   legitimate, telemedicine?

22   **A.**  Yes, sir, because the standards already existed.

23              **THE COURT:**  Anything further?

24              **MR. SABELLI:**  One moment, Your Honor, just making

25   sure -- I offer the full comments --

1          **THE COURT:**  I'll take it up outside.

2          **MR. SABELLI:**  Okay.

3          **THE COURT:**  I'll look at it.

4          **MR. SABELLI:**  Thank you very much, Mr. Catizone.  I

5     don't know if the Government's got anything else for you.  So

6     I'll stand here just in case.

7                          **(Laughter.)**

8                    **FURTHER REDIRECT EXAMINATION**

9     **BY MS. BROWN:**

10    **Q.**  You were asked by Mr. Sabelli about --

11         **THE COURT:**  Do you really want -- I think he's

12    answered the question.  He's answered as best he can.  The

13    answer is there.  Is there a really a follow-up question?

14    **BY MS. BROWN:**

15    **Q.**  Did you believe that you were advocating a change in the

16    law or simply a codification or clarification of the law as it

17    existed at the time?

18    **A.**  Codification.

19         **MR. SABELLI:**  Your Honor, I would offer 2503 into

20    evidence, given the amount of time that has been spent by both

21    counsel.

22         **THE COURT:**  I'll take it up outside the presence of

23    the jury.

24         **MR. SABELLI:**  Your Honor --

25         **THE COURT:**  Well, ten to 4:00.

**Proceedings**

```
 1              I don't think you've got a ten-minute witness, do
 2    you?  Or do you?
 3              MS. AULT:  If we could confer with our opposing
 4    counsel for a moment?
 5              THE COURT:  Sure.
 6              You can talk, ladies and gentlemen, by the way.
 7                        (Counsel confer.)
 8              MS. AULT:  We have been informed we do not have a
 9    ten-minute witness, Your Honor.
10                        (Laughter.)
11              THE COURT:  Okay.
12              All right, ladies and gentlemen, we are going to
13    take our recess now, and the Court obviously is going to spend
14    some time going over some of these issues.  So remember the
15    admonition given to you, don't discuss the case, allow anyone
16    to discuss it with you, form or express any opinion.
17              Your instructions this weekend are not to think
18    about the case and to watch as much baseball, football,
19    America's Cup, the blues concert in Golden Gate Park, the
20    Castro Fair -- what else is happening?
21              THE COURT REPORTER:  And the Blue Angels.
22              THE COURT:  And the Blue Angels.
23              So that's the order of the Court.  And have a very
24    nice vacation weekend, and I will see you on Tuesday morning
25    at -- I said 9:00, right?  Tuesday morning, 9:00 o'clock.
```

1    Thank you.

2                    **(Jury exits courtroom at 3:50 p.m.)**

3                    **THE COURT:**  The jury is out.

4            So as they say in Bridge, one has to review the

5    bidding.  It's not a bad idea to review the bidding.

6            If I understand the bidding is, when the case

7    started, the defense wanted to introduce into evidence the Ryan

8    Haight Bill, the declaratory relief judgment, and a number of

9    other things which are of legal -- they were the basically the

10   law or proposed changes to the law, or whatever it is, it is.

11           Then -- and I thought I said a number of these

12   things could come in by way, if the defendants were going to

13   testify, it goes to their state of mind and so forth, and it

14   may very well be relevant there.

15           Then the defendant said, well, we want to

16   cross-examine the experts on these things.  And whatever I

17   said, I said on that subject.  But it became clear to me by the

18   course of this witness' examination that the defendants should

19   be entitled to cross-examine the witness on a number of

20   so-called quasi-legal issues that somehow related to the

21   standard of care or the standard of appropriate medical

22   practice or pharmaceutical practice.

23           So, and they did, they did.  At least I thought we

24   had a lot of cross-examination on that subject.

25           So I don't know that that means, then, that the

**Proceedings**

```
1    witness' testimony comes in that he gave before the Congress.

2    Maybe there is no objection or maybe there is, I don't know,

3    but I don't know that that comes in.  He testified about a

4    number of things, I assume.

5            MS. AULT:  Your Honor, since we were just handed it,

6    we --

7            THE COURT:  I think we all ought to read it, and

8    then I'll make some ruling on it on Tuesday.

9            MS. AULT:  Thank you, Your Honor.

10           MR. SABELLI:  Would the Court like a copy?

11           THE COURT:  Yes, I would, please.  And one could be

12   marked.

13           MR. SABELLI:  It's been marked, Your Honor.

14           MS. AULT:  We would also like to know what exception

15   to the hearsay rule the defendants are offering it under.

16           THE COURT:  The exception is that so much has been

17   said about it, why doesn't it just come in.  That's the

18   exception.

19           MR. SABELLI:  It's a prior interest inconsistent

20   statement, Your Honor, and I'm go to look at the public record

21   exceptions that might apply to published proceedings in

22   Congress.  I had not anticipated on doing this, so I have not

23   completely thought it through.  I will be happy --

24           THE COURT:  That would be good if everybody thinks

25   its through, okay.
```

**Proceedings**

1          **MR. SABELLI:**  I want the Court to know, the question

2  wanted to ask him, which I knew wouldn't happen here in court,

3  but should Mr. Gower have gone to jail or not?

4          **THE COURT:**  Mr. who?

5          **MR. SABELLI:**  Has the Court seen "It's a Wonderful

6  Life"?

7          **THE COURT:**  No, see, I haven't seen that.

8          **MR. SABELLI:**  He's the pharmacist who Jimmy Stewart,

9  aka George Banks, saves in the beginning --

10         **THE COURT:**  Oh, no, I have seen that.

11         **MR. SABELLI:**  -- never goes to jail, because he just

12  made a mistake, and he was a good man.  And then in the movie

13  you see that he had led a good and excellent life.  And had

14  Jimmy Stewart died young, or never lived, rather, Mr. Gower

15  would have been a terrible person and a terrible human being,

16  the world would have been worse.

17         **THE COURT:**  Are we going to hear more about this in

18  the closing?

19              **(Laughter.)**

20         **MR. SABELLI:**  No, Your Honor.  I've said what I have

21  to say.

22         **THE COURT:**  Fine, let's talk about the statements

23  for this witness.

24          Now, you have advised Mr. Sabelli that you have a

25  lot of authority for the proposition that they had a

**Proceedings**

1   responsibility -- we know they had a responsibility of

2   disclosure, which they said they've done two years ago, giving

3   you all these statements, but they had a responsibility

4   indicating to you, or identifying to you, that it would be

5   offered for -- as an exception to the hearsay rule under 801D

6   something or other.

7            *MR. COHEN:*  The hearsay requirement, I think, Your

8   Honor -- and the Court may have access to the rules where we

9   don't, is --

10           *THE COURT:*  I have a lot access to all these rules.

11           *MR. COHEN:*  We believe it's Criminal Local Rule

12  36-3.

13           *MS. AULT:*  Which this Court has already made a

14  ruling on.

15           *THE COURT:*  Wait a minute.

16           There's nothing like a Local Rule.

17           *MR. COHEN:*  The rule is -- I'll let the Court find

18  it.

19           *THE COURT:*  What district are we in, Northern

20  District of California?

21           *MR. COHEN:*  Yes, indeed, Your Honor.

22           *THE COURT:*  Okay, wait a minute, slow down.  Get my

23  book out.

24           Which one do I look at?

25           *MR. COHEN:*  You look at Criminal Local Rule, Your

**Proceedings**

 1    Honor, 16-1(c)(4).

 2              **THE COURT:**  We have all these rules now?  Who did

 3    this?  I mean, this is terrible.

 4              **MR. SABELLI:**  Almost as regulated as the pharmacy

 5    business, Your Honor.

 6                        **(Laughter.)**

 7              **THE COURT:**  Well, I can tell you what the standard

 8    of practice is this in court.

 9                        **(Laughter.)**

10              **THE COURT:**  Let's see, I'm having a hard time

11    finding it.  I just have to --

12              **MR. SABELLI:**  It's a subsection 2, unless it's

13    changed.

14              **THE COURT:**  This is a criminal rule, right?

15              **MR. COHEN:**  Yes, Your Honor.

16              **MS. AULT:**  Your Honor, I believe that the Court's

17    ruling previously was, I understand why you want that, but I'm

18    not going to make them do it.

19              **THE COURT:**  That -- you know, that has -- you know

20    what that has?

21              **MR. COHEN:**  The ring of something that the Court

22    might say.

23              **THE COURT:**  You got that right.

24                        **(Laughter.)**

25              **THE COURT:**  That sounds to me like a verbatim quote,

**Proceedings**

```
 1   not even a summary.  I know why you want it, and I'm not

 2   ordering it.  I live by that.

 3            Mr. Cohen, I think you were here and heard that.

 4            MR. COHEN:  I've heard that before, Your Honor, so

 5   many times.  I'm not sure whether it was specifically said as

 6   to this issue.  I do not remember this specific issue coming

 7   up.  If the Court had said that, I probably would have referred

 8   the Court to the Ninth Circuit's decision in United States vs.

 9   Layton, which I just lost, which said that if the Court had

10   intended to order that, it would have been problematic.

11            THE COURT:  Oh, I see, you mean for once they

12   sided -- of course, that was against Judge Alsup, right?

13            MR. SABELLI:  No, Your Honor, Larry Layton was

14   the ---

15            THE COURT:  Oh, I remember.

16            MR. SABELLI:  The Jonestown case.  And that was

17   handled by the Federal Defender here.  I think Mr. Cannon might

18   have been in the office at the time.

19            THE COURT:  Who was the judge?

20            MR. SABELLI:  Judge Peckham, Your Honor.

21            THE COURT:  Oh.

22            MR. SABELLI:  Whom I clerked for, but this is before

23   my time.

24            And the cite for that is 720 F.2d.

25            THE COURT:  Wait a minute.  Did I already -- isn't
```

```
 1   it somewhat academic?  Now you have three days to get ready for
 2   this bombshell.  So that's time for -- even highly competent
 3   lawyers can do that in that amount of time.
 4           MS. AULT:  Your Honor, we intended to introduce a
 5   whole plethora of co-conspirator statements --
 6           THE COURT:  That means "a lot."
 7                   (Laughter.)
 8           MS. AULT:  -- given that this is a conspiracy case
 9   with all sorts of statements by the co-conspirators.
10           THE COURT:  Okay, so here is the thing.  Let's --
11   they are not going to have to identify each person's statements
12   and so forth --
13           MS. AULT:  Your Honor --
14           THE COURT:  -- because that's not my rule.
15           I guess the question is -- I don't want the case to
16   proceed by, you know, starts and stops.  So I think that there
17   is a legitimate reason for advising the counsel that Witness X,
18   you know, who is scheduled to come in on Monday or Tuesday or
19   Wednesday, will be testifying about a number of statements,
20   maybe.
21           MS. AULT:  Your Honor, that would essentially give
22   them a transcript of our examinations, which we are not
23   required to do.
24           MR. COHEN:  But what the Government --
25           THE COURT:  Here's what I'm concerned about.  I
```

**Proceedings**

1   mean, here is a -- it only comes in -- doesn't it only come in

2   as a statement in furtherance of a conspiracy?  Does it come in

3   under any other basis?

4           **MS. AULT:**  Your Honor, these particular

5   statements -- well, we believe they come in as yes, statements

6   in furtherance of the conspiracy by co-conspirators.

7           **THE COURT:**  Okay.  So it's not like at a gray area,

8   but here are statements that are made subsequent to the term of

9   the conspiracy; that is, these statements --

10          **MS. AULT:**  No, Your Honor.  They are made during the

11  term of the conspiracy.

12          **THE COURT:**  Or these were made during the term of

13  the conspiracy?

14          **MR. COHEN:**  This is --

15          **THE COURT:**  No, no, wait a minute.  I'm just trying

16  to work out a game plan that maybe you'll get something out of,

17  which you'll probably won't when I'm all finished.

18                        **(Laughter.)**

19          **THE COURT:**  If these statements are made, you know,

20  during the course of the charged conspiracy, I don't think you

21  have to go through the statements one by one, identify them,

22  have a conference before.  Because presumptively these

23  statements would come in, and if I find that they are not

24  statements in the furtherance of a conspiracy, then you make a

25  motion to strike and I will admonish the jury to disregard it,

**Proceedings**

1    which I understand is an inferior method to ruling pre-trial on

2    these things, but on the other hand, to require otherwise

3    essentially in this type of conspiracy case, at this point in

4    which the defense has had all of these statements for a

5    considerable period of time, would unnecessarily delay the

6    case.

7             So I'm not going to require the Government to

8    identify these things.  That's as to any statements made in --

9    from November during the course of the conspiracy.

10            As to statements that are made subsequent to it, I

11   think that the Government should identify those statements to

12   the defense before they call a witness, because presumably

13   those statements which were made subsequent to the -- to the

14   date of the conspiracy would be subject to a greater degree of

15   scrutiny in terms of admissibility than other statements.

16            So how's that?

17            **MR. SABELLI:**  Your Honor --

18            **MS. AULT:**  And that's fine, Your Honor, to the

19   extent that we -- and the only caveat I put on them is to the

20   extent that we are aware of them.  Sometimes a witness comes up

21   with something on the stand that we have never heard before,

22   and so to the extent we don't know about it, we can't disclose

23   it.

24            **MR. COHEN:**  The issue obviously, Your Honor, is that

25   the purpose of the rule is to fulfill the Ninth Circuit's

**Proceedings**

```
1   directive that the Court be able to assess in advance whether a

2   given statement is, in fact, in advance of the conspiracy,

3   furtherance of the conspiracy.  Because if that determination

4   is not made ex ante, then the statement should not have ever

5   come into evidence in the first place and, as the court

6   indicated, striking the statement is a poor substitute --

7           THE COURT:  I didn't say "poor."  I purposely chose

8   my words to say "it's less good."

9                       (Laughter.)

10          MS. AULT:  And, Your Honor, I believe what the Court

11  has said on this subject in the past is that this Court has

12  found this Court is perfectly capable of making decisions --

13          THE COURT:  I'm not sure that's true.  But putting

14  that aside, I've it before, and, you know, there's always the

15  risk.  Something comes out that is horrendous and there's no

16  basis for it, then there are remedies that are related to it.

17          So, I mean, I have to, one, basically rely on the

18  Government's judgment that they won't attempt to introduce

19  statements for which there isn't a bona fide or good-faith

20  belief to that it would be admissible.  Because if they do and

21  if it causes a mistrial, there would be no retrial in the case

22  if they invite it.

23          So there is a very high penalty to the Government

24  and an incentive to the Government to be very selective in

25  terms of the statements that they offer and the bases for
```

**Proceedings**

```
 1   offering those statements.  I also think that that's a proper
 2   role to give to the Government in this case.
 3           Mr. Sabelli?
 4           MR. SABELLI:  I want to make a legal point and than
 5   a very, very, very specific point about the case.
 6           The legal point is that the United States Supreme
 7   Court in Bourjaily v. United States 107 Supreme Court 2775,
 8   2778, ruled that the Government must provide or must prove that
 9   three essential elements by a preponderance before a
10   co-conspirator statement is admitted.  Those are the following:
11           The Court must have an independent evidence of the
12   existence of the conspiracy, of the defendant's connection to
13   it, and must conclude that the statement was made both during
14   and in furtherance of the conspiracy.
15           THE COURT:  As to the two points, they've been
16   established.  As to the third point, I haven't heard the
17   statement.
18           MR. SABELLI:  No, Your Honor, and that's the
19   specific point I want to make about this case.  The
20   Government's theory is that essentially there is a massive
21   conspiracy that involves lots and lots of people.
22           So you've heard evidence in this case already
23   about -- about things that were happening in different parts of
24   the United States that I would say were not related to my
25   client.  And so the Government might be right, there might be a
```

**Proceedings**

 1   conspiracy over here and there might be a conspiracy over here.

 2              And let's accept arguendo that my client was

 3   involved in a conspiracy, which of course we dispute.  That

 4   doesn't mean the Government is right that the statements that

 5   are offered over here are part of the same conspiracy.  And

 6   they have to be part of the same conspiracy under ***Bourjaily*** and

 7   ***Layton***.

 8              **THE COURT:**  I'm sure that's correct.  I'm sure they

 9   have to part of the same conspiracy.  The problem is always one

10   of timing.  And I thought the cases have held that the order in

11   which these items can be received into evidence is within the

12   direction of the Court, as distinct from you have to do this

13   first, you have to do that second, and until that's done, you

14   can't do the third, because --

15              **MR. SABELLI:**  That's not --

16              **THE COURT:**  -- it becomes -- if you're telling me,

17   and I'll go read it, but if you're telling me the Supreme Court

18   said there is a particular order and these two things have to

19   be done first before any statement is elicited from a witness,

20   that may be in furtherance of a conspiracy.

21              **MR. SABELLI:**  I'm looking at a brief that I think is

22   correct from another lawyer.  I will look at that case tonight,

23   but I urge the Court --

24              **THE COURT:**  I'll look at it.

25              **MR. SABELLI:**  I urge the Court that we -- there is

**Proceedings**

```
 1   an order of proof issue here which can't be corrected by

 2   unringing the bell.

 3              THE COURT:  Oh, I don't know why it can't be

 4   corrected.

 5              MR. SABELLI:  It depends on what the bell is.

 6              MS. AULT:  We believe that the testimony under

 7   dispute right now is squarely at the heart of this conspiracy.

 8   It is about Discount U.S. Drugs, which can all three defendants

 9   were involved with, and it's about statements that were made

10   both to keep Discount U.S. Drugs in operation and to conceal

11   the identity of Mr. Napoli.

12              MR. COHEN:  And they are statements to law

13   enforcement, Your Honor, and that's the only thing I wanted to

14   say is this is not a prototypical co-conspirator statement.

15              There are some situations when statements to law

16   enforcement may be in furtherance of the conspiracy, but it is

17   by no means a given.

18              MS. AULT:  And that is why we raise it with the

19   Court.

20              MR. CANNON:  Your Honor, there is one additional

21   point, because you let the government characterize it as these

22   statements to conceal the identity of Mr. Napoli and the

23   assertion of the right to counsel by the individual people who

24   gave those statements.  So to characterize those statements as

25   hiding Mr. Napoli's identity --
```

**Proceedings**

1          **THE COURT:**  I think whether they are hiding or not

2     is a question of argument.  The question now is what was said

3     and whether what was said was a statement in furtherance of the

4     conspiracy.

5          So Mr. Cohen's point is that what is unusual about

6     this is that these are statements that were made to law

7     enforcement officers, but he can't -- saying that that could be

8     a statement in furtherance of the conspiracy, but it has to be

9     viewed in that context.

10          For example, I think if a person were to say, as an

11    example, I'm not going to answer your questions, I don't think

12    that comes in, I don't think that -- that could be in a sense a

13    statement in the furtherance of a conspiracy because it doesn't

14    respond to questions that are asked, but I don't think that

15    would come in.

16          **MS. AULT:**  Well, Your Honor, we do think it would

17    come in.  For example, in this case, the inspector asked

18    Brandon Winstead at the pharmacy and the pharmacist, how does

19    the pharmacy operate?

20          And they said, we are not going to tell you that.

21          And asked, who signs your paycheck?

22          And they said, we are not going to tell you that.

23          And asked, how many doctors are there?

24          And that one they actually answered.

25          **THE COURT:**  These are the statements?

**Proceedings**

 1              **MS. AULT:**  There are statements to that effect, yes.

 2          And when the --

 3              **THE COURT:**  Okay.  All right.  Let's get real here,

 4    we have enough time to do this.  Tell me what the statements

 5    are.  I think I would have to take a look at them and be

 6    satisfied that they are statements in the furtherance of a

 7    conspiracy.

 8              I thought -- when you first described them, I

 9    thought they were, this place is owned by Jones; we don't do

10    pharmacy here.

11              **MS. AULT:**  They did --

12              **THE COURT:**  We have an examination room in the back.

13    I thought that they were --

14              **MS. AULT:**  So they're statements such as the

15    following.

16              **THE COURT:**  Well, not "such as."  I need to have

17    some specificity.

18              **MS. AULT:**  All right.

19              **THE COURT:**  Who is the declarant?

20              **MS. AULT:**  The declarants are three:  Norm Clement.

21              **THE COURT:**  Pardon?

22              **MS. AULT:**  Norm Clement, who is the pharmacist at

23    Discount U.S. Drugs.

24              Brandon Winstead and Christopher Latham.

25              **MR. COHEN:**  All of whom are available witnesses who

**Proceedings**

```
 1    are on the Government's witness list.

 2              THE COURT:  And Winstead is?

 3              MS. AULT:  He was the, I don't know, manager of

 4    Discount U.S. Drugs.

 5              THE COURT:  And Latham?

 6              MS. AULT:  Latham that was the straw purchaser.  He

 7    also worked at the pharmacy.

 8              THE COURT:  Okay, and this is Discount U.S. Drugs.

 9              And you are offering statements that these

10    individuals made at the time of the -- at the time that the

11    pharmacy was visited by DEA agents.

12              MS. AULT:  Yes, Your Honor.

13              THE COURT:  Okay.

14              And the statements were as follows:

15              MS. AULT:  They were asked -- Norm Clement was asked

16    if it was an Internet pharmacy.

17              THE COURT:  Who said -- clement?

18              MS. AULT:  He denied that it was an Internet

19    pharmacy and said it was a mail order pharmacy.  He also said

20    he was uncomfortable answering questions without Mr. Winstead

21    being there.

22              Mr. Winstead was asked who owned the pharmacy.  He

23    responded, Christopher Latham and Tarkhenov Trading.

24              THE COURT:  Tarkhenov.

25              MS. AULT:  Yes.
```

**Proceedings**

1             **THE COURT:**  And Latham?

2             **MS. AULT:**  Yes.

3             **THE COURT:**  Okay.

4             **MS. AULT:**  Mr. Winstead was asked about his prior

5    pharmacy experience.

6             **THE COURT:**  Yeah.

7             **MS. AULT:**  He responded that he had worked at a

8    pharmacy in North Carolina.

9             Mr. Winstead was asked who signed his paychecks.  He

10   refused to answer the question.

11            Mr. Clement was asked who signed his paychecks.  He

12   responded Tarkhenov Trading and Discount U.S. Drugs.

13            Mr. Winstead also denied that it was an Internet

14   pharmacy and said it was a mail order pharmacy.

15            **THE COURT:**  Okay.

16            **MS. AULT:**  Mr. Winstead said that the orders were

17   transmitted to Discount U.S. Drugs by fax, that they came from

18   the doctor's office and that the doctor was Joseph Carozza.

19            **THE COURT:**  How that's in furtherance of the

20   conspiracy?

21            **MS. AULT:**  Your Honor, we believe there were two

22   things that were going on here:  One, Mr. Winstead and

23   Mr. Latham were trying to keep the pharmacy in operation by

24   responding to as many questions as they could answer, although

25   truthfully, because they wanted the DEA Inspector to let them

**Proceedings**

1    keep their license and also -- but refusing to respond to any

2    questions that would reveal the identity of Mr. Napoli.

3            So this is in furtherance of the conspiracy in that

4    they both wanted to keep the pharmacy open but also conceal the

5    identity of Mr. Napoli.  And that is evidenced by the fact that

6    when the pharmacy inspector closed down the pharmacy,

7    Mr. Latham then reapplied for a DEA license and then they made

8    a number of statements when the inspector came to interview him

9    in connection with that license also designed to conceal the

10   identity of Mr. Napoli until the DEA inspector said, I'm not

11   going to give you the license, then Mr. Latham made a phone

12   call, and then he revealed the identity of Mr. Napoli,

13   Mr. Carozza, and joe Green.

14           We think this is all in furtherance of the

15   conspiracy in furtherance of these two goals, which was to keep

16   the pharmacy in operation and to try to do it without revealing

17   Mr. Napoli's identity.

18           **THE COURT:**  Well, some things I think come in are

19   easy to admit.  To the extent they say, we are not an Internet

20   pharmacy, we are a mail order pharmacy, that can come in

21   because -- given the fact that they wanted to compete in

22   business, I think there has to be other evidence of that.  That

23   would be a statement in furtherance of the conspiracy.

24           I don't know -- when they say they are not going to

25   say who signed the checks, I know why that's a statement in

**Proceedings**

 1   furtherance -- it maybe a concealment if they decide not to

 2   respond to the question, but there are a variety of reasons not

 3   to respond to the question.  And I think that there can be very

 4   legitimate reasons not to respond.

 5           **MS. AULT:**  But, Your Honor, they will respond to the

 6   questions when the answer isn't Mr. Napoli.

 7           **THE COURT:**  Well, I don't know.  That's an

 8   argument --

 9           You are saying they answered all the other

10   questions, but not the ones where they have to say Napoli?

11           **MS. AULT:**  That is exactly what I'm saying.  Or

12   anything that would reveal that they were operating as an

13   Internet pharmacy.

14           **THE COURT:**  But I give that you one.

15           **MS. AULT:**  And in addition, they made statements

16   such as -- and these are the gentlemen who are running the

17   pharmacy, so pharmacist and the two gentlemen who are running

18   the pharmacy.  And they say things like, we don't know where

19   the customer service number goes, we don't know who answers

20   that.

21           **THE COURT:**  They can say that.  Those statements all

22   come in.  What bothered me was when they, one, when they won't

23   answer a question, whether that can come in.  I think it

24   shouldn't.  And two, I -- when we go to Dr. Carozza, I mean, it

25   seems to me that I don't -- I don't understand how that's a

**Proceedings**

```
 1   statement in furtherance of the conspiracy.  If anything, it's
 2   a description of the conspiracy.
 3            MR. COHEN:  Correct.
 4            THE COURT:  It's not a statement in furtherance --
 5   say oh, we have a doctor.  Oh, well, there, sorry I asked,
 6   prescribe away.
 7            You know, I mean, that's not a statement in
 8   furtherance of the conspiracy.  It's not an act of concealment.
 9   I mean, I'm surprised that Mr. Cohen wouldn't ask this witness,
10   isn't it a fact that you told to DEA that Dr. Carozza was
11   issuing prescriptions?  I don't know if he's going to ask it or
12   not, but, you know, it cuts the other way.
13            MS. AULT:  Well, Your Honor, the actual question
14   was, how many doctors write prescriptions for the pharmacy?
15            And the answer is, I think that there are more than
16   one.
17            Can you name them?
18            Oh, I can only name one, Dr. Carozza.
19            THE COURT:  But how does that further the
20   conspiracy?  What is the act of concealment?
21            MS. AULT:  Your Honor, it's being evasive with the
22   DEA Agent.
23            THE COURT:  I think there was only one.
24            MS. AULT:  Your Honor --
25            THE COURT:  Was there more than one?
```

**Proceedings**

1          MS. AULT:  There was only one.

2          THE COURT:  So how is that evasive?

3          MS. AULT:  Because she asked how many there were and

4    they initially said there are many.

5          THE COURT:  Wait, now it's changing.

6          MS. AULT:  And then she asked them to name them, and

7    they couldn't name them.  They could only name one.

8          MR. CANNON:  Your Honor, this is --

9          THE COURT:  It may be you could get in the

10   statement, I think there are many doctors.  Let's say you got

11   that in, there are many.  You would to have stop there.

12   Because "many" is an act of concealment in that they want to

13   continue operating, so they are suggesting this is a normal

14   pharmacy operation.

15         MS. AULT:  And then --

16         THE COURT:  But when you get to the other part,

17   these are not statements in furtherance of the conspiracy.  You

18   are actually just really proving your conspiracy.  You are

19   proving, you know, and you can't use those statements for that

20   purpose.  It's not an exception to the hearsay rule, I don't

21   think, when the conspiracy has ended.

22         MS. AULT:  Your Honor, the conspiracy continued for

23   months after this.  This was all part and parcel of continuing

24   the conspiracy.  These gentlemen were trying to keep the

25   pharmacy open, while at the same time concealing Mr. Napoli's

**Proceedings**

```
 1    identity.  So they answered some questions truthfully, they

 2    lied to others, and they wouldn't answer some other questions.

 3              THE COURT:  I don't think you can get into the ones

 4    they didn't answer.  I have some concerns about the testimony

 5    that it was Dr. Carozza, especially in this case, when he is

 6    the defendant, one of the defendants in the case, and the focus

 7    is on him.  There are other ways to prove it, I would assume.

 8              MS. AULT:  Your Honor --

 9              THE COURT:  You can say --

10              MS. AULT:  We won't ask the question about

11    Dr. Carozza, but we do think that we should be able --

12                        (Court reporter requests break; recess

13                         taken at 4:20 p.m.)

14                        (Proceedings resumed at 4:32 p.m.)

15              THE COURT:  Now, Mr. --

16              THE COURT REPORTER:  Are we on the record, Your

17    Honor?

18              THE COURT:  Anything to be fair to Mr. Cohen.  We

19    will put on the record.

20              MS. AULT:  Mr. Cohen pointed out to me that it may

21    have been before the previous trial when you made that ruling.

22    To be quite honest, the defense has filed so many motions in

23    this case, I can't keep them all straight.  But that ruling may

24    have been before the previous trial.

25              MR. COHEN:  In other words --
```

**Proceedings**

1          **MS. AULT:**  But it was our understanding that the

2    Court wasn't requiring us --

3          **THE COURT:**  I wasn't.  Okay, so, I mean, maybe I

4    should have.

5          **MR. COHEN:**  I don't believe we were privy to any

6    such litigation that may have lead to such a ruling, because we

7    would have said to the Court then what we are saying now, which

8    is the Court should have let us have that notice so that we

9    could hash these things out.

10          **MS. AULT:**  And we don't believe that in a case like

11   this, where there is a conspiracy, there are lots of

12   co-conspirators' statement, that it's practical or reasonable

13   to require us to give the defense what is essentially a

14   transcript of our case, asking us to identify each and every

15   co-conspirator statement.  And previously the Court agreed.

16          **THE COURT:**  Well, here we are now.  So the question

17   is, what do we do now?

18          **MR. COHEN:**  What we would like to do, Your Honor,

19   now that we know -- and Ms. Ault's recitation of the statements

20   to the Court ten minutes ago was the first we had heard that

21   those particular statements are the ones the Government seeks

22   to introduce.

23          Now that we know that, we would like to take a look

24   at the issue and brief it for the Court tomorrow so that the

25   Court has the benefit of our views on when whether the

**Proceedings**

1    co-conspirator exception applies.

2            **MS. AULT:**  And also upon discussing with Mr. Cohen,

3    it occurred to me that most, if not all, of those statements

4    are not actually co-conspirator statements since we're not

5    offering them for the truth, simply for what was said and the

6    effect on the listener.  And it's evident --

7            **THE COURT:**  Wait a minute.  The listener being the

8    DEA Agent?

9            **MS. AULT:**  No, the listener being Mr. Latham,

10   Mr. Clement, and Mr. Winstead.

11           **THE COURT:**  I thought they were the declarants?

12           **MS. AULT:**  Well, the declarants or the

13   non-declarants, as it were.

14           **THE COURT:**  Do you mean they are all talking to one

15   another?

16           **MS. AULT:**  Your Honor, what we would like to be --

17           **THE COURT:**  You know what?  Guess what?  We're going

18   to have a brief on this.  Any statement that these people are

19   going to make, lay it out just very simply, not going to take

20   too long.  Just get it to me by noon tomorrow, because I have

21   to look at it.  If they are the next witnesses, I have to look

22   at it --

23           **MS. AULT:**  Well, so --

24           **THE COURT:**  -- so we move ahead on Tuesday.

25           **MS. AULT:**  To be clear, is Your Honor asking us to

**Proceedings**

```
 1    write a brief specifically moving to --

 2             THE COURT:  I think you put a statement in.  You put

 3    a statement in, if it's coming in, what did X say, you know,

 4    testimony would be X made the following statement, and then

 5    just indicate the rule why it's admissible.

 6             MR. COHEN:  And we would simply ask that there also

 7    be Y.  In other words, X said this to Y.  So that we know is

 8    this to a law enforcement officer or a co-conspirator.

 9             THE COURT:  My guess is you'll know that by virtue

10    of the 303, or whatever it is, the report.

11             MS. AULT:  And --

12             THE COURT:  The report set forth the statement who

13    heard what and so forth.

14             MS. AULT:  Exactly.

15             THE COURT:  All you need to do is just say, this

16    statement -- we intend to introduce this statement and it comes

17    in pursuant to Rule X.

18             MS. AULT:  And, Your Honor, we think it actually

19    should be the opposite, since they have the statements, that

20    the defense should move to exclude them and then we should

21    respond and say that they're admissible.

22             THE COURT:  Then that would give them another round

23    of briefing why your citation to the law is wrong.

24             MR. COHEN:  Plus we would have to brief issues --

25    statements that the Government has no intention of introducing.
```

**Proceedings**

1           **THE COURT:**  Well, that's right.

2           **MS. AULT:**  We can tell the defense that we pretty

3    much intend to introduce all the statements in those reports

4    that were made by Mr. Clement, Mr. Winstead, or Mr. Latham.

5           **MR. SABELLI:**  Well, none of us really want to do the

6    work, but in this case --

7           **THE COURT:**  What about meeting tomorrow morning at a

8    certain time, we are having a conference as a certain time, and

9    you orally identify the statements to them and the reason that

10   you think it ought to come in, okay?  And then both sides

11   filing anything that they want to by noon tomorrow.

12          **MR. SABELLI:**  Your Honor, I can't --

13          **THE COURT:**  Is that just too awful?

14          **MR. SABELLI:**  Your Honor, I can't be here tomorrow.

15          **THE COURT:**  You don't have to be here.

16          **MR. SABELLI:**  And there may be other folks here who

17   don't necessarily want to be here tomorrow.

18          What is the difficulty in having the proponent of

19   the evidence simply write out what that statements are,

20   identify them, and then we can litigate it?

21          **THE COURT:**  Well, the difficulty is -- the

22   difficulty is the timing, is that I have a jury coming back.

23   No one is going to be here Saturday, Sunday, and Monday.

24          **MR. SABELLI:**  Right.

25          **THE COURT:**  And jury comes back Tuesday morning.  So

```
 1   it would be nice if I would rule Tuesday morning as to these
 2   people, as to what is going to be said, for Tuesday.
 3            MR. SABELLI:  We are happy to do the work, don't
 4   mistake me, please, Your Honor.  We'll do it tomorrow, but I'm
 5   just saying, why can't the Government simply file either
 6   tonight or tomorrow morning a list of the statements they want
 7   in and then we'll respond?
 8            MS. AULT:  Your Honor, we've identified the
 9   statements.  We have given them the report.  They have had it
10   for two years.  We identified the witness months ago.
11            THE COURT:  But Mr. Cohen is saying he doesn't know,
12   and I'm not clear in my own mind, exactly which statement you
13   are going to elicit.  I don't think this is a big burden, is
14   it?  You have already written out your examination.  So just go
15   through your examination, and when you are going to ask them a
16   question as to what they said, as to what they said, just say
17   identify it and why it would come in.
18            But, you know, the state of mind -- I don't know the
19   state of mind of the DEA Agent is particularly relevant.  As I
20   understand your general -- the general relevancy or the purpose
21   of all this testimony is to show that they intended to continue
22   on.
23            MS. AULT:  They intended to continue on and try to
24   conceal Mr. Napoli's identity to the extent that they could.
25            THE COURT:  And they tried to conceal Mr. Napoli's
```

**Proceedings**

```
 1    identity.

 2              MR. COHEN:  By identifying Dr. Carozza as the

 3    doctor.

 4              MR. CANNON:  That's quite a leap.

 5              MS. AULT:  No, Your Honor, by answering any question

 6    where they didn't have to identify Mr. Napoli and refusing to

 7    answer questions where they did have to identify him.

 8              MR. SABELLI:  Your Honor, obviously we are not going

 9    to settle this now.  I don't think we are going to come to

10    terms.  But I would suggest as a first step, the Government

11    simply identify precisely what kind of statements are being

12    offered and what the basis of those statements are, and then

13    both sides can brief the issue.

14              They have in their position knowledge we don't have,

15    which is exactly what statements and the basis for the proffer

16    is.  Once they share that with us, both sides can brief it.  We

17    can get it all done tomorrow electronically -- over the

18    Internet.

19                        (Laughter.)

20              MR. SABELLI:  Without a face-to-face meeting.

21              THE COURT:  Prescription for disaster.

22                        (Laughter.)

23              THE COURT:  Look, guys, figure out how you want to

24    do it.

25              I need to look at it.  Since this is really
```

**Proceedings**

1    ostensibly being done for my benefit, I need to look at it.

2              Now, are there other witnesses who could testify

3    without getting into this stuff?  So, I mean, maybe we can

4    lighten up a little bit about when things are done.

5              **MS. AULT:**  Yes, Your Honor, the problem is these

6    witnesses were here today.

7              **THE COURT:**  No, I --

8              **MS. AULT:**  So we do need to check with them, because

9    we've made them both fly here, and now they are flying home and

10   now they're flying back.  So we need to accommodate them to the

11   extent we can.  So we will check with them to see.

12             **THE COURT:**  They -- if they are flying home now --

13             **MS. AULT:**  Yes.

14             **THE COURT:**  -- they may appreciate coming -- flying

15   in on Tuesday and testifying on Wednesday.

16             **MS. AULT:**  We will check with their schedules.

17             **THE COURT:**  Okay.  So I just think I need some time

18   to look at this.  In fairness, I think I need some time to look

19   at this since the rule -- this rule was not cited.

20             It was not cited, was it?  I don't remember.

21             **MS. AULT:**  Your Honor, I have a distinct

22   recollection of this issue being discussed, but I honestly

23   can't remember if it was prior to the last trial, if it was in

24   connection with pre-trial motions, or when it was.

25             **THE COURT:**  Well, I think if I had seen a rule, I

**Proceedings**

```
 1   would have followed it.

 2           MS. AULT:  I believe that that is not what the Court

 3   did previously.

 4           THE COURT:  You mean that I had seen the rule and

 5   then I chose to disregard it?

 6           MS. AULT:  I believe so, Your Honor.  But we also

 7   briefed this issue in that we believe it is an invalid rule in

 8   that is it is a Local Rule that expands the requirements of a

 9   Federal Rule of Criminal Procedure which the Supreme Court has

10   repeatedly held Local Rules cannot do.

11           THE COURT:  So it's unconstitutional?

12           MR. COHEN:  That I know we did not participate in.

13                       (Laughter.)

14           THE COURT:  Yeah, it looked unconstitutional to me.

15   But everything does.

16           Okay.  So what I'd like, since it looks like I'm

17   being called upon to make a decision, I would like the

18   Government to outline very succinctly the statements that it

19   intends to introduce on these subjects as indicated without

20   argument, just citing the rule, and the defense can then file

21   its objections.  It's called "The Sabelli Plan."

22           MS. AULT:  And, Your Honor, the concern we have with

23   that is that we then have to file another brief responding to

24   their brief.

25           THE COURT:  That's up to you.  You may be convinced
```

**Proceedings**

```
1   by their argument.

2           MS. AULT:  I'm not hopeful.

3           THE COURT:  Really?

4           Well, you're entitled to say as much as want to.

5   When you can say 801B dat, dat, dat, because, if you want to

6   say because dat, dat, dat, dat, dat, you say as much as you

7   want to.  Make it as long as you want it or as short as you

8   want it.

9           MS. AULT:  All right.  We will do that, Your Honor.

10          THE COURT:  You have 110 people in that office.

11  They are not all in trial.

12          MS. AULT:  No, Your Honor, but they are all very

13  busy.

14          THE COURT:  I don't think so.

15                  (Laughter.)

16          MS. AULT:  Thank you, Your Honor.

17          THE COURT:  Well, have a wonderful weekend,

18  everybody.  And everything I said to the jury, in terms of how

19  to spend the weekend, does not apply to you.

20          MR. COHEN:  Thank you, Your Honor.

21          MR. CANNON:  But I was impressed that you knew all

22  of that.

23          THE COURT:  Oh, yeah, I -- quite impressed.

24          All right.  Thank you.

25          MR. SABELLI:  Thank you, Your Honor.
```

Proceedings

1              **MS. AULT:**  Thank you, Your Honor.

2                     **(Proceedings adjourned at 4:46 p.m.)**

3

4                            **---o0o---**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **CERTIFICATE OF REPORTER**

3

4            I, Sahar Bartlett, Official Court Reporter for the

5    United States Court, Northern District of California, hereby

6    certify that the foregoing proceedings were reported by me, a

7    certified shorthand reporter, and were thereafter transcribed

8    under my direction into typewriting; that the foregoing is a

9    full, complete and true record of said proceedings as bound by

10   me at the time of filing.  The validity of the reporter's

11   certification of said transcript may be void upon disassembly

12   and/or removal from the court file.

13

14

15                          **/s/ Sahar Bartlett**
                   _____

16                  **Sahar Bartlett, RPR, CSR No. 12963**

17                     **United States Court Reporter**

18                      **Thursday, October 4, 2012**

19

20

21

22

23

24

25